**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ruben Myran Johnson,<br><br>        Petitioner,<br><br>v.<br><br>Charles L. Ryan, et al.,<br><br>        Respondents. | No. CV-18-889-PHX-DWL<br><br>DEATH PENALTY CASE<br><br>**ORDER** |

Pending before the Court is Petitioner Ruben Johnson's motion for stay and abeyance. (Doc. 23.) Johnson seeks a stay under *Rhines v. Weber*, 544 U.S. 269 (2005), so he can return to state court to challenge his conviction. He also seeks permission for his federal habeas counsel to appear on his behalf in state court. Respondents filed a response and Johnson filed a reply. (Docs. 24, 27.) As explained below, the Court will order the parties to file supplemental briefing on whether Johnson is entitled to a *Rhines* stay with respect to Claims 14 and 26 in his habeas petition.

## BACKGROUND

A.   <u>The Underlying Crime</u>

The following factual summary is derived from the Arizona Supreme Court's decision in *State v. Johnson*, 133 P.3d 735 (Ariz. 2006).

On November 7, 2000, Johnson and a fellow gang member robbed a massage parlor. *Id.* at 738-39. During the robbery, they encountered a witness named Stephanie Smith. *Id.* Although Johnson escaped, his partner was caught by the police. *Id.* Johnson then learned, through a court employee, that Smith was scheduled to testify at his partner's upcoming

preliminary hearing.  *Id.*  In response, Johnson pressured an acquaintance to reveal Smith's home address.  *Id.*

At around 1:00 a.m. on November 15, 2000—only a few hours before the preliminary hearing was scheduled to begin—Johnson and a different gang member went to Smith's house.  *Id.*  When they arrived, there were four people inside: (1) Smith, (2) Smith's four-year-old son, (3) a man named Mike Solo, and (4) a man named Leonard Justice.  *Id.*  The latter two were visitors who did not reside with Smith.  *Id.*  When Solo heard a dog barking behind the house, he went outside.  *Id.*  There, a black male put a gun to Solo's head, threatened to kill him, and asked who else was in the house.  *Id.*  Next, the gunman pushed Solo into the house and then told him to leave.  *Id.*  Solo hurried to his car and drove away.  *Id.*  In the meantime, Justice—who had seen what was happening through the back window of the house—called 911 and handed the phone to Smith so she could provide her address to the dispatcher.  *Id.*  When Smith and Justice saw Johnson enter the home, they both tried to hide—Justice hid in the bathroom and Smith went to a different room.  *Id.*  Johnson found Smith and shot her in the head, killing her.  *Id.*

Johnson fled after killing Smith.  *Id.*  Two days later, Johnson showed a newspaper article about the murder to an acquaintance, admitted he was the unnamed suspect mentioned in the story, and explained that he'd killed Smith because she was going to testify against "his cuz or one of his homies."  *Id.*

B.    The Trial

In February 2001, Johnson was indicted in Maricopa County Superior Court on the charges of first-degree murder, assisting a criminal syndicate/criminal street gang, first-degree burglary, and armed robbery.  (Doc. 18 at 38-39.)

In November 2001, following a thirteen-day trial, Johnson was convicted on all four counts.  (*Id.* at 39.)  "Following the guilt[y] verdicts as per the 2001 statute, the jury was dismissed in anticipation of a sentencing phase decided by the trial judge.  The guilt-phase jury did not have to find the presence or absence of aggravating factors."  (*Id.*)

In June 2002, before the start of Johnson's penalty phase, the U.S. Supreme Court decided *Ring v. Arizona*, 536 U.S. 584 (2002).

In November 2003, Johnson's sentencing hearing—which, per *Ring*, was conducted before a new jury—began. (Doc. 18 at 40.) The jury found three aggravating circumstances and concluded that Johnson should receive a death sentence. (*Id.*)

## C. The Direct Appeal

In January 2005, Johnson's counsel filed an opening brief in his direct appeal to the Arizona Supreme Court. (Doc. 18 at 40-41.) The brief's table of contents stated that the following seven issues were being raised for review:

(1)     The trial court's failure to sever Count II from the remaining counts deprived Johnson of a fair trial;

(2)     The penalty-phase jury instructions concerning aggravated circumstances provided no guidance and promoted unfettered discretion;

(3)     The trial court abused its discretion by allowing the prosecution to introduce gang evidence during the penalty phase;

(4)     The trial court erred in failing to permit defense counsel to voir dire the penalty-phase jurors concerning specific mitigating factors;

(5)     The trial court abused its discretion by allowing the prosecution to introduce a tape recording of Johnson's interview with a police detective;

(6)     The trial court's failure to provide certain mitigating-factor instructions during the penalty phase deprived Johnson of a fair sentencing; and

(7)     "Issues presented for purposes of federal review." [1]

(Doc. 19-3 at 3-4.)

---

[1]     The body of the brief stated that the following seven federal issues were being presented "to avoid future claims of procedural default": (1) "A.R.S. 13-703.01 Is Unconstitutional Because It Permits Jurors' Unfettered Discretion To Impose A Death Sentence Without adequate Guidelines To Weigh And Consider Appropriate Factors And Fails To Provide Principled Means To Distinguish Between Those Defendants Deserving Of Death And Those Who Do Not."; (2) "The requirement of the Arizona death penalty scheme that mitigating circumstances must be proved by a preponderance of the evidence improperly precludes jurors from considering mitigating facts."; (3) "Arizona's death penalty scheme violates the 5th, 8th and 14th Amendments by shifting the burden of proof and requiring that a capital defendant convince jurors his life should be spared."; (4) "Death-biased language Prejudiced Jurors in Favor of the Death Penalty."; (5) "Lack Of Guidance In Verdict Form Impedes Reliability."; (6) "Victim Impact Evidence Shifts Burden of Proof."; and (7) "The Failure of the Arizona courts to permit jurors to conduct a Proportionality review denies Appellant due process of law." (Doc. 19-3 at 69-80.)

In May 2006, the Arizona Supreme Court affirmed.  (Doc. 18 at 41.)

In November 2006, the U.S. Supreme Court denied certiorari.  *Johnson v. Arizona*, 127 S.Ct. 559 (2006).

D.    The PCR Proceedings

In November 2011, Johnson submitted his initial PCR petition.  (Doc. 18 at 41.)

In August 2012, Johnson filed an amended PCR petition.  (*Id.*)

In August 2014, after obtaining permission to withdraw his previous petition, Johnson filed a new PCR petition.  (*Id.* at 42.)  Johnson asserts that it raised the following seven claims (the sub-claims are excluded):

(1)    Prosecutorial misconduct;

(2)    Ineffective assistance of trial counsel;

(3)    Ineffective assistance of trial counsel during the penalty phase;

(4)    Ineffective assistance of trial counsel for failing to preserve Johnson's right to be present;

(5)    Ineffective assistance of appellate counsel;

(6)    "Johnson Was Deprived of His Sixth, Eighth, and Fourteenth Amendment Rights to a Reliable Capital Sentencing Trial in Which All Mitigation Evidence Had Been Investigated, Developed, Presented, and Considered."

(7)    "Constitution Challenges to the Death Sentence Raised and Preserved for Future Federal Review."

(Doc. 18 at 42 n.ii.) [2]

In January 2015, the superior court denied relief.  (Doc. 18 at 42.)

In January 2018, the Arizona Supreme Court denied Johnson's petition for review of the denial of his PCR petition.  (*Id.*)

…

---

[2]    Although Johnson provided, as an exhibit to his habeas petition, a copy of his opening brief from his direct appeal to the Arizona Supreme Court (*see* Doc. 19-3), it's unclear whether Johnson also provided a copy of his PCR petition.  Nevertheless, the habeas petition contains a footnote that claims to summarize the issues raised therein (*see* Doc. 18 at 42 n.ii.).

# ANALYSIS

I.   <u>The Stay Request</u>

A.   **Legal Standard**

In *Rhines v. Weber*, 544 U.S. 269 (2005), the Supreme Court addressed whether a district court has discretion to grant a stay in a habeas proceeding involving a "mixed" petition—that is, "a single petition containing some claims that have been exhausted in the state courts and some that have not"—so the petitioner may "present his unexhausted claims to the state court in the first instance, and then to return to federal court for review of his perfected petition." *Id.* at 271-72.

On the one hand, the Court cautioned that granting stay requests in this circumstance too frequently would "frustrate[] AEDPA's objective of encouraging finality by allowing a petitioner to delay the resolution of the federal proceedings" and "also undermine[] AEDPA's goal of streamlining federal habeas proceedings by decreasing a petitioner's incentive to exhaust all his claims in state court prior to filing his federal petition." *Id.* at 277. Thus, the Court held that "stay and abeyance should be available only in limited circumstances." *Id.* On the other hand, the Court held "it likely would be an abuse of discretion for a district court to deny a stay . . . if [1] the petitioner had good cause for his failure to exhaust, [2] his unexhausted claims are potentially meritorious, and [3] there is no indication that the petitioner engaged in intentionally dilatory litigation tactics." *Id.* at 278.

B.   **Parties' Arguments**

1.   <u>Johnson's Motion (Doc. 23)</u>

Johnson begins by asserting that he wishes to pursue certain claims in this proceeding "that are either partially or entirely unexhausted in state court." (Doc. 23 at 3.) Johnson does not, however, specify which of the 40 claims in his 520-page habeas petition meet these criteria.

As for the first element of the *Rhines* test, Johnson argues he "has established good cause for his failure to exhaust for two reasons: (1) trial and post-conviction counsel were ineffective and (2) the state violated *Brady v. Maryland*, 373 U.S. 83 (1963)." (*Id.* at 4-7.)

As for the second element of the *Rhines* test, Johnson argues (1) his prosecutorial-misconduct claim has potential merit because the prosecution failed to produce impeachment information concerning two key witnesses, used racially-coded language, and misstated the law during closing argument, (2) his ineffective-assistance claim has potential merit because his trial counsel failed to investigate alternative explanations for the victim's death and failed to make various objections, (3) the gang-related evidence and jury instructions were flawed, (4) there is a growing consensus, under *Roper v. Simmons*, 543 U.S. 551 (2005), that it would be unconstitutional to impose the death penalty against a defendant who was 21 years old at the time of the offense, as he was here, (5) his trial counsel's decision to concede death-eligibility during the penalty phase was improper under *McCoy v. Louisiana*, 138 S.Ct. 1500 (2018), as was his appellate counsel's decision to concede guilt during his direct appeal, (6) the penalty-phase jury instructions, which suggested that Johnson could be released on parole after 28 years if given a life sentence, were improper under *Lynch v. Arizona*, 136 S.Ct. 1818 (2016), and (7) various other errors marred his trial. (*Id.* at 7-10.)

As for the third element of the *Rhines* test, Johnson argues that he's followed all of the habeas rules and timelines. (*Id.* at 10-11.)

2. The Response (Doc. 24)[3]

Respondents argue, as a threshold matter, that Johnson is ineligible for a *Rhines* stay because his habeas petition isn't a "mixed" petition containing both exhausted and unexhausted claims. (Doc. 24 at 4-6.) Specifically, Respondents argue that, even though Johnson failed to present some of the arguments identified in his habeas petition during the state-court proceedings, all of those claims are now procedurally defaulted under Arizona law—and, thus, must be considered "technically exhausted" for purposes of federal habeas review. (*Id.*)

Next, Respondents argue that Johnson can't satisfy the first *Rhines* factor because (1) the performance of trial counsel is irrelevant when evaluating exhaustion, because the

---

[3] Respondents have filed a motion asking the Court to consider their response even though it was filed one business day late. (Doc. 25.) This request, which Johnson does not oppose, will be granted.

- 6 -

exhaustion doctrine only considers whether arguments were raised during state appellate and PCR proceedings, (2) Johnson only offers bald assertions concerning the ineffectiveness of his PCR counsel, and (3) Johnson can't rely on *Brady* to justify his failure to exhaust because he "does not explain when he obtained the allegedly suppressed evidence" and thus can't demonstrate the evidence was unavailable to him when he filed his PCR petition.  (*Id.* at 6-8.)

Finally, Respondents argue that, at a minimum, the Court should wait until they file their answer to the habeas petition before conducting any assessment of the second *Rhines* factor.  (*Id.* at 8.)

### 3.    Johnson's Reply (Doc. 27)

Johnson begins by addressing Respondents' claim that he's ineligible for a *Rhines* stay because all of his claims are exhausted or technically exhausted.  (Doc. 27 at 3-5.)  He first argues that it would be improper for this Court to predict whether any of his claims would be considered procedurally defaulted under Arizona law.  (*Id.* at 3.)  Alternatively, he argues that some or all of his claims wouldn't be considered defaulted under Arizona law because they're based on claims of actual innocence, new U.S. Supreme Court authority, and/or newly-discovered evidence.  (*Id.* at 3-5.)

As for the first *Rhines* factor, Johnson argues that he's done more than offer a bare-bones assertion of ineffective assistance by PCR counsel—he's provided concrete examples of the deficiencies in trial counsel's performance that PCR counsel should have raised.  (*Id.* at 5-8.)  He also argues that he's established good cause with respect to his *Brady* theory because most of the evidence at issue "continues to be suppressed" by the state.  (*Id.* at 9-10.)

Finally, as for the second *Rhines* factor, Johnson argues the Court shouldn't wait for Respondents to file their answer before ruling on his stay request because the purpose of the *Rhines* procedure is for state courts to have the first chance to evaluate the merits of unexhausted claims.  (*Id.* at 10-11.)

…

…

C.    **Analysis**

When assessing a request for a *Rhines* stay, a court must begin by determining whether the habeas petition contains any unexhausted claims[4]—that is, any claims that wouldn't be subject to a procedural bar if the petitioner tried to assert them in a future state-court proceeding.  As many courts have recognized, a *Rhines* stay is unavailable if a habeas petition contains only exhausted and/or technically exhausted claims.  *See, e.g., White v. Ryan*, 2010 WL 1416054, *12 (D. Ariz. 2010) ("[B]ecause the Petition in this case contains claims that are either actually or technically exhausted, it is not a mixed Petition and *Rhines* does not apply.").[5]

Johnson argues the Court shouldn't engage in its own exhaustion analysis and should, instead, simply accept his assertion that some of his claims are unexhausted.  (Doc. 27 at 5 ["[T]o ask this Court to rule on how Arizona state courts would apply its own rules of criminal procedure violates the very principles of comity and federalism a *Rhines* stay seeks to protect."].)  This argument is unavailing.  *Rhines* recognized that courts should be cautious about granting stay requests in habeas proceedings because they have the potential to "frustrate" AEDPA's twin objectives of encouraging finality and incentivizing petitioners to exhaust all claims in state court before coming to federal court.  544 U.S. at 277.  Thus, it would be inappropriate for a court to grant a *Rhines* stay based on the uncritical acceptance of a habeas petitioner's assertion that some of the claims in his petition are unexhausted as a matter of state law—it is necessary, and legitimate, for the

---

[4]        Although *Rhines* addressed whether the stay-and-abeyance remedy is available in a case involving a "mixed" petition containing both exhausted and unexhausted claims, the Ninth Circuit subsequently held that this remedy is also available in a cases involving a "petition that includes solely unexhausted claims." *Mena v. Long*, 813 F.3d 907, 910 (9th Cir. 2016).

[5]        *See also Nardi v. Schriro*, 2008 WL 4446963, *49 (D. Ariz. 2008) ("The stay-and-abeyance procedure is not appropriate in this case because . . . the petition is not 'mixed' because all of Petitioner's claims are either actually exhausted or technically exhausted."); *Greer v. Ariz. Attorney General*, 2006 WL 2553403, *7 n. 8 (D. Ariz. 2006) (same); *Parker v. Warden*, 2017 WL 1753320, *1 (D.S.C. 2017) (same); *Felder v. Hickman*, 2007 WL 2265146, *5 (S.D. Cal. 2007) (same). *See generally Marvin v. Clark*, 2013 WL 1123854, *18 (W.D. Va. 2013) (denying request for stay because the claims at issue were technically exhausted and stating that, in *Rhines*, the Supreme Court "recogniz[ed] the difference between unexhausted claims necessitating a stay and technically-exhausted, procedurally-defaulted claims that do not require a stay").

court to make its own evaluation.  *See, e.g., Armstrong v. Ryan*, 2017 WL 1152820, \*3 (D. Ariz. 2017) ("Petitioner asserts that a stay is appropriate because it is not absolutely clear that a successive petition would be procedurally barred, and the state courts are in a better position to determine whether a petitioner can meet Arizona's procedural requirements for bringing a successive claim.   This Court disagrees; it is the role of the district court to determine if a petitioner presently has a remedy available in state court.").

On the merits, Johnson argues that some or all of his claims wouldn't be considered defaulted under Arizona law because (1) Arizona's preclusion rules don't apply to actual innocence claims, and all of the claims in his habeas petition are based on this theory; (2) Arizona's preclusion rules don't apply to claims based on new U.S. Supreme Court authority, and claims 14, 26, and 30 in his petition are based on this theory; and (3) Arizona's preclusion rules don't apply to claims based on newly-discovered evidence, and claims 1 and 23 in his petition are based on this theory.  (*Id.* at 3-5.)   Each of these arguments is addressed below.

### 1.   Actual Innocence

Johnson's first theory is easily rejected.  Arizona Rule of Criminal Procedure Rule 32.1(h) provides an exception to preclusion[6] where "the defendant demonstrates by clear and convincing evidence that the facts underlying the claim would be sufficient to establish that no reasonable fact-finder would find the defendant guilty beyond a reasonable doubt, or that the death penalty would not have been imposed."  Johnson hasn't come close to meeting that standard here.  Although he offers an *ipse dixit* that he's actually innocent of the charges (Doc. 18 at 46 n.14), he doesn't provide any evidence to support this assertion.

### 2.   Significant Change In The Law

Johnson's second theory is based on Arizona Rule of Criminal Procedure 32.1(g), which provides an exception to preclusion where "there has been a significant change in

---

[6]     Arizona Rule of Criminal Procedure 32.2(a) generally precludes a PCR petitioner from raising issues that weren't raised during the original appeal or the initial PCR proceeding.  However, Rule 32.2(b) creates an exception for "claims for relief based on Rule 32.1(d) through (h)."

the law that, if applied to the defendant's case, would probably overturn the defendant's conviction or sentence." Johnson contends that three of the claims in his petition (Claims 14, 26, and 30) are premised on significant changes in the law. As explained below, although Claim 30 doesn't qualify under this exception, the Court will call for supplemental briefing on Claims 14 and 26.

▪ Claim 14: In Claim 14 of his petition, Johnson alleges that "his death sentence violates the Fifth, Sixth, Eighth, and Fourteenth Amendments because the trial court erroneously instructed his jury that if they did not impose a death sentence, Johnson might be released on parole." (Doc. 18 at 258.) In his motion, he identifies *Lynch v. Arizona*, 136 S. Ct. 1818 (2016), as the source of new law supporting this claim. (Doc. 23 at 7.)

In *Lynch*, the defendant was convicted in Arizona state court of murder and other crimes. 136 S. Ct. at 1818. Before the penalty phase of his trial began, the state successfully moved to prevent his counsel from informing the jury that, if he didn't receive a death sentence, he would be sentenced to life in prison without possibility of parole. *Id.* at 1819. The jury sentenced him to death. *Id.* On appeal, Lynch argued that, because the state had made his future dangerousness an issue when arguing for the death penalty, the jury should have been given an instruction under *Simmons v. South Carolina*, 512 U.S. 154 (1994), that the only non-capital sentence he could receive under Arizona law was life imprisonment without parole. *Id.* The Arizona Supreme Court affirmed, holding that the failure to give the *Simmons* instruction was not error because, under Arizona law, a defendant is eligible for executive clemency after serving 25 years of a life sentence (and, thus, a life sentence in Lynch's case wouldn't be tantamount to life without parole). *Id.* at 1820. The Supreme Court reversed, holding that, under *Simmons*, neither the possibility of executive clemency nor the possibility that state parole statutes will be amended can justify refusing a parole-ineligibility instruction. *Id.*

The Court is skeptical that Johnson would be permitted, under Arizona Rule of Criminal Procedure 32.1(g), to assert a *Lynch*-based claim in a future state-court proceeding. At the time *Lynch* was decided—on May 31, 2016—Johnson's PCR proceedings were still pending in state court. It seems doubtful that Johnson would be

allowed to invoke Rule 32.1(g) under these circumstances. *Cf. State v. McAlister*, 2013 WL 5886708, *2 (Ariz. Ct. App. 2013) ("[E]ven if *Brown* could be considered 'a significant change in the law' [under Rule 32.1(g)] . . . this court issued its decision in that case in 1997 and McAlister therefore could have raised a claim based on that ruling in at least three of his previous post-conviction relief proceedings."].) Furthermore, other courts have already concluded that *Lynch* doesn't represent a significant change in the law for purposes of Rule 32.1(g). *Garza v. Ryan*, 2017 WL 105983, *3 (D. Ariz. 2017) (denying habeas petitioner's request for *Rhines* stay, where petitioner wished to assert a *Lynch*-based claim in state court, because *Lynch*'s "holding does not constitute a significant change in law for purposes of Rule 32.1(g)" and "*Lynch* would not apply retroactively").

Nevertheless, because the parties have not briefed this issue in any depth, the Court declines to resolve it now.

▪ Claim 26: In Claim 26 of his petition, Johnson alleges that his "death sentence violates the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because his trial and appellate counsel conceded Johnson's guilt and death-eligibility." (Doc. 18 at 409.) In his motion, he identifies *McCoy v. Louisiana*, 138 S. Ct. 1500 (2018), as the source of new law supporting this claim. (Doc. 23 at 9.)

In *McCoy,* which was decided in May 2018 (after the Arizona Supreme Court denied Johnson's petition for review in his PCR proceeding), the U.S. Supreme Court held that "a defendant has the right to insist that counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty." 138 S. Ct. at 1505.

Although the parties have not provided any briefing on this issue, it appears, at least at first blush, that *McCoy* may represent a change in the law in Arizona. *Cf. State v. Pedrin*, 2010 WL 4136959, *2 (Ariz. Ct. App. 2010) ("Pedrin [argues] that trial counsel had been ineffective by conceding guilt on two counts in closing argument . . . . [W]e find the [trial] court correctly concluded trial counsel's decision to concede these points in closing argument was tactical, had a rational basis in the record, and did not constitute ineffective assistance."); *State v. George*, 2008 WL 4261033, *1-2 (Ariz. Ct. App. 2008) (affirming

denial of PCR petition, which complained that trial counsel "conceded guilt on four of the five counts in the indictment during closing argument," because a "'concession of guilt during closing argument may, in some circumstances, be viewed as a sound technical strategy' to focus or enhance credibility on counts that are defensible, thus barring a presumption of prejudice") (citation omitted). However, not all changes in the law implicate Rule 32.1(g)—the change must be "significant" and the new rule must be of the sort that applies retroactively. *See generally State v. Towery*, 64 P.3d 828, 831-36 (Ariz. 2003). Additionally, the type of concession that occurred in *McCoy* seems factually dissimilar from the concessions that allegedly occurred here.

For all of these reasons, the Court concludes it should receive supplemental briefing from the parties before resolving this issue.

▪ Claim 30: In Claim 30 of his petition, Johnson alleges that Arizona's capital sentencing scheme is unconstitutional. (Doc. 18 at 441.) Although his motion doesn't identify any new cases supporting this theory (Doc. 23 at 8-10), the body of his habeas petition asserts this claim is based in part on *Hurst v. Florida*, 136 S. Ct. 616 (2016). (Doc. 18 at 444-45.)

Johnson's reliance on *Hurst* is misplaced. In *Hurst*, the Supreme Court considered whether Florida's capital sentencing scheme violated *Ring*. Under the Florida scheme, a jury rendered an advisory verdict but the judge made the ultimate factual determinations necessary to sentence a defendant to death. 136 S.Ct. at 621-22. The Court held this procedure was invalid because "[a]s with Timothy Ring, the maximum punishment Timothy Hurst could have received without any judge-made findings was life in prison without parole. As with Ring, a judge increased Hurst's authorized punishment based on her own factfinding. In light of Ring, we hold that Hurst's sentence violates the Sixth Amendment." *Id.* at 622.

In his petition, Johnson argues that *Hurst*'s holding was much broader than this— he contends that *Hurst* requires a jury in a capital case to be instructed that, "to find [the defendant] eligible for the death penalty, it must conclude there are insufficient mitigating circumstances to outweigh the aggravating circumstances beyond a reasonable doubt."

(Doc. 18 at 445.)  This is inaccurate.  *Hurst* only addressed the propriety of having judges make factual determinations during capital sentencing.  It didn't address how juries should be substantively instructed.

### 3.   Newly Discovered Material Facts

Johnson's final theory is based on Arizona Rule of Criminal Procedure 32.1(e), which provides an exception to preclusion where "newly discovered material facts probably exist and those facts probably would have changed the verdict or sentence." Johnson contends that two of the claims in his petition (Claims 1 and 13) are premised on newly-discovered facts.  As explained below, this argument is unavailing.

▪ Claim 1:  In Claim 1 of his petition, Johnson alleges that "[d]ue to ineffective assistance of trial counsel and trial court error, the jury never learned of alternative explanations for Stephanie Smith's death and law enforcement's failure to investigate those leads."  (Doc. 18 at 46.)

This doesn't qualify as a claim based on "newly discovered material facts" under Arizona Rule of Criminal Procedure 32.1(e).  For example, Johnson argues that his trial counsel should have discovered that one of the individuals at the victim's house at the time of the murder (Leonard Justice) was involved in alien trafficking activities and introduced that evidence at trial to suggest the real killers were actually targeting Justice.  (Doc. 18 at 50-52.)  However, Johnson concedes that Justice's alien-trafficking activities became a matter of public record by no later than 2003.  (*Id.* at 51 n.16.)  This evidence was thus available to Johnson at the time he pursued his initial PCR petition in 2014.  His claim that PCR counsel was ineffective in failing to raise this issue (*see* Doc. 17 at 47) is not the same thing as a claim that he's relying on newly-discovered evidence.

Johnson's habeas petition also identifies other categories of evidence that he believes trial counsel should have uncovered through pre-trial investigation and then introduced at trial (*see* Doc. 18 at 53-60), but these claims suffer from the same flaw.

▪ Claim 13:  In Claim 13 of his petition, Johnson alleges that "[t]rial counsel was ineffective for failing to move to preclude rap lyrics, attributed to Johnson and co-

defendant Ross, on First Amendment and Confrontation Clause grounds, and the trial court erred in not excluding the lyrics based on offered evidentiary objections." (Doc. 18 at 243.)

As with Claim 1, this doesn't qualify as a claim based on "newly discovered material facts" under Rule 32.1(e). The fact that rap lyrics were introduced during trial has long been known to Johnson. To the extent he believes his trial counsel should have objected to their introduction, that is a claim he could have raised in his previous PCR petition.

D.    **Conclusion**

As discussed above, the Court concludes that Johnson has identified, at most, two claims in his habeas petition that might be considered unexhausted: Claims 14 and 26. However, due to the unusual manner in which the briefing unfolded in this case, Respondents have not had an opportunity to address whether the cases on which Claims 14 and 26 are premised, *Lynch v. Arizona*, 136 S. Ct. 1818 (2016), and *McCoy v. Louisiana*, 138 S. Ct. 1500 (2018), actually constitute "significant change[s] in the law that, if applied to the defendant's case, would probably overturn the defendant's conviction or sentence" for purposes of Arizona Rule of Criminal Procedure 32.1(g). Additionally, even if *Lynch* and/or *McCoy* satisfy this standard, Johnson would separately need to demonstrate that he can satisfy the *Rhines* three-part test as to Claims 14 and 26, and the parties haven't offered any targeted briefing on that issue because their earlier filings sought to address the entire universe of claims potentially subject to a *Rhines* stay.

Accordingly, **IT IS ORDERED** that Respondents' motion to accept late-filed response (Doc. 25) is **granted**.

**IT IS FURTHER ORDERED** that the parties shall submit supplemental briefs on the following issues: (1) whether *Lynch v. Arizona*, 136 S. Ct. 1818 (2016), constitutes a "significant change in the law that, if applied to the defendant's case, would probably overturn the defendant's conviction or sentence" for purposes of Arizona Rule of Criminal Procedure 32.1(g); (2) if so, whether Johnson is entitled to a stay under *Rhines* so he may pursue a *Lynch*-based claim in state court; (3) whether *McCoy v. Louisiana*, 138 S. Ct. 1500 (2018), constitutes a "significant change in the law that, if applied to the defendant's case, would probably overturn the defendant's conviction or sentence" for purposes of

Arizona Rule of Criminal Procedure 32.1(g); and (4) if so, whether Johnson is entitled to a stay under *Rhines* so he may pursue a *McCoy*-based claim in state court.  The deadline for the parties to submit simultaneous briefs on this issue shall be **5:00 p.m., Tuesday, March 12, 2019.**  No responses or replies to the supplemental briefs are permitted.  Each brief shall not exceed 10 pages in length.

Dated this 26th day of February, 2019.

_____
Dominic W. Lanza
United States District Judge