**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ruben Myran Johnson,<br><br>　　　　　　　Petitioner,<br><br>v.<br><br>Ryan Thornell, et al.,<br><br>　　　　　　　Respondents. | No. CV-18-00889-PHX-MTL<br><br>**ORDER**<br><br><u>DEATH PENALTY CASE</u> |

Petitioner Ruben Myran Johnson was convicted of murdering a witness set to testify against him for committing armed robbery. He was sentenced to death.

Now on death row in an Arizona prison awaiting execution, Johnson seeks habeas relief under 28 U.S.C. § 2254(d). Before the Court are his habeas petition and his notice of request for evidentiary development. (Docs. 18, 49.)

Respondents filed an answer to the petition and a response in opposition to the request for evidentiary development. (Docs. 37, 53.) The matters have been fully briefed. (*See* Docs. 18, 37, 44, 49, 53, 57; *see also* Docs. 60, 64, 65, 82, 83, 84.) The petition and the request for evidentiary development are denied for the reasons set forth below.

## **BACKGROUND**

The following summary is based on the facts set out in the Arizona Supreme Court's decision in *State v. Johnson*, 212 Ariz. 425 (2006),[1] and this Court's independent review

---

[1] These facts are "presumed correct." *Atwood v. Ryan*, 870 F.3d 1033, 1039 (9th Cir. 2017) (citing 28 U.S.C. § 2254(e)(1)).

of the state court record.[2]

On November 7, 2000, Johnson and Jarvis Ross, members of the Lindo Park Crips gang, robbed the Affordable Massage parlor in Phoenix. *Id.* at 428. They committed the robbery at the request of Johnson's friend Cheryl Newberry, who drove them to the location. *Id.*

During the robbery, Johnson and Ross encountered witnesses Stephanie Smith and Russell Biondo. *Id.* Johnson escaped, but Ross was caught by the police. *Id.* Johnson later learned, through his friend Phyllis Hansen, a clerk with the Maryvale Justice Court, that Smith was scheduled to testify at Ross's upcoming preliminary hearing. *Id.* In response, Johnson pressured Newberry to reveal Smith's home address. *Id.*

At around 1:00 a.m. on November 15, 2000—a few hours before the preliminary hearing was scheduled to begin—Johnson and another gang member, Quindell Carter, went to Smith's house. *Id.* When they arrived, four people were inside: Smith and her four-year-old son, Jordan, who lived in the house, along with two visitors, Mike Solo and Leonard Justice. *Id.* When Solo heard a dog barking behind the house, he went outside. *Id.* There, a black male put a gun to Solo's head, threatened to kill him, and asked who else was in the house. *Id.* at 429. The gunman pushed Solo into the house and then told him to leave. *Id.* Solo hurried to his car and drove away. *Id.* In the meantime, Justice—who had seen what was happening through the back window of the house—called 911 and handed the phone to Smith so she could provide her address to the dispatcher. *Id.* When Smith and Justice saw Johnson enter the home, they both tried to hide—Justice hid in the bathroom and Smith ran into Jordan's bedroom. *Id.* Johnson found Smith and shot her in the head, killing her. *Id.* Jordan was close enough to his mother when she was shot that her blood spattered onto his face. *Id.* at 438.

Johnson fled after killing Smith. *Id.* at 429. Two days later, he showed a newspaper article about the murder to Hansen, admitted he was the unnamed suspect mentioned in the

---

[2] The state court record was provided by the Arizona Supreme Court on November 26, 2019. (Doc. 52.)

1    story, and explained that he had killed Smith because she was going to testify against "his

2    cuz or one of his homies." *Id.*

3        Hansen eventually went to the police. *Id.* She turned over documents Johnson had

4    left at her home, including a paper containing Johnson's fingerprint. On the paper, in

5    Johnson's handwriting, were Russell Biondo's name and date of birth. *Id.*

6        An Arizona grand jury indicted Johnson on charges of first-degree murder, assisting

7    a criminal syndicate or street gang, first-degree burglary, and armed robbery. *Id.* at 428.

8        In November 2001, following a jury trial, Johnson was convicted on all four counts.

9    *Id.* His jury was then dismissed in accordance with Arizona's then-existing capital

10   sentencing scheme, which required a judge to determine if Johnson was eligible for the

11   death penalty. In June 2002, the United States Supreme Court decided *Ring v. Arizona*

12   *("Ring II")*, 536 U.S. 584 (2002), and held Arizona's capital sentencing scheme

13   unconstitutional under the Sixth Amendment because juries must determine if a defendant

14   is death eligible. Johnson's sentencing proceedings were stayed until the Arizona

15   Legislature amended Arizona's scheme in response to *Ring II*. Johnson's sentencing

16   proceedings began before a newly empaneled jury in November 2003.[3] At the conclusion

17   of the aggravation phase, the jury found that three aggravating factors had been proven

18   beyond a reasonable doubt: (1) Johnson was previously convicted of a serious offense,

19   under A.R.S. § 13-703(F)(2)[4]; (2) Johnson knowingly created a grave risk of death to

20   another person in addition to the person murdered, § 13-702(F)(3); and (3) Johnson

21   committed the offense in an especially heinous and depraved manner, § 13-703(F)(6).

22   *Johnson*, 212 Ariz. at 428. In the penalty phase, the same jury determined that Johnson

23

24   [3] In *State v. Ring ("Ring I")*, 200 Ariz. 267, 279–80 (2001), the Arizona Supreme Court
     upheld judge-determined death sentences, relying on the United States Supreme Court's
25   decision in *Walton v. Arizona*, 497 U.S. 639 (1990), which had previously upheld the
     scheme as constitutional. That holding was overruled in *Ring II*, after Johnson's conviction.
26
     [4] At the time of these offenses, Arizona's capital sentencing scheme was set forth in A.R.S.
27   § 13-703 (2001) and §§ 13-703.01 to -703.04. It is presently set forth in A.R.S. §§ 13-751
     to -759. The Court refers throughout this order to the statutes in effect at the time Johnson
28   committed the murder.

should receive the death sentence for the first-degree murder conviction. The trial court sentenced him to death for the murder and to consecutive, aggravated terms on the non-capital charges.[5] *Id.*

In May 2006, the Arizona Supreme Court affirmed Johnson's conviction and sentence. *Id.* at 441. In November 2006, the United States Supreme Court denied certiorari. *Johnson v. Arizona*, 549 U.S. 1022 (2006).

Johnson unsuccessfully pursued post-conviction relief ("PCR") in state court. He then filed in this Court a statement of intent to seek habeas relief. (Doc. 1.) The Court appointed the Federal Public Defender for the District of Nevada as counsel and set out briefing guidelines which, among other provisions, directed that Johnson's habeas petition "set forth, in a clear and concise manner, including full citations to the appropriate portions of the record and *application of the appropriate standards of review under 28 U.S.C. § 2254(d), the legal and factual basis for each claim for relief*." (Doc. 6 at 3 (emphasis added)). Johnson filed his petition on December 17, 2018. (Doc. 18.)

## LEGAL STANDARD

Johnson's habeas claims are governed by the terms of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").[6] The following legal framework guides the Court's analysis of Johnson's claims.

## I.    Exhaustion and Procedural Default

A writ of habeas corpus cannot be granted unless the petitioner has exhausted all available state court remedies or "there is an absence of available [s]tate corrective process" or "circumstances exist that render such process ineffective to protect the rights of the

---

[5] Maricopa County Superior Court Judge Thomas W. O'Toole presided over the 2003 sentencing proceedings. Judge James E. Padish presided over Johnson guilt-stage trial. Judge Rosa Mroz presided over the post-conviction relief proceedings.

[6] Johnson's challenge to the constitutionality of AEDPA (Doc. 18 at 33-38) is meritless. *See Crater v. Galaza*, 491 F.3d 1119, 1125-26 (9th Cir. 2007) (holding that AEDPA violates neither the Suspension Clause nor the separation of powers doctrine); *cf. Smith v. Thornell*, No. CV-12-00318-PHX-ROS, 2025 WL 563453, at *6 (D. Ariz. Feb. 20, 2025) (citing cases upholding constitutionality of AEDPA).

applicant." 28 U.S.C. § 2254(b)(1). Arizona has effective state corrective processes through direct appeal and Rule 32 of the Arizona Rules of Criminal Procedure. Thus, at issue here is whether Johnson exhausted all of his available state court remedies.

To exhaust state remedies, the petitioner must "fairly present[]" his claims to the state's highest court in a procedurally appropriate manner. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999); *see Swoopes v. Sublett*, 196 F.3d 1008, 1010 (9th Cir. 1999) (noting that capital prisoners must seek review in the Arizona Supreme Court to exhaust claims). A claim is fairly presented if the petitioner has described the operative facts and the federal legal theory on which the claim is based. *See Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 277-78 (1971). A petitioner must clearly alert the state court that he is alleging a specific federal constitutional violation. *See Casey v. Moore*, 386 F.3d 896, 913 (9th Cir. 2004). He also must make the federal basis of the claim explicit, either by citing specific provisions of federal law or federal case law, even if the federal basis of a claim is "self-evident," *Gatlin v. Madding*, 189 F.3d 882, 888 (9th Cir. 1999), or by citing state cases that explicitly analyze the same federal constitutional claim, *Peterson v. Lampert*, 319 F.3d 1153, 1158 (9th Cir. 2003).

In Arizona, there are two avenues for petitioners to exhaust federal constitutional claims: direct appeal and PCR proceedings. Rule 32 of the Arizona Rules of Criminal Procedure governs PCR proceedings and provides that a petitioner is precluded from relief on any claim that could have been raised on appeal or in a prior PCR petition. Ariz. R. Crim. P. 32.2(a)(3). The preclusive effect of Rule 32.2(a) may be avoided only if a claim falls within certain exceptions and the petitioner can justify his omission of the claim from a prior petition or his failure to present the claim in a timely manner. *See* Ariz. R. Crim. P. 32.1(b)-(h), 32.2(b), 32.4(b)(3).

A habeas petitioner's claims may be precluded from federal review in two ways. First, a claim may be procedurally defaulted in federal court if it was raised in state court but found by that court to be defaulted on state procedural grounds. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). Such claims will be found procedurally defaulted in federal

court so long as the state procedural bar was independent of federal law and adequate to warrant preclusion of federal review. *See Harris v. Reed*, 489 U.S. 255, 262 (1989). It is well established that Arizona's preclusion rule is independent of federal law, *see Stewart v. Smith*, 536 U.S. 856, 860 (2002), and the Ninth Circuit Court of Appeals has repeatedly determined that Arizona regularly and consistently applies its procedural default rules such that they are an adequate bar to federal review of a claim. *See Hurles v. Ryan*, 752 F.3d 768, 780 (9th Cir. 2014), *cert. denied*, 547 U.S. 1041 (2014) ("Arizona's waiver rules are independent and adequate bases for denying relief."); *Ortiz v. Stewart*, 149 F.3d 923, 932 (9th Cir. 1998) (explaining Rule 32.2(a)(3) is regularly followed and adequate); *Poland v. Stewart*, 117 F.3d 1094, 1106 (9th Cir. 1997) (finding Arizona not "irregular" in application of procedural default rules); *Martinez-Villareal v. Lewis*, 80 F.3d 1301, 1306 (9th Cir. 1996) (same).

Second, a claim may be procedurally defaulted if the petitioner failed to present it in state court and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Coleman*, 501 U.S. at 735 n.1; *see also Ortiz*, 149 F.3d at 931 (explaining that the district court must consider whether the claim could be pursued by any presently available state remedy). The latter form of preclusion is referred to as "technical exhaustion." *See Coleman*, 501 U.S. at 732 ("A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him."); *Smith v. Baldwin*, 510 F.3d 1127, 1139 (9th Cir. 2007) (observing that if the state court would find the claims procedurally barred, petitioner has technically exhausted the claims through procedural default). Therefore, in the present case, if there are claims that were not raised in state court, the Court must determine whether Johnson has state remedies currently available to him pursuant to Rule 32. *See Ortiz*, 149 F.3d at 931. If no remedies are currently available, Johnson's claims are "technically" exhausted but procedurally defaulted and barred from federal habeas review. *Coleman*, 501 U.S. at 732, 735 n.1.

1        Nonetheless, because the doctrine of procedural default is based on comity, not

2    jurisdiction, federal courts retain the power to consider the merits of procedurally defaulted

3    claims. *Reed v. Ross*, 468 U.S. 1, 9 (1984). As a general matter, however, the Court will

4    not review the merits of a procedurally defaulted claim unless the petitioner demonstrates

5    legitimate cause for his failure to exhaust the claim in state court and prejudice from the

6    alleged constitutional violation or shows that a fundamental miscarriage of justice would

7    result if the claim were not heard on the merits in federal court. *Coleman*, 501 U.S. at 750.

8        "Legitimate cause" exists if a petitioner can demonstrate that "some objective factor

9    external to the defense impeded counsel's efforts to comply with the State's procedural

10   rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *accord Coleman*, 501 U.S. at 753.

11   "Prejudice" is actual harm resulting from the alleged constitutional error. *Vickers v.*

12   *Stewart*, 144 F.3d 613, 617 (9th Cir. 1998). "The petitioner can meet the prejudice prong

13   if he demonstrates 'that the errors . . . worked to his *actual* and substantial disadvantage,

14   infecting his entire [proceeding] with errors of constitutional dimension.'" *Cooper v.*

15   *Neven*, 641 F.3d 322, 327 (9th Cir. 2011) (quoting *White v. Lewis*, 874 F.2d 599, 603 (9th

16   Cir. 1989)). "A petitioner can demonstrate a fundamental miscarriage of justice by

17   'establish[ing] that under the probative evidence he has a colorable claim of factual

18   innocence.'" *Id.* (quoting *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)).

19       Because the acts of a petitioner's counsel are not external to the defense, they are

20   generally attributable to the petitioner, and negligence, ignorance, or inadvertence on

21   counsel's part does not qualify as "legitimate cause." *Coleman*, 501 U.S. at 752-54 (citing

22   *Carrier*, 477 U.S. at 488); *see Shinn v. Ramirez*, 596 U.S. 366, 380 (2022). Cause, however,

23   is shown where the ineffective assistance of counsel amounts to an independent

24   constitutional violation. *Coleman*, 501 U.S. at 755.

25       Ineffective assistance of appellate counsel may serve as cause to excuse a procedural

26   default only where the ineffective assistance claim was first exhausted in state court as an

27   independent constitutional claim. *See Edwards v. Carpenter*, 529 U.S. 446, 453 (2000)

28   ("[A]n ineffective-assistance-of-counsel claim asserted as cause for the procedural default

of another claim can itself be procedurally defaulted . . . ."); *Carrier*, 477 U.S. at 489-90.

The United States Supreme Court in *Martinez v. Ryan*, 566 U.S. 1 (2012), held that ineffective assistance by post-conviction counsel can establish cause to excuse the procedural default of a claim of ineffective assistance of trial counsel. *See Leeds v. Russell*, 75 F.4th 1009, 1016 (9th Cir. 2023) (citation omitted). Under *Martinez*, a petitioner may establish cause for the procedural default of an ineffective assistance of trial counsel claim by demonstrating that PCR counsel was ineffective under the standards of *Strickland v. Washington*, 466 U.S. 668 (1984)—that is, "(a) post-conviction counsel's performance was deficient, and (b) there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different." *Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014), *overruled on other grounds by McKinney v. Ryan*, 813 F.3d 798, 819 (9th Cir. 2015).

Significantly, the *Martinez* exception to procedural default applies only to claims of ineffective assistance of trial counsel. It has not been expanded to other types of claims. *Martinez (Ernesto) v. Ryan*, 926 F.3d 1215, 1225 (9th Cir. 2019) ("[I]neffective assistance of PCR counsel can constitute cause only to overcome procedurally defaulted claims of ineffective assistance of trial counsel."); *Pizzuto v. Ramirez*, 783 F.3d 1171, 1177 (9th Cir. 2015) (explaining that the Ninth Circuit has "not allowed petitioners to substantially expand the scope of *Martinez* beyond the circumstances present in *Martinez*"); *Hunton v. Sinclair*, 732 F.3d 1124, 1126-27 (9th Cir. 2013) (noting that only the Supreme Court can expand the application of *Martinez* to other areas); *see Davila v. Davis*, 582 U.S. 521, 525, 529-30 (2017) (holding that the *Martinez* exception does not apply to claims of ineffective assistance of appellate counsel).

## II. Merits Review Under AEDPA

Pursuant to AEDPA, a petitioner is not entitled to habeas relief on any claim adjudicated on the merits in state court unless the state court's adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established [f]ederal law . . . or (2) resulted in a decision that was based on an unreasonable

1    determination of the facts in light of the evidence presented in the [s]tate [c]ourt

2    proceeding." 28 U.S.C. § 2254(d). If a claim was not adjudicated on the merits in state

3    court and review is not otherwise foreclosed, the Court reviews the claim *de novo* without

4    the deference required by § 2254(d). *See Cone v. Bell*, 556 U.S. 449, 472 (2009).

5           "Clearly-established federal law" refers to the holdings, as opposed to dicta, of the

6    Supreme Court's decisions at the time of the relevant state court decision. *Lockyer v.*

7    *Andrade*, 538 U.S. 63, 71 (2003). "[C]ircuit precedent does not constitute 'clearly

8    established Federal law'" and "cannot form the basis for habeas relief under AEDPA."

9    *Parker v. Matthews*, 567 U.S. 37, 48-49 (2012); *see Carey v. Musladin*, 549 U.S. 70, 76-77

10   (2006). A reviewing court may, however, "look to circuit precedent to ascertain whether it

11   has already held that the particular point in issue is clearly established by Supreme Court

12   precedent." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

13          A state court decision is "contrary to" clearly established federal law under 28

14   U.S.C. § 2254(d)(1) if the decision applies a rule contradicting the governing law set forth

15   in Supreme Court precedent, thereby reaching a conclusion opposite to that reached by the

16   Supreme Court on a matter of law, or if it confronts a set of facts that is materially

17   indistinguishable from a decision of the Supreme Court but reaches a different result.

18   *Williams (Terry) v. Taylor*, 529 U.S. 362, 405-06 (2000); *see*, *e.g.*, *Hooper v. Shinn*, 985

19   F.3d 594, 614 (9th Cir. 2021). Under the "unreasonable application" prong of § 2254(d)(1),

20   a federal court may grant habeas relief where a state court "identifies the correct governing

21   legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the

22   particular . . . case" or "unreasonably extends a legal principle from [Supreme Court]

23   precedent to a new context where it should not apply or unreasonably refuses to extend that

24   principle to a new context where it should apply." *Williams (Terry)*, 529 U.S. at 407; *see*,

25   *e.g.*, *Murray (Robert) v. Schriro*, 745 F.3d 984, 997 (9th Cir. 2014). The burden rests with

26   the habeas applicant to show that the state court applied clearly established Supreme Court

27   precedent in an objectively unreasonable manner. *See Woodford v. Visciotti*, 537 U.S. 19,

28   25 (2002).

1     The Supreme Court has emphasized that "an *unreasonable* application of federal
2  law is different from an *incorrect* . . . application of federal law." *Williams (Terry)*, 529
3  U.S. at 412. For a state court's decision to be an unreasonable application of clearly
4  established federal law, "the ruling must be 'objectively unreasonable, not merely wrong;
5  even clear error will not suffice.'" *Virginia v. LeBlanc*, 582 U.S. 91, 94 (2017) (quoting
6  *Woods v. Donald*, 575 U.S. 312, 316 (2015)); *see Shinn v. Kayer*, 592 U.S. 111, 118 (2020);
7  *Bolin v. Davis*, 13 F.4th 797, 805 (9th Cir. 2021). The burden is on the petitioner to show
8  "there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*,
9  562 U.S. 86, 98 (2011). This standard is intentionally "difficult to meet." *Id.* at 102. "An
10 unreasonable application . . . is one with which no fairminded jurist would agree." *Andrew
11 v. White*, 604 U.S. 86, 92 (2025).

12    Under 28 U.S.C. § 2254(d)(2), habeas relief is also available if the state court
13 decision was based on an unreasonable determination of the facts. *See Miller-El v. Dretke
14 (Miller-El II)*, 545 U.S. 231, 240 (2005). "[A] decision adjudicated on the merits in a state
15 court and based on a factual determination will not be overturned on factual grounds unless
16 objectively unreasonable in light of the evidence presented in the state-court proceeding."
17 *Miller-El v. Cockrell ("Miller-El I")*, 537 U.S. 322, 340 (2003). A state court's factual
18 determination is presumed correct, and a petitioner bears the burden of overcoming that
19 presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see Miller-El I*,
20 537 U.S. at 340; *Brumfield v. Cain*, 576 U.S. 305, 314 (2015) (explaining that § 2254(d)(2)
21 requires federal courts to "accord the state trial court substantial deference"). The Supreme
22 Court has not defined the precise relationship between 28 U.S.C. § 2254(d)(2) and
23 § 2254(e)(1) but has clarified "that a state-court factual determination is not unreasonable
24 merely because the federal habeas court would have reached a different conclusion in the
25 first instance." *Burt v. Titlow*, 571 U.S. 12, 18 (2013) (quoting *Wood v. Allen*, 558 U.S.
26 290, 301 (2010)); *see also Ayala v. Chappell*, 829 F.3d 1081, 1094 (9th Cir. 2016) ("A
27 state court's factual findings are unreasonable if 'reasonable minds reviewing the record'
28 could not agree with them.") (quoting *Brumfield*, 576 U.S. at 314).

1    Review under § 2254(d)(1) is "limited to the record that was before the state court
2    that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011)
3    ("[T]he record under review is limited to the record in existence at that same time, *i.e.* the
4    record before the state court."); *see Murray (Robert)*, 745 F.3d at 998 ("Along with the
5    significant deference AEDPA requires us to afford state courts' decisions, AEDPA also
6    restricts the scope of the evidence that we can rely on in the normal course of discharging
7    our responsibilities under § 2254(d)(1)."). "AEDPA also restricts the ability of a federal
8    habeas court to develop and consider new evidence, limiting review of factual
9    determinations under § 2254(d)(2) to the evidence presented in the State court
10   proceeding . . . ." *Shoop v. Twyford*, 596 U.S. 811, 819 (2022) (citation modified); *see*
11   *Gulbrandson v. Ryan*, 738 F.3d 976, 993 n.6 (9th Cir. 2013).

12        Under § 2254(b)(2), "[a]n application for a writ of habeas corpus may be denied on
13   the merits, notwithstanding the failure of the applicant to exhaust the remedies available in
14   the courts of the State." 28 U.S.C. § 2254(b)(2); *see Lambrix v. Singletary*, 520 U.S. 518,
15   524-25 (1997) (explaining that the court may bypass the procedural default issue in the
16   interest of judicial economy when the merits are clear but the procedural default issues are
17   not); *Lindh v. Murphy*, 521 U.S. 320, 334 n.7 (1997) ("[Section 2254(b)(2) authorizes]
18   federal courts to deny unexhausted claims on the merits."); *see also Franklin v. Johnson*,
19   290 F.3d 1223, 1232 (9th Cir. 2002) ("Procedural bar issues are not infrequently more
20   complex than the merits issues presented by the [habeas petition], so it may well make
21   sense in some instances to proceed to the merits if the result will be the same.").

## III.    *BRECHT* and Harmless Error

23        If "a state court determines that an error at trial did not prejudice a criminal
24   defendant," then "a federal court cannot grant relief without first applying both the test this
25   Court outlined in *Brecht* [*v. Abrahamson*, 507 U.S. 619 (1993),] and the one Congress
26   prescribed in AEDPA." *Brown v. Davenport*, 596 U.S. 118, 122 (2022). The test outlined
27   in *Brecht* requires a petitioner to "show that the error had a 'substantial and injurious effect
28   or influence' on the outcome of his trial." *Id.* at 126 (quoting *Brecht*, 507 U.S. at 637); *see*

*also Bains v. Cambra*, 204 F.3d 964, 977 (9th Cir. 2000) ("[W]e now join the vast majority of our sister circuits by deciding that the *Brecht* standard should apply uniformly in all federal habeas corpus cases under [28 U.S.C.] § 2254."). This Court must apply *Brecht*'s standard even if the state court did not conduct a harmless-error analysis. *Bains*, 204 F.3d at 977-78. If the state court did conduct a harmless-error analysis, a prisoner can only obtain relief if that determination was unreasonable. *Davis v. Ayala*, 576 U.S. 257, 268 (2015).

The *Brecht* standard does not apply to constitutional errors that are structural defects, or to claims under *Brady v. Maryland*, 373 U.S. 83 (1963), or *Strickland*. *See Kyles v. Whitley*, 514 U.S. 419, 436 (1995) (explaining that a showing of prejudice that satisfies *Brady* "cannot subsequently be found harmless under *Brecht*"); *Musladin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009) ("[W]here a habeas petition governed by AEDPA alleges ineffective assistance of counsel . . . , we apply *Strickland*'s prejudice standard and do not engage in a separate analysis applying the *Brecht* standard.").

## DISCUSSION

Johnson raises 40 claims in his 517-page petition, most of which were not exhausted in state court. Respondents raise procedural defenses to these claims, arguing that they are defaulted without excuse and barred from this Court's review. With respect to these claims, the Court will first address the parties' procedural arguments and will alternatively consider the merits of each claim. With respect to Johnson's properly exhausted claims, the Court applies the deferential standards of AEDPA. Johnson's allegations of ineffective assistance of counsel are governed by *Strickland* and, if exhausted in state court, also by AEDPA.

**I.     Trial Error Claims**

    **A.     Claim 3:**

Johnson argues that his rights to due process, a fair trial, and a reliable sentencing were violated by "repeated instances of prosecutorial misconduct." (Doc. 18 at 88.) The claim consists of five subclaims: (A)-(E). Johnson asserts in subclaims (A)-(D) that specific instances of prosecutorial misconduct warrant habeas relief. He alternatively argues, in subclaim (E), that relief is warranted because the instances discussed in (A)-(D) combine

1    to create cumulative misconduct.

2    Johnson contends that he exhausted subclaims (A), (B), and (C) by raising them in

3    state court. (*Id.*) He acknowledges that he failed to present Subclaim (D) or the allegations

4    in Subclaim (A)(5). (Doc. 18 at 88 & n.27.) Finally, Johnson does not address whether he

5    exhausted subclaim (E).

6    Respondents contend that this claim is entirely defaulted and meritless. (Doc. 37 at

7    44-45.) The Court agrees. Claim 3 is defaulted and barred from this Court's review.

8    Alternatively, the claim is meritless.

9    **1.    Procedural Status**

10    Johnson presented subclaims (A), (B), and (C) in his state court PCR petition. (IOR

11    839, PCR Pet., at 28-67; Pet. for Review, Doc. 19-10 at 11-26.)[7] The PCR court found the

12    subclaims "precluded in [their] entirety." (IOR 890, PCR Order, ME 1/28/15, at 3.)[8]

13    Applying Rule 32.2(a)(3) of the Arizona Rules of Criminal Procedure, the court explained

14    that the allegations of prosecutorial misconduct were waived because they could have been,

15    but were not, raised on direct appeal. (PCR Order, ME 1/28/15, at 3.) The court then

16    rejected Johnson's argument that pursuant to Rule 32.1(e) the claims were exempt from

17    preclusion because they were based on newly discovered material facts. (*Id.*) The court

18    found that Johnson failed to establish that the "allegedly 'new' information was either

19    material and/or unavailable to him at trial." (*Id.*) The court further found that the new

20    evidence related only to impeachment and was cumulative to information used by trial

21    counsel during cross-examination. (*Id.*)

22    Johnson contends that the PCR court's denial of this claim was a decision on the

23    merits rather than the application of a procedural bar pursuant to Rule 32.2(a)(3). (Doc. 44

24    at 54.) In support of this argument, Johnson relies on *Runningeagle v. Ryan*, 686 F.3d 758,

---

[7] Both parties use "IOR," or Index of Record, to refer to documents in the state court record, which was provided to this Court in November 2019. (Doc. 52.) The Court will adopt that usage.

[8] "ME" refers to the Minute Entries of the state court.

769 (9th Cir. 2012). In *Runningeagle*, the Ninth Circuit considered a state court ruling that initially denied the petitioner's *Brady* claim as waived and precluded under Rule 32.2(a)(3). *Id.* at 768. However, in a subsequent ruling, the state court deviated from its procedural default order, holding that the claim did not satisfy Rule 32.1(e) and summarily dismissed the claim under former Rule 32.6(c), which provided for the disposition of both procedurally precluded claims and claims presenting no material issue of fact or law. *Id.* The Ninth Circuit found the two decisions ambiguous and therefore applied the "presumption of a merits determination." *Id.* at 769 (quoting *Richter*, 562 U.S. at 99.)

*Runningeagle* is distinguishable. In Johnson's case, the PCR court issued a single order denying the prosecutorial misconduct claims as precluded under Rule 32.2(a)(3). In that same order the court addressed and rejected Johnson's argument the claims were exempt from preclusion. The court thus did not fail to adhere to its procedural default ruling. Moreover, even if the court had made an alternative finding that the claim was meritless, that would not nullify the default ruling. *See Harris*, 489 U.S. at 264 n.10.

Subclaims (A), (B), and (C) are therefore technically exhausted but procedurally defaulted and barred from federal review.

In his habeas petition, Johnson acknowledges that he did not present subclaim (D) in state court. (Doc. 18 at 88.) He ascribes this failure to the ineffective assistance of trial and PCR counsel. (*Id.*) Contrary to Johnson's argument, however, the default of subclaim (D) is not excused. First, while ineffective assistance of trial counsel may serve as cause to excuse a procedural default, the ineffective assistance allegation must be exhausted as an independent claim. *See Carrier*, 477 U.S. at 489. Johnson did not exhaust his ineffective assistance of trial counsel claim with respect to the arguments of prosecutorial misconduct in subclaim (D). Second, as discussed above, *Martinez* applies only to claims of ineffective assistance of trial counsel, meaning Johnson's cannot base subclaim (D) on actions taken by his PCR counsel. *See Martinez (Ernesto)*, 926 F.3d at 1225; *Pizzuto*, 783 F.3d at 1177; *Hunton*, 732 F.3d at 1126-27 (explaining that the Supreme Court has not extended the application of *Martinez* to defaulted *Brady* claims).

1    In his reply brief, Johnson states that subclaim (D)(3), alleging the prosecutor

2    committed misconduct by improperly arguing that mitigating evidence is relevant only if

3    it bears a causal connection to the crime,[9] was "raised by postconviction counsel as [an]

4    ineffective assistance of appellate counsel claim" and therefore Johnson can "overcome"

5    the default of the substantive prosecutorial misconduct claim. (Doc. 44 at 55.)

6    Again, ineffective assistance of appellate counsel may constitute cause to excuse a

7    procedural default where the ineffective assistance allegation was first exhausted in state

8    court as an independent constitutional claim. *See Edwards*, 529 U.S. at 453; *Carrier*, 477

9    U.S. at 489-90. In his PCR petition, Johnson alleged that appellate counsel performed

10   ineffectively in failing to raise the underlying prosecutorial misconduct claim. (PCR Pet.

11   at 147.) The PCR court summarily denied the claim as meritless. (PCR Order at 34.)

12   Johnson did not raise the claim in his Petition for Review to the Arizona Supreme Court.

13   (*See* Doc. 19-10 at 11-26.) Thus, it is not properly exhausted and cannot serve as cause to

14   excuse the underlying claim's default. *See Swoopes*, 196 F.3d at 1100.

15   Likewise, with respect to subclaim (E), although Johnson raised a claim of

16   cumulative prejudice from prosecutorial misconduct in his PCR petition, he failed to

17   include the claim in his Petition for Review to the Arizona Supreme Court.

18   Claim 3 is defaulted without excuse. Because the claim would now be untimely and

19   precluded if Johnson attempted to raise it in a successive post-conviction proceeding, it is

20   procedurally defaulted. *See Coleman*, 501 U.S. at 735 n.1; Ariz. R. Crim. P. 32.1(d)-(h);

21   32.2(a), (b). Accordingly, Claim 3 is denied as procedurally defaulted and barred from

22   federal review. As discussed next, the claim is also meritless.

23   **2.     Merits**

24   Johnson argues that "repeated instances of prosecutorial misconduct" violated his

25

26   [9] The sentencer in a capital case may "not be precluded from considering, *as a mitigating

27   factor*, any aspect of a defendant's character or record and any of the circumstances of the
     offense that the defendant proffers as a basis for a sentence less than death." *Eddings v.*

28   *Oklahoma*, 455 U.S. 104, 110 (1982) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978);
     *see Tennard v. Dretke*, 542 U.S. 274 (2004).

due process, fair trial, and reliable sentencing rights. (Doc. 18 at 88.) He asserts various forms of misconduct, including *Napue* and *Brady/Giglio* violations, improper prosecutorial vouching, use of racially coded language, and misrepresentations of the law. (*Id.*)

The appropriate standard for federal habeas review of a claim of prosecutorial misconduct is "the narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)). A petitioner is not entitled to relief in the absence of a due process violation even if the prosecutor's comments were "undesirable or even universally condemned." *Id.*

To succeed on a prosecutorial misconduct claim, a petitioner must prove that the prosecutor's remarks and other conduct were improper and that they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.*; *see also Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."); *Trillo v. Biter*, 769 F.3d 995, 1001 (9th Cir. 2014) ("[W]e do not grant habeas petitions solely because a prosecutor erred. Our aim is not to punish society for the misdeeds of the prosecutor; rather, our goal is to ensure that the petitioner received a fair trial.").

In determining if a defendant's due process rights were violated, a court "must consider the probable effect [of] the prosecutor's [remarks] . . . on the jury's ability to judge the evidence fairly." *United States v. Young*, 470 U.S. 1, 12 (1985). To make such an assessment, the prosecutor's remarks must be put into the context in which they are made. *See Boyde v. California*, 494 U.S. 370, 385 (1990); *Williams v. Borg*, 139 F.3d 737, 745 (9th Cir. 1998). In *Darden*, for example, the United States Supreme Court assessed the fairness of trial by considering whether the prosecutor's comments manipulated or misstated the evidence, whether the trial court gave a curative instruction, whether the comment was invited by the defense, whether defense counsel had an opportunity to rebut

1    it, and the "weight of the evidence against petitioner." 477 U.S. at 181-82; *see Trillo*, 769

2    F.3d at 1001.

3         If a petitioner can establish a due process violation, to be found eligible for habeas

4    relief he must also demonstrate that the violation resulted in a "substantial and injurious"

5    effect on the verdict under the standard set forth in *Brecht*, 507 U.S. at 637. *Fry v. Pliler*,

6    551 U.S. 112, 121-22 (2007).

7         Finally, courts have substantial latitude when considering prosecutorial misconduct

8    claims because "constitutional line drawing [in prosecutorial misconduct cases] is

9    necessarily imprecise." *Donnelly*, 416 U.S. at 645; *Matthews*, 567 U.S. at 48 (explaining

10   that the "*Darden* standard is a very general one, leaving courts more leeway . . . in reaching

11   outcomes in case-by-case determinations") (citation modified)).

12                    i.    **Claim 3(A):** *Napue*

13        Johnson raises several allegations that the prosecution presented, or failed to correct,

14   false testimony, in violation of *Napue v. Illinois*, 360 U.S. 264 (1959). (Doc. 18 at 90.)

15   Under *Napue*, a due process violation occurs when the State knowingly uses false

16   testimony to obtain a conviction. 360 U.S. at 269; *see United States v. Agurs*, 427 U.S. 97,

17   103 (1976) ("[A] conviction obtained by the knowing use of perjured testimony is

18   fundamentally unfair.") A *Napue* violation consists of three components: (1) the testimony

19   was actually false, (2) the prosecution knew or should have known that the testimony was

20   actually false, and (3) the false testimony was material. *See Hayes v. Ayers*, 632 F.3d 500,

21   520 (9th Cir. 2011); *Dickey v. Davis*, 69 F.4th 624, 636 (9th Cir. 2023) (explaining claimant

22   bears the burden of showing the three *Napue* elements). An error is material where "there

23   is any reasonable likelihood that the false testimony could have affected the judgment of

24   the jury." *Agurs*, 427 U.S. at 103; *see Dickey*, 69 F.4th at 644-45 (stating the materiality

25   prong is satisfied where the false testimony was "the centerpiece of the State's case" and

26   the prosecutor "exploit[ed]" the false testimony by "imploring the jury" to believe the

27   witness); *Panah v. Chappell*, 935 F.3d 657, 664 (9th Cir. 2019) (materiality prong not met

28   where the "State presented a powerful case of [the petitioner's] guilt, with substantial

1    evidence linking him" to the offense and the false testimony was "just one—and not a

2    crucial—piece of that presentation").

3                                    **a.    Phyllis Hansen**

4        Johnson first argues that the prosecutor violated *Napue* by giving the jury "the false

5    impression that Phyllis Hansen's only source of information about the crime came directly

6    from Johnson." (Doc. 18 at 90-94.)

7        Hansen testified that she was the former chief clerk at the Maryvale Justice Court,

8    that Johnson and her husband were friends, that Johnson frequently came to visit, and that

9    she gave Johnson information about the date of Jarvis Ross's preliminary hearing for the

10   Affordable Massage robbery. (RT 11/14/01 at 14, 16, 20-21, 23-27, 41.)

11       Hansen also testified that, two days after Smith's murder, Johnson came to her home

12   and asked her to read an *Arizona Republic* article about the crime. He told her he was the

13   "unnamed suspect" referred to in the piece. (*Id.* at 28-31.) Johnson also told Hansen that

14   he killed Smith because she was going to testify against "his cuz or one of his homies." (*Id.*

15   at 39-40.)

16       Hansen testified that before Johnson admitted his participation in the murder, she

17   had seen stories about the crime "on the news," but was unaware of any connection between

18   Johnson and the crime or that the murder of Smith was related to Ross's arrest for armed

19   robbery. (*Id.* at 29-30.)

20       Hansen also testified to additional details Johnson told her about the murder that

21   were not mentioned in the article, including that Smith "tried to shield herself using one of

22   the children"; that Carter was not in the room when Johnson shot Smith; that Johnson told

23   a man who was in Smith's house, "We're not here for you. We're here for the bitch"; that

24   Johnson spoke briefly to another man he encountered while fleeing the scene, responding

25   to his question about what was going on with "It ain't nothing," or "It ain't none of your

26   business"; and that after leaving the house, Johnson hid under a dumpster for a couple

27   hours, buried the murder weapon after filling its barrel with dirt, and eventually called his

28   girlfriend to pick him up. (*Id.* at 34-40.)

On cross-examination, defense counsel questioned Hansen about the details of the crime which, according to her testimony, Johnson had shared with her. (*Id.* at 77-84.) Counsel then asked whether, in preparation for her testimony, she had reviewed any of the police reports prepared by Detective Thomas Kulesa, the case agent. (*Id.* at 86.) Hansen responded that she had "never seen a police report." (*Id.*)

During his testimony, Detective Kulesa was asked about the availability of the police reports. He testified that he "restricted" the report for the murder so that only homicide personnel could access it. As a result, according to Kulesa, a patrol officer or detective from another unit "would not be able to access our police report." (RT 11/19/01 at 136-37.)

Detective Kulesa also testified about a series of search warrants executed on January 25, 2001. (*Id.* at 126-27.) The prosecutor asked whether the warrants were obtained from the Superior Court or Justice Court. (*Id.* at 127.) Over the defense's relevancy objection, Kulesa testified that the warrants were obtained from a Superior Court judge. (*Id.*)

Johnson argues that Hansen's testimony that Johnson told her details about the murder, and Detective Kulesa's testimony suggesting that Hansen could not have obtained those details from other sources, are false. (Doc. 18 at 91-94.) Respondents counter that "none of the testimony Johnson challenges was 'actually false' or material"; there is no evidence that Hansen or Kulesa testified falsely, and even if Hansen had obtained access to the police reports or search warrants at issue, they did not contain the details she testified had come from Johnson. (Doc. 37 at 58-60.)

Johnson first asserts that Detective Kulesa gave the "false impression" that Hansen could not have accessed the search warrants through her employment with the Justice Court. (Doc. 18 at 92.) Johnson cites a search warrant in Quindell Carter's file that was obtained from the Justice Court on the day of the murder. (*Id.*) As Respondents note, however, "the fact that the police obtained a search warrant for the crime scene from the Justice Court on November 15, 2000, does not render false Detective Kulesa's testimony that the eight warrants executed on January 25, 2001, were obtained from the Superior

1   Court." (Doc. 37 at 59.) Thus, there was no *Napue* violation because the testimony was not
2   "actually false." *See Hayes*, 632 F.3d at 520.

3         In addition, Detective Kulesa's testimony about the source of the search warrants
4   was not material under *Napue*. *See id.* The November 15 Justice Court warrant does not
5   contain information that, according to the prosecution, Hansen could have learned only
6   from Johnson. (*See* PCR Pet., Ex. 25.) Therefore, even if evidence showed Hansen could
7   have accessed the November 15 Justice Court subpoena, that information would not have
8   affected the prosecution's argument that Hansen knew details of the murder that could have
9   come only from Johnson. Detective Kulesa's testimony was neither false nor material. *See*
10  *Hayes*, 632 F.3d at 520.

11        Johnson's next argument fails for similar reasons. According to Johnson, Detective
12  Kulesa's testimony was misleading because Hansen could have obtained facts about the
13  murder through her position with the Justice Court. (Doc. 18 at 92.) Johnson bases this
14  claim on the following facts: Carter was indicted in Justice Court, his release questionnaire
15  and warrant fact sheet were filed in that court, and he obtained the homicide police reports
16  as disclosures prior to Hansen's first police interview. (*Id.*) However, the fact that there
17  may be inconsistencies in certain witness statements and other conflicts in the evidence
18  does not establish that the prosecution presented false testimony. *See United States v.*
19  *Zuno-Arce*, 44 F.3d 1420, 1423 (9th Cir. 1995) (inconsistencies between testimony at trial
20  and retrial did not amount to presentation of false testimony); *see also United States v.*
21  *Croft*, 124 F.3d 1109, 1119 (9th Cir. 1997) ("[T]hat a witness may have made an earlier
22  inconsistent statement, or that other witnesses have conflicting recollections of events, does
23  not establish that the testimony offered at trial was false."). Mere speculation regarding
24  these factors is insufficient to meet a petitioner's burden. *United States v. Aichele*, 941 F.2d
25  761, 766 (9th Cir.1991).

26        These facts do not demonstrate that Hansen or Detective Kulesa testified falsely;
27  they simply suggest that Hansen could have accessed material from the Justice Court that
28  concerned facts about the crime. Neither Hansen nor Detective Kulesa testified that she

1   could not have had access to any documents related to the case. Kulesa testified only that

2   the actual police report was restricted, not documents related to Carter's criminal charges

3   (RT 11/19/01 at 136-37), and no evidence contradicts that testimony. Moreover, Hansen

4   admitted that, at Johnson's behest, she accessed information regarding Carter's arrest and

5   charges. (RT 11/14/01 at 40-41.) Again, Johnson fails to establish that the prosecutor

6   elicited any testimony from Hansen or Detective Kulesa that was "actually false" under

7   *Napue*. Speculation that the witnesses lied is insufficient. *United States v. Aichele*, 941 F.2d

8   761, 766 (9th Cir. 1991).

9       Nor was the testimony regarding the police reports material. The Justice Court

10  documents regarding Carter's indictment contain none of the details the State asserted

11  could have been learned only from Johnson. (PCR Pet., Exs. 26, 43.) Furthermore, there is

12  no evidence that Carter gave Hansen access to the police reports, and she testified that she

13  did not see any police reports in this case. (RT 11/14/01 at 86.) Under these circumstances

14  there is no "reasonable likelihood" that the allegedly false testimony could have affected

15  the verdict. *See Agurs*, 427 U.S. at 103.

16              **b.        Cheryl Newberry**

17      Johnson argues that the prosecution violated *Napue* by failing to correct

18  "Newberry's testimony that she never received the Smith homicide report, was good

19  friends with Smith, and was in protective custody because she feared Johnson." (Doc. 18

20  at 94.)

21              **1)        Access to the Homicide Report**

22      Johnson contends that the prosecutor failed to correct Newberry's allegedly false

23  testimony in which she suggested that she had not read the police reports from Stephanie

24  Smith's murder. (Doc. 18 at 95-98.) During cross-examination, defense counsel confirmed

25  that Newberry was charged with multiple offenses arising from her participation in the

26  armed robbery and then asked if she had received "the police reports" in discovery in her

27  case. (RT 11/7/01 at 89.) The prosecutor objected, asking counsel to clarify whether he

28  meant the robbery or homicide reports. (*Id.*) The court overruled the objection. When

1    Newberry asked counsel to repeat the question, he asked whether she received the police
2    reports on the robbery, and she responded that she had. (*Id.*)

3    Counsel then asked if she received police reports on the homicide. (*Id.* at 90.) She
4    answered "No." (*Id.*) Counsel asked if she "[had] parts of the police report on the
5    homicide?" (*Id.*) She responded that she didn't "recall." (*Id.*) Counsel asked Newberry
6    whether she "got [the police reports]" and "reviewed them." (*Id.*) Newberry responded that
7    she "did not get all of the discover[y in her] case." (*Id.*) She then agreed that she "had an
8    opportunity to review the reports, not necessarily keep them." (*Id.*)

9    Arguing that this testimony was false, Johnson cites disclosure receipts showing that
10   Newberry's counsel received parts of the homicide police report as disclosure in her
11   criminal case. (Doc. 18 at 96; PCR Pet., Ex. 30.) Respondents counter that Newberry's
12   testimony was "ambiguous and equivocal" as to what she received and reviewed. (Doc. 37
13   at 61-62.) The Court agrees. Newberry testified that she did not receive the homicide police
14   reports and did not remember whether she received parts of them; she also testified,
15   however, that she "had an opportunity to review the reports." (RT 11/7/01 at 89-90.) The
16   disclosure receipts establish only that Newberry's counsel received portions of the
17   homicide report. (PCR Pet., Ex. 30.) To the extent Newberry's testimony suggested that
18   she did not read any of the homicide report, Johnson offers nothing to establish that her
19   testimony was false. Nothing in the record demonstrates that Newberry had in fact read the
20   homicide reports and therefore knowingly testified falsely. *See United States v. Renzi*, 769
21   F.3d 731, 752 (9th Cir. 2014) ("Mere inconsistencies or honestly mistaken witness
22   recollections generally do not satisfy the falsehood requirement."); *Henry v. Ryan*, 720
23   F.3d 1073, 1084 (9th Cir. 2013) (explaining there was no *Napue* claim where petitioner
24   "provided no evidence that [witness] knew his testimony was inaccurate at the time he
25   presented it, rather than [his] recollection merely being mistaken, inaccurate or
26   rebuttable").

27   Respondents further claim that the testimony was not material because the defense's
28   theory that Newberry learned details of the murder not from Johnson, as she testified, but

from police reports, was erroneous. (Doc. 37 at 61-62.) Newberry provided the same details of the crime to the police on August 22, 2001, almost two months before her counsel received portions of the homicide report. (PCR Pet., Ex. 1, Bates No. 010789, 010793); PCR Pet., Ex. 30, Bates No. 046460). The police report her lawyer obtained in discovery cannot have been the source of the information Newberry testified about at trial. Even if the prosecutor had corrected Newberry's testimony on redirect by establishing that she received and read the homicide the report, that would not support the defense's theory that she obtained the information from the reports rather than from Johnson. Consequently, there was not a reasonable likelihood that Newberry's testimony regarding the report, even if false, would have affected the jury's verdict. For the same reasons the Court rejects Johnson's argument that the prosecutor relied on false evidence in her closing argument.

Because Newberry's testimony was neither actually false nor material, Johnson has not presented a colorable *Napue* violation, and this claim is meritless.

### 2)    Newberry was not a "Close Personal Friend" of the Victim

Johnson next argues that the prosecutor knowingly presented false testimony that Newberry and the victim were close friends. (Doc. 18 at 98-99.) Newberry testified that Stephanie Smith "was a very good, close personal friend of mine that I worked with" and that she, Newberry, accepted a plea deal and prison sentence because she "owe[d] this to Stephanie." (RT 11/7/01 at 24, 152.) In support of his argument that this testimony was false, Johnson cites the position taken by the State at Newberry's sentencing. (Doc. 18 at 98-99.) There, the prosecutor noted that although Newberry maintained that Smith was her "very good friend," she failed to warn Smith or law enforcement of Smith's imminent murder, and Smith's family members claimed that she and Newberry were not close friends. (*Id*.) According to Johnson, the prosecutor had argued that Newberry deserved the maximum sentence under the plea agreement because she was dishonest about the friendship. (*Id*.)

Johnson's arguments are unpersuasive. First, the prosecution argued for a harsh sentence in Newberry's case not because she was dishonest about her relationship with Smith but because by orchestrating the armed robbery and taking no steps to prevent the murder of her "close friend," she was "both legally and morally an accomplice to Stephanie's murder." (*See* PCR Pet., Ex. 29 at 6-7.) Whether or not Newberry believed she and Smith were friends is essentially an unfalsifiable proposition, which, as Respondents note, cannot be disproved by the opinion of Smith's family. Additionally, the fact that Newberry stood by and allowed Smith to be killed renders immaterial any alleged failure by the prosecution to prevent or correct Newberry's testimony about her relationship with Smith. No evidence could be more persuasive in casting doubt on her testimony that Smith was a close friend.

Because Newberry's testimony cannot be shown to be actually false or material, there was no *Napue* violation.

### 3)       Protective Custody and Fear of Johnson

Johnson argues that the prosecutor elicited false testimony from Newberry that her motive for testifying was an "overpowering fear of Johnson" as evidenced by the fact that she was in protective custody at the jail. (Doc. 18 at 99-101.) Johnson argues that "Newberry was not in protective custody because of her fear of Johnson." (*Id.* at 99.)

On direct examination, Newberry testified that she was charged with five counts arising from the Affordable Massage robbery, that she pleaded guilty to one count of armed robbery, faced up to 18 years in prison, and was required to testify in Johnson's trial as part of her plea agreement. (RT 11/7/01 at 16-18.) On cross-examination, defense counsel highlighted the benefits Newberry received from her plea agreement, including the dropping of four of the charges, and questioned her about statements she had made to him in an earlier interview. (*Id.* at 85, 116-20.) In that interview she had denied involvement in the robbery and stated that she had no choice but to accuse Johnson as part of her plea agreement. (*Id.* at 115-16.)

On redirect examination, the prosecutor asked Newberry whether she was "concerned about [her] welfare in entering into this plea agreement?" (*Id.*) She answered yes when asked if she was "afraid of Ruben Johnson today" and confirmed that she "was concerned about [her] safety in prison after having testified during this trial." (*Id.*) When the prosecutor asked if she was currently in protective custody in the jail, defense counsel objected. (*Id.*) The trial court sustained the objection, and Newberry never answered the question. (*Id.* at 135-36.)

In support of his argument that the prosecutor knowingly elicited false testimony, Johnson relies on the events at a pretrial hearing in Newberry's case on May 18, 2001, when Newberry asked to be removed from administrative segregation. (Doc. 18 at 100.) Newberry's lawyer stated that she had told him she was "not in any danger" and she had not suggested to her previous lawyer "that she was ever in any danger of any type." (PCR Pet., Ex. 27 at 4-5.) Her lawyer told the court that Newberry felt that "where she is at right now is very restrictive," that she was "not allowed to have any family with her," that she was "in her cell 24 hours a day," and that she "feels she is being punished in this area where she doesn't feel there is any need for her to be there" and requested that "she be placed back in the general population." (*Id.*) The court denied Newberry's request, explaining: "There were some pretty compelling reasons and concerns and I still have them all." (*Id.*)

Johnson has not met his burden of showing that Newberry's statement that she feared for her safety because of testifying was "actually false" under *Napue*. Her stated desire to be removed from protective custody several months before Johnson's trial and her trial testimony that entering the plea agreement made her concerned for her safety are not mutually exclusive such that her trial testimony was necessarily false. *Cf. Tapia v. Tansy*, 926 F.2d 1554, 1563 (9th Cir. 1991) ("Contradictions and changes in a witness's testimony alone do not constitute perjury and do not create an inference, let alone prove, that the prosecution knowingly presented perjured testimony."). As Respondents argue, it is possible that Newberry was concerned when she entered her plea agreement, feared Johnson, and feared for her safety in prison after testifying, but did not believe she needed

1    to be in protective custody, or simply preferred not to be in protective custody for the

2    reasons she provided, while in the jail prior to her testimony in Johnson's trial. Because "it

3    is not entirely clear that [Newberry] lied" in her testimony, Johnson's *Napue* claim fails.

4    *See Schad v. Ryan*, 671 F.3d 708, 717 (9th Cir. 2011).

5            Also, because of its cumulative nature, there is no "reasonable likelihood" that the

6    challenged testimony affected the jury's verdict. *See id.* at 716. Newberry testified on direct

7    examination about her fear of Johnson. She described being in fear during the incident

8    when Johnson and two other men drove her around so that she could identify Smith's

9    house. (RT 11/7/01 at 58-64.) Knowing that Johnson had a gun and suspecting the other

10   occupants of the vehicle also had weapons, Newberry pulled her gun and kept it pointed at

11   the passenger seated to her left. (*Id.*) Newberry testified that she was "surprised [she] made

12   it home that day." (*Id.* at 65.) She also testified that she did not call the police after the

13   incident because she was "scared to death." (*Id.*) Finally, she testified that one night a

14   month and a half after Smith's murder, Johnson showed up at her home wearing latex

15   gloves; she did not answer the door but grabbed her gun and sat on the couch waiting until

16   morning. (*Id.* at 82-83.)

17           Newberry's allegedly false testimony was cumulative to this other evidence that she

18   feared Johnson. Accordingly, there is no reasonable likelihood that the redirect testimony

19   to which Johnson objects affected the jury's verdict. *See United States v. Persico*, 645 F.3d

20   85, 111 (2d Cir. 2011) (cumulative *Brady* or *Napue* evidence is not "material").

21           For the reasons just discussed, Johnson has failed to establish a *Napue* violation

22   arising from Newberry's testimony.

23                        **c.    Hansen's Fear of Johnson**

24           Johnson argues that the prosecutor knowingly presented false evidence that Phyllis

25   Hansen feared Johnson. (Doc. 18 at 101-03.) The claim is meritless.

26           On direct examination, the prosecutor asked Hansen about an incident when

27   Johnson came to her home about a week before his arrest for Smith's murder. (RT 11/14/01

28   at 42-43.) Hansen testified that "Ruben came into the house and we had a dresser in the

hallway that I had placed a gun in and—." (*Id.* at 43.) At that point defense counsel raised a relevance objection. (*Id.*) At a bench conference, the prosecutor explained that when Johnson asked Hansen where the gun was, she lied "because she had become afraid of him at this point and time." (*Id.* at 43.) The prosecutor argued that Hansen's fear was relevant to her state of mind in explaining why she ultimately contacted the police. (*Id.* at 43-45.) The court overruled the objection. (*Id.* at 44-45.) Hansen then testified that Johnson looked for the gun and asked her where it was. (*Id.* at 45.) She lied, telling him she had taken it to her parents' house "because [she] didn't feel safe with it at [her] house," even though the gun really was still in the home. (*Id.*)

Johnson argues that Hansen's testimony about fearing Johnson was false. (Doc. 18 at 102.) In support of this argument, he relies on statements Hansen made in an interview with Detective Kulesa on February 27, 2001. (*Id.*) The contents of that interview, however, do not contradict Hansen's trial testimony. In fact, Johnson identifies only a single statement from the interview as inconsistent with Hansen's testimony. (*Id.* at 102-03.) Hansen told Detective Kulesa that Johnson had borrowed the gun to "make a frame for it" for Hansen's husband. (PCR Pet. at 42-43; PCR Pet., Ex. 31 at 16-17.) According to Johnson, this showed that Hansen did not fear that Johnson would use the gun to eliminate her as a witness, as the prosecutor's questions implied. (*Id.*) The Court agrees with Respondents that the context of Hansen's statements indicated that Johnson borrowed the gun to "make a frame" for it before Smith's murder and prior to the incident about which Hansen testified. (Doc. 37 at 67-68; PCR Pet., Ex. 31 at 16-17.)

Johnson fails to meet his burden of showing that there was anything "actually false" about Hansen's testimony. Furthermore, the prosecutor's argument that Hansen lied to Johnson about the gun's location because she was afraid of him was a reasonable inference from Hansen's testimony about the incident and consistent with her repeated assertions that she was afraid of Johnson.

Finally, the testimony was not material. As the prosecutor argued, the reason for the testimony was to show Hansen's state of mind to explain why she eventually went to the

police with what she knew about the murder. In addition, during redirect examination, Hansen more directly stated that she had "concerns about [her] own welfare. "(RT 11/14/01 at 96.) Testimony about the gun incident was therefore cumulative to Hansen's testimony that she was worried for her safety; as a result, there was not a reasonable likelihood that it could have affected the verdict. *Persico*, 645 F.3d at 111.

### d.     Misrepresentation of Jarvis Ross's Jail Calls

Johnson argues that the prosecutor gave the jury the false impression that a call made from jail by Jarvis Ross on November 9, 2000, showed that Johnson was planning to murder Smith. (Doc. 18 at 103-05.) The prosecutor did this, according to Johnson, by excluding other calls that would have placed the November 9 call in context. (*Id.* at 103-04.) The claim is meritless.

At the guilt phase of trial, the State called Detective Rusty Stuart, whose testimony was offered primarily to establish that Johnson was a gang member and committed the offense of assisting a criminal street gang. During the detective's testimony, the State played a clip from a November 9 phone call that Jarvis Ross placed to Johnson from jail. (RT 11/19/01 at 73-74.) On the call the phrases "is it going down?" and "what's going down today?" and "confidential list" were used. (*Id.*) Detective Stuart testified that when Johnson responded to Ross's question "if it's going down today" by referring to the "confidential list," he meant "I'm not going to tell you right now." (*Id.* at 74-75.)

In his closing argument, defense counsel, citing evidence that Newberry filled out paperwork for a bond for Ross the following day, argues that in the November 9 call Ross and Johnson were discussing Ross's release on bond. (RT 11/26/01 at 71; *see* RT 11/7/01 at 54-56.) In rebuttal, the prosecutor argued that the call was not about a bond, but about Johnson's plan to murder Smith. (RT 11/26/01 at 112.)

Nothing in this scenario supports a *Napue* violation. Johnson has not met his burden with respect to any of the three elements; most notably he does not identify any false testimony or evidence.

Nor has Johnson supported a claim of prosecutorial misconduct. First, as

Respondents note, the prosecutor chose not to admit the other tapes of jail phone calls; the record does not show that she objected to their admission or moved to exclude them. (RT 11/19/01 at 59-61.) Next, the fact that the topic of other phone calls from Jarvis Ross involved obtaining a bond did not make it improper for the prosecutor to argue that in the November 9 call Johnson and Ross discussed the impending murder of Smith. *See United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993) ("[P]rosecutors must have reasonable latitude to fashion closing arguments, and thus can argue reasonable inferences based on the evidence . . . ."). Given Detective Stuart's testimony about the meaning of certain phrases, the otherwise ambiguous nature of the call, and the powerful evidence establishing Johnson's motive for killing Smith, it was reasonable for the prosecutor to infer that the call referred to Smith's upcoming murder.

Finally, Johnson cannot demonstrate that the prosecutor's handling of the call had a substantial and injurious effect on the verdict as required under *Brecht*. The call was not a significant part of the case against Johnson, given the direct evidence of his involvement in Smith's murder.

### e.     Gang Documentation Regarding Johnson's Brother

Johnson argues that in the penalty phase of trial, the prosecutor engaged in "distortion" with respect to whether Johnson's brother, Ruffin Johnson, Jr., was a gang member. (Doc. 18 at 105-06.)

The State's gang expert, Detective Stuart, testified that after reviewing his records he could not "document" Ruffin Johnson, Jr. "as a Lindo Park Crip. He is not involved in the criminal activities of the gang, to my knowledge." (RT 12/8/03, a.m., at 160.) During the penalty phase, a juror submitted a question to Johnson's father, Ruffin Johnson, Sr., asking whether Ruffin Jr. had "been in trouble with the law. . . ." (RT 12/15/03 at 121.) The court sustained the prosecutor's objection and did not ask the question. (*Id.* at 122.) Another juror asked Johnson's childhood social worker whether there has been gang involvement for either boy "at home or at school." (RT 12/17/03 at 53.) The witness

answered no. (*Id.*) In her closing argument, the prosecutor argued that Ruffin Jr. "was not a gang member. And you heard evidence from Detective Stuart about that." (RT 12/18/03 at 86.)

Johnson argues that this testimony and argument were factually incorrect. He cites a search warrant application, filed on January 23, 2001, in which Detective Kulesa wrote that Detective Stuart had advised him that Ruffin Johnson was a documented member of the Lindo Park Crips ("LPC"). (PCR Pet., Ex. 39 at 26.) He cites other records showing that Ruffin Jr. was the subject of police reports, arrests, and convictions. (*Id.*, Exs. 40, Ex. 41 at 9, 42 at 2; *see* Doc. 18 at 105.)

Detective Stuart's testimony that his records showed Ruffin Jr. was not a documented LPC is at the least inconsistent with the information in the search warrant application and other records from Johnson's files. The Court will assume that the first prong of a *Napue* violation is established. The second prong asks whether the prosecutor knew or should have known that the testimony was false. The Ninth Circuit has held that under AEDPA "it is *not* clearly established that a police officer's knowledge of false testimony may be attributed to the prosecution under *Napue*." *Reis-Campos v. Biter*, 832 F.3d 968, 977 (9th Cir. 2016). Johnson does not present any evidence suggesting the prosecutor knew of the 2001 search warrant or the other records now cited in the habeas petition. Without such evidence, Detective Stuart's contradictory views of whether Ruffin Jr. was a documented gang member cannot be imputed to the prosecution, and *Napue*'s second prong is not satisfied. *See Browning v. Baker*, 875 F.3d 444, 460 (9th Cir. 2017) (finding there must be "evidence suggesting that the prosecution knew [a witness] misrepresented the truth").

Finally, the Court finds that the materiality prong has not been satisfied. While "materiality under *Napue* requires a lesser showing of harm than under ordinary harmless error review," there must still "be a reasonable likelihood that the false testimony could have affected the judgment of the jury." *Panah*, 935 F.3d at 664 (quoting *Hayes v. Brown*, 399 F.3d 972, 985 (9th Cir. 2005)) (citation modified). "Thus, a *Napue* claim fails if, absent

1    the false testimony or evidence, the petitioner still 'received a fair trial, understood as a

2    trial resulting in a verdict worthy of confidence.'" *Id.* (quoting *Hayes*, 399 F.3d at 984).[10]

3         The prosecutor used Detective Stuart's testimony regarding Ruffin Jr. to challenge

4    the mitigating evidence presented through Johnson's father. The prosecutor argued that

5    Johnson's difficult childhood and the abuse inflicted by his father were not responsible for

6    his criminal behavior since Ruffin Jr., who was raised in the same home environment, did

7    not join a gang. As Respondents note, even if Ruffin Jr. was involved in a criminal gang,

8    the contrast between the brothers remains. There is no evidence that Ruffin Jr. ever

9    committed a crime as serious as Johnson's. Moreover, the determination that evidence of

10   Johnson's difficult childhood was entitled to "minimal weight" given its lack of connection

11   to the murder, would not have been altered by evidence that Johnson's brother also

12   participated in a criminal gang. *Johnson*, 212 Ariz. at 440. Under these circumstances,

13   Johnson cannot demonstrate there was a reasonable likelihood under *Napue* that Detective

14   Stuart's testimony or the prosecutor's argument would have affected the sentence.

15        This claim is denied as it fails to meet two of *Napue's* requirements.

16                          **ii.    Claim 3(B): *Brady/Giglio***

17        Johnson argues that the State failed to disclose impeachment materials on Hansen,

18   Newberry, and Biondo. (Doc. 18 at 106.)

19   ---

     [10] Respondents argue that the materials documenting Ruffin Jr.'s criminal background were
20   part of Johnson's own criminal proceedings and therefore available to him. (Doc. 37 at 71.)
     As Johnson notes, however, the Ninth Circuit Court of Appeals has held that, "[w]hether
21   defense counsel is aware of the falsity of the statement is beside the point." *Belmontes v.
     Brown*, 414 F.3d 1094, 1115 (9th Cir. 2005), *rev'd on other grounds sub nom. Ayers v.
22   Belmontes*, 549 U.S. 7 (2006). "[A] prosecutor's responsibility and duty to correct what he
     knows to be false and elicit the truth, requires him to act when put on notice of the real
23   possibility of false testimony." *Id.*; *but see Beltran v. Cockrell*, 294 F.3d 730, 736 (5th Cir.
     2002) ("[T]he Government can discharge its responsibility under *Napue* . . . by providing
24   defense counsel with the correct information at a time when recall of the prevaricating
     witnesses and further exploration of their testimony is still possible.") (citation modified);
25   *United States v. Mangual-Garcia*, 505 F.3d 1, 10-11 (1st Cir. 2007) ("When the defendant
     knows about the false testimony and fails to bring it to the jury or the court's attention, the
26   assumption is that he did so for strategic reasons, and the defendant will not be allowed to
     question his own strategic choices on appeal.").
27

28

In *Brady v. Maryland*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The duty to disclose includes impeachment as well as exculpatory material. *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Giglio v. United States*, 405 U.S. 150, 154 (1972).

The government violates its obligations under *Brady* where (1) the evidence in question was favorable to the accused, (2) the government willfully or inadvertently suppressed the evidence, and (3) prejudice resulted from the suppression (i.e., the evidence was "material"). *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *see Banks v. Dretke*, 540 U.S. 668, 691 (2004). Evidence is material for *Brady* purposes "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433 (quoting *Bagley*, 473 U.S. at 682). Materiality does not require a showing that the defendant would have been acquitted had the suppressed evidence been disclosed. *Id.* at 434-35. Instead, a *Brady* violation occurs if "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435.

### a.    Impeachment Materials on Hansen

Johnson argues that the State violated *Brady/Giglio* by failing to disclose evidence that Hansen was terminated from her job as a justice court clerk "for breaching court security, missing documents and files, and embezzlement," and was investigated by police but not prosecuted by the Maricopa County Attorney's Office. (Doc. 18 at 107-110.)

Respondents contend that "[t]o the extent Johnson suggests that this evidence demonstrated the existence of some agreement [between] Hansen and the State, such a claim would be entirely speculative." (Doc. 37 at 73.) Johnson counters that an undisclosed deal between Hansen and the State is "strongly implie[d]" by the evidence of Hansen's "various misdeeds . . . compared to the criminal consequences she has faced" and that

"even implicit agreements and the facts that imply an agreement must be disclosed."[11] (Doc. 44 at 79.)

"Evidence of a deal or promise of lenient treatment in exchange for a witness's testimony against a defendant may constitute evidence that must be disclosed under *Brady* and *Napue*." *Hovey v. Ayers*, 458 F.3d 892, 916 (9th Cir. 2006) (citing *Giglio*, 405 U.S. at 154-55). "The deal or promise need not be express; failure to disclose an agreement or guarantee of leniency 'indicated without making a bald promise' also may violate *Brady*." *Id.* at 917 (quoting *United States v. Butler*, 567 F.2d 885, 888 n.4 (9th Cir. 1978). "However, in the absence of a promise or deal, a witness's subjective belief that he might receive lenient treatment in exchange for testifying does not render perjurious his testimony that he received no promises that he would benefit from testifying." *Id.* (citing *Williams v. Calderon*, 52 F.3d 1465, 1475 (9th Cir. 1995)).

"If there is no agreement or understanding and no particular or tangible benefit afforded the witness, then there is nothing required to be disclosed under *Giglio*." *Alderman v. Zant*, 22 F.3d 1541, 1549 n.6 (11th Cir. 1994) ("By testifying truthfully against a codefendant, a witness may hope or even expect to receive better treatment at the hands of the state, however, as a matter of law such an expectation does not fall under *Giglio*."). Mere speculation as to the existence of an undisclosed deal or an understanding that a witness will receive leniency in exchange for his or her testimony is insufficient to establish the existence of an actual agreement that must be disclosed. *See Middleton v. Roper*, 455 F.3d 838, 854 (8th Cir. 2006) ("Relying purely on the sequence of events surrounding each witness, Middleton points to no evidence, beyond mere speculation, of an undisclosed deal offered by the prosecution or even an 'understanding' [the witnesses] would be given

---

[11] For this proposition Johnson cites *Carriger v. Stewart*, 132 F.3d 463 (9th Cir. 1997), which does not in any fashion address the issue of "implicit agreements." Instead, in *Carriger* the Ninth Circuit found a *Brady* violation based on the prosecution's failure to turn over the Department of Corrections file of the State's chief witness, the contents of which showed he "had long been known to state authorities as an habitual liar with a sociopathic personality, who had a lengthy history of burglaries, violence, and attempts at pinning his crimes on others." *Id.* at 466.

leniency in exchange for testifying against Middleton."); *United States v. Kerr*, 709 F. App'x. 431, 434 (9th Cir. 2017) (speculation about the possibility of an undisclosed leniency agreement between the Government and defendants' lawyer does not demonstrate violation of *Brady*); *Runningeagle*, 686 F.3d at 769 (explaining that "to state a *Brady* claim, [a petitioner] is required to do more than 'merely speculate'" about defense value of withheld evidence) (quoting *Wood v. Bartholomew*, 516 U.S. 1, 6 (1995)).

Johnson provides no evidence of an agreement, express or implied, that Hansen would not be prosecuted for her misconduct in exchange for testifying at Johnson's trial. He offers only speculation, which is insufficient to support a *Brady* violation. *See Barker v. Fleming*, 423 F.3d 1085, 1099 (9th Cir. 2005) ("The flaw in [defendant's] theory is that it is mere speculation."); *Harrison v. Johnson*, 564 F. App'x 900, 901 (9th Cir. 2014) ("Harrison's *Brady* suppression of evidence claim based on an 'implied agreement' between [the witness] and the prosecution fails because Harrison has not shown that any such agreement existed."). *Compare Sivak v. Hardison*, 658 F.3d 898, 910 (9th Cir. 2011) (undisclosed letters in prosecutor's file, while showing "no evidence of an explicit meeting of the minds between [witness] and the prosecutor's office," provided "ample evidence of an implicit *quid pro quo*."). At its core, Johnson's contention is there must be undisclosed information that undermines Hansen's "motivation for testifying." (Doc. 18 at 109.)

This *Brady* claim is meritless.

### b.    Impeachment Materials on Newberry

Johnson contends that the prosecution violated his rights under *Brady/Giglio* by failing to disclose evidence that Newberry: (a) had faced homicide charges related to her involvement in the conspiracy surrounding Smith's murder, and (b) testified while taking anti-psychotic medications. (Doc. 18 at 110-14.)

### 1)    Newberry's Murder Charges

At trial the jury learned that Newberry pleaded guilty to armed robbery and faced additional drug charges, but the drug charges would not be filed if she testified truthfully in Johnson's trial. (RT 11/7/2001 at 18, 21.) Johnson contends that the prosecution failed

1    to disclose that Newberry had also been "threatened" with murder charges but "that part of

2    Newberry's plea agreement was the State would not file murder charges against her." (Doc.

3    18 at 110-11.) As Respondents note, however, the record shows that the information was

4    disclosed and presented to the jury, so there was no *Brady* violation. (Doc. 37 at 76.)

5        The State admitted a copy of Newberry's plea agreement during her testimony at

6    the guilt phase of trial. (RT 11/7/01 at 24.) The agreement provided that no "additional

7    charges shall be filed by the Maricopa County Attorney's Office against [Newberry]

8    arising from Phoenix police reports 2000–01981003 [Affordable Massage armed robbery]

9    or 2000–02019300 [Smith murder]." (PCR Pet., Ex. 4 at 2, ¶ 3.) On cross-examination,

10   Newberry agreed that one "of the benefits that [she] received under the plea agreement is

11   that [she] would not be charged with any offense in connection with the death of Stephanie

12   Smith" and that this provision was one of the motivating factors for entering the plea. (RT

13   11/7/01 at 118-19.) During her aggravation phase testimony, Newberry again confirmed

14   that the plea agreement provided that she "wouldn't get charged with anything, murder,

15   conspiracy to commit murder in connection with the death of Stephanie Smith in return for

16   [her] testimony." (RT 12/1/03 at 173.)

17       Under these circumstances it is clear that the prosecutor did not, as Johnson argues,

18   fail to disclose the fact that Newberry's plea agreement provided that in return for her

19   truthful testimony, she would not be charged in connection with Smith's murder. That

20   benefit was explicitly included in the written plea agreement; the agreement was admitted

21   at trial; and defense counsel questioned Newberry about the benefits she received as a result

22   of the agreement, including not being charged in the murder.

23       Even if defense counsel only learned that Newberry avoided murder charges by

24   entering the plea when the prosecutor admitted her agreement during the trial, there still

25   would be no *Brady/Giglio* violation because counsel was able to use the information in

26   cross-examination. *See United States v. Vgeri*, 51 F.3d 876, 880 (9th Cir. 1995) (finding

27   no *Brady* violation where government disclosed impeachment information during trial

28   since defense counsel cross-examined witness with the material); *United States v. Chaggar*,

197 F. App'x 704, 706 (9th Cir. 2006) (finding no *Brady* violation where defense counsel was provided with witness's presentence report, which indicated that the government intended to move for a downward departure based on her cooperation, and counsel used the information to cross-examine the witness "on this very source of bias at trial").

Because the jury was fully aware that Newberry avoided murder charges by entering into the plea agreement, which required that she testify at Johnson's trial, there was no *Brady/Giglio* violation.

### 2)    Newberry's Mental Health Issues

Johnson argues that the prosecutor violated *Brady/Giglio* by failing to disclose until the penalty phase of trial that Newberry "was taking a cocktail of anti-psychotic medications (Risperdal and Clonidine) for a serious mental illness." (Doc. 18 at 112-13.)

At her change of plea, on October 11, 2001, Newberry stated that she was taking Risperdal and Clonidine but that the drugs did not affect her ability to understand the proceeding. (PCR Pet, Ex. 32 at 3-4.) At her sentencing on April 5, 2002, Newberry said that she had "post traumatic syndrome" from administrative segregation and took "psych medications three times a day to try to help." (PCR Pet., Ex. 3 at 14.) The court ordered "mental health . . . screening and help she may need while in the Department of Corrections." (*Id.* at 26.) During her testimony at the penalty phase of Johnson's trial, on December 1, 2003, Newberry explained that she did not recall a statement made during her pretrial defense interview because "at the time [she] was on nine milligrams of Clonopin a day, which is a narcotic." (RT 12/1/03 at 207-08.)

Respondents contend that the State did not suppress this information for purposes of *Brady* because it was available in the transcripts of Newberry's change of plea and sentencing proceedings, which are public record, and Johnson could have obtained it himself. (Doc. 37 at 78.) The Court agrees.

Courts have consistently held that "the *Brady* rule does not apply if the evidence in question is available to the defendant from other sources." *United States v. Wilson*, 901 F.2d 378, 380 (4th Cir. 1990) (quoting *United States v. Davis*, 787 F.2d 1501, 1505 (11th

Cir. 1986)); *see*, *e.g.*, *United States v. Coplen*, 565 F.3d 1094, 1097 (8th Cir. 2009) ("Coplen is also unable to establish a *Brady* violation. . . . Both Scott and Altman testified as defense witnesses in a related trial that predated Coplen's by several months and their testimony was a matter of public record."); *United States v. Infante*, 404 F.3d 376, 387 (5th Cir. 2005) ("Infante does not deny that Castellon's case file was a matter of public record, that he could have obtained the file upon request, and that the psychiatric exam order would have been apparent upon review of the file. . . ."); *United States v. Jones*, 160 F.3d 473, 479 (8th Cir. 1998) (finding no *Brady* violation where the government failed to inform defense counsel of details of witness's plea agreement "because transcripts of [the] plea and sentencing hearing were readily available"); *United States v. Delgado*, 350 F.3d 520, 527 (6th Cir. 2003) ("[B]ecause they are records of public court proceedings, transcripts of Mr. Carboni's trial testimony, plea hearing, and sentencing hearing were available to Mr. Delgado from sources other than the prosecution.").

There was no *Brady* violation here because the State did not suppress any evidence. The information documenting Newberry's mental health issues was contained in records available to Johnson. *See Infante*, 404 F.3d at 387; *Jones*, 160 F.3d at 479; *Delgado*, 350 F.3d at 527; *see also Cunningham v. Wong*, 704 F.3d 1143, 1154 (9th Cir. 2013) (prosecution did not "suppress" medical records of shooting victim, who was also an eyewitness, or murder victim's autopsy report where defense counsel possessed the facts that would have allowed them to request the documents since they knew that eyewitness had been shot and received medical treatment and that murder victim had been killed).

Johnson relies on *Silva v. Brown*, 416 F.3d 980 (9th Cir. 2005), to counter the authority cited by Respondents (*see* Doc. 44 at 94), but *Silva* did not address *Brady*'s suppression prong. At issue in *Silva* was a plea agreement between the prosecution and the state's key witness providing that the witness, who had suffered brain damage in a motorcycle accident, would not undergo a psychiatric evaluation before testifying. 416 F.3d at 986. There was no dispute that this "secret deal," *id.* at 990, was never disclosed to the defense, so the only issue before the court was materiality, *id.* at 986. Accordingly,

1    *Silva* does not, as Johnson contends, contradict cases holding that the State is not obligated

2    under *Brady* to disclose matters of public record. (*See* Doc. 44 at 95.)

3           This claim is denied as meritless.

4                      **c.      Impeachment Materials on Russell Biondo**

5           Johnson argues that the prosecutor violated his rights under *Brady/Giglio* by failing

6    to disclose evidence (1) that Russell Biondo was the target of pending felony

7    investigations; (2) that the Probation Department did not file a probation revocation

8    petition until after Biondo testified; and (3) that Biondo testified falsely that he was clean,

9    despite having failed several drug tests. (Doc. 18 at 114-15.)

10          In early 2001, Biondo was arrested for selling drugs and stolen cars to undercover

11   police officers. When he testified at the guilt phase of Johnson's trial on November 6, 2001,

12   however, neither criminal charges nor a probation revocation petition had been filed.

13   Biondo did admit to having three prior felony convictions and being on probation. (RT

14   11/6/01 at 42, 58-59.)

15          Biondo was arrested for a probation violation on November 29, 2001, the day after

16   the jury found Johnson guilty. He tested positive for methamphetamine. (PCR Pet., Ex. 37,

17   Bates No. 014514, 014521.) His probation officer filed a probation revocation petition

18   based on multiple violations, none of which were related to Biondo's transactions with the

19   undercover officers. (*Id.* at 014538.) On January 24, 2002, the trial court reinstated Biondo

20   on probation. (*Id.* at 014546.) On May 21, 2002, Biondo's probation officer filed to revoke

21   his probation based on the illicit sales to the undercover officers. (*Id.* at 014514.) On July

22   25, 2002, Biondo pleaded guilty to one count of attempted trafficking in stolen property

23   and was sentenced to five years imprisonment. (*Id.* at 014551-52, 014576-78.) In

24   November 2003, during his testimony at the sentencing phase of Johnson's trial, Biondo

25   again admitted to the three prior convictions, plus his latest conviction, and acknowledged

26   that he was currently in prison for that crime. (RT 11/25/03 at 21-22.)

27          There was no *Brady* violation. First, Johnson's allegation that there was a deal that

28   Biondo would receive leniency in exchange for his testimony is speculative and therefore

1    insufficient to establish the existence of an actual agreement that must be disclosed. *See*

2    *Middleton*, 455 F.3d at 854; *Barker*, 423 F.3d at 1099.

3            With respect to his guilt-stage testimony, Respondents contend that the State was

4    not required to disclose the misconduct that led to Biondo's January 2002 reinstatement of

5    probation and July 2002 conviction because such information was inadmissible under

6    Arizona's Rules of Evidence and therefore not material for purposes of *Brady*. (Doc. 37 at

7    80.) Respondents note that except for felony convictions, "extrinsic evidence is not

8    admissible to prove specific instances of a witness's conduct in order to attack . . . the

9    witness's character for truthfulness," unless "they are probative of the [witness's] character

10   for . . . untruthfulness."[12] *See id.*; Ariz. R. Evid. 608(b), 609(a)(1)(A). According to

11   Respondents, "[b]ecause Biondo's alleged sales of drugs and stolen property had not yet

12   resulted in felony conviction and did not involve dishonesty, Rule 608(b) would have

13   barred their admission at the guilt trial." (Doc. 37 at 81.)

14           The Court agrees. The undisclosed *Brady* information about Biondo does not

15   include any felony convictions or misconduct demonstrating an untruthful character.

16   Therefore, the evidence was not material, and its disclosure was not required. *See*

17   *Greenway v. Ryan*, No. CV-98-25-TUC-RCC, 2013 WL 6196293, at *22 (D. Ariz. Nov.

18   27, 2013), (nondisclosure of inadmissible evidence does not give rise to a *Brady*

---

[12] Rule 608(b) provides:

> (b) Specific Instances of Conduct. Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of:
>
> (1) the witness; or
>
> (2) another witness whose character the witness being cross-examined has testified about.

Rule 609 provides in relevant part: "(1) for a crime that, in the convicting jurisdiction, was punishable by death or by imprisonment for more than one year, the evidence: (A) must be admitted, subject to Rule 403, in a civil case or in a criminal case in which the witness is not a defendant. . . ."

violation)); *Powell v. Ryan*, No. CV-11-00271-TUC-FRZ, 2014 WL 4053446, at *16 (D. Ariz. Aug. 14, 2014) ("The nondisclosure of Ms. Graham's overall criminal history, other than her false reporting conviction, was not a constitutional violation because the evidence was not admissible and, thus, not 'material' under *Brady*.")

Even if evidence of the pending investigations were admissible under Arizona's Rules of Evidence, it was still not material under *Brady* because there was not "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433 (quoting *Bagley*, 473 U.S. at 682). The Supreme Court has held that "evidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict." *Smith v. Cain*, 565 U.S. 73, 76 (2012). In *Smith*, an eyewitness's testimony was the only evidence linking the defendant to the crime. *Id.* The witness testified that he had "[n]o doubt that Smith was the gunman he stood face to face with on the night of the crime," but in a detective's undisclosed notes the witness stated that he "could not ID anyone because [he] couldn't see faces" and "would not know them if [he] saw them." *Id.* (citation modified)

*Smith* is distinguishable. First, Biondo's testimony was not the only evidence linking Johnson to the robbery and murder. Other evidence included two witnesses, Hansen and Newberry, testifying that Johnson confessed to the crimes; Newberry arranging Johnson's participation in the armed robbery; and other eyewitnesses identifying Johnson as the perpetrator of Smith's murder. Next, the undisclosed evidence that Biondo was involved in other criminal activity did not "directly contradict" or undermine his testimony identifying Johnson as one of the participants in the robbery. *Smith*, 565 U.S. at 76. Because the State's other evidence was strong enough to sustain the convictions, the undisclosed impeachment information about Biondo was not material. *United States v. Payne*, 63 F.3d 1200, 1210 (2d Cir. 1995) ("In general, impeachment evidence has been found to be material where the witness at issue supplied the only evidence linking the defendant[ ] to the crime, or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case.") (citation modified).

The same analysis applies to evidence of Biondo's failed drug tests. In addition, his testimony about having been clean for a couple months was not necessarily inconsistent with the failed tests. Finally, the fact that he admitted to using methamphetamine on the night of the robbery and was cross-examined on the effects the drug had on his ability to perceive and remember the night's events, made additional evidence about his history of drug use cumulative. *See, e.g.*, *United States v. Kohring*, 637 F.3d 895, 908 (9th Cir. 2011) ("The newly-disclosed information also has to be more than merely cumulative to be material under *Brady/Giglio*. . . . Here, the newly-disclosed information regarding [the witness's] memory problems would have been merely cumulative if presented at trial.").

For these reasons, Johnson's *Bracy/Giglio* claims are denied as meritless.

### iii.    Claim 3(C): Improper Vouching

Johnson argues that the prosecutor vouched for the credibility of witnesses Cheryl Newberry and Detective Stuart, "despite knowing their testimony was untrustworthy or misleading." (Doc. 18 at 116.) These claims are without merit.

### a.    Newberry's Plea Agreement

Johnson contends that the prosecutor vouched for Newberry by emphasizing the provision in her plea agreement that required her to "testify truthfully" and by noting that the agreement had not been withdrawn. (*Id.* at 117) (citing RT 11/7/01 at 19-20, 152.) According to Johnson, this "left the jury to deduce that if the plea has not been withdrawn, the prosecutor believed that Newberry was telling the truth." (*Id.*)

A prosecutor commits misconduct when he or she vouches for the veracity of a government witness. *See United States v. Brooks*, 508 F.3d 1205, 1209 (9th Cir. 2007). Improper vouching occurs when "the prosecutor places the prestige of the government behind a witness by expressing his or her personal belief in the veracity of the witness or [] indicates that information not presented to the jury supports the witness's testimony." *See id.* (quoting *United States v. Hermanek*, 289 F.3d 1076, 1098 (9th Cir. 2002)).

The Ninth Circuit has found that an admission of evidence about truthfulness provisions in a plea agreement may constitute a "mild" form of vouching if it suggests that

a witness, who might otherwise seem unreliable, has been compelled by a prosecutor's threats or the government's promises to testify truthfully. *See id.* at 1210 (citing *United States v. Wallace*, 848 F.2d 1464, 1474 (9th Cir. 1988)). However, "referring to a plea agreement's mandate to be truthful does not constitute vouching for a witness if such references are 'made in response to an attack on the witness's credibility because of his plea bargain,' including an attack in defense counsel's opening statement." *United States v. Dorsey*, 677 F.3d 944, 953 (9th Cir. 2012) (quoting *United States v. Monroe*, 943 F.2d 1007, 1013-14 (9th Cir. 1991)).

In Johnson's case, defense counsel attacked Newberry's credibility in his opening statement, arguing that she "has some motive and interest" for her testimony, that "[s]he's trying to save herself," and that she had "lied about" the robbery. (RT 11/5/01 at 56.) Because the prosecutor's reference to the plea agreement's truthfulness provision occurred after the defense had attacked Newberry's credibility, it did not constitute improper vouching. *Dorsey*, 677 F.3d at 953; *see United States v. Reid*, 625 F.3d 977, 983 (6th Cir. 2010) ("[I]t is not improper vouching for the prosecutor to refer to the plea agreements of cooperating witnesses in the expectation that their credibility will be at issue."); *United States v. Kamerud*, 326 F.3d 1008, 1017 (8th Cir. 2003) ("The prosecutor did not improperly vouch for the government's cooperating witnesses merely by asking them about the plea agreements[,] . . . part of which included the government's agreement to move for downward departures on their sentences in exchange for truthful testimony.").

This claim is denied.

### b.    Jarvis Ross's Jail Phone Calls

Johnson argues that the prosecutor, in her closing arguments at both trial phases, improperly vouched for Detective Stuart's testimony that the subject of the November 9, 2000, phone call from Jarvis Ross was the upcoming murder of Smith. (Doc. 18 at 119.) Johnson cites the prosecutor's comment that "[Ross] didn't call just that day, he called a number of days by the phone records. And it wasn't about bonding somebody out." (RT 11/26/01 at 112.) According to Johnson, these remarks constituted vouching because,

1    "fairly construed, [they] were based on the [prosecutor's] personal knowledge apart from

2    the evidence in the case and that the jury might have so understood them." (Doc. 18 at

3    119-20) (quoting *United States v. Frederick*, 78 F.3d 1370, 1378 (9th Cir. 1996)).

4         The record belies Johnson's assertion that the prosecutor's comments "relied on

5    evidence not presented to the jury." (*Id.* at 119.)  Detective Kulesa testified that Jarvis Ross

6    made a number of calls from jail to Johnson's girlfriend's home. (RT 11/19/01 at 123-24.)

7    Also, as described above, at the guilt phase of trial Detective Stuart provided his opinion

8    about the meaning of the November 9 call (RT 11/19/01 at 74-75) and at the sentencing

9    hearing he testified that Johnson "wasn't talking about a bond." (RT 12/8/03 at 172-73).

10        Next, the prosecutor's comment must be viewed in context. *See Darden*, 477 U.S.

11   at 179. It was offered during her rebuttal closing argument after defense counsel had argued

12   that in the November 9 call, the day after Newberry had filled out paperwork concerning a

13   bond for Ross, Johnson and Ross were discussing Ross's release, not the planned murder

14   of Smith. (RT 11/26/01 at 71.) In arguing that the November 9 call "wasn't about bonding

15   somebody out," the prosecutor focused on the contents of the conversation, emphasizing

16   Johnson's statements that "it is going down today" and "put it on the confidential list." (*Id.*

17   at 112.) The prosecutor then asked the jury: "Ladies and Gentlemen, do you put a bond on

18   the confidential list. Was it a bond that was going down? It clearly wasn't." (*Id.*)

19        Given this context, it is clear that the prosecutor was not citing evidence outside the

20   record or improperly vouching for Detective Stuart. Moreover, her response was invited

21   by the defense argument that the topic of the November 9 call was bonding Ross out. *See*

22   *Darden*, 477 U.S. at 182 (in finding no due process violation resulting from prosecutorial

23   misconduct, the Court noted, among other factors, that "[m]uch of the objectionable

24   content was invited by or was responsive to the opening summation of the defense").

25        Finally, the trial court instructed the jurors that what the lawyers said was not

26   evidence. (RT 11/26/01 at 8.) "A jury is presumed to follow" a judge's instructions. *Weeks*

27   *v. Angelone*, 528 U.S. 225, 234 (2000); *see Leavitt v. Arave*, 383 F.3d 809, 834 (9th Cir.

28

2004) ("[W]e note that the jury was instructed that argument of counsel is not evidence. That instruction tends to draw the sting from improper arguments.").

This claim is denied.

### iv.    Claim 3(D):  "Inappropriate Comments"
#### a.    "Use of Racially Coded Language"

Johnson argues that the prosecutor committed misconduct by using racially coded language in her arguments to the jury. (Doc. 18 at 121-22.) He cites the following incidents: eliciting "irrelevant" testimony from Biondo "that Johnson, a large Black man, groped Smith, a smaller White woman"; using the phrases "Black man" or "Black male" during her opening statements; stating that Johnson shot Smith because his "home boy was locked up in jail" and that Johnson's use of the word "'Homie' speaks for itself"; arguing that Solo was "obviously" "scared" "at being accosted by this black man in the back, this dark backyard, and being let go"; and contrasting Johnson with his "civilized" brother who "was not a gang member" in the penalty phase closing argument. (*Id.* at 122-23.)

First, there was no error in the admission of Russell Biondo's testimony that Johnson "groped" Smith during the armed robbery. On cross-examination, defense counsel challenged Biondo's testimony about the height of the individuals who robbed Affordable Massage. (RT 11/7/01 at 62-67.) On redirect examination, the prosecutor questioned Biondo about the incident where the suspect was holding Smith around the chest. (*Id.* at 113-14.) This testimony was admissible to provide context for Biondo's description of the suspect's height and Biondo's state of mind when he made his observations. (*See id.* at 164-65.) There was no misconduct.

Next, the prosecutor's references to "Black man" or "Black males" were not racially charged. In her opening statement, the prosecutor often used those phrases when summarizing the proposed testimony of eyewitnesses such Biondo, Justice, and Solo, who used race in their descriptions of the unknown suspects they had encountered during the crimes. (*See* RT 11/5/01 at 37, 41-43.) In another instance, the prosecutor described Newberry's expected testimony about getting into a car with Johnson, whom she knew,

along with "another black male driving" and "an Hispanic male in the back." (*Id.* at 38.) The Court agrees with Respondents "that the prosecutor used race-descriptive terms in the opening statement because it accurately characterized expected testimony." (Doc. 37 at 86) (citing *Donnelly*, 416 U.S. at 646-47 ("[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.")); *cf. United States v. Santiago*, 46 F.3d 885, 891 (9th Cir. 1995) (finding no misconduct in prosecution's use of the term "Mexican Mafia" where the government "simply used the name of the gang at issue in the case and elicited relevant testimony that alluded to the ethnic background of certain prisoners, without any pejorative connotation").

For the same reasons, the prosecutor's references to race in her guilt-phase closing argument were proper based on the testimony of the witnesses, whose descriptions of the unknown perpetrators were understandably based on race and gender. (*See* RT 11/26/01 at 21.) The prosecutor's use of the terms "home boy" and "homie" in her guilt-phase closing argument was likewise based on the trial evidence. Detective Stuart, the State's gang expert, testified about a photograph found in Damon Ross's residence on which was written "Homie's from 1 Nine,"[13] (RT 11/19/01 at 54), and Phyllis Hansen testified that Johnson told her he killed Smith because she was going to testify against "his cuz or one of his homies." (RT 11/14/01 at 39-40.) Again, there was no misconduct.

Next, the prosecutor's use of the phrase "black man" in her aggravation stage closing argument was not, as Johnson argues, "problematic." (Doc. 18 at 122.) Again, the context of this comment reveals that the prosecutor was recounting the testimony of witnesses such as Mike Solo, which the prosecutor accurately recounted as: "The man in the yard looking scared. Remember here from Mike Solo, talking about what happened in the backyard, the gun to his head? . . . His description of how scared he was obviously at being accosted by this black man in the back, this dark backyard, and being let go." (RT 12/10/03 at 99; *see* RT 12/3/03 at 63-64.) The prosecutor's remarks in closing argument

---

[13]    "19" refers to 19th Avenue, as in "19th Ave. LPC." (RT 11/19/01 at 46.)

1    simply restated Solo's testimony, and the record does not suggest any improper motive for

2    doing so. *See Donnelly*, 414 U.S. at 646-47.

3        Finally, Johnson argues that the prosecutor used improper, racially coded language

4    when describing Johnson's brother Ruffin as "civilized" and "not a gang member." (Doc.

5    18 at 123 (quoting RT 12/18/03 at 86).) The prosecutor's comments were offered in

6    response to mitigating evidence presented by Johnson showing that he was "sternly

7    disciplined" by his father. (RT 12/18/03 at 86.) The context of the prosecutor's remarks

8    shows they were not offered with "pejorative connotation" about Johnson's race. *Santiago*,

9    46 F.3d at 891. The prosecutor challenged Johnson's mitigating evidence by arguing:

10            You have now heard from his father, and he told you very
11        candidly about what he did with the defendant during the
         defendant's childhood, and with his brother; his brother was
12        not a gang member. And you heard evidence from Detective
         Stuart about that. His brother who was raised in the same house
13        had the same opportunities.

14   (RT 12/18/03 at 86.) The prosecutor then noted that Ruffin "[s]till has a relationship with

15   his father. He still chooses to be a civilized man. The defendant chooses not to." (*Id.*)

16        These comments were supported by Detective Stuarts's testimony that he could not

17   "document Ruffin as a Lindo Park Crip. He is not involved in the criminal activities of the

18   gang, to my knowledge." (RT 12/08/03, a.m., at 160.)

19        The prosecutor's arguments did not constitute misconduct. "Counsel are given

20   latitude in the presentation of their closing arguments, and courts must allow the

21   prosecution to strike hard blows based on the evidence presented and all reasonable

22   inferences therefrom." *Ceja v. Stewart*, 97 F.3d 1246, 1253 (9th Cir. 1996) (citation

23   modified); *United States v. Tucker*, 641 F.3d 1110, 1120-21 (9th Cir. 2011). The

24   prosecutor's arguments did not manipulate or misstate the evidence; they were invited by

25   Johnson's argument that his father's harsh discipline was a mitigating factor; and the court

26   instructed the jury that counsel's remarks were not evidence (*see* RT 12/18/03 at 56). *See*

27   *Darden*, 477 U.S. at 181-82.

28

- 46 -

Johnson's allegations neither establish a due process violation nor meet the *Brecht* standard of showing a "substantial and injurious effect on the verdict." *Brecht*, 507 U.S. at 638. Biondo's "groping testimony" was relevant to his testimony about the perpetrator of the armed robbery; the prosecutor's references to race were based on descriptions offered by the eyewitnesses; and her use of slang terms such as "homie" was based on trial evidence that was relevant to establishing the gang-related nature of the murder.

### b.    Aligning the Jury with the State

Johnson argues that the prosecutor "attempted to align the jury improperly with the State." (Doc. 18 at 124.) He contends that the prosecutor improperly vouched for law enforcement by telling the jury that it was about to do its job, like the police and witnesses had done, and by comparing the jury's oath to that taken by the police and witnesses. (*Id.* at 124-25.)

Near the end of her guilt-phase closing argument, the prosecutor noted that the trial had been "a long one." (RT 11/26/01 at 127.) She then stated that the police "have all done their job," the witnesses had "come forward in the public eye before you and testified," and that she had "done [her] job." (*Id.* at 128.) Then she told the jurors:

> You are about to take the case into the jury room now to do your job and it is not an easy one. Like the police officers and like the witnesses, you took an oath at the beginning of this case several weeks ago, an oath which symbolizes a belief in individual accountability, an oath to follow the law and an oath of the personal courage symbolizing the personal courage to do justice. That when the State met that burden of proof that [defense counsel] Mr. Storrs talked about in opening statements, that mountain, that when the State met that burden of proof, and proved to you that the defendant was guilty of these crimes, that you would find the defendant guilty of these crimes, that you would find the defendant guilty as charged. And if the State did not meet that burden that you would find him not guilty of those charges.

(*Id.*)

Johnson contends that this constituted an impermissible argument that the jury was a "link in the chain of law enforcement." (Doc. 18 at 124.) In support of this argument he relies on *Leavitt*, 383 F.3d at 834. In that case, however, the prosecutor literally argued that

- 47 -

the jury was part of the law enforcement chain, along with the police, forensic scientists, prosecutors, and the judge.[14] *Id.* As the Ninth Circuit noted, "[t]his suggestion that the jury is simply a link in a chain of law enforcement which includes the police, the prosecutor, and the judge is just plain wrong. It minimizes the important role of the jury and tends to align neutrals—judge and jury—with a party to the case—the state itself." *Id.*

In Johnson's case, the prosecutor did not "plac[e the jury] in an adversarial position with respect to the defendant" or "portray[] the jury as part of a team opposing the defendant." *Id.* (quoting *Coleman v. Brown*, 802 F.2d 1227, 1238 (10th Cir. 1986)). In fact, the prosecutor, when speaking of the jury doing its job, referred to the State's burden of proof and the jurors' oath to find Johnson guilty or not guilty based on that burden being met. *See United States v. Santos*, 369 F. App'x. 794, 796-97 (9th Cir. 2010) (noting that while "[g]enerally, the prosecution cannot urge the jury to undertake a law enforcement function. . . . The very next sentence [of the prosecutor's closing argument] urges the jurors to look at all the evidence and compare it to the elements of the charged criminal activity"). Furthermore, while the phrase "do your job" mirrors the phrase found erroneous in *Young*, 470 U.S. at 18, where the prosecutor "exhort[ed] the jury to 'do its job,'" the similarity is superficial as the prosecutor in Johnson's case was literally referring to the fact that the

---

[14] The prosecutor's argument read, in relevant part:

> In closing let me just say that you are part of a very important chain called the chain of law enforcement. And law enforcement and justice don't work in our country unless you do your part. The police officers can be as well trained as you want them and the forensic sciences can be as well trained as you want in the sciences. . . . You can have the best prosecutors around. . . . And they work together like this because they are part of the chain of law enforcement that keeps our community safe.

> But the third link in that chain is a jury, which when they're given the proper evidence and they are given the proof beyond a reasonable doubt, they have the fortitude to be able to act upon that and to preserve that chain unbroken.

> And the fourth link in the chain, of course, is the judge who has the courage and also the wisdom to impose the appropriate sentence. Now, none of this works unless you do your job.

*Leavitt*, 383 F.3d at 834.

jurors were "about to take the case into the jury room now" and begin deliberations; she was not exhorting the jury to take a particular course of action in those deliberations, as was the case in *Young*.

Finally, despite finding the prosecutor's argument "wholly undesirable," the court in *Leavitt* concluded that it did not have a "'substantial and injurious' effect on the verdict." *Leavitt*, at 834 (quoting *Brecht*, 507 U.S. at 638). The court explained that "[i]n that regard, we note that the jury was instructed that argument of counsel is not evidence. That instruction tends to draw the sting from improper arguments." *Id.*; *see Santos*, 369 F. App'x. at 796-97. Johnson's jury received the same instruction and that, along with the far less objectionable nature of the prosecutor's argument, forecloses a finding that the *Brecht* standard was satisfied.

### c.    Causal Nexus Argument

Johnson argues that the prosecutor mischaracterized the law when she told jurors to decide if there was a causal nexus between Johnson's mitigation evidence and the crime. (Doc. 18 at 125.) This claim is meritless.

The sentencer in a capital case may "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Eddings*, 455 U.S. at 110 (quoting *Lockett*, 438 U.S. at 604). Accordingly, a state cannot adopt a "causal nexus" rule—that is, a rule precluding a sentencer from considering mitigating evidence unless a causal connection is established between the evidence and the crime. *See Tennard*, 542 U.S. at 287.

Courts have emphasized, however, that the sentencer may consider "causal nexus . . . as a factor in determining the weight or significance of mitigating evidence." *Lopez v. Ryan*, 630 F.3d 1198, 1204 (9th Cir. 2011), *overruled on other grounds by McKinney*, 813 F.3d at 819; *see McGill v. Shinn*, 16 F.4th 666, 683 (9th Cir. 2021) ("But *Eddings* does not hold that evidence of a causal nexus is *irrelevant* to the trier of fact."); *Sansing v. Ryan*, 41 F.4th 1039, 1062 (9th Cir. 2022) (finding no *Eddings* error where

sentencing court afforded "minimal weight" to mitigating circumstance not causally linked to the crime). "Once the jury has heard all of the defendant's mitigation evidence, there is no constitutional prohibition against the State arguing that the evidence is not particularly relevant or that it is entitled to little weight." *State v. Anderson*, 210 Ariz. at 350. In sum, "[t]he sentencer, and the [court of appeals] on review, may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration." *McKinney*, 813 F.3d at 802.

In support of the claim of prosecutorial misconduct, Johnson cites two passages from the prosecutor's penalty-phase opening statement and closing argument. In the first passage, the prosecutor stated:

> The State is not disputing that this defendant did not grow up in an ideal situation; that he was sternly disciplined by his father, who you'll hear from. That fact exists. That's not disputed. The State does dispute the impact of that and whether that abuse is why this defendant did what he did and chose to do what he did as an adult.

(RT 12/15/03 at 37.)

In the second passage cited by Johnson, from the State's closing argument, the prosecutor argued that as a youth Johnson, despite attempts by others to intervene in his life, "repeatedly chose to do what he wanted to do when he wanted and not get some kind of help." (*Id.* at 88.) The prosecutor further contended that Johnson's mitigating evidence did not satisfy the "significantly impaired" statutory mitigating factor.[15] (*Id.* at 88-89.) She thus argued that "there's absolutely no evidence that [Johnson's childhood trauma] . . . was to such an extent it . . . impaired his ability to know right from wrong." (*Id.* at 88.) She asked the jury to consider whether, even if the mitigating evidence was proven by a preponderance of the evidence, "Does it explain? How does it explain? Why? Does it have any connection at all with [Johnson's] behavior in this offense. . . ." (*Id.* at 89.) The

---

[15] Under A.R.S. § 13-751(G)(1), a mitigating factor exists where, "[t]he defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution."

prosecutor continued by asking the jury to consider whether the mitigating evidence was relevant, whether it had been proved, and "how much weight [it is] entitled to in comparison to all the aggravating circumstances which you have found?" (*Id.*)

Courts have found that such arguments do not violate *Eddings*. *See McGill*, 16 F.4th at 683 ("[T]he sentencing court may not exclude mitigation evidence because of a lack of a causal nexus, but the prosecutor may argue to the jury that such evidence is not deserving of any weight.); *United States v. Rodriguez*, 581 F.3d 775, 799 (8th Cir. 2009) ("The . . . challenged remarks do not direct jurors to disregard mitigating factors because no nexus links them to the killing. Rather, the prosecutor argued that, despite [the defendant]'s troubled past, he is capable of choosing for himself and has free will. This argument is permissible.") (citation modified).

The trial court instructed the jury that mitigating circumstances are "circumstances which, in fairness and sympathy, or mercy, may extenuate or reduce the degree of blame or moral culpability" and that "mitigating circumstances may be any factors presented by the defendant or the State that are relevant in determining whether to impose a sentence of less than the death penalty." (RT 12/18/03 at 58.). These instructions, "which informed the jurors that they should consider and give effect to all of [Johnson's] mitigation evidence," "cure[d] any potential error." *State v. Pandeli*, 215 Ariz. 514, 526 (2007).

### v.    Claim 3(E): Cumulative Error

Johnson argues that the cumulative effect of the prosecutor's misconduct entitles him to relief. (Doc. 18 at 127.) "Even when separately alleged incidents of prosecutorial misconduct do not independently rise to the level of reversible error, the cumulative effect of multiple errors can violate due process." *Wood v. Ryan*, 693 F.3d 1104, 1116 (9th Cir. 2012) (citation modified). However, because Johnson has failed to demonstrate that the enumerated errors actually constituted prosecutorial misconduct, the Court cannot conclude that the cumulative impact of the alleged misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643; *see Hayes*, 632 F.3d at 524 ("Because we conclude that no error of constitutional

1    magnitude occurred, no cumulative prejudice is possible."); *see also Taylor v. Beard*, 616

2    F. App'x. 344, 345 (9th Cir. 2015) ("[Petitioner] has failed to demonstrate any error here;

3    thus, there can be no cumulative error.").

4    **B.    Claim 6:**

5        Johnson argues that "the trial court erred in not striking the death penalty in light of

6    *Ring v. Arizona*'s intervention." (Doc. 18 at 163.) This claim consists of several subclaims

7    arising from the fact that separate juries were used for the guilt and sentencing phases of

8    Johnson's trial. Johnson asserts this violated his Eighth Amendment rights, his due process

9    rights, the Double Jeopardy Clause, and the *Ex Post Facto* Clause.

10        Johnson acknowledges that he did not raise these claims in state court. He argues

11    that the ineffective assistance of trial and PCR counsel excuses the default. (*Id.*)

12    Alternatively, he contends that the claims were "arguably" exhausted by the Arizona

13    Supreme Court's direct independent review of his sentence. These arguments fail.

14        As noted, under *Martinez* the ineffectiveness of PCR counsel may excuse only

15    claims of ineffective assistance of trial counsel. *See Martinez (Ernesto)*, 926 F.3d at 1225;

16    *Pizzuto*, 783 F.3d at 1177; *Hunton*, 732 F.3d at 1126-27. PCR counsel's ineffectiveness

17    cannot excuse the default of Claim 6. The ineffectiveness of trial counsel cannot serve as

18    cause to excuse the default of Claim 6 because that claim itself was not independently

19    exhausted in state court. *See Edwards*, 529 U.S. at 45; *Carrier*, 477 U.S. at 489-90.

20        In addition, the Arizona Supreme Court's independent review of Johnson's sentence

21    did not exhaust the alleged constitutional violations comprising Claim 6. When it

22    considered Johnson's appeal, the Arizona Supreme Court "independently review[ed] the

23    facts that established the aggravating and mitigating factors in order to justify the sentence

24    imposed." *Wood*, 693 F.3d at 1122; *Johnson*, 212 Ariz. at 438 ("[W]e independently review

25    the jury's 'findings of aggravation and mitigation and the propriety of the death sentence.'"

26    (quoting A.R.S. § 13-703.04.A)). This review, however, "does not necessarily exhaust all

27    claims of constitutional error." *Wood*, 693 F.3d at 1122 (citing *Moorman v. Schriro*, 426

28    F.3d 1044, 1057-58 (9th Cir. 2005)). The extent of review as articulated by the Arizona

1    Supreme Court is limited to an assessment of the aggravating factors, mitigating
2    circumstances, and propriety of the death sentence. The allegations in Claim 6, therefore,
3    "are not included in the scope of the Arizona Supreme Court's independent review of the
4    death sentence as defined by that court and therefore were not exhausted." *Moormann*, 426
5    F.3d at 1058.

6    Claim 6 is denied as procedurally defaulted and barred from federal review. It is
7    also meritless.

8    Johnson was convicted on November 28, 2001, and the jury was dismissed. In June
9    2002 the Supreme Court issued its decision in *Ring II*, 536 U.S. 584, invalidating Arizona's
10   death penalty scheme in which judges determined the existence of aggravating factors
11   making a defendant death eligible. On August 1, 2002, Arizona adopted a new capital
12   sentencing scheme in conformance with *Ring*. A second jury was empaneled for Johnson's
13   sentencing. It found several aggravating factors and determined death was the appropriate
14   sentence.

15   These circumstances did not result in a double jeopardy violation. The Double
16   Jeopardy Clause of the Fifth Amendment protects against "a second prosecution for the
17   same offense" after conviction and against multiple punishments for the same offense.
18   *Schiro v. Farley*, 510 U.S. 222, 229-30 (1994). The Supreme Court has held that the
19   sentencing phase of a capital case is not a successive prosecution for double jeopardy
20   purposes. *See id.* at 230-32; *see*, *e.g.*, *Ring v. Arizona* ("*Ring III*"), 204 Ariz. 534 (2003).
21   In *Ring III*, the Arizona Supreme Court cited *Arizona v. Rumsey*, 467 U.S. 203 (1984),
22   *Poland v. Arizona*, 476 U.S. 147 (1986), and *Sattazahn v. Pennsylvania*, 537 U.S. 101
23   (2003), for the proposition that double jeopardy does not bar a capital defendant from being
24   resentenced to death when he was not "acquitted" of death in the original sentencing. *Ring*
25   *III*, 65 P.3d at 932. The court also noted that in *Wade v. Hunter*, 336 U.S. 684 (1949)—a
26   case relied on by Johnson—the Supreme Court denied a double jeopardy claim where
27   charges were dropped in one military tribunal and reinstituted in another. *Id.* (citing *Wade*,
28   336 U.S. at 687-88). The *Ring III* court thus reasoned that "[t]he ability to resentence a

1   capital defendant by a different set of jurors is implicit" in *Rumson*, *Poland*, and *Wade*. *Id.*
2   In sum: "No clearly established federal law holds that empaneling a second jury for
3   sentencing implicates the Double Jeopardy Clause." *Hampton v. Ryan*, No. 14-2504-PHX-
4   ROS, 2019 WL 979896, *24 (D. Ariz. 2019); *see also Ellison v. Thornell*, 721 F. Supp. 3d
5   820, 916-17 (D. Ariz. 2024).

6       Nor was there an ex post facto violation. The Ex Post Facto Clause prohibits a state
7   from "retroactively alter[ing] the definitions of crimes or increas[ing] the punishment for
8   criminal acts." *Collins v. Youngblood*, 497 U.S. 37, 43 (1990). "[A]ny statute which
9   punishes as a crime an act previously committed, which was innocent when done; which
10  makes more burdensome the punishment for a crime, after its commission, or which
11  deprives one charged with a crime of any defense available according to law at the time
12  when the act was committed, is prohibited as ex post facto." *Dobbert v. Florida*, 432 U.S.
13  282, 292 (1977) (citation omitted).

14      In *Dobbert*, the petitioner's "ex post facto claim [was] based on the contention that
15  at the time he murdered his children there was no death penalty 'in effect' in Florida. This
16  is so, he contend[ed], because the earlier statute enacted by the legislature was, after the
17  time he acted, found by the Supreme Court of Florida to be invalid." 432 U.S. at 287, 297.
18  The Supreme Court rejected this "sophistic" "and "highly technical" argument—that there
19  was no "valid" death penalty in effect in Florida at the time of the murders—as "mock[ing]
20  the substance of the Ex Post Facto Clause." *Id.* at 297. The Court clarified that the changes
21  in Florida's statute were "clearly procedural" and "simply altered the methods employed
22  in determining whether the death penalty was to be imposed; there was no change in the
23  quantum of punishment attached to the crime." *Id.* at 293-94. So, too, in Arizona. Although
24  *Ring II* invalidated the procedure by which the death penalty was imposed in Arizona, it
25  did not eliminate the death penalty as a possible sentence for first-degree murder. *See, e.g.,*
26  *Schriro v. Summerlin*, 542 U.S. 348, 353-54 (2004) ("*Ring*'s holding is properly classified
27  as procedural."); *McGill*, 16 F.4th at 703-04 (same).

28      Claim 6 is denied.

1

C.    **Claim 7:**

2      Johnson argues that the State violated *Batson v. Kentucky*, 476 U.S. 79 (1986), by

3  "striking the sole Black venire-person during the sentencing phase." (Doc. 18 at 178.) He

4  asserts that he raised this claim in his PCR petition and his Petition for Review. (*Id.*)

5  Respondents argue that the claim is procedurally defaulted and meritless. (Doc. 37 at 118.)

6      Johnson did not raise an independent *Batson* claim in his PCR Petition. Instead, he

7  alleged, in Claim III(E)(5), that appellate counsel was ineffective for failing to raise a

8  *Batson* claim. (*See* PCR Pet. at 125.) Raising an ineffective assistance claim did not fairly

9  present, and thereby exhaust, the underlying *Batson* claim. *See Rose v. Palmateer*, 395 F.3d

10  1108, 1112 (9th Cir. 2005) ("[A]lthough Rose's Fifth Amendment claim is related to his

11  claim of ineffective assistance, he did not fairly present the Fifth Amendment claim to the

12  state courts when he merely discussed it as one of several issues which were handled

13  ineffectively by his trial and appellate counsel."); *see also White v. Mitchell*, 431 F.3d 517,

14  526 (6th Cir. 2005) (finding *Batson* claim to be unexhausted even though, in the state

15  courts, petitioner had discussed its substance within his habeas claim that appellate counsel

16  should have raised the *Batson* issue on appeal, because "[w]hile these two claims are

17  related due to the fact that the ineffective assistance claim is based on the failure to raise a

18  *Batson* challenge, the two claims are analytically distinct").

19      Replying to Respondents' argument that the claim is defaulted, Johnson, citing

20  *Edwards*, 529 U.S. at 451-52, argues that the ineffective assistance of appellate counsel

21  serves as cause to excuse the default of the *Batson* claim. (Doc. 44 at 151.) He further

22  contends that he properly exhausted Claim III(E)(5) by raising it in his Petition for Review;

23  while he did not specifically refer to the claim, he "asked the court to incorporate" the

24  arguments he had made during the briefing on his PCR Petition and cited "App. 6." (*Id.* at

25  144, citing PR at 19.) Respondents assert that this was insufficient to fairly present the

26  claim. (Doc. 37 at 119-20.) The Court agrees with Johnson that the claim was presented to

27  the Arizona Supreme Court. *See Gallegos v. Ryan*, 820 F.3d 1013, 1026 n.15 (9th Cir.

28  2016) (presenting claims in a PCR petition by including a copy of the petition in an

1    appendix to his petition for review to the Arizona Supreme Court was "'sufficient to

2    present the issue[s] in a full and fair manner to the state courts.'") (quoting *Scott v. Schriro*,

3    567 F.3d 573, 582 (9th Cir. 2009)).

4        Regardless of its procedural posture, the Court will consider the claim on its merits.

5    *See* 28 U.S.C. § 2254(b)(2) (allowing denial of unexhausted claims on the merits); *see also*

6    *Lambrix*, 520 U.S. at 524-25 (explaining that the court may bypass the procedural default

7    issue in the interest of judicial economy when the merits are clear but the procedural default

8    issues are not); *Carrion v. Butler*, 835 F.3d 764, 772 (7th Cir. 2016) ("We need not address

9    these potentially difficult procedural questions, however, because even if we were to decide

10   each of them in Mr. Carrion's favor, his claims clearly fail on the merits.").

### 1.    Additional Facts

12       On the first day of voir dire for Johnson's November 2023 sentencing, prospective

13   Juror 30, a 74-year-old black woman, was absent when the rest of the prospective jurors

14   were sworn in. (RT 11/12/03 at 14, 23.) She arrived at the courthouse at 8:15 a.m. and

15   reappeared two hours later, explaining that she had moved her vehicle to a new parking

16   space. (*Id.* at 64-65.) Subsequently, during individual voir dire, she asked to speak to the

17   court and counsel in private. She explained that she was caring for a sister who suffered

18   from Alzheimer's and that she would "prefer to come out here [to court] because it breaks

19   me down to see her in that shape." (RT 11/17/03 at 26; *see id.* at 175.) Serving as a juror

20   would give her someplace to go and "unwind." (*Id.* at 27.) She also stated that one of her

21   grandsons was in prison and another had been released a year ago; both had been convicted

22   of drug offenses. (*Id.*) When asked by the prosecutor if she leaned more toward the death

23   penalty or life in prison, prospective Juror 30 stated she was "leaning more toward a life

24   sentence" and agreed she would carry that belief through trial and into deliberations. (*Id.*

25   at 183.) Later she indicated she would be able to follow the instructions and vote for a death

26   sentence if the mitigating circumstances did not outweigh the aggravating factors. (*Id.* at

27   188-89.) When asked whether she was on any medications and questioned about her ability

28   to sit as a juror all day and pay attention to the evidence, she responded that she only took

vitamins and drank "Noonie [sic]" juice, and these had helped heal her nervous condition. (*Id.* at 185-86.) On her jury questionnaire, however, she had responded "Yes" to the question asking whether she had any "health problem . . . that might affect your ability to listen to and evaluate the testimony and evidence." (Doc. 19, Ex. 29 at 8.) In answer to the follow-up question asking, "what is the problem and how does it affect you?" she wrote: "I cant no more than 2 HR [sic]." (*Id.*)

At the close of voir dire, the defense raised a *Batson* challenge after the State struck prospective Juror 30, who was the only remaining black juror. (RT 11/24/03 at 13.) In response to the trial court's inquiry into the grounds for the strike, the State explained:

> [W]e lost this juror for two hours the first day [of jury selection], some of her answers to her questions really didn't make sense, there was a marked difference in her appearance one day to the next.
>
> She has grandsons that are in prison. She says she's coming here to relax, to get away from the pressures [of] taking care of her sister, and the State has strong concerns about her competency in general, specifically, her competence to sit on a case where life and death [sic], which is going to be asked with very specific jury instructions and extensive amount of evidence.

(*Id.*)

The court initially granted the defense motion, explaining:

> If the basis for a challenge includes grounds that are without merit, that makes the challenge effective. I do not recall her making any answers that do not make sense. She certainly—her demeanor changed, her appearance changed, but everything else has been consistent. Her mood changed, I should say. But other than that, she has answered the questions in a right fashion, some were entertaining at times, but she appears to be able to proceed, so that challenge is denied.

(*Id.* at 14.) The State added that during voir dire, the juror had initially leaned toward a life sentence. (*Id.* at 14-15.) The court indicated that its ruling remained the same. (*Id.* at 16.)

After a brief recess, however, the State asked the court to reconsider its ruling. (*Id.*) The State reiterated its grounds for the strike as follows:

> [T]his is the only juror on this panel, to counsel's recollection, that has anyone in prison. She has a grandson in prison, the

> defendant's approximate age. Another grandson who had been released from prison.
>
> She has indicated that she is involved with a sister that was in a death situation, she comes here to relax, to get away from that death situation.
>
> On the first date . . . your bailiff indicated that she got lost for a few hours, she showed up to this Court late.
>
> As I have indicated before, although maybe not ris[ing] into the level for cause, she indicated that she's already inclined at the beginning of being prone to a life disposition. And as noted by this Court on occasion, . . . she did appear with marked difference in her appearance on different days, would appear she was under the influence of something on the first day she attended here.

(*Id.* at 16-17.)

The court then reversed its decision granting the defendant's *Batson* challenge. (*Id.* at 18.) The court explained:

> Taking all of the information together, which the Court only had part of initially, and also upon further reading of *State v. Lucas*,[16] . . . [the] Court . . . denies the defense objection to the State's peremptory strike. All explanations given by the State, [to] a large extent, are supported by what this lady said, and her conduct in this case, all explanations are not discriminatory, that is, not violating *Batson*. . . .

(*Id.*)

The PCR court, in denying Johnson's claim that appellate counsel performed ineffectively in failing to raise the *Batson* issue, relied on the facts cited above and stated that the trial court's ultimate denial of the *Batson* challenge "specifically focused on the State's race-neutral basis for the strike. . . ." (PCR Order, ME 1/28/15, at 29.)

### 2.    Analysis

In *Batson*, the Supreme Court held that the Equal Protection Clause forbids a prosecutor from challenging potential jurors based solely on their race. 476 U.S. at 89. A defendant's challenge to a peremptory strike requires a three-step analysis. "First, the trial court must determine whether the defendant has made a prima facie showing that the

---

[16] *State v. Lucas*, 199 Ariz. 366 (App. 2001).

prosecutor exercised a peremptory challenge on the basis of race." *See Rice v. Collins*, 546 U.S. 333, 338 (2006). "Second, if [that] showing is made, the burden shifts to the prosecutor to present a race-neutral explanation" for the strike. *Id.* While the prosecutor must offer a "comprehensible reason" for the strike, *id.*, the reason need not be "persuasive, or even plausible," *Purkett v. Elem*, 514 U.S. 765, 768 (1995); *see Mitleider v. Hall*, 391 F.3d 1039, 1050 (9th Cir. 2004). If "the reason is not inherently discriminatory, it suffices." *Rice*, 546 U.S. at 338; *see Hernandez v. New York*, 500 U.S. 352, 360 (1991).

Finally, the third step requires the trial court to determine whether the defendant has carried his burden of proving purposeful discrimination. *Rice*, 546 U.S. at 338. The court must evaluate the persuasiveness of the justification to determine whether the prosecutor engaged in intentional discrimination. *Purkett*, 514 U.S. at 768. "The opponent of the strike bears the burden of persuasion regarding racial motivation." *Davis v. Ayala*, 576 U.S. 257, 271 (2015). The court need not agree with the prosecutor's stated nonracial reason—the question is not whether the reason represents a sound strategic judgment, but "whether counsel's race-neutral explanation for a peremptory challenge should be believed." *Hernandez*, 500 U.S. at 365. "[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett*, 514 U.S. at 768.

On habeas review, a petitioner is entitled to relief on a *Batson* claim only if the state court's denial claim constituted an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2). *See Rice*, 546 U.S. at 338; *Miller-El I*, 537 U.S. at 239-40. This Court can grant relief only "if it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge." *Rice*, 546 U.S. at 338. "State-court factual findings . . . are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" *Id.* at 338-39 (citing 28 U.S.C. § 2254(e)(1)). While "[r]easonable minds reviewing the record might disagree about the prosecutor's credibility, . . . on habeas review that does not suffice to supersede the trial court's credibility determination." *Id.* at 341-42. "A trial court is best situated to evaluate both the words and the demeanor of jurors who are peremptorily challenged, as well as the credibility of the prosecutor who exercised

those strikes." *Ayala*, 576 U.S. at 273-74. Accordingly, "in evaluating habeas petitions premised on a *Batson* violation, 'our standard is doubly deferential: unless the state appellate court was objectively unreasonable in concluding that a trial court's credibility determination was supported by substantial evidence, we must uphold it.'" *Jamerson v. Runnels*, 713 F.3d 1218, 1225 (9th Cir. 2013) (quoting *Briggs v. Grounds*, 682 F.3d 1165, 1170 (9th Cir. 2012)); *see Sifuentes v. Brazleton*, 825 F.3d 506, 518 (9th Cir. 2016) (explaining "doubly deferential standard" where "the federal court defers to the state reviewing court's determination of the facts, and the reviewing court defers to the trial court's determination of the prosecutor's credibility").

Here, neither the trial court nor the PCR court unreasonably applied *Batson*. Johnson argues that a comparative analysis with other jurors whom the State did not move to strike shows that the State's proffered explanations for striking prospective Juror 30 were pretextual. (Doc. 18 at 186.) Specifically, Johnson argues that the State did not strike white prospective jurors with "relatives who were in trouble with the law/in prison" or who "favored a life sentence." (*Id.* at 187-92.)

The Supreme Court and the Ninth Circuit have used comparative juror analysis to assess whether a prosecutor's race-neutral explanation was in fact a pretext for a discriminatory strike. *See Miller-El II*, 545 U.S. at 241 ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step."); *see also McDaniels v. Kirkland*, 813 F.3d 770, 778 (9th Cir. 2015) ("The prosecution's treatment of minority jurors as compared to its treatment of nonminority jurors is among the facts indicative of the presence of a purpose to discriminate.").

Johnson is correct that the prosecution did not move to strike several potential white jurors who had indicated on the juror questionnaire that they or a close friend or family member had been arrested or charged with a crime. (*See* Doc. 18 at 187-89; Doc. 19, Exs. 26, 27, 28, 30.) He is also correct that the State did not challenge every prospective juror

- 60 -

who expressed equivocal feelings about the death penalty. (*See id.* at 189-92; Doc. 19, Exs. 31-35.) He does not, however, identify any prospective jurors who shared both these characteristics. Nor does the record reveal any potential jurors whose ability to sit as a juror and be attentive to the evidence was subject to question, as it was with respect to Juror 30.

While a comparative analysis such as that offered by Johnson can be probative even though the jurors who were not struck were not identically situated to Juror 30, *see Miller-El II*, 545 U.S. at 247 n. 6 (noting there is no rule holding that a comparison cannot be probative unless the situation of the jurors is identical in all respects), it is not objectively unreasonable to conclude that the prosecutor did in fact challenge Juror 30 based upon a combination of characteristics which distinguished her from the non-stricken jurors. *See Hicks v. Johnson*, 186 F.3d 634, 637 (5th Cir. 1999) (rejecting *Batson* challenge where white jurors who were not stricken possessed certain objectionable characteristics identified by the prosecutor but none possessed the combination of qualities identified by the prosecutor as the basis for exercising strikes against black potential jurors); *Devoil-El v. Groose*, 160 F.3d 1184, 1187 (8th Cir. 1998) (affirming trial court's finding that state's peremptory strikes were not racially motivated where black venirepersons were removed for a combination of reasons which distinguished them from non-challenged white venirepersons); *see also Williams v. Johnson*, No. CV 15-00623-SJO (KS), 2016 WL 4238648, at *11 (C.D. Cal. Apr. 19, 2016) ("[T]he state appellate court was not unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge after considering comparative juror analysis and finding that none of the seated jurors had the same combination of characteristics as [the prospective juror in question].") (citation modified).

*Flowers v. Mississippi*, 588 U.S. 284 (2019), cited by Johnson in his reply brief (Doc. 44 at 152-57), is distinguishable. In *Flowers*, the Court found that the prosecutor struck a black juror with discriminatory intent in violation of *Batson*. In support of this conclusion, the Court cited several circumstances, including the fact that over the course of six trials, the prosecutor struck 41 of 42 black prospective jurors, including five of the

six black jurors in the final trial. *Id.* at 315. The Court also noted that the prosecutor engaged in "dramatically disparate" questioning of black and white potential jurors and that in justifying the strikes of black prospective jurors the prosecutor made several inaccurate statements. *Id.* at 307-08, 313-14.

None of these circumstances were present in Johnson's case. The prosecutor did not exhibit a pattern of discriminatory strikes. Johnson argues that in a prior sentencing proceeding that was ultimately stayed, "the State excluded the only Black prospective juror left on the panel." (Doc. 144 at 154.) That juror was dismissed for cause after saying that he could not vote for a death sentence. (RT 1/13/03 at 94-99.) Any disparity in the questioning of prospective Juror 30 is explained by the unique set of circumstances she presented, including her questionable ability to sit as a juror and be attentive to the evidence. Finally, the prosecutor did not use inaccurate statements to support his request to strike Juror 30.

In sum, the explanations offered by the prosecutor for striking prospective Juror 30 were race-neutral and supported by the record. *See*, *Mitleider*, 391 F.3d at 1048. They were not implausible or fantastic. *Purkett*, 514 U.S. at 768. Under the doubly deferential standard of review required by *Batson* and 28 U.S.C. § 2254(d)(2), "there is not sufficient evidence to 'supersede the trial court's credibility determination.'" *Jamerson*, 713 F.3d at 1230 (quoting *Rice*, 546 U.S. at 341-42). It was not unreasonable for the state courts to credit the prosecutor's explanations and find that Johnson failed to carry his burden of showing purposeful discrimination. *Rice*, 546 U.S. at 338. Claim 7 is therefore denied.

### D.    Claim 8:

Johnson argues that he was "denied a fair trial because biased jurors sentenced him to death." (Doc. 18 at 199.) He contends that the aspects of this claim dealing with Juror 95 (hereinafter "Juror JD") were exhausted in his PCR Petition and Petition for Review. (*Id.*) He acknowledges that he did not raise the remaining allegations of juror bias. (*Id.*) Respondents argue that the claim is procedurally defaulted and barred from review. (Doc. 37 at 124-25.)

Claim III(E)(4) of Johnson's PCR Petition consisted of the heading "Appellate Counsel Failed to Appeal Denial of Defendant's Right to be tried by a fair and impartial jury per *Morgan*." (PCR Pet. at 122-25.) In *Morgan v. Illinois*, 504 U.S. 719, 729 (1992), the Supreme Court held that a capital defendant has a due process right to be tried by a fair and impartial jury comprised of members who will not automatically vote for the death penalty and will fairly consider the evidence offered in mitigation.

PCR Claim III(E)(4) consisted of three specific allegations. First, Johnson argued that "[c]ounsel failed to keep track of the venirepersons excused," a reference to the fact that prospective Juror 18 continued to sit after being excused for hardship, forcing counsel to use a peremptory strike to remove her. (PCR Pet. at 123-24.) This allegation is included in Claim 8(E) of Johnson's habeas petition, albeit not as a claim of ineffective assistance of appellate counsel. (Doc. 18 at 206.) Next, Johnson alleged that Juror 26 should have been excluded because her views on the death penalty prevented her from "considering and giving effect to mitigation."[17] (PCR Pet. at 124.) Johnson did not include this claim in his habeas petition. Finally, Johnson alleged that Juror JD was biased in favor of the death penalty and should have been removed for cause. (PCR Pet. at 123-25.) Johnson included this allegation in his habeas petition, *see* Claims 8(B) and (C)—again, not as a claim of ineffective assistance of appellate counsel—adding an allegation that JD and other jurors were also racially biased and biased against street gangs as well as biased in favor of the death penalty. (Doc. 18 at 200-03.)

The PCR court addressed Claim III(E)(4) as a claim of ineffective assistance of appellate counsel, concluding there was no *Morgan* violation so appellate counsel did not perform ineffectively in failing to raise the issue. (PCR Order, ME 1/28/15, at 26-28.)

The parties do not address the fact that Johnson failed to raise a stand-alone *Morgan* claim in state court; nor does Johnson appear to argue, at least with respect to the allegations concerning the seating of JD, that the default of the claim was excused under *Edwards* by the ineffective assistance of appellate counsel. Johnson argues that he

---

[17] The PCR Petition erroneously refers to her as "Juror 2." (PCR Pet. at 124-25.)

incorporated Claim III(E)(4) by reference in his Petition for Review. (Doc. 44 at 150.) The Court agrees that this was sufficient to present the claim to the Arizona Supreme Court. *See Gallegos*, 820 F.3d at 1026 n.15; *Scott*, 567 F.3d at 582. Again, regardless of procedural status, the Court will address the claim on its merits. *See Lambrix*, 520 U.S. at 524-25; 28 U.S.C. § 2254(b)(2).

The remaining allegations in Claim 8—that is, everything beyond the allegations concerning JD and Juror 18—were not raised in state court. The default of these allegations, in Claims 8(B), (C), and (D), is not excused, as Johnson argues, by the ineffective assistance of appellate or PCR counsel. *Edwards*, 529 U.S. at 451-52; *Martinez (Ernesto)*, 926 F.3d at 1225; *Pizzuto*, 783 F.3d at 1177; *Hunton*, 732 F.3d at 1126-27. They remain procedurally defaulted and barred from federal review.

Claim 8(E) argues ineffective assistance of trial counsel "for failing to challenge for cause or use a peremptory challenge on other prospective jurors." (Doc. 18 at 205.) The Court will consider below whether the ineffective assistance of PCR counsel excuses the claim's default.

### 1.      Claims 8(B) and (C): Juror JD

Johnson argues that Juror JD, who served on his sentencing jury, exhibited anti-gang, racial, and pro-execution biases in her responses to questions on the juror questionnaire and during voir dire. (Doc. 18 at 200-03.) On the questionnaire, JD answered "Yes" to a question asking whether evidence of gang involvement in the crime would "influence you or play any part in your ability to be fair and impartial in deciding the issue in this case?" (*Id.*) She explained: "I have no patience for black street gangs. Living outside D.C. made me hate the gangs." (Doc. 20, Ex. 38 at 15.) She did not fill out the question about Johnson's race affecting her ability to be fair and impartial. (*Id.* at 14.)

During voir dire, JD explained that she had had no "personal confrontations" or experiences with gangs and that her opinions were based on "hearing news around the area." (RT 11/19/03 at 102-03.) She stated that she had no concerns about her ability to set aside her beliefs and "determin[e] the case, issues in this case, based on the facts and

evidence that would be presented in this courtroom." (*Id.* at 102.) When asked whether the fact that the crime for which Johnson was being sentenced involved a criminal street gang would cause her to be an "unfair juror," JD responded, "I don't think so." (*Id.* at 103.) She repeated that she believed she would be able to set aside her feelings about gangs and "determine this case based on the facts that are presented." (*Id.* at 104.)

During voir dire she also agreed that Johnson's race would not cause her to be unfair and that she had no concerns about her ability to be "fair, impartial to both sides [and] appropriately look at all of the evidence and follow the law from Judge O'Toole, and determine the facts based just on what is presented in the courtroom." (*Id.* at 105.) She acknowledged that she did not respond to the racial bias question on the questionnaire but stated that the answer to the question would be no. (*Id.* at 112.)

With respect to JD's views on the death penalty, Johnson cites her written response on the questionnaire that the death penalty "should [be] in all states and it isn't used enough." (Doc. 20, Ex. 38 at 18.) During voir dire she affirmed these opinions. (RT 11/19/03 at 106-07.) She also stated that her "personal feelings" were that the death penalty should always be imposed for premeditated murder. (*Id.* at 114-15.)

In the colloquy that followed, JD agreed that the strength of her opinion about the death penalty would influence her decision, or at least that she could not be sure it would not influence her. (*Id.* at 115-16.) She also stated she was "pretty sure that I can vote whatever way the evidence is." (*Id.* at 116.) When asked whether she would be able to maintain an open mind driven by the law and evidence, and not her personal opinions or beliefs, JD replied: "Okay. Then, yes, I will be fair that way, yes." (*Id.* at 116-17.) Following further discussion, including an explanation of the nature of mitigating evidence, JD indicated repeatedly that she could follow the law and consider whether leniency was warranted. (*Id.* at 119-21.) She assured the court and counsel that she could be fair and impartial. (*Id.* at 120.)

JD agreed with the court that her "assessment of [her] ability to be fair, impartial changed" during voir dire. (*Id.* at 121.) She also agreed that her revised opinion of her

ability to be fair was informed by her "understanding of how the law actually works." (*Id.*)

Defense counsel challenged JD for cause. (RT 11/20/03 at 171.) The trial court denied the challenge, explaining:

> Although she wasn't certain about her views initially, after we thoroughly questioned her, she said she had no concern about her ability to follow the law, in fact, can be fair to both sides. She assured us she will give life if leniency was shown. And her experience with blacks, she said that would not influence her in this case, race would not cause her to be unfair or vote one way or the other. So that challenge for cause is denied. . . .

(*Id.* at 171-72.)

The PCR court rejected Johnson's claim that appellate counsel performed ineffectively by failing to argue that the trial court erroneously denied Johnson's motion to strike Juror JD for cause. (PCR Order, ME 1/28/15, at 26-28.) The court noted that the trial judge "had observed [JD's] demeanor" and "assessed her credibility." (*Id.* at 28.) The PCR court concluded that Johnson failed "to establish that objectionable jurors were seated and . . . provided no evidence that the jury that sentenced the defendant was other than fair and impartial." (*Id.*) Accordingly, the court found, Johnson "failed to establish that appellate counsel's performance was deficient for failing to challenge the jury on *Morgan* grounds." (*Id.*) Johnson contends that this decision was "an unreasonable determination of the facts in light of the evidence of the jurors' bias." (Doc. 44 at 160.)

The Sixth Amendment guarantees criminal defendants the right to trial by a fair and impartial jury. *Skilling v. United States*, 561 U.S. 358, 377 (2010); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). "[A]n impartial jury consists of nothing more than jurors who will conscientiously apply the law and find the facts." *Lockhart v. McCree*, 476 U.S. 162, 178 (1986) (citation modified). In a capital case, "a prospective juror may be excluded for cause because of his or her views on capital punishment" if their "views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (citing *Adams v. Texas*, 448 U.S. 38, 45 (1980)). A juror who would automatically impose the death penalty

if a defendant were found guilty is not impartial and must be removed for cause. *Morgan*, 504 U.S. at 733.

Findings about a prospective juror's fitness to serve are "based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province." *Witt,* 469 U.S. at 428 (citing *Patton v. Yount*, 467 U.S. 1025, 1038 (1984)); *see Uttecht v. Brown*, 551 U.S. 1, 9 (2007) ("Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, . . . a factor of critical importance in assessing the attitude and qualifications of potential jurors."); *United States v. Allen*, 605 F.3d 461, 466 (7th Cir. 2010) ("Because appellate judges are absent from voir dire, when a prospective juror fails to express herself 'carefully or even consistently . . . it is [the trial] judge who is best situated to determine competency to serve impartially.'") (quoting *Yount*, 467 U.S. at 1039). The trial court's resolution of these questions is a matter of historical fact which is entitled to a presumption of correctness. *Yount*, 467 U.S. at 1036-38. The question for this Court is simply "whether there is fair support in the record for the state court's conclusion that the jurors here would be impartial," *id.* at 1038, not whether it was right or wrong in its determination of impartiality, *Witt*, 469 U.S. at 434. Finally, the requirements of AEDPA "provide additional, and binding, directions to accord deference" to the state courts' rulings. *Uttecht*, 551 U.S. at 10; *see White v. Wheeler*, 577 U.S. 73, 78 (2015).

During individual voir dire, Juror JD was questioned over the course of 25 transcript pages, giving the court ample opportunity to assess her credibility and demeanor. *See Uttecht*, 551 U.S. at 10-11; *Yount*, 467 U.S. at 1028. While she did not express herself "carefully or even consistently," during the early stages of questioning, she ultimately assured the court that she could set aside her preconceived opinions and render a verdict based on the evidence and the law. *Yount*, 467 U.S. at 1039; *see, e.g.*, *Wheeler*, 577 U.S. at 79 ("A fairminded jurist could readily conclude that the trial judge's exchange with [the juror] reflected a diligent and thoughtful voir dire; . . . that she was fair in the exercise of her broad discretion in determining whether the juror was qualified to serve in this capital case"; and that the juror's responses "were at least ambiguous as to whether he would be

able to give appropriate consideration to imposing the death penalty") (citation modified); *Uttecht*, 551 U.S. at 7 (holding that "when there is ambiguity in the prospective juror's statements," the trial court is "entitled to resolve it in favor of the State") (quoting *Witt*, 469 U.S. at 434)).

Given the level of deference afforded to the trial judge, who had the opportunity to observe and assess JD, this Court finds there is fair support in the record for the trial court's determination that JD was unbiased and for the court's denial of the defense motion to strike for cause. *Witt*, 469 U.S. at 424. Applying the independent level of deference required by 28 U.S.C. § 2254(d), *Uttecht*, 551 U.S. at 10, the Court concludes that this claim is meritless.

### 2.      Claim 8(E)

Claim 8(E) raises several arguments. First, Johnson argues that trial counsel performed ineffectively by using a peremptory strike against a venireperson, Juror 18, who had already been excused. (Doc. 18 at 206.) Johnson also asserts that trial counsel performed ineffectively in failing to challenge two other potential jurors and that bias should be presumed with respect to several other jurors. (*Id.* at 205-07.)

As noted above, in his PCR Petition Johnson raised several claims of ineffective assistance of appellate counsel, including claims based on counsel's failure to appeal the alleged violation of Johnson's rights under *Morgan*. One of these claims alleged that "[c]ounsel failed to keep track of venirepersons excused." (PCR Pet. at 123.) This failure forced trial counsel to use a peremptory strike against Juror 18, who had been excused for hardship but continued to sit on the jury. (*Id.* at 123-24.)

The PCR court denied this claim because "[t]he defendant does not claim that the jury seated was not fair and impartial" and because "[t]he loss of peremptory challenges does not constitute a violation of the right to an impartial jury." (PCR Order, ME 1/28/15, at 27.) For the latter reason the court cited *Poland v. Stewart*, 169 F.3d 573, 583 (9th Cir. 1999), which cited *Ross v. Oklahoma*, 487 U.S. 81, 88 (1988). (PCR Order, ME 1/28/15, at 27.) In *Ross*, the Supreme Court "reject[ed] the notion that the loss of a peremptory

challenge constitutes a violation of the constitutional right to an impartial jury." 487 U.S. at 88. The Court reiterated that "peremptory challenges are not of constitutional dimension. They are a means to achieve the end of an impartial jury. So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." *Id*. (citations omitted).

In support of his habeas claim regarding Juror 18, Johnson relies on *Fortson v. State*, 587 S.E.2d 39, 40 (Ga. 2003), which held that under Georgia law "causing a defendant to unnecessarily use a peremptory strike on a juror that should have been excused for cause is per se harmful error" and presumptively prejudicial under *Strickland*. This holding, however, was overruled by *Willis v. State*, 820 S.E.2d 640 (Ga. 2018), where the Georgia Supreme Court held a Sixth Amendment inquiry focuses on whether "challenged jurors who served on [a defendant's] twelve-person jury were unqualified." *Id.* at 707.

Johnson also contends, in a claim not raised in state court, that trial counsel performed ineffectively by failing to challenge for cause or use a peremptory strike against a prospective juror (Juror 48) whose uncle was killed by a relative who was never charged for the crime, and another juror (Juror 73) with a best friend whose mother was murdered. (Doc. 18 at 205.) Johnson argues these jurors "could not have remained impartial." (*Id.*)

When asked whether her uncle's killing "would have any effect on how [she] would view this [trial]," Juror 48 responded: "No." (RT 11/18/03 at 79.) When defense counsel asked whether the murder of her best friend's mother "might interfere in any way with sitting on a case where . . . Mr. Johnson has been found guilty of first degree murder," Juror 73 answered, "No. I don't believe so, because there's really no link between the two cases whatsoever." (*Id.* at 236.)

Based on this record, Johnson cannot show that defense counsel's performance satisfied either prong of *Strickland*. "Establishing *Strickland* prejudice in the context of juror selection requires a showing that, as a result of trial counsel's failure to exercise peremptory challenges, the jury panel contained at least one juror who was biased." *Davis v. Woodford*, 384 F.3d 628, 643 (9th Cir. 2004) (citing *United States v. Quintero-Barraza*,

78 F.3d 1344, 1349 (9th Cir. 1995)). The test for bias is whether the jurors "had such fixed opinions that they could not judge impartially the guilt of the defendant." *Yount*, 467 U.S. at 1035. Johnson has made no showing that Jurors 48 and 73 fit that description. *See Fields v. Brown*, 503 F.3d 755, 764-65, 767 (9th Cir. 2007) (rejecting bias claim where juror's wife had been a victim of a sexual assault similar to the crime for which the defendant was being tried; juror "truthfully represented that he was impartial"); *United States v. Mitchell*, 568 F.3d 1147, 1152-53 (9th Cir. 2009) (finding no bias in narcotics case where juror's uncle had been killed by a drug dealer; juror responded that she did not think what happened to her uncle would prevent her from being a fair juror and further indicated, "no, I'll be fine. No. Actually, I'm fine.").

Johnson also argues that bias should be presumed with respect to seven other jurors because they had children. (Doc. 18 at 206-07.) According to Johnson, "[t]hese jurors likely would have put themselves in Smith's position during trial." (*Id.* at 207.) In *Fields* the Ninth Circuit noted that "it is well accepted that bias may be presumed only in 'extreme' or 'extraordinary' cases." *Fields*, 503 F.3d at 772. Examples of an extreme or extraordinary case include "a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction." *Id.* at 771 (quoting *Smith v. Phillips*, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring)). Bias may also be presumed where "a juror failed honestly to answer a voir dire question that is material to impartiality before a trial result could be invalidated." *Id.* (citing *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984)). A parent serving on a jury does not meet this definition of an extreme or extraordinary case.

Because Johnson has failed to show any bias on the part of the jurors who sentenced him, his claim of ineffective assistance of trial counsel is meritless. Because the underlying claim is meritless, PCR counsel did not perform ineffectively in failing to raise it. *See Runningeagle*, 825 F.3d at 982; *Atwood*, 870 F.3d at 1060. Therefore Claim 8(E) remains procedurally defaulted and barred from federal review.

### 3.    Conclusion

The allegations contained in Claim 8 are denied as procedurally defaulted and barred from federal review and meritless.

### E.    Claim 9:

Johnson argues that "limitations in his sentencing voir dire mandate a new trial." (Doc. 18 at 208.) Claim 9 consists of two subclaims. Johnson raised subclaim (A) on direct appeal, and it was denied by the Arizona Supreme Court. *Johnson*, 212 Ariz. at 434-435. Johnson did not raise subclaim (B) in state court. (Doc. 18 at 208.)

### 1.    Claim 9(A)

Johnson argues that he was "denied a fair and impartial sentencing jury" because the trial court refused to allow his counsel to question individual jurors about specific aggravating and mitigating factors, like substance abuse, his childhood, and psychological problems. (*Id.* at 208, 211.) The Arizona Supreme Court's denial of this claim was neither contrary to nor an unreasonable application of clearly established federal law.

Johnson relies on *Morgan*, 504 U.S. 719, for the proposition that "general questions regarding aggravating and mitigating circumstances are not a sufficient inquiry." (Doc. 18 at 212.) He asserts that voir dire in his case "failed to extend beyond questions related to mere general impartiality and following the law and thus inadequately explored jurors' views on mitigation," which, according to Johnson, requires that counsel be allowed to question jurors about specific mitigating factors. (*Id.*)

"[T]he proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Witt*, 469 U.S. at 424 (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). Applying this standard, "[a] juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." *Morgan*, 504 U.S. at 728.

In *Morgan*, the trial court did not allow defense counsel to ask prospective jurors the following question: "If you found [the defendant] guilty, would you automatically vote to impose the death penalty no matter what the facts are?" 504 U.S. at 723. The Supreme Court held that general questions about following the law were not sufficient to detect bias and that it was error to exclude more specific questions designed to identify jurors "who would *always* impose death following conviction." *Id.* at 733, 735.

*Morgan*, however, "does not compel a trial court to allow questions about how a potential juror would vote if given specific examples of aggravating or mitigating evidence." *Hodges v. Colson*, 727 F.3d 517, 528 (6th Cir. 2013) ("*Morgan* simply does not require a trial court to permit defense counsel to ask prospective jurors how they would vote assuming the existence of particular mitigating or aggravating circumstances . . . *Morgan* allows for the identification and exclusion of jurors who are biased for or against the death penalty before being presented with any evidence and would *always* vote in accordance with their biases without regard to the particular facts of the particular case.") (citation omitted)); *see United States v. McVeigh*, 153 F.3d 1166, 1207 (10th Cir. 1998) ("[W]e have held that *Morgan* does not require a court to allow questions regarding how a juror would vote during the penalty phase if presented with specific mitigating factors. Other courts have issued similar rulings, holding that *Morgan* does not require questioning about specific mitigating or aggravating factors." (citation omitted)); *Garcia v. Shinn*, No. CV-15-00025-PHX-DGC, 2022 WL 1166408, at *47 (D. Ariz. Apr. 20, 2022).

Johnson does not argue that the trial court prevented him from asking prospective jurors the question required by *Morgan*—whether the juror would automatically "impose death regardless of the facts and circumstances of conviction." 504 U.S. at 735. The Arizona Supreme Court correctly noted that the trial court "clearly complied with *Morgan*" by "requir[ing] each potential juror to fill out a 23-page juror questionnaire that fully addressed *Morgan* issues," "conduct[ing] individual voir dire of every prospective juror whose responses raised impartiality concerns," and then dismissing jurors who were not

rehabilitated.[18] *Johnson*, 212 Ariz. at 435.

Claim 9(A) is denied as meritless.

### 2.    Claim 9(B)

Johnson argues that he was "denied a fair and impartial jury at the sentencing phase due to the lack of Black prospective jurors on the venire." (Doc. 18 at 213.) He concedes that this claim was not raised in state court. (*Id.* at 208.) He argues that the default is excused by the ineffective assistance of trial and PCR counsel. (*Id.*) But as discussed above, ineffective assistance of trial counsel may serve as cause to excuse a procedural default only if the particular ineffective assistance allegation was itself exhausted independently. *See Edwards*, 529 U.S. at 45; *Carrier*, 477 U.S. at 489-90. Johnson did not exhaust an ineffective assistance of trial counsel claim with respect to the allegations in subclaim (B). The ineffectiveness of PCR counsel does not excuse the default because *Martinez* applies only to claims of ineffective assistance of trial counsel. *See Martinez (Ernesto)*, 926 F.3d at 1225; *Pizzuto*, 783 F.3d at 1177; *Hunton*, 732 F.3d at 1126-27.

Claim 9(B) is procedurally defaulted and barred from federal review. It is also meritless.

Johnson cites *Apodaca v. Oregon*, 406 U.S. 404, 413 (1972), *abrogated on other grounds by Ramos v. Louisiana*, 590 U.S. 83 (2020), which held that the "Constitution forbids . . . systematic exclusion of identifiable segments of the community from jury panels and from the juries ultimately drawn from those panels." (Doc. 18 at 213.) To prevail on this claim, however, Johnson "must prove that his race has been systematically excluded." *Apodaca*, 406 U.S. at 413. Johnson has not proved, or attempted to prove, that

---

[18] The questionnaire asked prospective jurors: "Are your views regarding the death penalty, whether based on moral, philosophical, religious or any other grounds, so strongly held by you that you will be prevented or substantially impaired from performing your sworn duty to follow the law and applying [sic] it to the facts of the case?" and "[W]ill you, for whatever reason, automatically vote for the death penalty without considering the evidence and the instructions of law that will be presented to you?" (*See* IOR 397.)

black individuals were systemically excluded from his jury panel.[19] Instead, he "merely" challenges the makeup of the panel based on the small number of Black potential jurors noticed by defense counsel. This is not sufficient. *Id.; see Gray v. Clark*, No. 23-15331, 2024 WL 4784530, at *1 (9th Cir. Nov. 14, 2024) ("Gray does not make any showing that black people were systematically excluded from the trial jury.").

### F.    Claim 11:

Johnson argues that "Arizona's definitions of 'criminal street gang' and 'criminal street gang member' are void for vagueness." (Doc. 18 at 220.) He concedes that he did not raise this claim in state court. (*Id.*) He argues that default is excused by the ineffective assistance of trial and PCR counsel. (*Id.*) Again, the alleged ineffectiveness of trial counsel in failing to raise a vagueness claim cannot serve as cause because Johnson did not exhaust an independent claim of ineffective assistance regarding the instruction. *See Edwards*, 529 U.S. at 552. Ineffective assistance of PCR counsel cannot excuse the default because *Martinez* applies only to claims of ineffective assistance of trial counsel. *Martinez (Ernesto)*, 926 F.3d at 1225; *Pizzuto*, 783 F.3d at 1177; *Hunton*, 732 F.3d at 1126-27.

Alternatively, Johnson asserts that the claim was exhausted by the Arizona Supreme Court's review of his sentence. (Doc 18 at 220.) As explained above, that court's review was limited to assessing the aggravating factors, mitigating circumstances, and propriety of the death sentence. Johnson's challenges to the jury instructions were "not included in the scope of the Arizona Supreme Court's independent review of the death sentence as defined by that court, and therefore were not exhausted." *Moormann*, 426 F.3d at 1058.

Claim 11 is procedurally defaulted and barred from federal review. The claim is also meritless.

Johnson argues that Arizona's definitions of criminal street gang and criminal street gang member are unconstitutionally vague because "the statute can be satisfied when one

---

[19] For the same reason, Johnson's contention that counsel performed ineffectively by failing to raise a timely objection to the venire panel (Doc. 18 at 213-14) satisfies neither prong of *Strickland*.

person has an 'ongoing association' (not defined in the statute) with someone, *either* of them attempts to commit a felony individually, and one of those persons satisfies the two criteria of Ariz. Rev. Stat. § 13-105(9)," which "would encompass nearly any association of peoples whose members individually commit crimes."[20] (Doc. 18 at 224.) As Respondents note, Johnson lacks standing to make this argument. (Doc. 37 at 142-43.)

"One to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Parker v. Levy*, 417 U.S. 733, 756 (1974); *see State v. Tocco*, 156 Ariz. 116, 119 (1988) ("A defendant whose conduct is clearly proscribed by the core of the statute has no standing to attack the statute."); *see State v. Baldenegro*, 188 Ariz. 10, 14, (App. 1996). One "who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Vill. of Hoffman Ests. v. Flipside*, 455 U.S. 489, 495 (1982); *Parker*, 417 U.S. at 756 ("[O]ne who has received fair warning of the criminality of his own conduct from the statute in question is [not] entitled to attack it because the language would not give similar fair warning with respect to other conduct which might be within its broad and literal ambit"). The statutes at issue clearly apply to Johnson, whose crimes—robbery and murder—were linked to his membership in the Lindo Park Crips, and Johnson "nowhere . . . claim[s] that *his* potentially innocent conduct is being prosecuted." *Baldenegro*, 188 Ariz. at 14, 932 P.2d at 279 (quoting *Tocco*, 156 Ariz. at 119, 750 P.2d at 877). Johnson, therefore, lacks standing to challenge the

---

[20] Under Arizona law, a person commits the offense of assisting a criminal street gang "by committing any felony offense, whether completed or preparatory for the benefit of, at the direction of or in association with any criminal street gang." A.R.S. § 13-2321(B). A criminal street gang is "an ongoing formal or informal association of persons in which members or associates individually or collectively engage in the commission, attempted commission, facilitation or solicitation of any felony act and that has at least one individual who is a criminal street gang member." *Id.* § 13-105(8). A "criminal street gang member" is "an individual to whom at least two of the following seven criteria that indicate criminal street gang membership apply": (a) self-proclamation; (b) witness testimony or official statement; (c) written or electronic correspondence; (d) paraphernalia or photographs; (e) tattoos; (f) clothing or colors; (g) any other indicia of street gang membership. *Id.* § 13-105(9). Johnson's guilt-phase jury was so instructed. (RT 11/26/01 at 14-15.)

statutes for vagueness.[21]

Johnson relies on *Johnson v. United States*, 576 U.S. 591 (2015), for his argument that Arizona criminal gang statutes are unconstitutionally vague. (Doc. 18 at 222-23; Doc. 44 at 173-74.) *Johnson* rejected "the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." 576 U.S. at 602. It did not, however, address the principle that "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness," *Parker*, 417 U.S. at 756, or "alter the general rule that a defendant whose conduct is clearly prohibited by a statute cannot be the one to make a facial vagueness challenge." *United States v. Hasson*, 26 F.4th 610, 620-21 (4th Cir. 2022) (citation omitted). Claim 11 is denied.

### G.    Claim 12:

Johnson argues that his rights were violated by the admission of "prejudicial and unreliable character evidence" throughout his trial. (Doc. 18 at 226.) The claim consists of three subclaims. In subclaim (A), Johnson alleges that his rights were violated by the trial court's refusal to sever Count 2, the charge that Johnson assisted a criminal street gang. (*Id.* at 226, 228.) In subclaim (B), Johnson alleges that the trial court "erroneously allowed flawed character evidence to establish Johnson's propensity for committing the crime." (*Id.* at 230.) In subclaim (C), Johnson alleges that the trial court erred by denying the defense motion to preclude all gang-related evidence during the sentencing phase. (*Id.* at 238.) The Arizona Supreme Court denied subclaims (A) and (C) on direct appeal. *Johnson*, 212 Ariz. 429-30, 433-34. Johnson did not raise subclaim (B) in state court.

The subclaims fail on the merits. Claim 12(B) is also procedurally defaulted and barred from federal review.

### 1.    Claim 12(A)

Johnson argues that his rights under the First, Fifth, Sixth, Eighth, and Fourteenth Amendments were violated by the trial court's refusal to sever the assisting-a-criminal-

---

[21] Arizona courts have rejected the argument that A.R.S. § 13-105(9) is void for vagueness. *See, e.g.*, *State v. Ochoa*, 189 Ariz. 454, 461 (App.1997).

1   street-gang charge. (Doc. 18 at 226, 228.)

2          In denying this claim, the Arizona Supreme Court first rejected Johnson's argument

3   that he was entitled to severance as a matter of right. *Johnson*, 212 Ariz. at 429 (citing Ariz.

4   R. Crim. P. 14.4.b). The court found that Count 2 was not of "the same or similar character"

5   as the others and that "evidence material to Count 2 could have been admitted to establish

6   motive and identity in the armed robbery, murder, and burglary charges." *Id.* at 429-30.

7   The court explained that Smith's murder "resulted from Johnson's desire to eliminate a

8   witness to an armed robbery with which Jarvis Ross, Johnson's 'cuz' or 'homeboy,' was

9   being charged." *Id.* at 430. The court noted the "ample evidence" showing that the armed

10  robbery and the murder were committed "to further the criminal objectives of the LPC,"

11  which "were consistent with the LPC's typical criminal activity of pursuing pecuniary gain

12  and intimidating witnesses." *Id.* Therefore, the "evidence of Johnson's gang involvement

13  helped to establish his identity and motive for committing the other charged crimes." *Id.*

14  Furthermore, because the evidence of gang involvement would have been admissible in a

15  trial on the other counts, prejudice from the trial court's failure to sever was unlikely. *Id.*

16         Finally, the Arizona Supreme Court noted that the trial judge took steps to reduce

17  any potential prejudice from joinder. *Id.* The judge "cautioned the State against misusing

18  the gang evidence and instructed it to avoid presenting evidence of any gang motivation

19  until later in the case, when its relevance became clear." *Id.* The trial court also instructed

20  the jury to consider each offense separately and explained that each must be proven beyond

21  a reasonable doubt. *Id.*

22         With respect to both Claim 12(A) and 12(C), Johnson asserted in his habeas petition

23  that the Arizona Supreme Court's "adjudication of the claim was contrary to, and consisted

24  of an unreasonable application of, clearly established federal law, and was based on an

25  unreasonable determination of the facts." (Doc. 18 at 226.) Beyond this recitation of the

26  standard for merits review under AEDPA, Johnson does not attempt to support his claim

27  that the state supreme court's ruling satisfied 28 U.S.C. § 2254(d). (*See* Doc. 18 at 226-30.)

28  Instead of addressing the state courts' "last reasoned decision," *McKinney*, 813 F.3d at 811,

1    he challenges the evidentiary rulings of the trial court. (Doc. 18 at 228-30.) It is only in his

2    reply brief that Johnson offers substantive arguments challenging the Arizona Supreme

3    Court's denial of these claims. (*See* Doc. 44 at 170-74.)

4            Johnson's failure to support these claims in his petition deprived Respondents of an

5    opportunity to address his arguments. That is why a reply "is not the proper pleading to

6    raise additional grounds for relief." *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir.

7    1994); *see Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir. 2010) ("[A]rguments raised for

8    the first time in a reply brief are waived."). Johnson's arguments in support of Claims 12(A)

9    and (C), "raised for the first time in [his] reply brief," are "deemed waived." *See Delgadillo

10   v. Woodford*, 527 F.3d 919, 930 n.4 (9th Cir. 2008) (citing *Burlington N. & Santa Fe Ry.

11   Co. v. Vaughn*, 509 F.3d 1085, 1093 n.3 (9th Cir. 2007)); *cf. Adams v. Armontrout*, 897

12   F.2d 332, 334 (8th Cir. 1990) (holding that "a petitioner must state specific, particularized

13   facts which entitle him or her to habeas corpus relief for each ground specified. These facts

14   must consist of sufficient detail to enable the court to determine, from the face of the

15   petition alone, whether the petition merits further habeas corpus review").

16           Even if the Court were to consider the arguments, Johnson would not be entitled to

17   relief. In his reply brief, Johnson first alleges that the Arizona's Supreme Court's

18   determination that the gang evidence was relevant to motive and identity "should be

19   afforded no deference because it is based on an unreasonable application of law in light of

20   the facts." (Doc. 44 at 178.) According to Johnson, the Arizona Supreme Court made an

21   unreasonable factual determination under 28 U.S.C. § 2254(d)(2) by finding that Jarvis

22   Ross was a fellow LPC gang member whom Johnson sought to protect by murdering a

23   witness to the Affordable Massage robbery. (*Id.* at 179.) This determination was

24   unreasonable, Johnson asserts, because the testimony of Detective Stuart, the State's gang

25   expert, was "inherently unreliable and patently suspect." (*Id.*) Johnson focuses on evidence

26   that Jarvis Ross was actually a member of another gang, the West Side City Crips. (*Id.*)

27   Contrary to Johnson's argument, however, the Arizona Supreme Court's determination that

28   he and Ross were both LPC members was supported by sufficient evidence.

At the time of his testimony, Detective Stuart was investigating South Phoenix street gangs, including LPC, for 13 years. (RT 11/19/01 at 12.) He had been qualified as an expert witness on gangs and testified in state court more than 20 times. (*Id.* at 13.) Detective Stuart testified that based on his review of "documents, phone calls, letters . . . and prior historical documentation" that Jarvis Ross was an LPC gang member. (*Id.* at 64-65.) According to Detective Stuart, Jarvis Ross "flipped" between the two gangs, LPC and the West Side City Crips, and was a member of both. (*Id.* at 65-66, 95-96.) Detective Stuart testified that there are "a lot of flippers in black gangs" and that it can be an "accepted" practice depending on the personalities and circumstances involved. (*Id.* at 24.) He explained that Jarvis Ross's brother was an OG, or high-ranking member of LPC, which "played a part in Jarvis Ross's acceptance into both Lindo Park and West Side City." (*Id.* at 99.) Detective Stuart added that there are groups within the West City and Lindo Park gangs "that don't like each other at all" as well as "groups within these gangs that associate together." (*Id.* at 85.)

As evidence that Jarvis Ross was in fact a member of LPC, Detective Stuart testified that during a phone call to Johnson, Ross stated that an inmate he referred to as "Joker" had his back or was helping him out in jail. (*Id.* at 99.) This was significant because "Joker," being "hardcore Lindo Park," would not have been helping or watching out for Jarvis Ross unless Ross was also an LPC member. (*Id.*) Detective Stuart also testified that the word "cuz'" is specific to Crips gangs. (*Id.* at 27.) Phyllis Hansen testified previously that Johnson told her he killed Smith because "she was going to testify against his cuz or one of his homies." (RT 11/14/01 at 40.)

The Arizona Supreme Court's factual determination that Ross's membership in LPC was a motivation for Johnson to kill Smith is presumed correct under 28 U.S.C. § 2254(e)(1). *See Miller-El I*, 537 U.S. at 340. Johnson "merely disagrees with" the Arizona Supreme Court's "interpretation of the facts" and therefore has failed to carry his burden of rebutting that presumption by clear and convincing evidence. *Lugo v. Hatton*, 804 F. App'x 843, 844 (9th Cir. 2020); *see Rice*, 546 U.S. at 341-42 (explaining that "[r]easonable minds reviewing the record might disagree" about a factual finding, but "on

1  habeas review that does not suffice to supersede" the state court's determination"); *McGill*,

2  16 F.4th at 687 (the "daunting" 28 U.S.C. § 2254(d)(2) standard is met in "relatively few

3  cases") (citation omitted). It was not objectively unreasonable for the Arizona Supreme

4  Court to find that Ross was a member of LPC. The record, including Detective Stuart's

5  testimony, clearly supports such a conclusion. *Cf. Taylor v. Maddox*, 366 F.3d 992, 1001

6  (9th Cir. 2004) (explaining that unreasonable factual determinations can occur "where the

7  state courts plainly misapprehended or misstated the record in making their findings").

8      Johnson next argues that the Arizona Supreme Court's decision was unreasonable

9  under 28 U.S.C. § 2254(d)(1) because the trial court's refusal to sever the gang charges

10  allowed the State to present "blatant propensity" evidence at trial with "Johnson's alleged

11  character being used to prop up the State's case." (Doc. 44 at 180.) According to Johnson,

12  the prosecution "should not be permitted to present evidence that Johnson's alleged acts

13  'were consistent with the LPC's typical criminal activity of pursuing pecuniary gain and

14  intimidating witnesses.'" (*Id.* (quoting *Johnson*, 212 Ariz. at 430).)

15      The Ninth Circuit recognizes that there exists no clearly established federal law, as

16  determined by the United States Supreme Court, mandating the severance of joined

17  charges. *See Grajeda v. Scribner*, 541 F. App'x 776, 778 (9th Cir. 2013) ("The Supreme

18  Court has not held that a state or federal trial court's denial of a motion to sever can, in

19  itself, violate the Constitution."). Thus, the denial of severance is only of constitutional

20  magnitude if it is so prejudicial as to deny a defendant a fair trial. *United States v. Lane*,

21  474 U.S. 438, 446 & n.8 (1986); *see Sandoval v. Calderon*, 241 F.3d 765, 772 (9th Cir.

22  2000) ("There is no prejudicial constitutional violation unless 'simultaneous trial of more

23  than one offense . . . actually render[ed] petitioner's state trial fundamentally unfair and

24  hence, violative of due process.'") (quoting *Featherstone v. Estelle*, 948 F.2d 1497, 1503

25  (9th Cir. 1991)). To establish prejudice, a petitioner must show that the impermissible

26  joinder "had a substantial and injurious effect or influence in determining the jury's

27  verdict." *Davis*, 384 F.3d at 638. Johnson has failed to make this showing.

28      First, as noted, the Arizona Supreme Court held that under state law evidence of

1    gang involvement would have been admissible in Johnson's murder trial. *Johnson*, 212

2    Ariz. at 429-30. While Johnson contests the ruling, this Court does not review state law

3    decisions on state law issues. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *see also*

4    *Ramirez v. Almager*, 619 F. Supp. 2d 881, 900 (C.D. Cal. 2008). Whatever potential

5    prejudice resulted from joinder of the counts was significantly reduced by the

6    cross-admissibility of the evidence from each charge. *See Davis*, 384 F.3d at 638-39;

7    *Sandoval*, 241 F.3d at 772 (where evidence in one set of crimes would be admissible to

8    prove motive and intent in another set of crimes, "cross-admissibility dispels the prejudicial

9    impact of joining all counts in the same trial"); *Windham v. Merkle*, 163 F.3d 1092,

10   1103-04 (9th Cir. 1998) (finding that the admission of gang evidence did not violate

11   defendant's right to a fair trial, in violation of due process, where the gang evidence was

12   relevant to establish motive in committing the charged crimes).

13        Johnson argues that even if the gang-related evidence was relevant, it constituted

14   inadmissible propensity evidence, and its prejudicial effect outweighed its probative value.

15   (Doc. 18 at 230-31) (citing Rules 403 and 404(b) of the Arizona Rules of Evidence).[22] This

16   argument is unpersuasive.

17        The United States Supreme Court has never held that the introduction of prior bad

18   acts evidence to show propensity to commit the current crime violates due process. *Estelle*,

19   502 U.S. at 75 n.5 ("[W]e express no opinion on whether a state law would violate the Due

20   Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to

21   commit a charged crime."); *see Mejia v. Garcia*, 534 F.3d 1036, 1046 (9th Cir. 2008)

22

23   [22] Rule 403 provides that: "The court may exclude relevant evidence if its probative value
     is substantially outweighed by a danger of one or more of the following: unfair prejudice,

24   confusing the issues, misleading the jury, undue delay, wasting time, or needlessly
     presenting cumulative evidence." Ariz. R. Evid. 403(b).

25

26   Rule 404(b)(1) provides that "evidence of other crimes, wrongs, or acts is not admissible
     to prove the character of a person in order to show action in conformity therewith." Ariz.

27   R. Evid. 404(b)(1). However, under Rule 404(b)(2), such evidence may "be admissible for
     other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge,

28   identity, or absence of mistake or accident." Ariz. R. Evid. 404(b)(2).

(rejecting challenge to introduction of propensity evidence where petitioner could point to no Supreme Court precedent establishing that admission of otherwise relevant propensity evidence violated the Constitution); *see also Ramirez*, 619 F. Supp. 2d at 900 ("To the extent Petitioner argues the gang expert's testimony inflamed the jury by suggesting Petitioner's propensity to commit crimes, Petitioner's claim fails.").

In *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009), the Ninth Circuit held that "[u]nder AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." The court continued:

> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair. . . , it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ. Absent such "clearly established Federal law," we cannot conclude that the state court's ruling was an "unreasonable application."

*Id.* (citation omitted).

Recently, however, the Supreme Court did make such a "clear ruling," holding that a trial can be rendered fundamentally unfair by the "mistaken admission of irrelevant evidence." *Andrew v. White*, 604 U.S. 86, 96 (2025). The Court clarified that "clearly established law provide[s] that the Due Process Clause forbids the introduction of evidence so unduly prejudicial as to render a criminal trial fundamentally unfair." *Id.*; *see Payne*, 501 U.S. at 825 (holding that when "evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief"). Accordingly, in *Andrew* the question on remand was "whether a fairminded jurist reviewing this record could disagree . . . that the trial court's mistaken admission of irrelevant evidence was so 'unduly prejudicial' as to render [his] trial 'fundamentally unfair.'" 604 U.S. at 96 (quoting *Payne*, 501 U.S. at 825);

1   *cf. Johnson*, 63 F.3d at 930 ("The admission of evidence does not provide a basis for habeas

2   relief unless it rendered the trial fundamentally unfair in violation of due process.").

3          In contrast to *Andrew*, where the irrelevant character evidence concerned the

4   defendant's extramarital affairs, sexual habits, and provocative clothing, 604 U.S. at 89,

5   the gang-related evidence admitted in Johnson's trial was not unduly prejudicial such that

6   he was denied a fair trial.

7          The Ninth Circuit has explained that the admission of evidence can violate the

8   constitution "only when there are *no* permissible inferences the jury may draw from the

9   evidence." *Windham*, 163 F.3d at 1103 (citation modified). In *Windham*, the court rejected

10  the petitioner's argument that "he was denied his due process right to a fundamentally fair

11  trial when the trial court admitted evidence tending to support the prosecution's 'gang

12  involvement theory.'" *Id.* The court explained that it had "no authority to review alleged

13  violations of a state's evidentiary rules in a federal habeas proceeding." *Id.* Its role instead

14  was "limited to determining whether the admission of evidence rendered the trial so

15  fundamentally unfair as to violate due process." *Id.* The court concluded there was no due

16  process violation because the testimony at issue was relevant to motive and did not lead

17  only to impermissible inferences about the petitioner's character. *Id.* at 1104.

18         Likewise, in Johnson's case, the Arizona Supreme Court determined

19  gang-affiliation evidence was properly admitted as relevant to both motive and identity.

20  *See Johnson*, 212 Ariz. at 430. The court explained:

21             the three individuals involved in the murder and robbery were
               all members of or affiliated with the LPC; as an original
22             gangster (O.G.), Johnson had an obligation to "bring up," or
               look after, younger gang members such as Jarvis Ross; Damon
23             Ross, another LPC O.G., went with Johnson to locate Smith's
               house; and Johnson told Phyllis Hansen that he killed Smith to
24             keep her from testifying against his "cuz," or fellow gang
               member, referring to Jarvis Ross. The evidence of gang
25             involvement provided a motive for Johnson to kill Smith, who
               had no connection with Johnson other than her role as a witness
26             against his fellow gang member. The State provided evidence
               that these acts were consistent with the LPC's typical criminal
27             activity of pursuing pecuniary gain and intimidating witnesses.
               The evidence of Johnson's gang involvement helped to
28             establish his identity and motive for committing the other
               charged crimes.

*Id.* at 430. This decision was neither contrary to nor an unreasonable application of clearly established federal law.

In *United States v. Abel*, 469 U.S. 45, 49 (1984), the United States Supreme Court upheld the use of gang-affiliation evidence to establish bias. It concluded that the trial court did not abuse its discretion by allowing a co-defendant to impeach another witness's credibility by testifying that the witness was a member of the Aryan Nation prison gang and that the gang required its members to lie, cheat, steal, and kill to protect each other. *Id.* at 47-49. The Court explained, "[a]ssessing the probative value of common membership in any particular group, and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 and ultimately, if the evidence is admitted, for the trier of fact." *Id.* at 54. The Court concluded that the district court had not abused its discretion when it admitted the gang affiliation evidence because the district court had taken steps to minimize any undue prejudice, including "offer[ing] to give a limiting instruction concerning the testimony." *Id.*

Other courts have also allowed gang-affiliation evidence to establish motive and intent. In *Santiago*, the prosecution sought to establish motive for the defendant's murder of another inmate through a cellmate's testimony that the defendant sought to become a member of the Mexican Mafia. 46 F.3d at 887-88. In affirming the district court's admission of evidence of the defendant's ties to the Mexican Mafia, the Ninth Circuit Court of Appeals determined that the testimony did not violate Rule 404(b) because it "did not relate to other crimes" and it fell within the exception for evidence regarding motive. *Id.* at 889. The court reasoned that testimony about the Mexican Mafia was necessary to explain why Santiago would kill a stranger and to show why other inmates helped him obtain a weapon. *Id.* The court rejected the argument that the testimony was a pretext intended to denigrate the defendant for his affiliation with a prison gang. *See id.* at 889-90. Because the evidence reflected that the defendant had expressed interest in the gang and had associated with gang members, including on the night before the murder, a sufficient foundation was laid to admit the testimony. *See id.* at 890; *see also United States v.*

1    *Rodriguez*, 766 F.3d 970, 986 (9th Cir. 2014) ("As in *Santiago*, the Mexican Mafia

2    testimony was critical to the government's theory that Appellants did not act in self-defense

3    and that their attack on [a fellow inmate] for seemingly insignificant acts of disrespect was

4    motivated by their ties to the Mexican Mafia."); *Windham*, 163 F.3d at 1103-04 (finding

5    that the admission of gang evidence did not violate defendant's right to a fair trial where

6    the evidence was relevant to establish motive in committing the charged crimes).

7        In *United States v. Easter*, 66 F.3d 1018, 1020 (9th Cir. 1995), the Ninth Circuit

8    held that evidence linking the defendants to a particular gang, "NSG," was relevant to the

9    issue of identity. There, a member of NSG admitted to planning two armed robberies and

10    only recruiting fellow gang members to assist. *Id.* This "made the NSG membership of

11    suspected accomplices in the second robbery highly relevant." *Id.* Moreover, the getaway

12    car used in the first robbery displayed the letters NSG on the windshield. *Id.*; *see United

13    States v. Major*, 676 F.3d 803, 810 (9th Cir. 2012) (holding the district court did not abuse

14    its discretion in permitting admission of jacket linking the defendants to a criminal street

15    gang. The court concluded the evidence of their gang affiliation was directly relevant to

16    proving their motive and identity as the perpetrators of a robbery.)

17        Finally, Johnson argues that the Arizona Supreme Court's determination that the

18    trial court took actions to reduce any prejudice resulting from joinder "deserves no

19    deference because it was unreasonable application of law." (Doc. 44 at 181.) The Court

20    disagrees. The jury was instructed to consider each charge individually. The jury was

21    instructed that: "Each count charges a separate and distinct offense. You must decide each

22    count separately on the evidence and law applicable to it, uninfluenced by any decision as

23    to the other counts." (IOR 158.) Jurors are presumed to follow instructions given by the

24    court. *See Weeks*, 528 U.S. at 234. Notwithstanding Johnson's assertions to the contrary,

25    courts have held that such instructions limit any prejudice from joinder. *See Davis*, 384

26    F.3d at 639 (explaining that "any prejudice was further limited through an instruction

27    directing the jury to consider each count separately"); *United States v. Rousseau*, 257 F.3d

28    925, 932 (9th Cir. 2001) ("[W]hen a court charges the jury on the elements of each count

1    separately, its action militates against a finding of prejudice.").

2        The Arizona Supreme Court's denial of Claim 12(A) was not contrary to or an

3    unreasonable application of clearly established federal law, including *Andrew v. White*. It

4    was not based on an unreasonable determination of the facts. The claim is therefore denied.

5                    **2.    Claim 12(B)**

6        Respondents argue, and Johnson concedes, that subclaim (B), alleging that the trial

7    court erroneously admitted "flawed" propensity evidence in the form of a gang expert's

8    "contradictory" and "inherently unreliable" testimony, was not presented in state court and

9    is procedurally defaulted. (Doc. 18 at 226; *see* Doc. 44 at 176.)

10        Again, contrary to Johnson's arguments, ineffective assistance of trial counsel

11    cannot serve as cause because Johnson did not exhaust an independent claim of ineffective

12    assistance with respect to the issue. *See Edwards*, 529 U.S. at 552. The ineffective

13    assistance of PCR counsel cannot excuse the default because *Martinez* applies only to

14    claims of ineffective assistance of trial counsel. *Martinez (Ernesto)*, 926 F.3d at 1225;

15    *Pizzuto*, 783 F.3d at 1177; *Hunton*, 732 F.3d at 1126-27.

16        The claim is also meritless. Johnson contends that the testimony of the gang expert,

17    Detective Stuart, was inconsistent and unreliable because, for instance, Stuart "painted a

18    picture of the LPC as incredibly sophisticated and violent, but also as disorganized and

19    lacking structure." (Doc. 18 at 233.) As Respondents note, however, the fact that the gang

20    "possessed both of those qualities . . . does not render Detective Stuart's testimony faulty."

21    (Doc. 37 at 149.)

22        Johnson also provides no factual or analytical support for his argument that

23    Detective Stuart's testimony was "blatantly suspect" and "unhelpful."[23] (Doc. 18 at

24    234-35.) He thus has not demonstrated that the detective's testimony was so "flawed" as

25    to render his trial fundamentally unfair. Any weaknesses or discrepancies in Detective

26    _____

27    [23] Johnson asserts that Detective Stuart's testimony contained "several glaring errors"—for
     example, that he had seen gang members as young as four years old, that gang members
28    write a certain way but "forget a lot," and that gang members like to wear black beanies.
     (Doc. 44 at 184.) Johnson does not explain how this testimony was erroneous.

Stuart's testimony were for the jury to assess. *Cf. Henderson v. Pollard*, No. 2:13-CV-02153-MWF-MAA, 2020 WL 4938467, at *17 (C.D. Cal. Mar. 16, 2020), *report and recommendation adopted*, No. 2:13-CV-02153-MCS-MAA, 2022 WL 17417967 (C.D. Cal. Dec. 5, 2022) ("Construing the claim more broadly as a challenge that the witnesses' testimony was false or inconsistent, or that the testimony was impeachable or unreliable, Petitioner does not identify a constitutional violation meriting federal habeas relief. Even if Petitioner supported his allegations of the witnesses' perjured testimony with evidence (which he utterly fails to do), the fact that a witness presented false testimony at trial, standing alone, does not amount to a constitutional violation; whether testimony is true or false is a question properly left to the jury."). Claim 12(B) is denied.

### 3.    Claim 12(C)

Johnson argues that the trial court erred by denying the defense motion to preclude all gang-related evidence during the aggravation and penalty phases of trial. (Doc. 18 at 238.) The trial court denied Johnson's motion to preclude the State from presenting gang evidence, ruling that "at the aggravation hearing, gang membership has a limited non-character purposes because it is offered to show the motive was witness elimination" and finding that "gang membership is probative at the aggravation phase and that this probative value outweighs any prejudicial effect." (IOR 245 at 2.) The court also ruled the State could offer gang evidence during the final phase only if it rebutted specific mitigation evidence presented by Johnson. (*Id.* at 3.)

In support of this claim, Johnson asserts that "Detective Stuart's penalty-phase testimony was just as flawed as his guilt testimony." (Doc. 18 at 239.) Again, however, in Johnson's petition fails to address the operative state court ruling, which is the Arizona Supreme Court's denial of the claim on direct appeal. The Arizona Supreme Court found that the trial court did not abuse its discretion by admitting the evidence because "an abundance of evidence linked Johnson, his crimes, and his affiliation with the Lindo Park Crips" and such evidence was "was particularly probative on the issue of motive." *Johnson*, 212 Ariz. at 433-34.

In his reply brief, Johnson repeats his argument offered in support of Claim 12(A)—that the Arizona Supreme Court made an unreasonable factual determination when it found that he and Jarvis Ross were members of the same gang. (Doc. 44 at 179-80.) The Court rejects that argument for the reasons already stated and denies Claim 12(C).

### 4.    Conclusion

Clearly established federal law holds that a criminal trial can be rendered fundamentally unfair by the "mistaken admission of irrelevant evidence." *Andrew*, 604 U.S. at 96. In Johnson's case, as the Arizona Supreme Court reasonably determined, the gang-related evidence was relevant to motive and intent. Its admission was not mistaken, let alone unduly prejudicial, and there was no due process violation.

### H.    Claim 14:

Relying on *Simmons v. South Carolina*, 512 U.S. 154 (1994), and its progeny, Johnson alleges that his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendment were violated because "[a]n improper jury instruction likely caused the jury to vote for death to ensure Johnson was never released from custody." (Doc. 18 at 258.)

### 1.    Background

In *Simmons*, the Supreme Court held that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." 512 U.S. at 156; *see Lynch v. Arizona*, 578 U.S. 613 616-17 (2016) (holding that *Simmons* applies to Arizona capital cases). In Arizona, parole is available only for juveniles and individuals who committed a felony before January 1, 1994. A.R.S. § 41-1604.09(I). These categories do not apply to Johnson. The trial court, however, in its juror questionnaire, during voir dire, and in its instructions, informed jurors that Johnson would receive a sentence of life without parole or life with the possibility of parole after 28 years if not sentenced to death. (*See, e.g.*, RT 12/18/03 at 62; IOR 539 at 10) (instructing the penalty-phase jury that if it voted for a life sentence, the court would "sentence the defendant to natural life in prison without the possibility of parole, or life in prison without

1    the possibility of parole until 28 calendar years have been served.").

2         Johnson filed his habeas petition in this Court on December 17, 2018. (Doc. 18.) He

3    acknowledged that he did not raise a *Simmons* claim in state court. (*Id.* at 258.) On January

4    19, 2019, Johnson filed a motion to stay his case and hold it in abeyance under *Rhines v.*

5    *Weber*, 544 U.S. 269 (2005), while he returned to state court to exhaust his *Simmons* claim.

6    (Doc. 23.) After supplemental briefing, the Court denied Johnson's request for a stay,

7    rejecting his argument that *Lynch* represented a "significant change in the law for purposes"

8    of Rule 32.1(g) of the Arizona Rules of Criminal Procedure, which allows a petitioner to

9    file a successive PCR petition when such a change in the law has occurred. (Doc. 32.)

10   Johnson filed a motion for reconsideration, citing the Supreme Court's grant of certiorari

11   in *Cruz v. Arizona*, 142 S. Ct. 1412 (U.S. March 28, 2022). (Doc. 60 at 9-10.) The Court

12   denied the motion but acknowledged that "whether there is an available state remedy for

13   Johnson to exhaust a *Lynch* claim may turn on the outcome of the proceedings in *Cruz*."

14   (Doc. 66 at 4.) The order, dated April 28, 2022, also directed the parties to "notify the Court

15   if a *Simmons/Lynch* claim is filed in state court, the outcome of the claim, and the outcome

16   of *Cruz*." (*Id.*)

17        Meanwhile, on July 12, 2021, Johnson filed a pro se motion in the Maricopa County

18   Superior Court. The state court treated the motion as a Notice of Post-Conviction Relief

19   and appointed counsel. (Doc. 61-1 at 2.) Johnson described these developments in a brief

20   filed in April 2022 seeking reconsideration of this Court's order denying his second motion

21   for a *Rhines* stay. (Doc. 65 at 4.) He also noted his "understanding" that the *Simmons/Lynch*

22   claim "will be presented to the state court in the new [PCR] petition." (*Id.* at 5.)

23        In January 2023, at Johnson's request, the PCR court removed Johnson's

24   court-appointed counsel and allowed Johnson to represent himself. (Doc. 83 at 48.)

25        The Supreme Court decided *Cruz* in February 2023. 598 U.S. 17 (2023). The Court

26   held that *Lynch* represented a "significant change in the law" for the purposes of Rule

27   32.1(g). *Id.* at 27. The Court determined that the "Arizona Supreme Court's application of

28   Rule 32.1(g) to *Lynch* was so novel and unfounded that it does not constitute an adequate

1    state procedural ground." 598 U.S. at 29.

2          On October 9, 2023, Johnson filed, pro se, his successive PCR petition. (Doc. 79;

3    Doc. 83 at 23-39.) He did not raise Claim 14, or any allegation based on *Simmons/Lynch*.

4    (*See* Doc. 79 at 4-26.) The PCR court found the claims raised were procedurally precluded

5    and meritless and denied Johnson's request for evidentiary development. (Doc. 83, Attach.

6    3 at 32-39.) Johnson's petition for review of that order is currently pending in the Arizona

7    Supreme Court. (*Id.*, Attach. 5.)

8          In September 2024, the parties having failed to acknowledge the *Cruz* decision, and

9    Johnson neither notifying this Court of any claim filed in state court nor moving for relief

10   here, the Court ordered supplemental briefing to address the effect of *Cruz* on Claim 14.

11   (Doc. 80.) That briefing has been completed. (Docs. 82, 83, 84.)

12         On April 7, 2025, Johnson filed a "Notice of Supplemental Authority in Support of

13   Renewed Motion for Reconsideration of Motion for Stay and Abeyance" ("Notice"). (Doc

14   86.) The Notice cites *Doerr v. Shinn*, 127 F.4th 1162 (9th Cir. 2025), as supplemental

15   authority supporting Johnson's request for a *Rhines* stay to allow him to exhaust Claim 14

16   in state court. As described in more detail below, in *Doerr* the Ninth Circuit Court of

17   Appeals held, in a divided decision, that the petitioner was entitled to a *Rhines* stay

18   premised in part on the court's uncertainty about whether Arizona courts would enforce

19   their procedural default rules to preclude the petitioner's ineffective assistance of counsel

20   claim.[24] 127 F.4th at 1171. This Court again ordered supplemental briefing. (Doc. 87.)

                          **2.      Analysis**

22         In his supplemental brief on the *Cruz* decision, Johnson argues that because *Cruz*

23   held that *Lynch* was a significant change in law under Rule 32.1(g) there is no procedural

24   bar to prevent him from returning to state court to exhaust Claim 14. (Doc. 82 at 11.)

25   Because the claim is now unexhausted, Johnson also asks the Court to reconsider its

26   previous denials of his request for a *Rhines* stay. (*Id.* at 12.) He further contends that the

---

[24] Respondents in *Doerr* have moved for rehearing *en banc*. *Doerr v. Shin*, 20-99002, Dkt. 94. Briefing on the motion is ongoing. *See* Dkt. 98.

1   decision in *Doerr* opens another path to exhaustion in state court by calling into question

2   the consistency with which Arizona courts apply their rules of preclusion. (Doc. 86 at 2.)

3       Respondents argue that neither *Doerr* nor *Cruz* affect the analysis of Claim 14

4   because the claim itself fails under *State v. Bush*, 244 Ariz. 575, 592-93 (2018). (Docs. 83,

5   90 at 4.) They also assert that the *Doerr* decision is limited in scope and does not establish

6   a path to exhaustion under the circumstances of Johnson's case. (Doc. 90 at 2-4.)

7       Respondents also oppose a *Rhines* stay, arguing that Claim 14 would be found

8   untimely in state court, that Johnson has not established good cause for his failure to

9   exhaust the claim, the claim is meritless, and Johnson has been dilatory in pursuing the

10  claim. (Doc. 83 at 7-15.)

11      The Court will first address Respondents' argument that Claim 14 is meritless under

12  *Bush* because Johnson never requested a parole ineligibility instruction.[25] The Court joins

13  other courts in this district in finding that *Bush* forecloses *Simmons* relief where a defendant

14  did not seek a parole-ineligibility instruction.[26]

15      In *Bush*, the Arizona Supreme Court adopted a "narrow interpretation of *Simmons*,"

16  holding that "the due process right under *Simmons* merely affords a parole-ineligible

17  capital defendant the right to 'rebut the State's case' (if future dangerousness is at issue)

18  by informing the jury that 'he will never be released from prison' if sentenced to life."

19  *Bush*, 244 Ariz. at 592-93 (citation modified); *see also O'Dell v. Netherland*, 521 U.S. 151,

20  159 (1997) (noting that in *Simmons* "there was no opinion for the Court" and that four

21  Justices merely "concluded that the Due Process Clause required allowing the defendant

---

22  [25] Johnson concedes he did not request such an instruction. (*See* Doc. 82 at 19; Doc. 18 at

23  259-60.)

24  [26] *Nordstrom v. Thornell*, No. CV-20-00248-TUC-RCC, 2024 WL 1092517, at *6 (D. Ariz.
    Mar. 13, 2024); *Fitzgerald v. Thornell*, No. CV-19-05219-PHX-MTL, 2023 WL 5671335,

25  at *5 (D. Ariz. Sept. 1, 2023); *Payne v. Thornell*, 679 F. Supp. 3d 931, 938 (D. Ariz. 2023);
    *Morris v. Thornell*, No. CV-17-00926-PHX-DGC, 2023 WL 4237334, at *6 (D. Ariz. June

26  28, 2023*), reconsideration denied*, No. CV-17-00926-PHX-DGC, 2024 WL 3091200 (D.
    Ariz. June 20, 2024); *Bearup v. Thornell*, No. CV-16-03357-PHX-SPL, 2023 WL

27  5608385, at *6 (D. Ariz. Aug. 30, 2023); *Ellison v. Thornell*, No. CV-16-08303-PCT-
    DWL, 2023 WL 4847599, at *5 (D. Ariz. July 28, 2023).

28

1  to inform the jury—through argument or instruction—of his parole ineligibility in the face

2  of a prosecution's future dangerousness argument").[27]

3      The Arizona Supreme Court noted that in every case in which it or the United States

4  Supreme Court has found reversible *Simmons* error, the trial court had "either rejected the

5  defendant's proposed jury instruction regarding his ineligibility for parole, prevented

6  defense counsel 'from saying anything to the jury about parole ineligibility' or both." *Bush*,

7  244 Ariz. at 593 (quoting *Simmons*, 512 U.S. at 175 (Ginsburg, J., concurring)).[28]

8      The *Bush* court concluded that relief under *Simmons* was foreclosed because, unlike

9  other cases involving reversible error, "the trial court neither refused to instruct, nor

10 prevented Bush from informing, the jury regarding his parole ineligibility." *Id.*; *see also*

11 *State v. Riley*, 248 Ariz. 154, 195 (2020) ("[R]elief under *Simmons* is foreclosed by the

12 defendant's failure to request a parole ineligibility instruction at trial." (citation modified)).

13     Johnson asserts that his case is distinguishable because it "involve[s] affirmative

14 mis-instruction versus the absence of further clarification." (Doc. 84 at 4.) He explains,

15 "[t]he trial court did not simply reject a parole ineligibility jury instruction or argument

16 from trial counsel. Rather, the trial court affirmatively mis-instructed the jury." (*Id.*) This

17 is not a point of distinction between Johnson's case and *Bush*. The Arizona Supreme Court

18 describes the instructions in *Bush* as follows:

> The trial court . . . instructed the first pool of prospective jurors
> that if they were to find the defendant guilty, find one or more
> aggravating circumstances, but nonetheless "unanimously
> agree[ ] that . . . life in prison is the appropriate sentence, the
> Court will sentence the defendant to either life imprisonment
> without the possibility of release or life without the possibility

[27] Reviewing the plurality opinion in *Simmons*, the Arizona Supreme Court found that Justice O'Connor's opinion, separately concurring in the judgment with Chief Justice Rehnquist and Justice Kennedy, represented the "'narrowest ground[ ]' that 'may be viewed as [the] position taken by' the Court on the issue of what due process requires in this context.'" *Bush*, 244 Ariz. at 592.

[28] The Arizona Supreme Court also cited *Lynch*, 578 U.S. at 614; *Kelly*, 534 U.S. at 249; *Shafer*, 532 U.S. at 41-46; *State v. Hulsey*, 243 Ariz. 367, 394 (2018); *State v. Rushing*, 243 Ariz. 212, 221 (2017); and *State v. Escalante-Orozco*, 241 Ariz. 254, 284 (2017). *Bush*, 244 Ariz. at 595.

- 92 -

of release until at least 35 calendar years have been passed [sic]." The court repeated that same incorrect instruction the next day, again without objection, before a different panel of prospective jurors. The voir dire process then began, the petit jurors were selected, and the jury found Bush guilty on all charges.

At the beginning of the aggravation phase . . . the trial court instructed the jury about possible sentences Bush faced if the jurors found one or more aggravating circumstances. The court explained that if the jury returned a life sentence, "then the judge will sentence [Bush] to either life imprisonment without the possibility of release or life imprisonment with the possibility of release after 35 years."

*Bush*, 244 Ariz. at 590-91. These instructions are functionally identical to those provided in Johnson's case. (*See, e.g.*, RT 12/18/03 at 62.) Johnson's argument that the holding in *Bush* does not govern his case must be rejected.

The Court will also deny Johnson's renewed request for the Court to reconsider its denial of a *Rhines* stay. A district court may grant a motion to reconsider only in "highly unusual circumstances." *School Dist. No. 1J, Multnomah Cnty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993). "The Court will ordinarily deny a motion for reconsideration of an Order absent a showing of manifest error or a showing of new facts or legal authority that could not have been brought to its attention earlier with reasonable diligence." LRCiv. 7.2(g)(1). A *Rhines* stay is appropriate only if (1) Johnson had good cause for his failure to exhaust Claim 14 in state court; (2) the claim is potentially meritorious; and (3) there is no indication he has engaged in "intentionally dilatory litigation tactics." *See Rhines*, 544 U.S. at 278. Claim 14 satisfies none of these criteria.

The Court has already addressed the merits of Claim 14. In support of his argument that good cause exists for his failure to exhaust Claim 14, and that he has not been intentionally dilatory in his pursuit of a *Simmons/Lynch* claim in state court, Johnson argues that "it was not clear that the Arizona Supreme Court would accept these [*Simmons/Lynch*] cases for review until its recent decision" in *State v. Anderson*, 257 Ariz. 226 (2024), which was decided in May 2024. (Doc. 82 at 23; Doc. 84 at 4-5, 7-8)

Johnson moved for reconsideration only after the Court ordered supplemental

briefing—briefing which itself was necessitated by Johnson's failure to notify the Court of his intentions following the *Cruz* decision. Johnson's supplemental brief was filed on October 4, 2024, five months after the *Anderson* decision and nineteen months after *Cruz*. (Doc. 82.) This is not consistent with the "reasonable diligence" requirement of LRCiv. 7.2(g). It also demonstrates dilatory intent, which negates a *Rhines* stay. 544 U.S. at 278.

Nor has Johnson shown good cause for his failure to exhaust Claim 14 in state court. Johnson himself did not raise such a claim in his pro se successive PCR petition, filed in October 2023, eight months after *Cruz*. He argues that the ineffectiveness of PCR counsel and the futility, before *Cruz* and *Anderson*, of raising such a claim both satisfy the good cause criterion. (Doc. 82 at 15.)

In *Anderson*, the Arizona Supreme Court held that the petitioner's successive claim of ineffective assistance of counsel was not precluded under Rule 32. The case involved a defendant who was advised by counsel that parole would be available if he were found guilty at trial. 257 Ariz. at 229. Relying on that advice, Anderson declined a plea deal and was convicted at trial. *Id.*

Almost twenty years after filing his initial PCR petitions, he learned he was never parole-eligible because the Arizona legislature eliminated parole in 1993, seven years before his conviction. *Id.* He then filed a third PCR petition claiming ineffective assistance of counsel, explaining that his failure to timely file a notice of PCR was because he had only recently learned that he was not parole eligible and that his attorney's advice was incorrect. *Id.* at 229-30. The Arizona Supreme Court agreed and found that the defendant "was not at fault for the pervasive confusion about parole eligibility at the time of sentencing." *Id.* at 231. The court explained that while "preclusion requires defendants to raise all *known* claims for relief in a single petition," Anderson's claim was not untimely because "it was not cognizable as a 'known' claim" when his previous PCR petitions were filed. *Id.* at 232 (citation modified).

*Anderson* established, in "extremely rare . . . circumstances," there is an equitable exception to the rule precluding successive ineffective assistance of counsel claims. *Id.* at

232-33. Johnson does not explain how that decision could have had any impact on his ability to raise a substantive *Simmons* claim in state court—a path that was opened at the latest, in *Cruz. Cf. Anderson (Frank) v/ Thornell*, 2024 WL 3091180, at *14-15 (D. Ariz. June 20, 2024) (finding *Anderson*'s equitable exception not applicable where "the claim was known and recognized well before [petitioner's] PCR proceedings were concluded in state court").

In *Doerr*, the court relied on *Anderson* and *State v. Diaz*, 236 Ariz. 361 (2014), to support its determination that "it is not clear that the Arizona courts would hold that [a petitioner's] ineffective assistance claim in a second postconviction petition is barred because of his failure to raise it in his first petition." 127 F.4th at 1171 (citation modified). In *Diaz*, the petitioner's first post-conviction attorney filed an untimely petition; his second filed only a notice to file a petition. 236 Ariz. at 362. When a third attorney finally filed a petition, it was summarily denied as precluded by Rule 32.2(a)(3) because the ineffective assistance claim contained in the petition could have been raised in the two previous petitions. *Id.*

The Arizona Supreme Court reversed, explaining that Diaz had lost the opportunity to raise his ineffective assistance claim "through no fault of his own." *Id.* at 363. Diaz "was blameless regarding his former attorneys' failures to file an initial PCR petition," and the court would "not deem his IAC claim waived pursuant to Rule 32.2(a)(3)." *Id.*

The court then clarified that its "holding in this peculiar scenario does not frustrate Rule 32's preclusion provisions" because "[p]ermitting Diaz to file his first petition to assert an IAC claim under the circumstances here will not result in repeated review of the IAC claim; it would result in its first review." *Id.* The court continued: "Once the petition is adjudicated, and assuming that Diaz does not obtain relief, this and all other claims that Diaz might have brought will be precluded and Diaz will not be able to raise them in a successive petition." *Id.*

The scenario present in *Diaz* and *Anderson*—the cases on which the *Doerr* majority based its conclusion upon—is not present in Johnson's case. There were no "extremely

1    rare . . . circumstances," *Anderson*, 257 Ariz. at 232, preventing Johnson from filing a

2    *Simmons/Lynch* claim in state court. As noted above, Johnson and his counsel were aware

3    of the claim prior to the filing of Johnson's latest PCR petition. (Doc. 65 at 5; *see* Doc. 31

4    at 2-7.)  Johnson further has not "adequately explain[ed]" why the failure to raise Claim 14

5    was not his fault. *Anderson*, 257 Ariz. at 231.

6         Johnson's failure to exhaust Claim 14 was a "mere failure to recognize a valid claim

7    might exist," and not due, as in *Anderson*, to the systemic confusion about parole

8    availability. *See id.* As described above, such a claim was known and cognizable when

9    Johnson filed his latest PCR petition. The equitable exception recognized in *Anderson*

10   therefore is not available for Johnson's *Simmons/Lynch* claim. *See Anderson (Frank)*, 2024

11   WL 3091180, at *15.

12        In sum, this Court does not read *Doerr* as suggesting that Arizona state courts would

13   fail to apply their preclusion rules in the absence of unusual circumstances, such as those

14   in *Diaz* and *Anderson*, where an equitable remedy is necessary because a potentially

15   meritorious claim was omitted from a PCR petition through no fault of the petitioner.

16        Accordingly, Claim 14 is denied as meritless. Neither *Cruz* nor *Doerr* entitles

17   Johnson to a *Rhines* stay.[29] Because Johnson is not entitled to a stay, it is not appropriate

18   to authorize the Federal Public Defender to represent him in state court. *See Harbison v.*

19   *Bell*, 556 U.S. 180, 185 (2009).

20   _____

21   [29]    On October 9, 2025, Respondents filed a Notice of Supplemental Authority citing
     the Arizona Supreme Court's decision in *State v. Traverso*, --- Ariz. ---, 576 P.3d 97 (Ariz.
22   2025). (Doc. 92.) *Traverso* clarified that successive PCR claims of ineffective assistance
     of trial counsel are not automatically precluded, but reaffirmed, as Respondents note, that
23   Arizona bars consideration of successive ineffective assistance claims, unless the claim
     involves a violation of a constitutional right that can only be waived knowingly,
24   voluntarily, and personally. *Id.* at 105–07. The court found that the right to be informed by
     counsel of the terms of a plea agreement fit within the "narrow category of rights" requiring
25   a defendant's personal waiver. *Id.* at 105–06. Johnson filed a response brief arguing that
     *Traverso* supports his request for a stay. (Doc. 93.) The Court disagrees. *Traverso*
26   addresses Arizona's procedural rules only in the context of ineffective assistance of counsel
27   claims; it offers no new support for Johnson's arguments and does not affect the Court's
     analysis of Claim 14's procedural status.
28

I.      Claim 15:

Johnson argues that he was denied conflict-free counsel at (A) the sentencing phase of his trial and (B) during the post-conviction proceedings. (Doc. 18 at 266.) Both claims are meritless.

1.      Claim 15(A)

In his PCR Petition, Johnson asserted that his second-chair counsel at the sentencing, Nate Carr, had a conflict of interest because he had previously represented witness Phyllis Hansen. (*See* PCR Pet. at 1, 116.) The PCR court denied the claim on the merits. (PCR Order, ME 1/28/15, at 21–22.) The parties disagree about the claim's procedural status, with Johnson arguing that he properly exhausted the claim by incorporating it into his Petition for Review. (Doc. 44 at 204; *see* Doc. 37 at 165.) Regardless of its procedural posture, the Court will consider Claim 15(A) on the merits. *See* 28 U.S.C. § 2254(b)(2) (allowing denial of unexhausted claims on the merits); *see also Lambrix*, 520 U.S. at 524-25.

At a hearing on December 12, 2003, the prosecutor made a record of the fact that Phyllis Hansen "had consulted [with Carr] some time ago about another murder committed by the defendant." (RT 12/12/03 at 6.) According to the prosecutor, Carr "didn't recall" having consulted with Hansen. (*Id.*) The prosecutor indicated that Hansen was willing to testify without raising the issue that she had previously consulted with Carr and assured the court that Hansen was not going to be asked about it. (*Id.* at 6-7.)

In his PCR Petition, Johnson argued that because of the consultation with Hansen, Carr possessed "confidential information that should have been used to impeach her." (PCR Pet. at 1.) In denying the conflict-of-interest claim, the PCR court explained that "[b]ased on its review of the transcript, the Court does not find a conflict of interest sufficient to disqualify Mr. Carr. The information to which counsel Carr had access appears to be inculpatory as to defendant rather than impeaching as to Hansen." (PCR Order, ME 1/28/15, at 22.)

The right to counsel guaranteed by the Sixth Amendment includes the "right to

representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981). An ineffective assistance of counsel claim based on a conflict of interest requires a petitioner to show "that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). "[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." *Id.* at 350. Prejudice is presumed if a petitioner shows that his lawyer labored under an actual conflict of interest. *United States v. Rodrigues*, 347 F.3d 818, 823 (9th Cir. 2003) (citing *Sullivan*, 446 U.S. at 347). An "actual conflict of interest" means "a conflict *that affected counsel's performance*—as opposed to a mere theoretical division of loyalties." *Mickens v. Taylor*, 535 U.S. 162, 171 (2002).

"In *Mickens*, the Supreme Court explicitly limited this presumption of prejudice for an actual conflict of interest . . . to cases involving 'concurrent representation,'" or simultaneous representation of two or more defendants. *Rowland v. Chappell*, 876 F.3d 1174, 1192 (9th Cir. 2017) (citing *Mickens*, 535 U.S. at 175); *see Earp v. Ornoski*, 431 F.3d 1158, 1184 (9th Cir. 2005) ("The *Mickens* Court specifically and explicitly concluded that *Sullivan* was limited to joint representation. . . .").

Because the alleged conflict of interest here does not involve concurrent representation, *Sullivan* does not apply. Johnson cannot show an actual conflict of interest that would lead to a presumption of prejudice.

To be entitled to relief on this claim, Johnson must demonstrate prejudice under *Strickland*. *See, e.g.*, *Rodrigues*, 347 F.3d at 823; *United States v. Walter-Eze*, 869 F.3d 891, 900 (9th Cir. 2017) (explaining that *Strickland* analysis applies in the absence of an actual conflict under *Sullivan*). He cannot make that showing, offering only speculation that Carr would have gained useful impeachment material during his consultation with Hansen about another murder allegedly committed by Johnson. *Cf. Triana v. United States*, 205 F.3d 36, 41 (2d Cir. 2000) (burden of proof in conflict-of interest claims "cannot be met by speculative assertions of bias or prejudice") (citing *Cuyler*, 446 U.S. at 350); *Smith*

*v. Dorsey*, 30 F.3d 142 (10th Cir. 1994) (to be entitled to relief, petitioner "must point to specific instances in the record showing a conflict-related impairment of counsel's adversary function that is real rather than hypothetical"). In fact, lead counsel Storrs vigorously cross-examined Hansen. (*See* RT 12/4/03 at 53-79.) Johnson has not suggested how cross-examining Hansen about a second murder he allegedly committed would have benefited rather than harmed the defense such that there was a reasonable probability of a different result at sentencing. *See Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001). Claim 15(A) is denied as meritless.

### 2.    Claim 15(B)

In subclaim 15(B), Johnson alleges that a conflict of interest existed because the office to which his PCR case was ultimately assigned had represented Jarvis Ross, Johnson's co-defendant in the Affordable Massage robbery case, and David Smith, the husband of murder victim Stephanie Smith. (Doc. 18 at 269-70.) This claim, which Johnson concedes he did not raise in state court, is defaulted and procedurally barred from federal review. It is also non-cognizable and meritless. There is no Sixth Amendment right to counsel in collateral proceedings, so there can be no independent constitutional violation arising out of PCR counsel's alleged ineffectiveness. *See Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987*); see Murray v. Giarratano*, 492 U.S. 1, 10 (1989). In addition, Johnson's case was not transferred to the Office of the Legal Advocate, where the alleged conflict existed, until August 2017. This was after his PCR Petition had been filed (August 8, 2014) and denied (January 29, 2015). It also was after the Petition for Review was filed (February 16, 2016), fully briefed, and pending before the Arizona Supreme Court—where it was denied in January 2018. Any conflict of interest had no bearing on the PCR proceedings. Claim 15(B) is denied.

### J.    Claim 18:

Johnson argues that his "due process rights were violated by multiple trial court errors at the penalty phase," including the lack of qualified mitigation specialists and the court's order that a defense expert's re-interview of Johnson be recorded. (Doc. 18 at

335-41.)

Johnson acknowledges that he did not raise these claims in state court. (*Id.* at 335.) He again argues that the ineffective assistance of trial and PCR counsel excuses the default. (*Id.*) Alternatively, he contends that the claims were exhausted by the Arizona Supreme Court's independent review of his sentence. (*Id.*)

As already noted, under *Martinez* the ineffectiveness of PCR counsel may excuse only claims of ineffective assistance of trial counsel. *See Martinez (Ernesto)*, 926 F.3d at 1225; *Pizzuto*, 783 F.3d at 1177; *Hunton*, 732 F.3d at 1126-27. PCR counsel's ineffectiveness cannot excuse the default of Claim 18. The ineffectiveness of trial counsel cannot excuse the default because that claim itself was not independently exhausted in state court. *See Edwards*, 529 U.S. at 45; *Carrier*, 477 U.S. at 489-90. Nor did the Arizona Supreme Court's independent review of Johnson's sentence exhaust the constitutional violations alleged in Claim 18. That review, which is limited to an assessment of the aggravating and mitigating factors and the propriety of the death sentence, does not encompass the allegations contained in Claim 18. *See Moormann*, 426 F.3d at 1058.

Claim 18 is denied as procedurally defaulted and barred from federal review. It is also meritless.

### 1.    Mitigation Specialist

Johnson argues that David Wilcox, a former probation officer, was not "qualified to conduct the unique and specialized task of capital mitigation investigation." (Doc. 18 at 337.) According to Johnson, Wilcox "lacked specialized training in identifying, documenting or interpreting symptoms of mental impairments, neurobiological deficits, long term consequences of deprivation and neglect during developmental years, social, cultural, and ethnic influences on behavior, and presence, severity and consequences of exposure to chronic trauma." (*Id.* at 337-38) (citations omitted). Johnson asserts that the trial court's "complete failure to supply Johnson with the necessary personnel to conduct a mitigation investigation amounted to constitutional error" under *Ake v. Oklahoma*, 470 U.S. 68 (1985). These arguments fail.

First, regardless of whether Wilcox lacked the requisite training and experience, much of the mitigating investigation—approximately 300 hours' worth—had been conducted by indisputably qualified mitigation specialists. Wilcox was appointed mitigation specialist in April 2003. (PCR Pet., Ex. 19.) Prior to his appointment, Pamela Siller, a mitigation specialist with 18 years of experience, served on Johnson's team. Siller billed for 90 hours of work during her tenure, from October 10, 2002, to December 16, 2002. (*Id.*, Ex. 16.) Prior to Siller's appointment, mitigation specialist Nora Shaw spent "in excess of 200 hours on [Johnson's case]." (*Id.*, Ex. 15, at 4, ¶ 7.)

Next, the areas of investigation identified by Johnson, including his mental health and the effects of childhood deprivation and trauma, were also investigated by defense experts Dr. Carlos Jones, a psychologist, and Dr. Mark Walter, a neuropsychologist. As discussed below, other mitigation witnesses also testified about these issues.

Finally, the *Ake* decision on which Johnson relies is inapposite, as it does not establish entitlement to a mitigation specialist. In *Ake*, the Supreme Court held that "when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." 470 U.S. at 83. As the Ninth Circuit has explained: "Due process under *Ake* does not require the appointment of a mitigation specialist." *Ramirez v. Ryan*, 937 F.3d 1230, 1249 (9th Cir. 2019), *rev'd on other grounds sub nom. Shinn v. Ramirez*, 596 U.S. 366 (2022) ("[W]e assess whether Ramirez was denied access to an independent psychological evaluation. We agree with the district court that even under a broad reading of *Ake*, Ramirez's claim fails because he did receive the assistance of an independent psychologist."); *see Wogenstahl v. Mitchell*, 668 F.3d 307, 340 (6th Cir. 2012) ("*Ake* itself does not mandate the appointment of a general mitigation expert or investigator for the penalty phase.").

### 2.    Recording of Examination

As the penalty phase was about to begin, the defense notified the State that Dr. Jones

intended to re-interview Johnson. (RT 12/11/2003 at 3-4.) The State asked to audio or video tape the evaluation to prepare for its interview of Dr. Jones, to which it was entitled under Rule 15 of the Arizona Rules of Criminal Procedure. (*Id.* at 4, 7-8.) Defense counsel objected on the grounds that recording the session would interfere with Dr. Jones's ability to evaluate Johnson. (*Id.* at 4-5.) The court granted the State's request, explaining that "exigent circumstances exist which support the recording of the interview. Due to the late nature of the interview and the timeframe of the proceedings, there is not adequate time for a written report to be prepared by Dr. Jones." (IOR 507.) Rather than comply with the court's order, defense counsel decided not to have Dr. Jones re-interview Johnson. (RT 12/11/03 at 11-12.)

Respondents correctly note that "Johnson provides no legal authority supporting his contention that recording of a mental health interview violates due process, and . . . the circumstances here supported the state court's decision." (Doc. 37 at 191.) In fact, the cases Johnson cites stand for the proposition that when "specialized circumstances justify[] a recording," *United States v. Wilson*, 920 F. Supp. 2d 287, 306 (E.D.N.Y. 2012), the decision whether to grant a request to record a mental health evaluation "is discretionary with the court." *E.E.O.C. v. Grief Bros. Corp.*, 218 F.R.D. 59, 64 (W.D.N.Y. 2003).

In his reply brief, again citing *Ake*, Johnson asserts that "[t]he court's order violated [his] due process rights to an expert." (Doc. 44 at 238.) *Ake* was satisfied here because Johnson had access to a "competent psychiatrist who . . . conduct[ed] an appropriate examination and assist[d] in evaluation, preparation, and presentation of the defense." 470 U.S. at 83. Claim 18 is denied.

### K.    Claim 22:

Johnson argues that the reasonable-doubt instruction given at the guilt and aggravation phases of his trial "impermissibly lowered the State's standard of proof and shifted the burden to [him]." (Doc. 18 at 371.)

Johnson argues that he exhausted this claim by raising it in his PCR Petition and Petition for Review. (*Id.*) As Respondents note, however, Johnson presented only a claim

that appellate counsel was ineffective for not challenging the reasonable-doubt instruction but did not raise a stand-alone challenge to the instruction. (*See* PCR Pet. at 146-47.) The PCR court found that counsel was not ineffective because, "[b]ased on the state of the law at the time of defendant's appeal . . . the challenges are meritless." (PCR Order, ME 1/28/15, at 34.) Because Johnson did not raise the underlying challenge to the reasonable doubt instruction in state courts, it is unexhausted and procedurally defaulted. While an exhausted claim of appellate counsel ineffectiveness can excuse a claim's procedural default, Johnson cannot establish cause with respect to this claim because it is meritless.

During the guilt and aggravation phases of trial, the court provided the following instruction:

> Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every doubt. If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty. If on the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty.

(RT 11/26/01 at 9-10; RT 12/10/03 at 59-60.)

"The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course." *Victor v. Nebraska*, 511 U.S. 1, 5 (1994). As long as the jury is instructed that the defendant must be found guilty beyond a reasonable doubt, "the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. Rather, taken as a whole, the instructions must correctly convey the concept of reasonable doubt to the jury." *Id.* (citation modified).

The instruction provided by the trial court, which was consistent with Arizona law, *see State v. Portillo*, 182 Ariz. 592, 596 (1995), is based on the pattern instruction adopted by the Federal Judicial Center. *See State v. Van Adams*, 194 Ariz. 408, 417-18 (1999). Johnson cites no authority holding that it impermissibly lowers the burden of proof, and, in *Victor*, Justice Ginsburg praised the instruction as "clear, straightforward, and accurate."

1    511 U.S. at 26 (Ginsburg, J., concurring). The Ninth Circuit also has upheld identical or

2    substantially similar instructions. *See, e.g.*, *United States v. Artero*, 121 F.3d 1256, 1257-59

3    (9th Cir. 1997); *United States v. Velasquez*, 980 F.2d 1275, 1278-79 (9th Cir. 1992).

4        Claim 22 is denied as procedurally defaulted and meritless.

5    **L.    Claim 23:**

6        Johnson argues that the trial court's premeditation instruction "crucially misled" the

7    jury. (Doc. 18 at 374.) He acknowledges that he did not raise the claim in state court but

8    again argues that its default is excused by the ineffective assistance of trial and PCR

9    counsel. (*Id.*) These arguments fail for the reasons discussed above. The alleged

10    ineffectiveness of trial counsel in challenging the instruction cannot serve as cause because

11    Johnson did not exhaust an independent claim of ineffective assistance regarding the

12    instruction. *See Edwards*, 529 U.S. at 552. Ineffective assistance of PCR counsel cannot

13    excuse the default because *Martinez* applies only to claims of ineffective assistance of trial

14    counsel. *Martinez (Ernesto)*, 926 F.3d at 1225; *Pizzuto*, 783 F.3d at 1177; *Hunton*, 732

15    F.3d at 1126-27. Claim 23 is procedurally defaulted and barred from federal review.

16        The claim is also meritless, so Johnson's defaulted claim of trial counsel's

17    ineffectiveness (*see* Doc. 18 at 374; Doc. 44 at 262) is not excused by the ineffective

18    assistance of PCR counsel. *See Runningeagle*, 825 F.3d at 982; *Atwood*, 870 F.3d at 1060.

19        The trial court provided the following instruction, which mirrored the statutory

20    definition of premeditation in A.R.S. § 13-1101(1):

21        Premeditation means that the defendant acts with either the
        intention or the knowledge that he will kill another human
22        being when such intention or knowledge precedes the killing
        by any length of time to permit reflection. Proof of actual
23        reflection is not required but an act is not done with
        premeditation if it is the instant effect of a sudden quarrel or
24        heat of passion.

25    (RT 11/26/2001 at 14.)

26        This instruction was arguably erroneous because it included the phrase "[p]roof of

27    actual reflection is not required," which the Arizona Supreme Court later "disapprove[d]

28    of" when used without "further clarification." *State v. Thompson*, 204 Ariz. 471, 480

(2003). Johnson asserts that the premeditation instruction relieved the prosecution of its burden of proving the element of actual reflection.

Due process requires that the state prove every element of a crime beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970); *Sandstrom v. Montana*, 442 U.S. 510, 520 (1979). An improper jury instruction will merit habeas relief only if the "instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72. The instruction "'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Id.* (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). A petitioner must show that there is a reasonable likelihood that the jury applied the instruction in a manner that violated a constitutional right. *Id.*; *see Carriger v. Lewis*, 971 F.2d 329, 334 (9th Cir. 1992). Johnson cannot make that showing.

First, the instruction included the "further clarification" that "an act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion"—language that "distinguishes impulsive killings from planned or deliberated killings." *Thompson*, 204 Ariz. at 478.[30] Next, evidence showed that the murder was premeditated, and the motive was witness elimination. *See Johnson*, 212 Ariz. at 428-29, 439-40. Finally, Johnson's defense at trial was mistaken identity, not lack of premeditation. Thus, any mistake in "[t]he jury instruction was rendered less pivotal than it otherwise might have been." *State v. Dann*, 205 Ariz. 557, 566 n.3, *supplemented*, 206 Ariz. 371 (2003) ("Dann's defense was not that he killed Andrew in the heat of passion. He argued instead that he was not at the scene and did not commit the murders.").

Johnson also argues, in another claim not raised in state court, that trial counsel

---

[30] The instruction also omitted language stating that the "length of time" for premeditation can be "as instantaneous as the time it takes to make successive thoughts to kill." *Thompson*, 204 Ariz. at 478. In *Thompson*, the Arizona Supreme Court explained such language was improper because that "interpretation . . . relieve[s] the state of its burden to prove actual reflection and would render the first degree murder statute impermissibly vague and therefore unconstitutional under the United States and Arizona Constitutions." *Thompson*, 204 Ariz. at 478; *see also State v. Thompson*, 201 Ariz. 273, 281 (App. 2001).

performed ineffectively by failing to "articulate specific constitutional objections to the instruction." (Doc. 18 at 374.) He agrees that counsel, citing the Arizona Court of Appeals' decision in *State v. Thompson*, 201 Ariz. 273 (App. 2001), which found the premeditation statute, as judicially construed, void for vagueness, argued that the instruction was unconstitutional. (*Id.*) Johnson's conclusory allegation that if counsel had "articulated the Due Process grounds for objecting to this instruction, there is a reasonable probability it would not have been given" (*id.* at 377-78) is insufficient to establish ineffective assistance under *Strickland*. *See Greenway v. Schriro*, 653 F.3d 790, 804 (9th Cir. 2011) (explaining that petitioner's "cursory and vague claim cannot support habeas relief").

Claim 23 is denied.

**M.    Claim 24:**

Johnson argues the trial court erred by "instructing the guilt-phase jury that punishment would be left up to the judge, thereby diminishing their sense of responsibility." (Doc. 18 at 379.) Johnson concedes he did not raise this claim in state court. (*Id.*) His argument that the claim's default is excused by the ineffective assistance of trial and PCR counsel fails for the reasons discussed above. Under *Martinez* the ineffectiveness of PCR counsel may excuse only claims of ineffective assistance of trial counsel. *See Martinez (Ernesto)*, 926 F.3d at 1225; *Pizzuto*, 783 F.3d at 1177; *Hunton*, 732 F.3d at 1126-27. PCR counsel's ineffectiveness cannot excuse the default of Claim 18. The ineffectiveness of trial counsel cannot excuse the default because that claim itself was not independently exhausted in state court. *See Edwards*, 529 U.S. at 45; *Carrier*, 477 U.S. at 489-90. The claim is therefore defaulted and barred from federal review. It is also meritless.

In support of the claim, Johnson relies on *Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985), which held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." However, the Court found reversible error only "when the sentencing jury is led to believe that responsibility for determining the appropriateness of a death sentence rests not with the

1    jury but with the appellate court which later reviews the case." *Id.* at 323.

2    During voir dire at the guilt phase of Johnson's trial, the court told the jury panel

3    that "[p]unishment is decided by the judge, not the jury" and that the decision to sentence

4    Johnson to either life imprisonment or death was "solely the Court's." (RT 10/30/2001 at

5    39.) This instruction, at the time it was given—that is, before *Ring II*—was accurate. *See*

6    *Ellison*, 721 F. Supp. 3d at 874 (noting that the petitioner's *Caldwell* argument failed

7    "because, when his jury was selected, juries were not responsible for deciding whether a

8    death sentence is appropriate") (quoting *State v. Ellison*, 213 Ariz. 116, 129 (2006));

9    *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994) ("The infirmity identified in *Caldwell* is simply

10    absent in this case: Here, the jury was not affirmatively misled regarding its role in the

11    sentencing process."). There was no *Caldwell* violation in Johnson's case. Claim 24 is

12    denied.

13    **N.    Claim 29:**

14    Johnson argues that his rights under the Sixth, Eighth, and Fourteenth Amendments

15    were violated because "significant portions" of the trial proceedings were not recorded,

16    principally bench conferences and meetings in chambers. (Doc. 18 at 434.) He concedes

17    that he did not raise this claim in state court but again argues, incorrectly, that the claim's

18    default is excused by the ineffective assistance of trial and PCR counsel. *See Martinez*

19    *(Ernesto)*, 926 F.3d at 1225; *Pizzuto*, 783 F.3d at 1177; *Hunton*, 732 F.3d at 1126-27;

20    *Edwards*, 529 U.S. at 45; *Carrier*, 477 U.S. at 489-90.

21    This claim is meritless as well as defaulted. When a state chooses to provide for

22    appellate review, the state must provide a defendant with "a record of sufficient

23    completeness to permit proper consideration of [his] claims" in order to satisfy the

24    constitutional guarantees of due process and equal protection. *Mayer v. City of Chicago*,

25    404 U.S. 189, 193-94 (1971) (citation modified); *see Britt v. North Carolina*, 404 U.S. 226,

26    230 (1971). A record of sufficient completeness, however, "does not translate

27    automatically into a complete verbatim transcript." *Mayer*, 404 U.S. at 194. Whether a

28    transcript is needed for an effective defense or appeal depends on: "(1) the value of the

transcript to the defendant in connection with the appeal or trial for which it is sought, and (2) the availability of alternative devices that would fulfill the same functions as a transcript." *Britt*, 404 U.S. at 433-34.

The Ninth Circuit has held that the *Britt* criteria apply in evaluating a habeas petitioner's claim that his due process rights were violated by the lack of a complete transcript. *Madera v. Risley*, 885 F.2d 646, 648 (9th Cir. 1989) ("There is no Supreme Court or Ninth Circuit authority on the due process implications of a state court's failure to record portions of a criminal trial."). Johnson has the burden of establishing prejudice from the lack of a complete transcript. *Id.* at 648-49 (finding that the petitioner was not entitled to habeas relief because he had not shown prejudice by the absence of a complete transcript); *see Scott v. Elo*, 302 F.3d 598, 604 (6th Cir. 2002) ("[F]ederal habeas relief based on a missing transcript will only be granted where the petitioner can show prejudice."); *White v. State of Fla., Dep't of Corr.*, 939 F.2d 912, 914 (11th Cir. 1991) ("[I]n a federal habeas corpus case brought by a state prisoner, the absence of a perfect transcript does not violate due process absent a showing of specific prejudice").

Johnson fails to meet his burden of showing specific prejudice from the lack of a complete transcript. He does not explain the value of the missing transcripts of sidebars, bench conferences, or in-chambers meetings, offering only conclusory statements such as "failure to preserve these critical phases of the proceedings denied Johnson the right to due process and a full and complete review of his trial proceedings." (Doc. 18 at 439.) *See Madera*, 885 F.2d at 648 (indicating a petitioner must identify a "tenable theory" as to the appealable error that would be found in the missing transcript); *Scott*, 302 F.3d at 605 (finding no prejudice where petitioner offered only "gross speculation of error in the missing portion of the transcript").

Claim 29 is denied as both procedurally defaulted and barred from federal review and meritless.

**O.    Claim 32:**

Johnson argues that the trial court gave an "improper anti-sympathy instruction" at

sentencing, in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Doc. 18 at 463.) He acknowledges that he failed to raise the claim in state court. (*Id.*) His argument that the claim's default is excused by the ineffective assistance of trial and PCR counsel fails for the reasons discussed above. *See Martinez (Ernesto)*, 926 F.3d at 1225; *Pizzuto*, 783 F.3d at 1177; *Hunton*, 732 F.3d at 1126-27; *Edwards*, 529 U.S. at 45; *Carrier*, 477 U.S. at 489-90.

Along with being procedurally defaulted and barred from federal review, Claim 32 is meritless. The trial court instructed Johnson's sentencing jury that their decision may not be based on "mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling; it must be based on the evidence and information presented to you." (RT 12/18/2003 at 60; IOR 539 at 9.) "[F]ederal courts have consistently held that jury instructions admonishing the jury to base its penalty determination on mitigating or aggravating evidence, not on sympathy for the defendant, pass constitutional muster." *Mayfield v. Woodford*, 270 F.3d 915, 923 (9th Cir. 2001) (citing *Victor*, 511 U.S. at 13); *Johnson v. Texas*, 509 U.S. 350, 371-72 (1993); *California v. Brown*, 479 U.S. 538, 542-43 (1987)). Claim 32 is denied.

## P.     Claim 33:

Johnson argues that "[a]llowing the jury to question witnesses transformed neutral jurors into biased fact-finders and lessened the State's burden of proof" in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.[31] (Doc. 18 at 467.) He concedes that he did not raise this claim in state court but again argues that the default is excused by the ineffective assistance of trial and PCR counsel. (*Id.*) Those arguments are, again, unavailing. *See Martinez (Ernesto)*, 926 F.3d at 1225; *Pizzuto*, 783 F.3d at 1177; *Hunton*, 732 F.3d at 1126-27; *Edwards*, 529 U.S. at 45; *Carrier*, 477 U.S. at 489-90. Claim 33 is procedurally defaulted and barred from federal review.

---

[31] Rule 18.6(e), Arizona Rules of Criminal Procedure, permits jurors to question witnesses. Before a jury question is asked of the witness, it is submitted to the court and considered outside the presence of the jury, with the parties given the opportunity to object. *Id.*

The claim is also meritless. As the Sixth Circuit has observed, there are no "Supreme Court decision[s] . . . holding that juror questioning violates the Sixth or Fourteenth Amendments." *Slaughter v. Parker*, 450 F.3d 224, 236 (6th Cir. 2006). While some courts have "voic[ed] disapproval of juror questioning of witnesses," there has been no "successful constitutional challenge to the process." *State v. Greer*, 190 Ariz. 378, 379 (App. 1997); *see United States v. Bush*, 47 F.3d 511, 514 (2d Cir. 1995) ("Every circuit court that has addressed this issue agrees" that "direct questioning by jurors is a matter within the judge's discretion, like witness-questioning by the judge himself.") (citation modified); *cf. State v. Doleszny*, 176 Vt. 203, 209 (2004) (explaining that "[t]he vast majority of states that have ruled on the issue allow juror questioning in some form"; "of the ten federal circuits that have considered the juror questioning issue, all allow the practice in some form in the trial court's discretion"; "scholarly and professional commentary is near unanimous in its support for allowing jurors to question witnesses"; and "researchers have concluded that jurors who ask questions do not thereby become advocates for a particular trial result"); *Medina v. People*, 114 P.3d 845, 853 (Colo. 2005) ("[W]hile theoretically plausible," concerns that juror questioning creates the risk that jurors will "draw conclusions or settle on a given legal theory before the parties have completed their presentations, and before the court has instructed the jury on the law of the case" and that "the practice can upset the burden of production and persuasion in a criminal case . . . were not verified in the scholarly work which has examined juror questioning.") (citing *State v. Costello*, 646 N.W.2d 204, 211 (Minn. 2002); *Morrison v. State*, 845 S.W.2d 882, 886-887 (Tex. Crim. App. 1992)).

Claim 33 is denied.

## Q.    Claim 34:

Johnson argues that his rights under the Fifth and Fourteenth Amendments were violated when the trial court denied his motion for a mistrial after Russell Biondo testified that Johnson groped Stephanie Smith during the Affordable Massage robbery. (Doc. 18 at 476.) He acknowledges that he did not raise the claim in state court. (*Id.*) The alleged

1   ineffectiveness of PCR counsel cannot excuse the default because *Martinez* applies only to

2   claims of ineffective assistance of trial counsel. *Martinez (Ernesto)*, 926 F.3d at 1225;

3   *Pizzuto*, 783 F.3d at 1177; *Hunton*, 732 F.3d at 1126-27. Claim 34 is procedurally defaulted

4   and barred from federal review.

5       Johnson also alleges that trial counsel was ineffective for failing to request a limiting

6   instruction after Biondo's testimony. (Doc. 18 at 476.) The Court considers this ineffective

7   assistance claim below.

8       **R.    Claim 35:**

9       Johnson argues that the trial court's admission of excessively gruesome photographs

10  undermined the fundamental fairness of his trial and violated his rights under the Fifth,

11  Sixth, Eighth, and Fourteenth Amendments. (Doc. 18 at 482.) He did not raise this claim

12  in state court, and its default is not excused by the ineffective assistance of trial and PCR

13  counsel. (*Id.*); *see Martinez (Ernesto)*, 926 F.3d at 1225; *Pizzuto*, 783 F.3d at 1177; *Hunton*,

14  732 F.3d at 1126-27; *Edwards v. Carpenter*, 529 U.S. at 45; *Carrier*, 477 U.S. at 489-90.

15  Claim 35 is procedurally defaulted and barred from this Court's review. It is also meritless.

16      At issue are two autopsy photographs of the victim's head and the gunshot wound,

17  introduced during the guilt phase of trial to show the range and trajectory of the shot, and

18  six photographs of the crime scene, introduced during the aggravation phase of trial in

19  support of the F.3 aggravating factor (grave risk of death to another, "zone of danger").

20  (Doc. 18 at 482-83.) Johnson argues that the photographs were erroneously admitted

21  because there were no disputed issues regarding the bullet wound and because the photos

22  of the crime scene were "inflammatory." (*Id.* at 486.) These arguments fall short of

23  establishing entitlement to habeas relief. "The State cannot be compelled to try its case in

24  a sterile setting." *State v. Bocharski*, 200 Ariz, 50, 56 (2001) (citation omitted); *see Boggs*

25  *v. Shinn*, No. CV-14-02165-PHX-GMS, 2020 WL 1494491, at *34 (D. Ariz. Mar. 27,

26  2020). Likewise, an "assertion that the photos were probative only of matters not in dispute

27  does not render them irrelevant as the state must carry its burden of proof on uncontested

28  issues as well as contested ones." *State v. Canez*, 202 Ariz. 133, 154 (2002), *abrogated on*

1   *other grounds* by Ariz. R. Crim. P. 16.2(b); *see Walden v. Shinn*, 990 F.3d 1183, 1205 (9th

2   Cir. 2021). Finally, Johnson has not shown that admission of the photographs had a

3   substantial and injurious effect or influence in determining the jury's verdict. *Brecht*, 507

4   U.S. at 623; *Plascencia v. Alameida*, 467 F.3d 1190, 1203 (9th Cir. 2006).

5   **S.    Claim 36:**

6   Johnson argues that his Fifth, Sixth, Eighth, and Fourteenth Amendment rights were

7   violated by a PowerPoint presentation used in the State's closing argument during the guilt

8   phase of trial. (Doc. 18 at 487.) Johnson did not present this claim in state court, and its

9   default is not excused by the ineffective assistance of trial or PCR counsel. *See Martinez*

10  *(Ernesto)*, 926 F.3d at 1225; *Pizzuto*, 783 F.3d at 1177; *Hunton*, 732 F.3d at 1126–27;

11  *Edwards*, 529 U.S. at 45; *Carrier*, 477 U.S. at 489-90. Claim 36 is procedurally defaulted

12  and barred from review. It is also meritless.

13  According to Johnson, the PowerPoint included "three photographs of a gun pointed

14  at the viewer, which in this case were the jurors. Under each gun was the name of Russell

15  Biondo, Mike Solo, or Leonard Justice." (Doc. 18 at 487.) The record shows, as

16  Respondents note and as the trial court found, that the slides were used to support "the

17  credibility inferentially of the witnesses who saw the gun pointed at them as they

18  described" and the "presentation was [not] unduly prejudicial nor intimidating." (RT

19  11/26/01 at 61.) Moreover, notwithstanding the "purported rationale" for using the slides,

20  Johnson "fails to show" how their use "rendered his trial unfair. There was no misstatement

21  or manipulation of the evidence, nor was there any conduct that directly implicated any of

22  Johnson's constitutional rights." *Hovey*, 458 F.3d at 923-24. The use of the slides did not

23  so infect Johnson's trial with unfairness as to make his conviction a denial of due process.

24  *Id.* at 923 (citing *Darden*, 477 U.S. at 181).

25  **II.    Ineffective Assistance of Counsel Claims**

26  Johnson raises 30 claims of ineffective assistance of trial counsel, involving every

27  stage of his trial, along with half a dozen claims of ineffective assistance of appellate

28  counsel. Several of these claims are procedurally defaulted. Johnson argues that the default

is excused under *Martinez* by the ineffective assistance of PCR counsel. As discussed above, to establish cause under *Martinez* for the default of a claim of ineffective assistance of trial counsel, Johnson must show that PCR counsel performed ineffectively under the *Strickland* standard. *See Clabourne*, 745 F.3d at 377. This requires a demonstration that PCR counsel's performance was deficient and that, without the deficiency, there was a reasonable probability the result of the PCR proceedings would have been different. *Id.*

To establish "prejudice" under the second prong of *Martinez*'s "cause and prejudice" analysis, a petitioner must demonstrate that his underlying ineffective assistance of trial counsel claim is "substantial." *Id.* In *Martinez*, the Supreme Court defined a "substantial" claim as a claim that "has some merit," noting that the procedural default of a claim will not be excused if the underlying ineffective assistance of counsel claim "is insubstantial, *i.e.*, it does not have any merit or . . . is wholly without factual support." *Martinez*, 566 U.S. at 14–16. The standard for finding a claim "substantial" is analogous to the standard for issuing a certificate of appealability. *Id.* at 14; *see Detrich v. Ryan*, 740 F.3d 1237, 1245 (9th Cir. 2013). Under that standard, a claim is "substantial" if "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Detrich*, 740 F.3d at 1245 (quoting *Miller-El II*, 537 U.S. at 336).

Because a petitioner must demonstrate both cause and prejudice, courts may analyze the two requirements in any order. *See id.* (citations omitted). Although the cause and prejudice requirements are distinct, there is considerable overlap since each "considers the strength and validity of the underlying ineffective assistance claim." *Leeds*, 75 F.4th at 1017 (citing *Michaels v. Davis*, 51 F.4th 904, 931 (9th Cir. 2022)).

The Ninth Circuit has offered guidance in assessing whether cause exists under *Martinez*. In *Atwood*, for example, the court explained:

> In evaluating whether the failure to raise a substantial claim of ineffective assistance of trial counsel in state court resulted from ineffective assistance of state habeas counsel under Strickland, we must evaluate the strength of the prisoner's underlying ineffective assistance of trial counsel claim. If the ineffective assistance of trial counsel claim lacks

1
2
3
4

> merit, then the state habeas counsel would not have been deficient for failing to raise it. Further, any deficient performance by state habeas counsel would not have been prejudicial, because there would not be a reasonable probability that the result of the post-conviction proceedings would have been different if the meritless claim had been raised.

5
6

870 F.3d at 1059-60; *Hooper*, 985 F.3d at 627. In *Runningeagle*, the court elaborated on the standard for finding PCR counsel's performance prejudicial:

7
8
9
10

> Although the prejudice at issue is that in PCR proceedings, this is a recursive standard. It requires the reviewing court to assess trial counsel's as well as PCR counsel's performance. This is because, for us to find a reasonable probability that PCR counsel prejudiced a petitioner by failing to raise a trial-level IAC claim, we must also find a reasonable probability that the trial-level IAC claim would have succeeded had it been raised.

11
12

825 F.3d at 982; *see Murray (Roger) v. Schriro*, 882 F.3d 778, 816 (9th Cir. 2018).

13
14
15
16

The *Strickland* standard is applied with "full force when considering [PCR counsel's] actions in the *Martinez* cause analysis." *Leeds*, 75 F.4th at 1022 (citing *Clabourne*, 745 F.3d at 377); *see Sexton v. Cozner*, 679 F.3d 1150, 1157 (9th Cir. 2012) (explaining that PCR counsel "would not be ineffective for failure to raise an [IAC] claim with respect to trial counsel who was not constitutionally ineffective").

17
18
19
20
21
22
23
24
25
26
27
28

The Supreme Court, however, has limited the evidence that may be presented in support of a *Martinez* argument (*i.e.*, an argument that PCR counsel performed ineffectively for purposes of cause and prejudice). In *Shinn v. Ramirez*, the Court held that with respect to claims that were not adjudicated on the merits in state court, "a federal court may not hold an evidentiary hearing—or otherwise consider new evidence," unless the "stringent requirements" of 28 U.S.C. § 2254(e)(2) are met. 596 U.S. at 389. Section 2254(e)(2) applies only when there has been "a failure to develop the factual basis of a claim" due to "a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Id.* at 383 (quoting *Williams (Michael) v. Taylor*, 529 U.S. 420, 432 (2000)). A petitioner bears "'responsibility' for all attorney errors during [PCR] proceedings," including "counsel's negligent failure to develop the state postconviction record." *Id.* (quoting *Williams (Michael)*, 529 U.S. at 432). In such a case, a federal court

1    may order an evidentiary hearing or otherwise expand the state-court record only if the

2    prisoner can satisfy § 2254(e)(2).[32]

3          Under *Strickland*, "[t]he benchmark for judging any claim of ineffectiveness must

4    be whether counsel's conduct so undermined the proper functioning of the adversarial

5    process that the trial cannot be relied on as having produced a just result." 466 U.S. at 686.

6    To prevail, a petitioner must show that counsel's representation fell below an objective

7    standard of reasonableness and the deficiency prejudiced the defense. *Id.* at 687-88. Unless

8    both showings are made, "it cannot be said that the conviction or death sentence resulted

9    from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687.

10         The inquiry under *Strickland* is highly deferential. *Id.* at 689. "A fair assessment of

11   attorney performance requires that every effort be made to eliminate the distorting effects

12   of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to

13   evaluate the conduct from counsel's perspective at the time." *Id.* The "standard is

14   necessarily a general one," *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009), because "[n]o

15   particular set of detailed rules for counsel's conduct can satisfactorily take account of the

16   variety of circumstances faced by defense counsel or the range of legitimate decisions

17   regarding how best to represent a criminal defendant," *Strickland*, 466 U.S. at 688-89.

18         Deficient performance is established by "showing that counsel made errors so

19   serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the

20   Sixth Amendment." *Id.* at 687. To make this showing, a petitioner must overcome "the

21   presumption that, under the circumstances, the challenged action might be considered

22   sound trial strategy." *Id.* at 689 (citation omitted). "The question is whether an attorney's

---

[32] Under § 2254(e)(2), if the petitioner has "failed to develop the factual basis of a claim in State court proceedings," a district court cannot hold an evidentiary hearing on the claim unless (1) the claim relies on either "a new rule of constitutional law made retroactive by . . . the Supreme Court to cases on collateral review" or "a factual predicate that could not have been previously discovered through due diligence" and (2) "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."

representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Richter*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 690). "The defendant bears the heavy burden of proving that counsel's assistance was neither reasonable nor the result of sound trial strategy." *Murtishaw v. Woodford*, 255 F.3d 926, 939 (9th Cir. 2001). "[T]he relevant inquiry . . . is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable." *Murray (Robert)*, 745 F.3d at 1011 (quoting *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998)). Ultimately, "it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." *Richter*, 562 U.S. at 111.

With respect to *Strickland*'s second prong, a petitioner must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112. The petitioner "bears the highly demanding and heavy burden [of] establishing actual prejudice." *Allen v. Woodford*, 395 F.3d 979, 1000 (9th Cir. 2005) (quoting *Williams (Terry)*, 529 U.S. at 394). The strength of the prosecution's case factors into the determination of prejudice. *See Strickland*, 466 U.S. at 696 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."); *Riley v. Payne*, 352 F.3d 1313, 1321 n.8 (9th Cir. 2003) ("[O]ur evaluation of *Strickland* prejudice must be considered in light of the strength of the government's case.").

Johnson raises a number of ineffective assistance claims that were exhausted in state court. AEDPA affords these claims a second layer of deference. "Surmounting *Strickland*'s high bar is never an easy task," *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010), and "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult," *Richter*, 562 U.S. at 105 (describing review as "doubly

deferential"); *see Burt*, 571 U.S. at 15 (explaining that under AEDPA, the reviewing court "gives both the state court and the defense attorney the benefit of the doubt"); *Lewis v. Andes*, 95 F.4th 1166, 1177 (9th Cir. 2024). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105. Therefore, the "only question that matters" under § 2254(d) is whether the state court's decision was "so obviously wrong as to be 'beyond any possibility for fairminded disagreement.'" *Kayer*, 592 U.S. at 124 (quoting *Richter*, 562 U.S. at 102, 103).

### A.    Claim 1:

Johnson argues that "due to ineffective assistance of trial counsel and trial court error, the jury never learned of alternative explanations for Stephanie Smith's death and law enforcement's failure to investigate those leads." (Doc. 18 at 46.) The claim, consisting of six separate allegations of ineffectiveness, along with a claim of trial court error, is procedurally defaulted and meritless.

Johnson's allegations of guilt-phase ineffective assistance of counsel are based on his assertion that various elements of the victim's lifestyle made her vulnerable to violence and that counsel performed ineffectively by failing to present evidence to support an alternative-suspect theory. Specifically, Johnson argues that counsel was ineffective for failing to introduce evidence that Smith was "involved in illegally trafficking persons from Mexico," "served as a driver for a burglary ring," "associated with several felons with ties to white supremacist groups," had a "turbulent marriage" to a violent man who once threatened to shoot her, "used and sold methamphetamine," and "prostituted herself at Affordable Massage," which itself was a "generally unsafe" business.[33] (*Id.* at 46-61.) Johnson argues that if counsel had presented this evidence, there was a reasonable probability that the jury would not have convicted him of Smith's murder. (*Id.* at 61.)

Before turning to the ineffective assistance of counsel claims, the Court will briefly

---

[33] This information is set out in the Phoenix Police Department supplemental reports prepared by Detective Thomas Kulesa. (*See* IOR 675.)

address Johnson's allegation that the trial court erroneously "foreclosed the defense's modest attempts to introduce two alternative explanations for Smith's deaths—prostitution and methamphetamine use."[34] (*Id.* at 49.) Johnson did not present this claim in state court, and because it does not allege ineffective assistance of trial counsel, its default cannot be excused under *Martinez*. The allegation therefore is barred from federal review. It is also meritless as the evidence would have been inadmissible for the reasons discussed below. *See, e.g*, *Spivey v. Rocha*, 194 F.3d 971, 978 (9th Cir. 1999) (exclusion of speculative evidence offered for third-party culpability did not render habeas petitioner's trial fundamentally unfair).

With respect to the ineffective assistance allegations in Claim 1, Johnson acknowledges that in his PCR petition he presented only a "general claim for failure to investigate guilt-phase issues" (Doc. 18 at 46-47), that the specific allegations in Claim 1 were not presented in state court, and that the claim is procedurally defaulted (Doc. 44 at 22). He argues the default is excused under *Martinez* by the ineffective assistance of PCR counsel. (Doc. 18 at 46; Doc. 44 at 22.) Respondents counter that the underlying claims are meritless—trial counsel did not perform ineffectively because evidence of third-party culpability would have been inadmissible—so PCR counsel did not perform ineffectively in failing to raise them. (Doc. 37 at 30.) The Court agrees.

Under Arizona law, "[w]hile a defendant may attempt to show that a third party committed the crime with which the defendant is charged, the trial court retains discretion to exclude the evidence if it raises 'only a possible ground of suspicion against another.'" *Dann*, 205 Ariz. at 568 (quoting *State v. Prion*, 203 Ariz. 157, 161 (2002)). Evidence offered to establish third-party culpability is relevant if it "tend[s] to create a reasonable

---

[34] The trial court granted the State's motion in limine to preclude the defense from questioning witness Cheryl Newberry about any escort services or prostitution she or the victim were engaged in as well as the source of the drugs they used. (RT 11/7/01 at 8-9.) The court rejected defense counsel's argument that such testimony was relevant to Newberry's credibility. (*Id.*) The court denied the State's motion in limine to preclude a third-party culpability defense. (IOR 88.) Johnson indicated that the only person about whom he might introduce such evidence was Quindell Carter. (ME 10/29/01 at 6.)

doubt as to the defendant's guilt." *Id.* (quoting *State v. Gibson*, 202 Ariz. 321, 323-24 (2002)). "The proper focus in determining relevancy is the effect the evidence has upon the *defendant's* culpability." *Gibson*, 202 Ariz. at 324. If relevant, the evidence is admissible unless "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Id.* Accordingly, "[w]hile a defendant may attempt to show that another person is guilty of the crime with which he is charged, the trial court is not obligated to allow the defendant to offer mere suspicion or speculation regarding a class of persons." *Dann*, 205 Ariz. at 569; *see State v. Machado*, 226 Ariz. 281, 284 n.2 (2011) (explaining that a defendant "may not, in the guise of a third-party culpability defense, simply throw strands of speculation on the wall and see if any of them will stick.") (citation omitted)).

The evidence Johnson argues counsel should have introduced was inadmissible under these standards. Evidence that Smith was involved in human smuggling, had driven for a burglary ring, associated with white supremacist felons, had a turbulent marriage, used and sold methamphetamine, and worked as a prostitute would have no tendency to create reasonable doubt as to Johnson's guilt, which was supported by direct evidence, including eyewitness testimony and his confessions to the murder. *See Dann*, 202 Ariz. at 568. Under these circumstances, evidence suggesting third-party culpability based on allegations about Smith's lifestyle amounts to nothing more than "suspicion or speculation regarding a class of persons" of a type that is inadmissible under *Dann* and *Prion*. Johnson can only speculate that any of these activities bore a relationship to Smith's murder. *See State v. Fulminante*, 161 Ariz. 237, 252 (1988) ("Before a defendant may introduce evidence that another person may have committed the crime, the defendant must show that the evidence has an inherent tendency to connect such other person with the actual commission of the crime. Vague grounds of suspicion are not sufficient."); *State v. Goudeau*, 239 Ariz. 421, 460 (2016) ("[T]he trial court could reasonably have found that the proffered third-party culpability evidence did not create a reasonable doubt as to Goudeau's guilt and was inadmissible on several grounds. There were no suspects and no

1    suggestion that the alleged assault [by two unidentified males on the murder victim] had

2    any connection to [the] murder."); *see also People of Territory of Guam v. Ignacio*, 10 F.3d

3    608, 615 (9th Cir. 1993) ("Evidence of third-party culpability is not admissible 'if it simply

4    affords a possible ground of suspicion against such person; rather, *it must be coupled with*

5    *substantial evidence tending to directly connect that person with the actual commission of*

6    *the offense.*'") (quoting *Perry v. Rushen*, 713 F.2d 1447, 1449 (9th Cir. 1983)).

7        Consequently, evidence suggesting that Smith lived a "risky" lifestyle would not

8    have been admissible. Such evidence failed to create a reasonable doubt as to Johnson's

9    guilt and was "tenuous and speculative" in nature. In *Dann*, for example, the Arizona

10   Supreme Court held that the trial court did not abuse its discretion in excluding evidence

11   that the murder victim used and sold drugs and trafficked in stolen goods, finding that such

12   evidence "did not tend to point to a third person's culpability in the murders." 202 Ariz. at

13   569; *see State v. Foshay*, 239 Ariz. 271, 279 (App. 2016) (holding that the trial court

14   correctly excluded evidence offered to establish third-party culpability where such

15   evidence "did not make it more likely that someone other than Foshay had killed [B.B.],"

16   explaining that "Foshay has not shown any connection between B.B.'s use of

17   methamphetamine before his death and anyone's desire to kill him. As the court noted, the

18   use of methamphetamine and the sale of drugs two years before his death do not tend to

19   make it more likely that someone other than Foshay murdered B.B."); *State v. Maley*, No.

20   2 CA-CR 2019-0132, 2020 WL 7238383, at *3 (Ariz. App. Dec. 8, 2020) ("A defendant

21   may not present evidence of a victim's 'criminal propensities' to support 'unfounded

22   suspicions' that a third party may have been culpable.") (citation modified); *State v. Bell*,

23   No. 2 CA-CR 2008-0246, 2009 WL 2710089, at *1 (Ariz. App. Aug. 28, 2009) (finding

24   trial court did not abuse its discretion in precluding evidence that the victim was selling

25   marijuana where defendant "offered no evidence to connect this activity to the attacks on

26   [the victim], other than to speculate that the drug trade in general is violent"); *see also*

27   *Spivey*, 194 F.3d at 978 (upholding trial exclusion of evidence of victim's gang affiliation,

28   explaining that "Spivey had no evidence of another person's actual motive to murder

Marcus. Instead, Spivey sought to introduce evidence of Marcus's gang affiliation to 'raise an inference that an unknown party (such as [a] Blood gang rival) may have shot Marcus for gang related reasons.' This evidence is purely speculative. It does not identify a possible suspect or link any third party to the murder, or establish an actual motive rather than a possible or potential motive.").

Because the evidence was inadmissible, trial counsel did not perform ineffectively in failing to introduce it. *See Doe v. Ayers*, 782 F.3d 425, 431 (9th Cir. 2015) (finding counsel was not ineffective for failing to present third-party culpability evidence that was inadmissible under California law); *Hoyos v. Davis*, No. 17-99009, 2022 WL 4011175, at *3 (9th Cir. Sept. 2, 2022) (finding no prejudice from counsel's handling of the third-party culpability issue where "[a]t most, Hoyos shows that third parties may have had motive and opportunity to kill the [victims], but he does not provide any substantial evidence connecting a third party to the murders"); *cf. Rhoades v. Henry*, 638 F.3d 1027, 1036-37 (9th Cir. 2011) (rejecting claim counsel was ineffective for failing to admit evidence of third-party confession to murder where there was no evidence linking other party to the victim, the scene, or the murder weapon).[35]

PCR counsel, in turn, did not perform ineffectively by failing to raise a claim alleging trial counsel performed ineffectively with respect to the third-party culpability issue. *See Atwood*, 870 F.3d at 1060 ("If the ineffective assistance of trial counsel claim lacks merit, then the state habeas counsel would not have been deficient for failing to raise it."); *Runningeagle*, 825 F.3d at 982 (explaining that to find prejudice based on PCR counsel's failure to raise a trial-level ineffective assistance of counsel claim, the court "must also find a reasonable probability that the trial-level IAC claim would have

---

[35] Some evidence of the type Johnson faults defense counsel for omitting was in fact presented at trial. For example, Russell Biondi testified that Affordable Massage was not a safe place to work, having been robbed or burglarized on several previous occasions, to the extent that during the night shift employees were not allowed to work there alone. (*See* RT 11/6/01 at 6, 47-48.) Biondi also testified, on cross-examination, that he and the murder victim Stephanie Smith both used methamphetamine and that she had supplied the meth they either smoked or injected on the night of the robbery. (*Id.* at 51.)

1    succeeded had it been raised"). There is not a reasonable probability that the results of the

2    PCR proceedings would have been different if counsel had raised this claim. Johnson

3    therefore cannot show cause under *Martinez* for the claim's default. Claim 1 remains

4    procedurally defaulted and barred from federal review.

5        **B.    Claim 2:**

6        Johnson argues that trial counsel was "ineffective for failing to object and offer

7    rebuttal evidence" challenging the eyewitness testimony. (Doc. 18 at 62.) He contends that

8    counsel should have retained an expert to challenge Russell Biondo's identification of

9    Johnson as one of the armed robbers and the in-court identifications made by Leonard

10   Justice and Andrew Murbach. (*Id.* at 62-87.) He also argues that counsel should have

11   retained an expert who could have explained the effect of methamphetamine use on

12   perception and memory.[36] (*Id.*)

13       Johnson raised this claim in his PCR petition as Claim III(B)(1)(b). (PCR Pet. at

14   74-83.) He argued that an expert could have testified that the photo lineups used in this

15   case were unduly suggestive and that cross-racial identifications are unreliable. (*Id.* at 80.)

16   Johnson cited a 2010 report prepared by Dr. Roy Malpass, a psychologist with "expertise

17   in eyewitness behavior." (*See id.*, Ex. 49).[37]

18       The PCR court denied the claim. (PCR Order, ME 1/28/05, at 5.) The parties

19   disagree as to whether Johnson properly exhausted this claim by presenting it in his Petition

20   for Review. In his Petition for Review, Johnson cited Claim III(B), which encompassed all

21   of the guilt-phase ineffective assistance claims raised in his PCR Petition, and asserted,

22   albeit with only a general reference to counsel's lack of preparedness, that the claims were

---

24   [36] In a declaration attached to Johnson's PCR Petition, lead counsel Storrs acknowledges
25   that he did not retain an eyewitness expert or file motions to suppress any of the eyewitness
     identifications. (PCR Pet., Ex. 28, ¶ 18.)

26   [37] In his habeas petition, Johnson cites an updated report by Dr. Malpass, dated November
27   2018. (*See* Doc. 18 at 70, 71, 72, 74, 76.) Because the claim was adjudicated on the merits
     in state court, this Court may not consider the new report in its application of § 2254(d).
28   *Pinholster*, 563 U.S. at 184-85.

colorable and that he was entitled to an evidentiary hearing. (PR at 19.) He also attached

the PCR to the Appendix to his Petition for Review. (*See id.*; App'x 6.) This was sufficient

to present the claim to the Arizona Supreme Court. *See Gallegos*, 820 F.3d at 1026 n.15;

*Scott*, 567 F.3d at 582. The Court will consider Claim 2 on the merits.

In denying this claim, the PCR court first found that counsel did not perform

deficiently under *Strickland*:

> As to Biondo, the record demonstrates that counsel pursued the reasonable strategy of cross-examining the witness about his drug use, and argued the unreliability of eyewitness testimony in closing. As to Justice and Murbach, trial counsel again pursued the reasonable strategy of challenging the identifications through aggressive cross-examination, eliciting the concessions that their pretrial identifications had failed, and highlighting cross-racial misidentifications in closing argument. Additionally, PCR counsel's conclusion that expert testimony related to the effect of a witness's methamphetamine use or to cross-racial identification, which go to the credibility of the witnesses' identifications, would have been both available and admissible is mere speculation. Whether to call particular witnesses, including experts, is a strategic decision made by counsel.
>
> The Court finds that counsel's strategic decision to challenge lay witnesses' identification through strenuous cross-examination and argument rather than with expert opinion testimony was a reasonable, strategic decision. Counsel's performance was not deficient.

(PCR Order, ME 1/28/05, at 5) (citation omitted). The court added that Johnson failed to

establish prejudice for any of the ineffective assistance claims presented in the PCR petition

and concluded that "there are no colorable claims for ineffective assistance of trial and

appellate counsel under both prongs of the *Strickland* test." (*Id.* at 34.)

The last reasoned decision of the state courts was the PCR court's denial of the

claim. *See, e.g., Mann v. Ryan*, 828 F.3d 1143, 1154 (9th Cir. 2016). The Court will review

that denial under the "doubly" deferential standards of *Strickland* and § 2254(d). *Richter*,

562 U.S. at 105. Under that standard of review, the PCR court's decision was neither

contrary to nor an unreasonable application of *Strickland*; nor was it based on an

unreasonable determination of the facts. *See, e.g., Moore v. Hardee*, 723 F.3d 488, 497 (4th

Cir. 2013) (applying doubly deferential standard to reject claim of ineffective assistance

based on trial counsel's failure to present an eyewitness expert).

Although the "only question that matters" under AEDPA is whether the state court's decision was "so obviously wrong as to be 'beyond any possibility for fairminded disagreement,'" *Kayer*, 592 U.S. at 124 (quoting *Richter*, 562 U.S. at 103), Johnson does not, in his petition, address the substance of the PCR court's ruling or make any attempt to show that it satisfied §2254(d). (*See* Doc. 18 at 62-87.) In his reply brief, he engages briefly with the PCR court's decision, asserting it was an unreasonable application of clearly established federal law.[38] (Doc. 44 at 45, 52.) According to Johnson, it was unreasonable for the court to determine that counsel performed reasonably by relying on cross-examination and argument rather than the testimony of an eyewitness expert. The Court disagrees.

"[W]hile the Constitution requires that a criminal defendant receive effective assistance of counsel, the presentation of expert testimony is not necessarily an essential ingredient of a reasonably competent defense." *Bonin v. Calderon*, 59 F.3d 815, 834 (9th Cir. 1995). The Ninth Circuit has held that a criminal defendant generally suffers no prejudice under *Strickland* when defense counsel fails to call an expert witness regarding the unreliability of eyewitness testimony. *Howard v. Clark*, 608 F.3d 563, 574 (9th Cir. 2010). In *Howard*, the court noted that it had repeatedly upheld decisions excluding such expert testimony in federal trials. *Id.* at 573-74 ("If federal defendants are not prejudiced by the exclusion of testimony from eyewitness-identification experts, [habeas petitioner] Howard was not prejudiced by his trial attorney's failure to call such an expert. . . .") The court further explained that any purported prejudice resulting from the exclusion of such expert testimony can be alleviated by "skillful cross examination of eyewitnesses, coupled with appeals to the experience and common sense of jurors." *Id.* at 574. These methods of challenging eyewitness testimony "sufficiently alert jurors to specific conditions that

---

[38] Johnson also asserts that "a [habeas] petition exists to allege a factual basis supporting each claim. It does not require a citation to authority in support of each claim." (Doc. 44 at 41.) However, this proposition itself is unsupported by citation to legal authority, and it is incorrect. (*See* Doc. 6 at 3) (citing LRCiv. 7.1).

render a particular eyewitness identification unreliable." *Id.* (citation omitted); *see also United States v. Labansat*, 94 F.3d 527, 530 (9th Cir. 1996) (finding counsel's failure to call eyewitness identification expert was not deficient or prejudicial, where counsel chose to expose the unreliability of the identifications through cross-examination and closing argument); *Crisp v. Covello*, No. 19-16987, 2023 WL 154959, at *1 (9th Cir. 2023) ("Neither *Strickland* and its progeny, nor 'prevailing professional norms,' require trial counsel to consult or call an eyewitness expert; therefore, the state court's conclusion that eyewitness expert testimony need not have been admitted was not objectively unreasonable."); *Brown v. Terhune*, 158 F. Supp. 2d 1050, 1071 (N.D. Cal. 2001) (rejecting ineffective assistance claim based on failure to call eyewitness expert where counsel cross-examined witnesses concerning identification of defendant and emphasized problems with their identification in closing argument).

As discussed next, and as the PCR court found, trial counsel's cross-examination of the eyewitnesses, and his closing argument emphasizing the weaknesses of their identifications of Johnson, satisfied *Strickland*.

### 1.    Russell Biondo

Biondo, who was present with Smith during the Affordable Massage robbery, picked Johnson out of a photo lineup on February 1, 2001, and identified him in court as one of the armed robbers. (RT 11/6/01 at 19, 42-45, 78, 116.) On cross-examination, counsel challenged Biondo's identification of Johnson, noting that when interviewed by detectives he never described the suspect as having a facial scar (Johnson has a noticeable scar running from his cheek to his upper lip). (*Id.* at 77-78.) Biondo also acknowledged that his identification of Johnson in the photo lineup was equivocal—he informed the officer that "I'm thinking it is No. 3," which was the photo showing Johnson, but also stated that the nose of the person in photo No. 4 looked familiar. (*Id.* at 80-83.) Defense counsel also questioned Biondo about inconsistencies in his descriptions of the heights of the robbers. (*Id.* at 63.) Finally, he questioned Biondo about his drug use, with Biondo admitting he and the victim had used methamphetamine—either smoking it, as Biondo

1 testified at trial, or injecting it, as Biondo told Detective Kulesa—a couple hours before
2 arriving at the massage parlor. (*Id.* at 50, 97-98.) On direct examination Biondo testified
3 that he had three felony convictions, including a conviction for possession of
4 methamphetamine, a dangerous drug. (*Id.* at 42.)

5       Respondents contend that counsel did not perform ineffectively by failing to retain
6 an eyewitness expert in part because of limits imposed on such evidence by Arizona courts,
7 which restrict testimony "to an exposition of the factors affecting reliability," *State v.*
8 *Chapple*, 135 Ariz. 281, 295 (1983), and "caution that expert witnesses should not be
9 allowed to give their opinion of the accuracy or credibility of a particular witness," *State*
10 *v. Nordstrom*, 200 Ariz. 229, 243 (2001), *abrogated on other grounds by State v. Ferrero*,
11 229 Ariz. 239 (2012). These limitations support the reasonableness of counsel's decision
12 to rely on cross-examination and argument rather than expert testimony.

13       Johnson argues that counsel performed ineffectively by failing to challenge the
14 lineup from which Biondo was able to pick Johnson's photograph as that of one of the
15 Affordable Massage robbers. He asserts that the lineup was unduly suggestive because he
16 was "the only person . . . with braids or with his face rotated." (Doc. 18 at 71.) The Court
17 agrees with Respondents that such a challenge to the lineup would have been futile.

18       "When a witness identifies the defendant in a police-organized photo lineup . . . the
19 identification should be suppressed only where 'the photographic identification procedure
20 was so [unnecessarily] suggestive as to give rise to a very substantial likelihood of
21 irreparable misidentification.'" *Perry v. New Hampshire*, 565 U.S. 228, 238 (2012)
22 (quoting *Simmons v. United States*, 390 U.S. 377, 384-85 (1968)). That is not the case here.
23 The photo lineup shows six young Black males with facial hair. *See United States v. Beck*,
24 418 F.3d 1008, 1012 (9th Cir. 2005) (finding no impermissible suggestion where the
25 photospread showed six pictures of clean-shaven "Caucasian males in the same age range
26 with similar skin, eye, and hair coloring"); *United States v. Carabajal*, 956 F.2d 924, 929
27 (9th Cir. 1992) (finding no impermissible suggestion where the photospread showed six
28 pictures of "Hispanic males in the same age range, with similar skin, eye, and hair coloring"

as well as similar hair length and facial hair).

The Ninth Circuit has explained that "insubstantial differences between the defendant's photograph and the others do not in themselves create an impermissible suggestion." *United States v. Burdeau*, 168 F.3d 352, 357 (9th Cir. 1999). In *Burdeau*, the court held that a photo array was not suggestive even though the defendant's picture was placed in the center of the array, was "darker than the rest," and was the only one showing a person with closed eyes. *Id.*; *see United States v. Johnson*, 820 F.2d 1065, 1073 (9th Cir. 1987) (finding photographic array was not impermissibly suggestive when defendant's photograph was hazier than others); *United States v. Sambrano*, 505 F.2d 284, 286 (9th Cir. 1974) (finding photographic array in which defendant's photograph was darker and clearer was not impermissibly suggestive). In the lineup at issue here, the lighting, focus, background, and size of the photographs are similar. (*See* IOR 853, Ex. 48.) There is a variety of head positions, so that Johnson's slightly "rotated" head does not stand out.

In Arizona, "the law only requires that [lineups] depict individuals who basically resemble one another such that the suspect's photograph does not stand out." *State v. Alvarez*, 145 Ariz. 370, 373 (1985); *see State v. Walden*, 183 Ariz. 595, 606 (1995). "Arizona courts have rejected claims of undue suggestiveness based on far less subtle distinctions than those complained of in this case." *State v. Strong*, 185 Ariz. 248, 251 (App. 1995) (citing cases). In *State v. Ault*, 150 Ariz. 459, 467 (1986), for example, the Arizona Supreme Court rejected an argument similar to the one raised by Johnson, finding that a photographic lineup was not unduly suggestive even though the defendant's photograph was "the only one not taken from a full, frontal position, but at an upward angle." Courts have also rejected the argument that a lineup was unduly suggestive where the defendant was the only one with a beard or mustache. *See State v. Via*, 146 Ariz. 108, 119 (1985); *State v. Money*, 110 Ariz. 18, 21-23 (1973); *see also State v. Bailes*, 118 Ariz. 582, 587 (App. 1978) (photographic lineup was not unduly suggestive despite the fact that only the defendant was disfigured with two black eyes and a broken nose).

Because the individuals in the photo lineup "basically resemble[d] one another" and

Johnson's photo did not "stand out," *Alvarez*, 145 Ariz. at 373, counsel did not perform ineffectively in failing to challenge the lineup as unduly suggestive.[39]

The Court also rejects Johnson's argument that trial counsel performed ineffectively by failing to retain an expert to address the impact of methamphetamine use on perception and memory and to rebut Biondo's testimony that his methamphetamine use on the night of the robbery did not impair his ability to identify Johnson. (Doc. 18 at 73-75.)

The PCR's denial of this claim was not contrary to or an unreasonable application of *Strickland*. Biondo's criminal record, history of methamphetamine use, drug use on the night of the robbery, and inconsistent statements were all before the jury. *Cf. Moore*, 723 F.3d at 498-99 (rejecting ineffective assistance claim under AEDPA standard of review and distinguishing *Bell v. Miller*, 500 F.3d 149, 157 (2d Cir. 2007), which found ineffective assistance on direct review where counsel failed "to consider consulting an expert to ascertain the possible effects of trauma and pharmaceuticals on the memory of the witness," "the memory of [the eyewitness was] obviously impacted by medical trauma and prolonged impairment of consciousness, and where the all-important identification [was] unaccountably altered after the administration of medical drugs"); *see Barros v. Beard*, No. 07-1300, 2009 WL 2924530, at *5 (E.D. Pa. Sept. 8, 2009) (finding no ineffective assistance where counsel adequately challenged the witness's credibility through introduction of his inconsistent statements, criminal offenses bearing on his truthfulness, and his drug use at the time of the incident).

## 2.     In-Court Identifications

Leonard Justice, who was in Stephanie Smith's home when she was murdered, identified Johnson in court as the man he saw enter the house with a gun and follow Smith down the hallway before hearing a gunshot. (RT 11/5/01 at 86-89, 94-95, 101, 131.) On cross-examination, Justice admitted that he had failed to identify Johnson in the three photo lineups he was shown. (*Id.* at 118.) The parties entered into a stipulation that Justice was

---

[39] As Respondents note that Biondi was the only witness to identify Johnson's photo further supports a finding that the lineup was not unduly suggestive. (Doc. 37 at 39.)

shown a lineup that included a photo of Johnson, but he did not recognize anyone in the lineup as the person he saw enter Smith's house. (RT 11/7/01 at 15; *see also* RT 11/20/01 at 41-42.) Counsel also challenged Justice's original description of the suspect as "light-complected" and of "Puerto Rican or Jamaican descent." (RT 11/7/01 at 125-29.)

Murbach, a neighbor of Smith's who observed a suspect running away from the scene as the police arrived, was unable to identify Johnson in a photo lineup but identified him in court. (RT 11/13/01 at 118-21.) On direct examination, he first described the man he had seen as standing between six feet and six feet three inches tall. (*Id.* at 114.) He later acknowledged that during his 911 call on the night of the incident he described the suspect as five feet ten inches tall. (*Id.* at 118.)

On cross-examination, Murbach acknowledged that in one of the photo lineups he identified an individual other than Johnson. (*Id.* at 132.) In total, Murbach was shown five lineups, each containing six photos, one of which included a photo of Johnson, but Murbach failed to make an identification. (*Id.* at 132-33.) Defense counsel also noted, with respect to Murbach's "suggestive" in-court identification of Johnson, that Johnson was the "only . . . young black male sitting this side of the rail." (*Id.* at 136.) Finally, counsel questioned Murbach about his descriptions of the suspect as having a pock-marked face and inconsistencies in Murbach's descriptions of the type of gun the suspect held, and how many black men he saw that night. (*Id.* at 193, 204.)

Michael Solo, who was at Smith's residence at the time of the murder and encountered one of the suspects when he went outside to investigate the barking dog, testified on cross-examination that he was unable to identify Johnson in either of the photo lineups he was shown. (*Id.* at 203-205.) He made no in-court identification of Johnson.

In his closing argument, defense counsel emphasized the potential weaknesses in the eyewitness identifications. Referencing jurors' personal experiences, he explained that a witness's confidence in their identification is unrelated to the accuracy of that identification: "There's a couple of reasons that life teaches us about these things even if you don't read psychology today [sic] and some other journals about eye witness

1    identification, is that the sureness of your opinion about whether or not you recognize
2    somebody really has nothing to do with whether you're right or wrong." (RT 11/26/01 at
3    65.) He then argued that "we're much more apt to makes mistakes about misidentification
4    when it is cross-racial." (*Id.* at 66.)

5        Counsel challenged Biondo's identification of Johnson as one of the Affordable
6    Massage robbers. (*Id.*) He noted that Biondo testified that the suspect wore a nylon stocking
7    covering the top half of his face but not covering the area where Johnson's conspicuous
8    scar is located. (*Id.*) Counsel added that Biondo described the suspect he identified as
9    Johnson as being taller than the other suspect when in fact Johnson was slightly shorter
10   than Jarvis Ross. (*Id.* at 67.) He reiterated that Biondo's identification of Johnson in a photo
11   lineup was equivocal, with Biondo saying "I'm thinking it is No. 3." (*Id.* at 69.)

12       Counsel next pointed out that Mike Solo "doesn't identify anybody, didn't identify
13   anybody when he came in here." (*Id.* at 77.) He also noted that Solo testified the suspect
14   who held a gun on him was approximately his height, or five feet, six inches. (*Id.* at 78.)
15   Citing Justice's description of the intruder he encountered in Smith's house as "light
16   complected," counsel countered that "Ruben doesn't look light to me." (*Id.* at 81.)

17       Counsel then challenged Murbach's in-court identification of Johnson. He reminded
18   the jury that Murbach was unable to pick Johnson out of a photo lineup. (*Id.* at 82.) He
19   noted that Murbach described pock marks, which Johnson did not appear to have, but not
20   the type of conspicuous scar Johnson has on his cheek and upper lip. (*Id.* at 82-83.) Counsel
21   also noted the discrepancies in height provided by Murbach, ranging from six feet, three
22   inches to five feet, ten inches. (*Id.* at 83.) Finally, counsel identified the risk that Murbach
23   would identify the defendant, a young black man sitting at the defense table, as the black
24   man he saw the night of the incident. (*Id.* at 83-84.)

25       Based on this record, counsel engaged in "skillful cross examination of [the]
26   eyewitnesses" and in his closing argument "appeal[ed] to the experience and common
27   sense of [the] jurors." *Howard*, 608 F.3d at 574 (citation modified); *see Taylor v. Cate*, No.
28   CV 10-6929-JST MAN, 2011 WL 2441451, at *9 (C.D. Cal. Apr. 11, 2011), *report and*

*recommendation adopted*, No. CV 10-6929-JST MAN, 2011 WL 2415798 (C.D. Cal. June 14, 2011) ("While expert testimony might have provided additional support for counsel's attack on the reliability" of the eyewitness identifications, "counsel was well able to, and did, make an effective attack on [the witness's] identification of Petitioner without expert testimony.") (citing *Labansat*, 94 F.3d at 530); *cf. Moore*, 723 F.3d at 498 ("Although the cases cited by Moore and the district court support a conclusion that an expert in eyewitness identification might have provided helpful evidence for the defense, they do not go so far as to foreclose disagreement over whether failure to provide such a witness constitutes ineffective assistance.").

The PCR court did not unreasonably apply *Strickland* in denying Johnson's claim that counsel rendered ineffective assistance by failing to present an expert on the fallibility of eyewitness identifications. It was "well within the bounds of a reasonable judicial determination for the state court to conclude that defense counsel could follow a strategy that did not require the use of experts." *Moore*, 723 F.3d at 498 (quoting *Richter*, 562 U.S. at 106-07). This Court "cannot say there is no reasonable argument that counsel's use of cross-examination to challenge [the eyewitnesses'] credibility constituted ineffective assistance." *Id.*; *see Richter*, 562 U.S. at 103 (holding that "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement"). Accordingly, applying the doubly deferential standard of *Strickland* and § 2254(d), the Court denies Claim 2 as meritless.

**C.    Claim 4:**

Johnson argues that trial counsel performed ineffectively at the guilt phase by not adequately preparing for trial and failing to investigate and challenge the State's evidence. (Doc. 18 at 129.) This consists of several subclaims, most of which were raised in Johnson's PCR Petition (PCR Pet. at 68-74, 83-90) and denied on the merits by the state court (PCR Order, ME 1/28/15, at 4-8). These subclaims assert that trial counsel was ineffective for not seeking a continuance so they could finish guilt phase preparation and

1    failing to investigate and present evidence impeaching prosecution witnesses Russell

2    Biondo, Phyllis Hansen, and Cheryl Newberry. (PCR Pet. at 68-74, 83-90)

3    　　　The parties again disagree as to whether Johnson properly exhausted these

4    subclaims by presenting them in his Petition for Review. As stated above with respect to

5    Claim 2, in his Petition for Review, Johnson cited Claim III(B), which encompassed all the

6    guilt-phase ineffective assistance claims raised in his PCR Petition, asserted that the claims

7    were colorable, and attached the PCR to the Appendix to the Petition for Review. (PR at

8    19; *id.*, App'x 6.) This was sufficient to present the claims to the Arizona Supreme Court.

9    *See Gallegos*, 820 F.3d at 1026 n.15; *Scott*, 567 F.3d at 582. These components of Claim

10   4 are therefore exhausted.

11   　　　Claim 4 also includes two subclaims that were not presented in state court: that

12   counsel performed ineffectively by failing to "place Johnson's videotape[d] statements in

13   context" and a cumulative prejudice claim from counsel's alleged errors. (Doc. 18 at

14   148-51.) Johnson argues that their default is excused under *Martinez* by the ineffective

15   assistance of PCR counsel. (*Id.* at 129.)

16   　　　　　　**1.    Failure to Prepare for the Guilt Phase of Trial**

17   　　　Robert Storrs was appointed to Johnson's case on March 13, 2001. (IOR 30.) A

18   second chair attorney, Rick Tosto, was appointed on September 21, 2001, four weeks

19   before the October 30, 2001, trial date.

20   　　　At a pretrial conference on October 18, 2001, the prosecutor expressed concern that

21   defense counsel would not be able to complete their pretrial interviews of the State's 50

22   witnesses and wanted to make a record that "this Defendant understands the things that

23   happened and things that have yet to be done and are not going to be done by counsel in

24   preparation for this trial." (RT 10/18/01 at 5.) Storrs informed the court that: "It's my

25   client's position that this matter not be continued." (*Id.* at 7.) He agreed that "there are a

26   number of interviews to be done and a number of motions" but had assured Johnson that,

27   "I'll do everything I can within human limitations to be prepared for trial, or as prepared

28   as I can be given the circumstances." (*Id.*) Storrs continued: "I believe that it is his

[Johnson's] desire that we proceed and that he would object to this matter being continued . . ." (*Id.*) The court then advised Johnson, "[i]f you insist on going to trial on the 30th, your attorney may not have had the opportunity to interview all of the witnesses who would testify against you . . . [a]nd . . . you may not at some later point be able to point at Mr. Storrs and say he wasn't representing me adequately. . . ." (*Id.* at 9.) Johnson indicated that he understood. (*Id.*) The court also stated that "in all likelihood," if the defense asked for a continuance, it would be granted. (*Id.*)

At a hearing on October 29, 2001, two days before jury selection, Storrs informed the court that he interviewed all the civilian witnesses and had retained fingerprint and handwriting experts but did not interview Detective Kulesa or finish interviewing the State's gang expert, Detective Stuart. (RT 10/29/01 at 8.) Storrs acknowledged that preparations were "somewhat hurried and rushed" and that there were "more things that could be done so far as preparation is concerned," including contacting "some of the people the State is not intending to call. . . ." (*Id.* at 8-9.) The court again stated that it would grant a continuance if one were requested. (*Id.* at 10.) Defense counsel responded that: "[i]t is my client's desire, I think, to proceed." (*Id.*) He explained that "given the circumstances I have outlined, I am not ready to go. I am ready to go as with the limitations I have described." (*Id.* at 10.)

The court informed counsel that the decision to proceed to trial or request a continuance was his to make, not the clients, and that if the interests of justice supported a continuance, the court would be acting within its discretion in granting a continuance even if opposed by the defendant. (*Id.* at 10-11.) Storrs indicated again that he was not seeking a continuance. (*Id.* at 11.) The court then engaged in a colloquy with Johnson, again explaining that "in the Court's opinion, you would be better served if you allowed your attorney more time to prepare your case for trial" and that if Johnson made a motion to continue the trial the court would grant the motion to allow "sufficient time in order for your attorney to complete the necessary work to prepare for trial." (*Id.* at 12-13.) Johnson indicated that he understood and confirmed that he "still wish[ed] to proceed to trial" the

next day. (*Id.* at 13.) The court found that "the defendant's insistence on proceeding to trial is made by him voluntarily, knowingly, and with full understanding of the consequences that are associated with proceeding to trial without permitting his attorney the opportunity to be completely prepared for trial." (*Id.* at 13.)

In denying the claim that counsel performed ineffectively in proceeding to trial under these circumstances, the PCR court found that counsel's performance was not deficient because he "made a reasonable strategic decision to proceed to trial in accordance with his client's demands." (PCR Order, ME 1/28/15 at 5.)

Johnson contends that the PCR court's ruling that counsel made a reasonable strategic decision in acceding to Johnson's demands was itself unreasonable, and therefore not entitled to AEDPA deference, as the "decision to ask for a continuance because counsel requires additional time to prepare belongs to counsel, not the defendant." (Doc. 18 at 133.) In support of this proposition, Johnson cites *Shepherd v. Fahringer*, 158 Ariz. 266, 269 (1988). But *Shepherd*, a special action dealing with Arizona's speedy trial statute, does not address, let alone support, the proposition that the decision to seek a continuance resides solely with counsel.

Notwithstanding Johnson's misplaced argument, it is well settled that a defendant's own statements or actions influence the reasonableness of counsel's actions. *Strickland*, 466 U.S. at 691; *see Gonzalez v. Morgan*, 127 F. App'x 243, 246 (9th Cir. 2005) (finding counsel did not perform ineffectively by failing to adequately present alcohol impairment defense where it was defendant who had refused to waive his speedy trial rights despite temporary unavailability of expert retained by counsel); *Prevatte v. French*, 499 F. Supp. 2d 1324, 1329 (N.D. Ga. 2007) ("[W]here . . . counsel advises a defendant as to the benefits of seeking a continuance, and that defendant, against the advice of counsel, instructs his attorneys not to seek a continuance and insists upon proceeding to trial quickly based upon his belief that the State will be unable to prepare its case in time, the Court will not hear that defendant complain, literally decades later, that counsel's decision to abide by his wishes was professionally unreasonable."). "Counsel will not be deemed ineffective for

1    following their client's wishes, so long as the client made an informed decision." *Dowthitt*

2    *v. Johnson*, 230 F.3d 733, 748 (5th Cir. 2000). The trial court found that Johnson made an

3    informed decision to proceed to trial without a continuance. The PCR court reasonably

4    applied *Strickland* in denying this subclaim.

5         Moreover, as Respondents correctly note Johnson fails to identify any specific

6    deficiencies in counsel's representation that resulted from acceding to Johnson's insistence

7    that they proceed to trial. *See Strickland*, 466 U.S. at 690 (holding that a defendant "must

8    identify the acts or omissions of counsel that are alleged not to have been the result of

9    reasonable professional judgment"). Johnson relies on *State v. Vickers*, 180 Ariz. 521,

10   525-27 (1994). But there, the results of counsel's lack of preparation were readily apparent

11   and dramatic. For instance, counsel withdrew a motion to suppress, allowing damning

12   testimony that had previously been ruled inadmissible. *Id.* at 526. Counsel's "preparation

13   for trial was haphazard at best"; his "general inattention" and "lack of preparation" were

14   demonstrated "not only by his failure to interview witnesses but also by his seemingly

15   endless requests for continuances"; and the State even filed a motion to determine counsel

16   prior to trial out of alarm at counsel's "complete lack of preparation." *Id.* As discussed

17   next, there were no comparable failures by Johnson's counsel.

18              **2.    Failure to Investigate the State's Witnesses**

19                   **i.    Russell Biondo**

20         Johnson argues that defense counsel failed to investigate and present evidence that

21   would have impeached Biondo, including information from his probation file showing that

22   he lied about his continued drug use, failed to comply with court-directed drug counseling,

23   and failed to register as a sex offender. (Doc. 18 at 138.) Johnson also argues that counsel

24   should have presented expert testimony from a pharmacologist about the effects of

25   methamphetamine use on Biondo's ability to form accurate memories of the Affordable

26   Massage robbery. (*Id.* at 139.) Finally, Johnson contends that if counsel had further

27   investigated Biondo's 1992 conviction he would have discovered that it was a felony sex

28   offense which would have been admissible to impeach Biondo's credibility. (*Id.*)

The PCR court found that trial counsel "aggressively challenged [Biondo's] eyewitness identification," so the "failure to present additional, cumulative impeaching evidence was reasonable and his performance was not deficient." (PCR Order, ME 1/28/15 at 6.) The court explained:

> As to Russell Biondo, for impeachment purposes, records relating to his compliance with the terms and conditions of probation including ongoing drug use, failure to register as a sex offender and custody of his minor son. Biondo admitted to using drugs the night of the robbery; he also admitted to three prior felony convictions, two from 1996 and one from 2000. RT 11/6/2001 at 49, 42. Further, counsel and the trial court were aware of the 1992 conviction, with the State arguing that the nature of the offense, a child crime offense, would render it more prejudicial than probative for impeachment purposes.

(*Id.*)

This decision was neither an unreasonable application of *Strickland* nor based on an unreasonable determination of the facts.

First, as Respondents note, the records containing the impeachment evidence do not appear to have been available to counsel at the time of Biondo's testimony. The documents citing Biondo's failure to comply with court-ordered drug counseling and failure to register as a sex offender post-date the guilt phase of Johnson's trial (*see* PCR Pet., Ex. 37 at Bates No. 014506-10, 014525-28, 014539-43, 014558-61), as do the documents referencing Biondo's methamphetamine use (*id.* at Bates No. 014511, 014520, 014529, 014532, 014538, 014544, 014553, 014565, 014571). Counsel did not perform ineffectively in failing to secure records that were not available. *See Hovey*, 458 F.3d at 909 (finding no prejudice where the information petitioner thought counsel should have investigated "likely would have been unavailable even if counsel had attempted to obtain it"). In any event, as described above, Biondo admitted to using methamphetamine on the night of the robbery, and defense counsel thoroughly cross-examined him on that issue.

Next, the trial court found that Biondi's 1992 conviction was inadmissible:

> [G]iven the ambiguity regarding its status, that is, whether it remains a felony or has been designated a misdemeanor, and I would have to say that as it doesn't appear to be ascertainable by the usual methods[,] that would lead me to believe probably

it has been designated as a misdemeanor.

Regardless, I do find that the prejudicial effect outweighs the probative value in regard to the 1992 conviction. I say that because Mr. Biondo's credibility will be subject to impeachment with three prior felony convictions and it appears to me that the probative effect of his prior felony convictions given the number that he will be impeached with already, is sufficient and that adding yet a fourth conviction of an unknown character would add, frankly, not much to the mix in terms of permitting the jury to determine his credibility.

Putting it another way, I would expect the jury would weigh three or four felony convictions about the same and the addition of one or more conviction, if it is, in fact, a felony, doesn't have sufficient probative value given the prejudicial nature of the crime, that is, it appears to be something that requires registration as a sex offender.

(*Id.* at 66.) The court then indicated that it would revisit the issue after the next witness testified to see if further information was available. (*Id.*) After receiving the additional information, the court reaffirmed its ruling. (ME 11/05/01 at 2.) Citing "the still unclear designation of the 1992 crime in California, the nature of the crime, its remoteness, and the fact that Mr. Biondo has three prior convictions which may be used for impeachment," the court again concluded that "the prejudicial effect of permitting impeachment on the 1992 California conviction outweighs the probative value." (*Id.*)

Based on this record, with the trial court finding that Biondo's 1992 conviction, even if it was a felony, was inadmissible as more prejudicial than probative and with the impeachment evidence that was admitted, Johnson cannot show that counsel's performance here was either deficient or prejudicial under *Strickland*, let alone that the PCR court's decision denying this claim was unreasonable under the doubly deferential standard required by AEDPA. *See Stanley v. Schriro*, 598 F.3d 612, 620 (9th Cir. 2010) ("No prejudice is suffered when counsel declines to pursue the development of testimony that would be inadmissible at trial.") (citing *Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999)); *see also Horton v. Mayle*, 408 F.3d 570, 576-77 (9th Cir. 2005) (finding additional evidence of drug use and felony convictions cumulative where witness's own testimony showed his extensive drug use and the fact he was on probation).

1

ii.    **Phyllis Hansen**

2    Johnson argues that counsel "failed to investigate and effectively confront" Phyllis

3    Hansen, "one of the State's main witnesses." (Doc. 18 at 140.) Johnson contends that

4    counsel was ineffective in impeaching Hansen. Specifically, he argues, counsel should

5    have examined Hansen on the fact that she was a "suspect in the murder of Michael

6    LeMay" and that she "stole public funds and was not prosecuted for it." (*Id.* at 140-42.)

7    Johnson also argues that counsel should have presented impeachment testimony from

8    Heather Grant, who lived in Hansen's home in 2000 and would have testified that Hansen

9    was not "terrified" of Johnson. (*Id.*)

10    Respondents correctly note that Johnson did not raise a claim in state court alleging

11    ineffective assistance based on counsel's failure to impeach Hansen with evidence that she

12    was a suspect in another murder. (Doc. 37 at 100.) Although it was his burden to do so,

13    *see, e.g.*, *Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003), Johnson did not challenge

14    Respondents' procedural default defense; nor did he argue that cause and prejudice existed

15    to excuse the default. (*See* Doc. 44 at 113-14.) The claim remains procedurally defaulted

16    and barred from federal review. It is also meritless because evidence that Hansen was the

17    subject of a murder investigation would have been inadmissible.

18    Johnson did raise the claim that trial counsel performed deficiently with respect to

19    evidence that Hansen was investigated for embezzlement and ultimately dismissed from

20    her position with the Justice Court. (PCR Pet. at 85-88.) The PCR court denied the claim

21    on the merits. (PCR Order, ME 1/28/15, at 6-7.) The court explained:

22
23
24

> The Rules permit the use of a felony *conviction* for impeachment purposes. *See* Rules 608(b) and 609, Arizona Rules of Evidence. Hansen did not have any convictions at the time of trial. Consequently, trial counsel was not deficient for failing to investigate, discover, and use the information.

25
26
27
28

> While introduction of materials related to Hansen's dismissal for embezzlement could have provided additional impeaching material, the impeachment material would have been cumulative to the evidence that Hansen misused her office. Furthermore, it could have led to the implication that Hansen furnished the defendant with additional identifying material from nonpublic sources and that would have further implicated the defendant in the murder.

1    (*Id.*)

2          Because Hansen was not convicted of these offenses, the admissibility of such

3    evidence was governed by Rule 608(b) of the Arizona Rules of Evidence, which provided:

>    (b) Specific Instances of Conduct. Except for a criminal
>    conviction under Rule 609, extrinsic evidence is not admissible
>    to prove specific instances of a witness's conduct in order to
>    attack or support the witness's character for truthfulness. But
>    the court may, on cross-examination, allow them to be inquired
>    into if they are probative of the character for truthfulness or
>    untruthfulness of:
>
>    (1) the witness; or
>
>    (2) another witness whose character the witness being cross-
>    examined has testified about.

11         Under Rule 608(b), evidence that Hansen was a suspect in a murder investigation

12   would have been inadmissible. Such evidence would have involved a "collateral line of

13   inquiry," irrelevant to the charges for which Johnson was being tried. *United States v. Key*,

14   40 F. App'x 545, 547 (9th Cir. 2002). It also "sheds no light on [Hansen's] character for

15   truthfulness." *Id.* (finding the trial court did not abuse its discretion by precluding the

16   defendant from impeaching a witness with evidence the witness was "a suspect in a murder

17   case and had been arrested for domestic violence."); *see Greenway v. Ryan*, No. CV-98-

18   25-TUC-RCC, 2013 WL 6196293, at *15 (D. Ariz. Nov. 27, 2013), *aff'd*, 856 F.3d 676

19   (9th Cir. 2017) (finding counsel did not perform ineffectively by not investigating witness's

20   background where the witness had no felony convictions and other evidence was

21   inadmissible under Rule 608(b) as speculative and not "evinc[ing] a character for

22   untruthfulness").

23         As for counsel's failure to present evidence that Hansen was under investigation for

24   embezzlement, Johnson has not shown that the PCR court unreasonably applied *Strickland*

25   in rejecting the claim. According to Johnson, Rule 608(b) provides that "extrinsic evidence

26   may be inquired into" and therefore "evidence that Hansen was under investigation

27   for . . . stealing public funds was admissible." (Doc. 44 at 122.) Rule 608(b), however, and

28   the case Johnson relies on, are to the contrary. *See State v. Woods*, 141 Ariz. 446, 450

1    (1984) ("[U]nder Rule 608(b) the trial court has discretion to allow cross-examination of a

2    witness about his specific acts of misconduct, if they are probative of truthfulness, even

3    though the witness has not been convicted of any crime in connection with those acts. One

4    limitation on this discretion is that the use of such acts is limited to cross-examination of

5    the witness; the acts may not be proved by extrinsic evidence.").

6           There was no felony conviction, so extrinsic evidence concerning the embezzlement

7    investigation would not have been admissible to impeach Hansen. Even if the trial judge

8    had permitted the defense to cross-examine Hansen about the theft allegations, counsel

9    would not have been allowed to present evidence countering her answers. *See United States*

10   *v. Stuart*, 773 F.3d 849, 853 (7th Cir. 2014) (finding counsel's decision not to

11   cross-examine prosecution witness about her alleged embezzlement did not constitute

12   ineffective assistance. "Counsel could have asked [the witness] about embezzlement

13   during her cross-examination, but Stuart gives us no reason to believe that she would have

14   confessed to a crime for which she has never been charged. And counsel would not have

15   been entitled to introduce extrinsic evidence . . . to prove embezzlement because Federal

16   Rule of Evidence 608 forbids introducing extrinsic evidence to prove the truthfulness of

17   prior acts of misconduct.").

18          Counsel did not perform ineffectively by failing to discover and cross-examine

19   Hansen about the allegations that she embezzled funds from the Justice Court.

20          Finally, the PCR court rejected Johnson's claim that counsel performed

21   ineffectively by failing to impeach Hansen's testimony that she feared Johnson and that

22   was her motive to testify against him. (PCR Order, ME 1/28/15, at 7; *see* PCR Pet. at 44.)

23   The court stated that it "decline[d] to second-guess the statement as reflected in the

24   transcript" and would "presume that Hansen testified in accordance with her oath regarding

25   her recollection of her feelings on that occasion." (*Id.*)

26          Johnson argues that trial counsel should have presented testimony from Heather

27   Grant, who lived at Hansen's home in 2000 and was romantically involved with both Fred

28   Day (Hansen's husband) and Johnson. According to Johnson, Grant "could have

- 140 -

impeached Hansen's character for truthfulness and rebutted Hansen's claim to be 'terrified' of Johnson." (Doc. 18 at 143.) In a declaration from 2010, Grant attested that "she did not believe that Phyllis or Fred were afraid of Reuben [sic]." (Doc. 45-7, Ex. 85, ¶ 43.) She also "perceived Phyllis to come across as the innocent victim," despite knowing her husband sold and used drugs. (*Id.*, ¶ 44.)

Prior to Hansen's testimony, the prosecution filed a motion in limine to preclude evidence that Hansen had obtained an order of protection against Grant's former boyfriend, a drug dealer named Andy who had threatened to kill Hansen's husband. (*See* RT 11/14/01 at 4-11.) Defense counsel wanted to present the evidence to show "motive and bias" on Hansen's part—"another example of what this woman will do to protect and do for her man" and "the lengths to which this woman will go to do things her husband wants her to do." (*Id.* at 9, 10.) The court granted the motion in limine, finding the probative value of the proposed evidence "substantially outweighed by considerations of undue delay, waste of time, confusion of the issues, or misleading of the jury." (*Id.* at 11.)

Hansen testified that she met Johnson through her husband. (*Id.*) Johnson had been to their home approximately "100 times," most often to see Day, sometimes Hansen. (*Id.* at 20.) He also spent time with Hansen's daughters. (*Id.*) In July 2000, Day and Johnson were arrested on a drug offense. (*Id.* at 20-21.) Johnson, who posted a bond while Day served a short sentence, continued to visit Hansen while Day was incarcerated. (*Id.* at 21.)

Around November 10, 2000, Johnson contacted Hansen asking for information about his friend Jarvis Ross, who had been arrested and was in custody. (*Id.* at 24-25.) Johnson wanted to know if charges had been filed; Hansen told him that Ross had been charged with armed robbery or armed burglary. (*Id.* at 27.) Hansen also testified that Johnson was aware that the date of Ross's preliminary hearing was November 15. (*Id.*)

Hansen next testified that on November 17 Johnson came to her home and showed her a newspaper article about the Smith murder. (*Id.* at 28.) He told Hansen he was the unnamed suspect mentioned in the article and, according to Hansen, proceeded to recount the details of his involvement in the crime. (*Id.* at 30.) Hansen testified that she was "very

shocked" to hear this information. (*Id.* at 31.)

Hansen testified that Johnson asked her for information about the status of Carter, who had been arrested on the night of the murder. (*Id.* at 40-41.) She provided the information. (*Id.* at 41.) Hansen did not contact the authorities at that point. (*Id.*)

About a week before he was arrested in January, while Day was in custody, Johnson came to Hansen's home. (*Id.* at 42.) Over defense counsel's objection, Hansen testified that Johnson began looking for a gun which he knew she kept in a dresser drawer. (*Id.* at 45.) She lied and told Johnson that she had taken the gun to her parents' house. (*Id.* at 45.)

After Johnson was arrested, he called Hansen from the jail infirmary. (*Id.* at 48-49.) He told her that he had had a female visitor and that "they were going to take care of Cheryl." (*Id.* at 49.) Hansen believed "Cheryl" was Cheryl Newberry. (*Id.* at 50.) Over defense counsel's objections, Hansen testified that she was "afraid for Cheryl," "concern[ed] for Cheryl's safety," and "too scared to think about what to do." (*Id.*) After the call, Hansen contacted the authorities. (*Id.* at 51.)

On cross-examination, Hansen admitted she had been good friends with Johnson, even telling him on occasion that she loved him. (RT 11/14/01 at 83.) She agreed that "at least up to a certain point [she] had a certain degree of affection for [Johnson]" and continued to take calls from him. (*Id.* at 83-84.)

Counsel did not perform ineffectively in failing to present testimony from Heather Grant which, even if admissible, was consistent with Hansen's testimony that she, Day, and Johnson had socialized together and been on friendly terms. Hansen's testimony about fearing Johnson related to the period after he had confessed to murdering Smith and had threatened "Cheryl." This is not inconsistent with anything in Grant's declaration. *See, e.g.*, *Santos v. Maddox*, No. CIV S-02-1571-FCD-JFM-P, 2006 WL 1686091, at *20 (E.D. Cal. June 16, 2006) (finding attorney's failure to impeach witness with statements that were not inconsistent but described different time periods was not ineffective assistance).

### iii.    Cheryl Newberry

Johnson argues that counsel was ineffective by failing to investigate Newberry and

impeach her testimony with evidence of her various lies and inconsistent statements, including about her relationship with the victim and her own involvement in the crimes; evidence that she had read the police reports and been in contact with Phyllis Hansen; and evidence that she was taking medication for mental health issues. (Doc. 18 at 144.)

The PCR court denied the claim on the merits. (PCR Order, ME 1/28/15, at 7-8.) It noted that the jury was aware of Newberry's role in the armed robbery, that she had entered into a plea agreement, that she would not be charged in connection with the robbery, and that no charges related to contraband, methamphetamine, or a firearm would be filed against her. (*Id.* at 7.) The court explained that through "aggressive cross-examination," defense counsel elicited testimony about the factual basis of Newberry's plea, which included her admission that she "set up, planned and arranged the robbery of Affordable Massage." (*Id.*) (citation omitted). On cross-examination Newberry also acknowledged that she had previously told counsel she was not involved in the robbery and had only admitted involvement in order to take advantage of the plea agreement. (*Id.*) Newberry also acknowledged that under the plea agreement she would not be charged in Smith's murder. (*Id.*) The PCR court noted that counsel impeached Newberry with "her access to police reports, her role in the massage robbery, including knowing that the victim would be present and her initial profession of innocence, her methamphetamine addiction, her drug use, and Ross' allegation that she 'wanted Stephanie dead.'" (*Id.* at 8) (citation omitted).

The court then found, with respect to Newberry's mental health issues, that there was "no indication that either the state or defense counsel, or the court, or her own court-appointed counsel, had concerns about Newberry's competence to testify." (*Id.* at 8.) She was "able to organize her thoughts and respond to somewhat-leading questions on direct, as well as parrying defense counsel's aggressive cross-examination." (*Id.*)

The court next found that Newberry was adequately impeached on her claim to have been a "close personal friend of the victim's," a claim belied by her involvement in Smith's murder, including her actions in "pointing out the victim's house to the defendant and Ross's statement that Newberry wanted Stephanie killed." (*Id.*) According to the PCR

court, "[t]he jury could—and reasonably would—have concluded that Newberry was overstating her relationship." (*Id.*)

> In denying this claim of ineffective assistance, the court concluded:
>
> The alleged additional impeaching information would have been used by the jury to assess Newberry's credibility. Given the extensive cross-examination conducted by counsel based on the material then-available, the impeaching materials are cumulative and, even if considered at trial, the result would have been the same—the defendant would have been convicted of the murder. The Court finds counsel's performance was not deficient nor was the defendant prejudiced by counsel's performance.

(*Id.* at 8.)

Johnson argues that this decision was based on an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2). (Doc. 44 at 125-26.) Specifically, he contests the court's finding that due to counsel's extensive cross-examination, additional impeachment material was merely cumulative. (*Id.*) According to Johnson, the impeachment evidence that should have been presented "was directly relevant to Newberry's motive and opportunity to fabricate her testimony, and her willingness to lie about her role in the Affordable Massage robbery itself." (*Id.* at 126.) However, as described, and as found by the PCR court, these issues were covered in cross-examination. Thus, the jury was aware that Newberry was motivated by her desire to avoid jail time, had read the police reports, and had lied during interviews with defense counsel. Finally, regarding Newberry's mental health problems and the "influence of anti-psychotic drugs," Johnson cites only materials that post-date the guilt phase of trial. (Doc. 18 at 145-46.) Counsel cannot have been ineffective for failing to discover the information those sources contained.

Because reasonable minds reviewing the record could agree with the PCR court that trial counsel did not perform ineffectively, *see* 28 U.S.C. § 2254(d)(2); *Brumfield*, 576 U.S. at 314, this claim is without merit and will be denied.

### 3.    Failure to Place Johnson's Videotaped Statements in Context

During the penalty phase, the prosecution played a four-minute clip taken from a

thirty-minute videotaped interview between Johnson and Detective Kulesa. (RT 12/17/03 at 145-48.) Defense counsel objected that the evidence was irrelevant, inflammatory, and "very prejudicial" under Rule 403, and that its admission would violate Johnson's Sixth and Fourteenth Amendment rights. (*Id.* at 87-94.) In the clip played for the jury, Johnson stares at Detective Kulesa and shouts "Fuck you, Stephanie Smith and everyone in this motherfucking building." (*See* Doc. 17, Exs. 23, 24.) Johnson argues that counsel performed ineffectively by failing to put the clip in context by playing the preceding portion of the tape which showed that Johnson was "initially friendly" and his outburst came only after the detective's prolonged "in your face routine." (Doc. 18 at 148-49.)

Johnson did not raise this claim in state court. He contends its default is excused under *Martinez* by the ineffective assistance of PCR counsel. (*Id.* at 129.) The Court disagrees.

The tape was admitted during the rebuttal testimony of the State's expert, Dr. Gina Lang, who relied on Johnson's behavior in the clip when diagnosing him with a personality disorder that included antisocial histrionic traits. (RT 12/17/03 at 147-48.) The trial court admitted the tape "for the limited purpose of showing how [Johnson] reacts when confronted regarding his activities and histrionics, and to support the opinion of [Dr. Lang] of the existence of histrionic traits." (*Id.* at 146.) Before the tape was played, the court offered the following limiting instruction:

> [T]his video is merely offered to help you understand this doctor's opinion, basis for her opinion as to defendant's various psychological characteristics. Language in the tape . . . is not offered for the substance; it is merely offered as part of . . . the defendant's behavior. . . .
>
> With that understanding, that's the only purpose this videotape is being admitted [sic].

(*Id.* at 148.)

Johnson challenged the admission of the tape on direct appeal. The Arizona Supreme Court found that the trial court did not abuse its discretion in admitting the clip because it was "helpful to the jurors in several ways," including demonstrating one of the

features of Dr. Lang's diagnosis and rebutting the defense expert's opinion, and because "the trial court properly instructed the jury as to the limited purpose of the videotape." *Johnson*, 212 Ariz. at 436.

To show that counsel failed to litigate an issue competently, a petitioner must "prove that his . . . claim is meritorious." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). The Arizona Supreme Court found that the tape was admissible. Because the issue is meritless, Johnson cannot show that he was prejudiced by the way it was litigated. *See Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) ("[T]he failure to take a futile action can never be deficient performance.").

In addition, under *Strickland* counsel's actions are presumed to reflect sound trial strategy. 466 U.S. at 689. Johnson cannot overcome that presumption with the conclusory allegation that offering the entire taped interview, in the interest of providing context, was the only constitutionally permissible course for counsel to take. *See Siripongs v. Calderon*, 133 F.3d 732, 736 (9th Cir. 1998) ("[T]he relevant inquiry under *Strickland* is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable."). The remainder of the tape includes statements by Johnson regarding his frequent involvement with law enforcement and the fact that he had just been released from prison. Counsel could reasonably have determined that avoiding any additional focus on the police interrogation was the better strategy. Finally, the trial court's limiting instruction is presumed to have cured any prejudice from the admission of the tape. *See Dubria v. Smith*, 224 F.3d 995, 1002 (9th Cir. 2000).

Because the claim of trial counsel ineffectiveness lacks merit, PCR counsel did not perform ineffectively in failing to raise it. *See Atwood*, 870 F.3d at 1060; *Sexton*, 679 F.3d at 1157. There is not a reasonable probability that the results of the PCR proceedings would have been different if counsel had raised this claim. Johnson therefore cannot show cause under *Martinez* for the claim's default. The claim remains procedurally defaulted and barred from federal review.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 4.    Cumulative Error

Finally, Johnson raises a claim of cumulative prejudice based on the individual allegations of ineffective assistance. (Doc. 18 at 150-51.) He did not raise this claim in state court, and he does not address Respondent's argument that the claim is procedurally defaulted. Whatever its procedural status, however, the claim is meritless.

The United States Supreme Court has not specifically recognized the doctrine of cumulative error as an independent basis for habeas relief. *See Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002) ("The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief."); *cf. Morris v. Sec'y Dep't of Corr.*, 677 F.3d 1117, 1132 n.3 (11th Cir. 2012) (refusing to decide whether "under the current state of Supreme Court precedent, cumulative error claims reviewed through the lens of AEDPA can ever succeed in showing that the state court's decision on the merits was contrary to or an unreasonable application of clearly established law"); *Hooks v. Workman*, 689 F.3d 1148, 1194 n.24 (10th Cir. 2012) ("We note that there is a split in the circuits on whether the need to conduct a cumulative-error analysis is clearly established federal law under § 2254(d)(1).").

The Ninth Circuit has held that in some cases, "although no single trial error . . .is sufficiently prejudicial to warrant reversal, the cumulative effect of [multiple] errors may stills prejudice a defendant" to such a degree that his conviction must be overturned. *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002), *overruled on other grounds by Slack v. McDaniel*, 529 U.S. 473 (2000). Cumulative prejudice exists only where the aggregation of errors undermines confidence in the verdict. *Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007).

Here, the Court has not identified any constitutional error arising in Johnson's trial. "Because there is no single constitutional error in this case, there is nothing to accumulate to [the] level of a constitutional violation." *Mancuso*, 292 F.3d at 957; *see Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005); *Morris*, 677 F.3d at 1132 & n.3. "If there are no errors, there is no need to consider their cumulative effect." *McGill*, 16 F.4th at 685.

Because Supreme Court precedent does not recognize the doctrine of cumulative error, and because this Court has determined that no prejudice resulted from the errors alleged by Johnson, and because confidence in the verdict is not undermined by the purported errors, the claim of cumulative prejudice is meritless.

Claim 4 is denied.

**D.    Claim 5:**

Johnson argues that trial counsel performed ineffectively during guilt-phase voir dire. (Doc. 18 at 152.) He argues that counsel failed to ensure a diverse jury pool, spoke to the potential jury pool in only three instances, questioned only one juror individually, failed to ask constitutionally required questions, failed to follow up with potentially biased jurors, and failed to ensure all voir dire proceedings were recorded. (*Id.* at 156-61.) These allegations are set forth in subclaims (A) through (E). Johnson admits he did not raise these claims in state court. (*Id.* at 152.) He argues that their default is excused by the ineffective assistance of PCR counsel. (*Id.*) The Court will address that argument below. In subclaim 5(F), Johnson asserts that the trial court committed reversible error by failing to use juror questionnaires.[40] (*Id.* at 161.) He did not raise this claim in state court. His argument that the default is excused fails because *Martinez* applies only to claims of ineffective assistance of trial counsel. Accordingly, Claim 5(F) is procedurally defaulted and barred from federal review. *See Martinez (Ernesto)*, 926 F.3d at 1225; *Pizzuto*, 783 F.3d at 1177.

**1.    Background**

Voir dire took place on October 30, 2001. The judge questioned the jury panel as a group. At the outset of his questioning, he informed the panel that if he or the attorneys asked a question a juror would rather not talk about publicly, he would provide an opportunity for the juror to answer the question in private. (RT 10/30/01 at 4.)

---

[40] Johnson's counsel had prepared a draft juror questionnaire and argued for its use. (RT 10/29/01 at 111.) The trial court declined, finding that questionnaires are "incredibly time consuming" and explaining that he would ask most of the questions on the questionnaire and allow counsel as much time as they needed to ask any permissible questions during voir dire. (*Id.*)

The judge asked if any of the jurors had "any conscientious or religious scruples or feelings that would prevent you from voting for first degree murder because of the possible imposition of the death penalty?" (*Id.* at 39.) Two panel members responded, one ultimately agreeing he could render a verdict based solely on the evidence "without considering the fact that the death penalty might be involved," the other maintaining that it would be "more difficult . . . to vote for a conviction knowing that the death penalty is possible." (*Id.* at 39-43.) The court then took a break during which several jurors were questioned individually by the court and counsel. (*Id.* at 56-61.) After the break the court asked two more questions of the jury panel, each of which elicited no response: "Are there any of you who could not set aside any conscientious or religious feelings that you might have against the death penalty and impartially weigh the evidence in this case, or render a verdict in accordance with the law?" and "Is there anyone here who believes that all persons convicted of first degree murder should receive the death penalty?" (*Id.* at 61-62.)

The court also asked the panel about race:

> Mr. Johnson is an individual of African American heritage. As I look about the jury panel, I don't readily ascertain anybody here who is also African American. Ultimately what I need to find out from all of you is whether a person's race or heritage would in any way affect you in evaluating the testimony of that person or being fair and impartial in this case.
>
> Nobody wants to say yep, that is me. I'm a redneck. I can't do it. And I understand that. I think the issue is often more subtle than that. . . .

(*Id.* at 86.) After providing examples from other cases in which potential jurors, having asked to speak privately with the judge, shared personal experiences they believed might be relevant to the issue of race (*id.* at 86-87), the court continued with its questioning:

> So when I asked the question whether Mr. Johnson's race or heritage will in any way affect your ability in evaluating this case, or whether anybody's race or heritage would in any way affect you in evaluating their testimony, the question is broader than it might appear.
>
> So, having put it in those terms, is there anybody here who has any sort of a response to this general area of inquiry or has anything they would like to share with us?

(*Id.* at 87-88.) One panel member responded that her father had racist views which she did not share and would not affect her ability to perform as a fair juror. (*Id.* at 88.) The rest of the jurors remained silent. (*Id.*)

Finally, the judge asked the panel about their ability to presume Johnson innocent and hold the State to its burden of proving guilt beyond a reasonable doubt on each element of the offenses. (*Id.* at 108-09.) The panel remained silent in assent. (*Id.* at 109-10.)

Following his own questioning of the panel, the judge offered the attorneys the opportunity to ask questions. (*Id.* at 110.) The prosecutor had no questions. (*Id.*) Defense counsel asked the panel members whether any of them had "feelings about guns, gun laws or anything of that nature" that would affect their ability to be objective. (*Id.* at 111.) No one answered in the affirmative. (*Id.*) He then asked if the allegation that Johnson was involved with gangs meant that he started out with a "strike against him" and would prevent the jurors from fairly considering the evidence and applying the proper burden of proof. (*Id.* at 111-12.) Again, there were no responses. (*Id.* at 112.)

The peremptory strike process and any *Batson* objections took place off the record. (*See id.* at 115-16.) Voir dire was completed the same day. (*See id.* at 116.)

## 2.    Analysis

The Ninth Circuit has explained, "[t]he conduct of voir dire 'will in most instances involve the exercise of a judgment which should be left to competent defense counsel.'" *Hovey*, 458 F.3d at 910 (quoting *Gustave v. United States*, 627 F.2d 901, 906 (9th Cir. 1980)). Again, under *Strickland* it is presumed that counsel's actions might be a matter of sound trial strategy. 466 U.S. at 689; *see, e.g.*, *Ochoa v. Davis*, 50 F.4th 865, 890 (9th Cir. 2022), *cert. denied sub nom. Ochoa v. Smith*, 144 S. Ct. 381 (2023); *Stanford v. Parker*, 266 F.3d 442, 455 (6th Cir. 2001); *Ellison*, 721 F. Supp. 3d 820, 905 (9th Cir. 2024).

A petitioner alleging ineffective assistance must "affirmatively prove prejudice." *Fields v. Woodford*, 309 F.3d 1095, 1107 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 693). "Establishing *Strickland* prejudice in the context of juror selection requires a showing that, as a result of trial counsel's [error,] . . . the jury panel contained at least one juror who

was biased." *See Davis*, 384 F.3d at 643; *Wilson*, 185 F.3d at 991 (holding that counsel was not ineffective for failing to ask certain questions during *voir dire* when all jurors stated that they would be fair and follow the law).

"A claim of failure to adequately question jurors will fail where adequate questions are not identified and alleged improperly seated jurors are not identified." *DePasquale v. McDaniel*, No. 3:07-CV-00472-ECR, 2011 WL 841419, at *12 (D. Nev. Mar. 7, 2011) (citing *Cummings v. Sirmons*, 506 F.3d 1211, 1228 (10th Cir. 2007)).

In subclaim 5(A), Johnson first argues that counsel performed ineffectively by failing to "ensure a diverse jury pool." (Doc. 18 at 156.) This allegation is wholly conclusory. Johnson offers no indication that the jury pool was not diverse, beyond an offhand comment by the judge about the panel, nor does he indicate the nature of counsel's failure to "challenge[] the method by which the panel was selected." (*Id.*)

Conclusory allegations of ineffective assistance of counsel do not warrant habeas relief. *Jones v. Gomez*, 66 F.3d 199, 205 (9th Cir. 1995); *see Weaver v. Massachusetts*, 582 U.S. 286, 303 (2017) (rejecting claim where petitioner offered no legal argument or evidence showing prejudice); *Roseberry v. Ryan*, No. CV-15-01507-PHX-NVW, 2019 WL 3556932, at *22 (D. Ariz. Aug. 5, 2019). Claim 5(A) is denied as meritless.

Johnson's next claim, 5(B), that counsel performed ineffectively by asking only three transcript pages worth of questions and that "[n]o reasonable attorney would have asked so few questions" (Doc. 18 at 157), is equally conclusory. Johnson's citation to *Mu'Min v. Virginia*, 500 U.S. 415, 424 (1991), does not support this argument. There the Supreme Court noted two of the principles governing voir dire: that "the possibility of racial prejudice against a black defendant charged with a violent crime against a white person is sufficiently real that the Fourteenth Amendment requires that inquiry be made into racial prejudice" and that "the trial court retains great latitude in deciding what questions should be asked on *voir dire*." *Id.* at 424.

In Johnson's case, the trial court made inquiry into the issue of racial prejudice. Johnson does not identify what questions counsel should have asked; nor does he specify

which juror or jurors were improperly seated because of counsel's failures. *See DePasquale*, 2011 WL 841419, at *12. Claim 5(B) is denied.

Claim 5(C), arguing that counsel performed ineffectively by "fail[ing] to ask constitutionally required questions"—namely follow-up questions to individual jurors about the interracial aspect of the crime—is denied for the same reason. *See id.*; *see also Mahdi v. Bagley*, 522 F.3d 631, 637-38 (6th Cir. 2008) (affirming state court ruling that ineffective assistance claim was "purely speculative" and finding that "[t]rial counsel's decision not to voir dire prospective jurors on racial and religious bias seems a reasonable tactical decision.").

In Claim 5(D), Johnson asserts that counsel performed ineffectively by failing to ask follow-up questions of a juror who worked for the *Arizona Republic* newspaper, jurors who had sat on criminal juries that rendered guilty verdicts, jurors with children, and jurors with ties to law enforcement. (Doc. 18 at 159-60.) He also alleges that counsel's failure to "rehabilitate jurors who may have been favorable to his case" constituted ineffective assistance. (*Id.* at 160.) Johnson asserts that these failures "prejudiced [him] because potentially biased jurors sat on his jury." (*Id.*)

Again, these allegations are conclusory with respect to both prongs of *Strickland*. The court questioned the jury panel on the issue of pretrial publicity, including questions about a television show and newspaper articles. (RT 10/30/01 at 29-30.) None of the jurors indicated they had been exposed to any coverage of the case. (*Id.* at 30.) The panelists all agreed that they could hold the State to its burden of proof. (*Id.* at 108-10.)

Counsel's reliance on a jurors' commitment they "would be fair and would follow the law as instructed" warrants "deference as a tactical decision." *Wilson*, 185 F.3d at 991. Johnson's bald assertion that counsel's failure to ask follow-up questions resulted in "potentially biased" jurors being empaneled falls far short of affirmatively establishing prejudice. *See Roberts v. Broomfield*, 637 F. Supp. 3d 872, 1007 (E.D. Cal. 2022) ("Petitioner has not established a reasonable possibility that racial bias contributed to the jury's guilt-phase verdict."); *Windham v. Cate*, No. EDCV 09-2340-RSWL, 2012 WL

3150354, at \*16 (C.D. Cal. June 11, 2012), *report and recommendation adopted*, No. EDCV 09-2340-RSWL, 2012 WL 2913160 (C.D. Cal. July 17, 2012), *aff'd*, 594 F. App'x 911 (9th Cir. 2014) ("[T]here is no evidence before the Court suggesting that Petitioner suffered any prejudice as a result of counsel's inability to conduct further voir dire. Nothing in the record suggests bias on the part of any member of Petitioner's jury; indeed, Petitioner does not even describe the nature of the alleged bias. Petitioner cannot base an ineffective assistance claim on a purely speculative showing of prejudice." (citations omitted)).

Claim 5(D) is therefore denied.

In Claim 5(E), Johnson argues that counsel performed ineffectively by failing to insist that all substantive proceedings, including the peremptory strikes discussion and the *Batson* challenges, be recorded. (Doc. 18 at 160-61.)

Again, however, Johnson offers only conclusory allegations of prejudice. (*See id.* at 161.) These allegations are insufficient to meet his burden under *Strickland*. *See Green v. Johnson*, 160 F.3d 1029, 1042 (5th Cir. 1998) (denying claim of ineffective assistance of counsel based on failure to ensure bench conferences were recorded because "[m]ere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue"); *Newell v. Ryan*, No. CV-12-02038-PHX-JJT, 2019 WL 1280960, at \*12 (D. Ariz. Mar. 20, 2019); *Williams v. Belleque*, No. 3:03-CV-01678-JO, 2018 WL 3853172, at \*4, (D. Or. Aug. 9, 2018) ("[P]etitioner fails to demonstrate that counsel's alleged failures prejudiced him by identifying an issue or claim that he could have successfully pursued had counsel moved to have bench conferences recorded and/or made a record of topics and results covered.").

Claim 5(E) is denied as meritless.

### E.    Claim 10:

Johnson argues that counsel performed ineffectively by "failing to request an instruction that mere gang membership is not a crime." (Doc. 18 at 216.) He acknowledges that he did not raise the claim in state court, but argues its default is excused under *Martinez* by the ineffective assistance of PCR counsel. (*Id.*)

1    At the guilt phase of Johnson's trial, the State requested the court give the Standard

2   Criminal 26 jury instruction, which would have advised the jury that mere gang

3   membership is not a crime. (RT 11/21/01 at 78-79.) The State noted Johnson had not

4   requested it, but the State sought it out of an "abundance of caution." (*Id.* at 79.) Defense

5   counsel explained that they did not want the instruction:

6           It is—I think it is more confusing. There's the evidence I
            brought out about his distributing marijuana. There's the arrest
7           for the misconduct involving weapons with Fred Day. There's
            all the gang stuff. And I think that if you were to craft or I were
8           to craft an instruction that specifically addressed all of those
            things,    it    would    just    simply    reemphasize    them
9           disproportionately to my client's advantage [sic]. I didn't ask
            for it and that is my reason.
10

11  (*Id.*) The Court ruled in Johnson's favor and did not give the instruction. (*Id.*)

12    In his petition, Johnson offers only conclusory statements that counsel's

13  performance was deficient and prejudicial. (*Id.* at 218-19.) To the extent he makes

14  substantive arguments, he saves them for his reply brief. (*See* Doc. 44 at 160-62.) This is

15  inappropriate. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court

16  need not consider arguments raised for the first time in a reply brief."); *Delgadillo*, 527

17  F.3d at 930 n.4; *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994).

18    Even considering the arguments raised in the reply brief, this claim fails because

19  Johnson does not satisfy his burden with respect to either prong of *Strickland*. Defense

20  counsel made a strategic choice to oppose the instruction on the grounds that it would

21  confuse the jury and "reemphasize" the gang aspect of the case. (RT 11/21/01 at 79.) This

22  kind of strategic choice is "virtually unchallengeable." *Strickland*, 466 U.S. at 690; *see*

23  *Vasquez v. Evans*, No. CV-05-5747-PSG-OP, 2008 WL 5111880, at *13 (C.D. Cal. Dec.

24  2, 2008) (explaining that "defense counsel's unwillingness to call more jury attention to

25  the prejudicial gang evidence by not requesting a limiting instruction . . . was not

26  unreasonable."); *Suggs v. United States*, No. 2:06 CV 7, 2006 WL 1050686, at *5 (N.D.

27  Ind. Apr. 13, 2006) (rejecting claim that counsel performed ineffectively where it was

28  "very possible that Defendants' lack of a request for such an instruction was a tactical

decision to avoid emphasizing gang membership") (quoting *United States v. Suggs*, 374 F.3d 508, 518 (7th Cir. 2004)).

Johnson cannot show prejudice because, as he and Respondents agree, none of the charged offenses permitted a finding of guilt based solely on gang membership. (Doc. 37 at 140; Doc. 44 at 169.) *See Johnson v. United States*, No. 16-3022, 2017 WL 1146921, at *11 (C.D. Ill. Mar. 27, 2017) (finding no prejudice where the court "properly instructed the jury, . . . which accurately indicated that more than association or gang affiliation was required"). Additionally, given the strength of the evidence against him, Johnson has not met his burden of affirmatively showing there was a reasonable probability of a different verdict if the instruction had been given. *See Vasquez*, 2008 WL 5111880, at *13 ("Petitioner cannot show that but for his counsel's failure to request the limiting instruction, he might have been acquitted of the charges."); *Suggs*, 2006 WL 1050686, at *5 ("[G]iven the substantial evidence of the Suggses' guilt, the court does not believe that any prejudice could have resulted from the failure to give a limiting instruction on the gang-affiliation evidence.") Again, an instruction that belonging to a gang is not a crime may have served, as counsel apparently worried, to reinforce the argument that Johnson *did* belong to a gang.

Because this claim of ineffectiveness lacks merit, PCR counsel did not perform ineffectively in failing to raise it. *See Atwood*, 870 F.3d at 1060; *Sexton*, 679 F.3d at 1157. There is not a reasonable probability that the results of the PCR proceedings would have been different if counsel had raised the claim. Johnson therefore cannot show cause under *Martinez* for the claim's default. The claim remains procedurally defaulted and barred from federal review.

Claim 10 is denied.

## F.    Claim 13:

Johnson argues that counsel performed ineffectively by "failing to move to preclude rap lyrics, attributed to Johnson and co-defendant Ross, on First Amendment and Confrontation Clause grounds." (Doc. 18 at 243.) He also asserts that the State committed misconduct by failing to follow the trial court's ruling admitting the lyrics and that the trial

court erred in not excluding the lyrics based on his evidentiary objections. (*Id.*) Johnson raised none of these claims in state court. (*See id.*) He argues that their default is excused by the ineffective assistance of PCR counsel. (*Id.*) Because *Martinez* applies only to claims of ineffective assistance of trial counsel, Johnson's claims of prosecutorial misconduct and trial court error remain procedurally defaulted and are barred from this Court's review. The Court will consider Johnson's claim that counsel performed ineffectively to determine if its default is excused under *Martinez*.

Before trial, defense counsel filed several motions to preclude evidence of gang affiliation.[41] Among these was a motion in limine to preclude evidence of rap lyrics, which argued that the evidence was "extremely prejudicial, irrelevant, and its probative value is substantially outweighed by its prejudicial effect" under Rules 401, 402, 403, and 404 of the Arizona Rues of Evidence. (IOR 93.) After hearing the parties' arguments, including defense counsel's argument that the gang evidence was "highly prejudicial" (RT 10/29/01 at 91), the trial court denied the motion, but "with the caveat that the detective [Stuart] will not be permitted to opine regarding the hidden meaning between what may or may not be lyrics. If there is language that is slang parlance of gangs, the detective may interpret the slang words." (PCR Order, ME 10/29/01, at 5.)

Counsel renewed his objections during the aggravation phase of trial. (RT 12/08/03 at 5-10.) The court again ruled the evidence was admissible. (*Id.* at 10-11.)

Johnson argues that counsel performed ineffectively by failing to "articulate" his evidentiary objections, particularly the prejudicial nature of the lyrics; failing to raise a First Amendment objection to the admissibility of the lyrics; and failing to challenge their authenticity as material written by Johnson. (Doc. 18 at 246-53.) These arguments are unpersuasive.

Counsel did not perform ineffectively by failing to use the First Amendment's protection of "offensive speech" as the basis of his motion to preclude the rap lyrics. The

---

[41] Defense counsel successfully moved to exclude rap lyrics from a PowerPoint presentation used by Detective Stuart. (RT 11/15/01 at 183-84, 187-89.)

First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993); *see Duncan v. City of San Diego*, 401 F. Supp. 3d 1016, 1037-38 (S.D. Cal. 2019) (recognizing rap music may be introduced in criminal trials as speech probative of state of mind and motive for purposes of gang enhancements); *United States v. Carpenter*, 372 F. Supp .3d 74, 78 (E.D.N.Y. 2019) (holding that admission of the defendant's rap lyrics and videos would not violate First Amendment because they were not admitted to portray defendant as "morally reprehensible" but to prove the charged crimes).

Counsel did not perform ineffectively by failing to file a meritless motion relying on the First Amendment as grounds for precluding the evidence. *See, e.g.*, *Campbell v. United States*, No. 3:17-CR-567-M(1), 2023 WL 3395135, at *4 (N.D. Tex. Apr. 12, 2023), *report and recommendation adopted*, No. 3:17-CR-567-M(1), 2023 WL 3400495 (N.D. Tex. May 11, 2023) (finding no ineffective assistance where "Movant fails to show that counsel had a valid First Amendment objection to make to the evidence [including rap lyrics and videos] or the Court's consideration of it").

Because counsel filed a motion in limine citing the applicable evidentiary rules and argued to the court that the evidence was unduly prejudicial, his performance in seeking to preclude the rap lyrics was neither deficient nor prejudicial. The fact that the motion was denied does not mean that counsel's performance was ineffective. *Strickland*, 466 U.S. 689-90; *see, e.g.*, *Milam v. Davis*, 733 F. App'x 781, 786 (5th Cir. 2018) ("Counsel's representation cannot be viewed as ineffective simply because the trial court denied the motion."); *Hemphill v. United States*, 601 F. Supp. 2d 249, 251 (D.D.C. 2009) ("Counsel did file a motion for a change in venue based on pretrial publicity, and counsel is not ineffective merely because this Court denied her motion.").

Because this claim of ineffectiveness lacks merit, PCR counsel did not perform ineffectively in failing to raise it. *See Atwood*, 870 F.3d at 1060; *Sexton*, 679 F.3d at 1157. There is not a reasonable probability that the results of the PCR proceedings would have been different if counsel had raised the claim. Johnson therefore cannot show cause under

*Martinez* for the claim's default. The claim remains procedurally defaulted and barred from federal review.

Claim 13 is denied.

## G.    Claim 16:

Johnson argues that trial counsel performed ineffectively at the penalty phase of trial. (Doc. 18 at 271.) He presents seven subclaims to support this argument. Subclaims (A)-(E) encompass Johnson's arguments that counsel failed to adequately investigate and present mitigating evidence about his social history and physical and mental health issues, particularly his brain dysfunction and childhood exposure to lead. Subclaim (F) concerns Johnson's argument counsel erred in allowing the jury to hear Quindell Carter's admissions and Phyllis Hansen's reference to another murder. Subclaim (E) addresses Johnson's argument he was prejudiced by the cumulative effect of counsel's errors. (*Id.* at 271-329.) Respondents contend that Johnson waived the claims in state court and alternatively that the claims are meritless. (Doc. 37 at 169.)

As discussed previously, these claims were raised in Johnson's PCR Petition. The PCR court denied the claims on the merits as not colorable. (PCR Order, ME 1/28/15, at 16-19.) Shortly thereafter, Johnson filed a handwritten, pro se document titled "Supplement to Post-Conviction Petition and Request to Strike Claims." (IOR 892.) Johnson sought to strike from the PCR petition claims that counsel had included over his objection, including the claims alleging ineffective assistance based on counsel's alleged failure to investigate and present mitigating evidence of Johnson's social history. (*Id.* at 7.) In an attached affidavit, Johnson stated that he chose "not to present any mitigation and sentencing issues at post-conviction relief proceedings" and that he understood that "failure to present claims now will result in preclusion." (*Id.*, Affidavit.) Johnson objected to the presentation of "causally connected" mitigating evidence on the grounds that it was inconsistent with his position that he was actually innocent of the murder. (*See id.* at 5-6.)

Two court-appointed experts found Johnson competent to waive his PCR claims. After confirming with Johnson that he still wished to waive the claims identified in his pro

se pleading, the court found that Johnson "has validly waived the claims as specified in his Pro Per Supplement, and that he did so knowingly, intelligently, and voluntarily." (IOR 912, 913.) The court therefore deemed those claims waived. (*Id.*)

Johnson then, through counsel, filed a Petition for Review, arguing that the PCR court incorrectly denied his ineffective assistance of counsel claims, including the claims that Johnson subsequently waived. (PR at 19-20.) Johnson also argued that the PCR court erred by deeming those claims waived. (*Id.* at 20-21.) The Arizona Supreme Court summarily denied review.

In his habeas petition, Johnson argues that the state court's acceptance of his waiver, after they had already ruled on the merits of his claims, was "highly unique and based on unclear authority." (Doc. 44 at 214.) He also argues that the fact that the state court initially reached the merits of the claims "precludes any procedural default." (*Id.*)

Rather than further addressing the procedural status of these claims, which is far from clear, and out of an abundance of caution, the Court will instead consider the claims on their merits. *See* 28 U.S.C. § 2254(b)(2) (allowing denial of unexhausted claims on the merits); *see also Lambrix*, 520 U.S. at 524-25.

### 1.    Claims 16(C)-(E)

The Court considers these subclaims together as they each allege ineffective assistance concerning the identification, development, and presentation of mitigating evidence.

#### i.    Additional Background

In the context of a capital sentencing, a key step in assessing counsel's performance under *Strickland* is to review the "totality of the available mitigating evidence," including "both that adduced at trial, and the evidence adduced" in the PCR proceedings. *Wiggins v. Smith*, 539 U.S. 510, 534, 536 (2003) (emphasis omitted). The Court discusses that evidence next.

##### a.    Penalty-Phase Evidence

At the opening of the penalty phase, the court instructed the jury on the following mitigating circumstances: (1) Johnson's capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law was significantly impaired; (2) Carter's disparate sentence; (3) relatively minor participation in the crime; (4) age and maturity; and (5) residual doubt. (RT 12/15/03 at 22.) In support of these and other circumstances, defense counsel called six mitigating witnesses over four days.

The first witness was Johnson's father, Ruffin Johnson, Sr., who testified about Johnson's upbringing and family life. Ruffin Sr. testified that he regularly beat Johnson from the time Johnson was old enough to walk, or a little over a year old. (*Id.* at 59.) He used an open hand, a belt, sometimes on the child's bare bottom, and a metal baseball bat; he described his efforts to position himself to land blows while the child was trying to protect himself. (*Id.* at 58-61, 64-67.) During one beating, Ruffin Sr. had to switch hands because he "couldn't stand the pain of whooping them with that arm anymore." (*Id.* at 64.)

Ruffin Sr. also testified that Johnson witnessed him beating Johnson's mother, Myra, and brother, Ruffin Jr. (*Id.* at 53-54, 58-59, 120.) Ruffin Sr. would often "throw blows" when Myra "talk[ed] back"; he intended to "inflict some serious pain." (*Id.* at 53-54.) He hit her with his fists and once with a clothes basket, which snapped in half from the force of the blow. (*Id.* at 54.) He explained that he learned to use physical violence as discipline from his grandmother: "When . . . you did something to grandmother, she would lash out." (*Id.* at 54, 57.) Along with subjecting his family to physical violence, Ruffin Sr. was often absent during Johnson's childhood, had trouble holding a job, and was repeatedly unfaithful to Myra. (*Id.* at 53, 63.)

Ruffin Sr. provided additional information about Johnson's childhood. He testified that Johnson had disciplinary problems at school including fights with other students and a confrontation with a security guard (*id.* at 70-71, 89-91, 105, 119); that at age sixteen Johnson was hospitalized with serious injuries after crashing a stolen car (*id.* at 93-94); and that Johnson had other contacts with the police as a young teenager, including arrests (*id.* at 107-10, 114). Ruffin Sr. also testified that Johnson was "popular at school," "people

flocked to him," and he was "always a friendly person" who "was trying to help somebody." (*Id.* at 114.) Ruffin Sr. had not visited Johnson since his arrest. (*Id.* at 79.)

The next witness was a psychologist, Dr. Carlos Jones. Dr. Jones met with Johnson four times for about nine hours. (*Id.* at 138.) He administered the Wechlser Adult Intelligence Scale and the Minnesota Multiphasic Inventory-II (MMPI-II) and conducted clinical interviews. (*Id.*) He also reviewed "an extensive amount of records" during the almost two years he had been involved in the case, including Johnson's juvenile records which contained a report prepared in 1996 by Dr. Stan Cabanski, a psychologist with the Adobe Mountain juvenile facility. (*Id.*) He also reviewed police reports, jail disciplinary and medical reports, and a presentence investigation. (RT 12/16/03, a.m., at 56.) Dr. Jones interviewed Johnson's mother and reviewed the transcript of an interview with Ruffin Sr. (RT 12/15/03 at 145.) He also reviewed a report prepared by Dr. Mark Walter, a neuropsychologist, and a report from the State's expert, Dr. Gina Lang. (*Id.*)

Dr. Jones diagnosed Johnson with the following conditions: rule out psychotic disorder not otherwise specified; rule out mood disorder not otherwise specified; cocaine abuse, cannabis abuse, and hallucinogenic abuse; and borderline personality disorder.[42] (*Id.* at 183-84.) He explained that borderline personality disorder consists of "a pattern of instability in interpersonal relationships and self-image, affect, emotional functioning, impulsive behavior beginning by early childhood." (*Id.* at 185.)

Dr. Jones testified that Johnson satisfied seven of the nine criteria necessary to support a diagnosis of borderline personality disorder. (*Id.* at 185-86.) He cited records describing Johnson's emotional instability and intensity; history of "unstable and intense interpersonal relationships"; behavioral acting out; gang involvement and participation in criminal activities "that were potentially harmful or life-threatening"; and "antisocial acting out." (*Id.* at 187-95.) Johnson also began using marijuana at age 12. (*Id.* at 154.)

---

[42] Dr. Jones originally diagnosed Johnson with bipolar 1 disorder with psychotic features; rule out schizoaffective disorder; polysubstance abuse; rule out unknown substance dependence; rule out borderline personality disorder; and adult antisocial behavior. (RT 12/15/03 at 139.)

1    Dr. Jones testified that Johnson had engaged in other impulsive behavior that was
2    "self-damaging," including self-mutilation and suicidal behavior. He had burned his arm
3    with cigarettes and attempted suicide, by hanging or electrocution, multiple times when he
4    was in third or fourth grade. (*Id.* at 195-97.) He also reported to Dr. Jones that he had played
5    "Russian roulette," using up to five rounds in a six-chambered revolver. (*Id.* at 197.)

6    According to Dr. Jones, individuals who engage in self-mutilation feel a "sense of
7    deep personalization [sic] and disconnection with others." (RT 12/16/03, p.m., at 27.) They
8    "inflict pain upon themselves" so that they can "feel" and to "relieve . . . tension." (*Id.*) Dr.
9    Jones agreed that a person who burned himself with cigarettes might "have a lot of stressors
10   on themselves." (*Id.* at 28.)

11   Dr. Jones testified that, consistent with the borderline personality disorder diagnosis,
12   Johnson experienced "inappropriate intense anger or difficulty controlling anger." (*Id.* at
13   29.) This kind of acting-out behavior dated back to when Johnson was thirteen or fourteen
14   years old and was noted by his juvenile social worker, Steven Miller. (*Id.* at 29-30.)

15   Dr. Jones described Johnson's condition as "[a]dult antisocial behavior." (*Id.* at 31.)
16   He testified that individuals with a history of physical and sexual abuse, neglect, conflict,
17   and parental loss or separation are more likely to develop borderline personality disorder.
18   (*Id.* at 35-37, 47.) These factors, a "precursor" to borderline personality disorder, were
19   present in Johnson's background. (*Id.*) Dr. Jones noted that there was "a history of physical
20   abuse" and "documentation about . . . some instances of sexual abuse." (*Id.*) He testified
21   that Johnson "didn't have a good relationship with his father," and his mother, with whom
22   he had a "very close relationship," would be gone for up to six months of the year. (*Id.* at
23   36-37.) Dr. Jones identified the primary "triggering factor[]" for Johnson's disorders as
24   "the abusive conflictual relationship with his father." (*Id.* at 48.) He opined that these
25   impairments remained present when Johnson committed the murder. (*Id.* at 49.) He added
26   that children exposed to violence are more likely to become violent adults. (*Id.* at 48.)

27   Dr. Jones testified that Johnson's abuse of multiple drugs was indicative of
28   impulsivity, poor judgment and decision-making, lack of behavioral control, and

recklessness. (RT 12/16/03, p.m., at 22, 52.) He acknowledged, however, that a personality disorder does not necessarily prevent a person from knowing right from wrong. (*Id.* at 22.)

Dr. Jones also testified about the findings of Dr. Walter, the neuropsychologist who had examined Johnson.[43] According to Dr. Jones, these findings suggested that Johnson suffered "some level of left frontal lobe dysfunction" and "memory and executive function impairment." (*Id.* at 46.) These conditions affect an individual's ability to "control and moderate behavior." (*Id.*) Dr. Jones identified Johnson as having a mood disorder as well as a thought disorder. (*Id.* at 46-47.)

Dr. Jones acknowledged that Johnson's school records and juvenile records, while they documented disruptive behavior, assaultive behavior, and failure to cooperate with treatment, did not include any diagnosis that Johnson suffered from a mental illness. (RT 12/16/03, p.m., at 19-20.) He testified, however, that although no diagnosis had been made, Johnson's behavior "was indicative of mood disruption, possibly a thought disorder." (*Id.*)

In discussing the inconsistencies in some of the scales on the tests he administered, Dr. Jones testified that Johnson "doesn't seem to be consistent about who he is over periods of time." (RT 12/16/03, p.m., at 44.) He noted that Johnson was a "block monster" or enforcer in a street gang but "he was also a kid who was sleeping in the bed with his mother and needed some level of security there." (*Id.*) He also noted that Johnson reported hearing hallucinations, including the voices of his mother and his daughter. (*Id.* at 65.) Dr. Jones characterized these as "nondescript auditory hallucinations" which often present with individuals experiencing depression or some other mood disorder." (*Id.* at 65, 66.)

---

[43] At Dr. Walter's recommendation, Johnson was neurologically evaluated by Dr. Drake Duane. (IOR 856 at 339.) Dr. Duane conducted an evaluation in September 2003, which included an MRI of the brain, which was "within normal limits," blood work (also normal), and electrical brain mapping, "which . . . visualized frontal lobe dysfunction." Dr. Duane noted "mild problems in verbal learning, auditory digital memory and mild problems in attention, cognitively." (PCR Pet., Ex. 58 at 1.) He reported testing that "showed long processing speeds suggestive of cognitive inefficiencies" and "cognitive limitation of an organic nature." *Id.* at 3. Dr. Duane stated his findings were consistent with the findings of Dr. Walter. *Id.*

Dr. Jones, who had experience working with gang members, testified that individuals often join gangs out of fear and a lack of other options. (RT 12/15/03 at 191-92.) He also explained how difficult it was to leave a gang after becoming a member. (*Id.*)

The next mitigation witness was Janice Marquez, an attorney for the Juvenile Department of Corrections from 1993-98. (RT 12/16/03, p.m., at 83.) She served as a youth rights administrator, representing juveniles in disciplinary hearings. (*Id.* at 84-86.) She reviewed Johnson's records from his stay at the facility in 1996-97, where he was committed to secured care (or the equivalent of "youth prison") for a period of twelve months, until his eighteenth birthday. (*Id.* at 84-89.) Ms. Marquez testified that a "needs assessment" prepared by a psychologist stated that Johnson required counseling to address his lack of impulse control, lack of motivation, and drug abuse issues. (*Id.* at 91-92.) Johnson was eligible for Adobe Mountain's Recovery Program or Boot Camp Program, or for placement in specialty cottages which provided services to address an offender's specific needs, but because of his 12-month sentence there was no opportunity to take part in such programs. (*Id.* at 92-97.) Instead, Johnson was housed in a "generic" cottage where he was subjected to "marathon" counseling sessions, which, according to Ms. Marquez, "quite often were not conducted in a therapeutic manner," and was placed on "reflection status, where he was essentially in solitary confinement in his room, which was not appropriate." (*Id.* at 98-101.)

The next mitigation witness was Steven Miller, a social worker who provided individual and family counseling for the Johnsons in 1992, when Johnson was 12 years old. (RT 12/17/03 at 9-10.) Miller testified that he met with Ruben and Ruben's mother for five sessions; he also had two sessions with Ruben's father and five sessions with Ruffin Jr. (*Id.* at 11-12.) The counseling services were offered through Myra Johnson's health insurance. (*Id.*) Seven authorized sessions remained, but the family did not use them. (*Id.* at 12.) In Miller's opinion, Johnson would have benefited from the additional counseling. (*Id.*)

When Miller first met with Johnson, he had been suspended from school for verbally

harassing a teacher. (*Id.* at 13-14.) Miller observed the following "symptom pattern" in Johnson: "disturbance in judgment and impulse control, disturbance in affect, and disturbance in behavior." (*Id.* at 14.) Miller testified that Johnson's behavioral problems started at about age 10. (*Id.* at 52.)

Miller then testified about the "clinical narrative" he prepared based on his observations and intake notes. (*Id.* at 14.) Miller noted that Johnson's father had been physically violent with him and his brother, but that Johnson was "beginning to resist his father's abuse." (*Id.*) During their sessions, Johnson reported that he was concerned about his father's abuse of his mother. (*Id.* at 18, 24.) Miller noted Johnson's "escalating defiant school anger" and observed that Johnson "has ability, but is not performing." (*Id.*)

Miller testified that there was nobody in Johnson's family life who could serve as an appropriate model. (*Id.* at 19.) Johnson's father had been married several times; he had numerous affairs when married to Johnson's mother; he would come and go and had difficulty holding a steady job. (*Id.*) His response to family stressors was to run away or turn verbally and physically abusive. (*Id.*) Miller noticed these same kinds of behaviors developing in Johnson; when confronted with a problem in school, he would become verbally or physically aggressive or "just disappear" and refuse to participate. (*Id.* at 19-20.) Miller testified that both Johnson and Ruffin Jr. modeled their father's conduct by "withdrawing from situations or confronting, verbally, physically aggressively." (*Id.* at 40-41.) It was Miller's observation that Johnson's "acting out problems were a reflection of what Ruben himself was experiencing." (*Id.* at 52.) Miller's recommendation for Johnson was participation in weekly individual and family outpatient treatment, for three to six months. (*Id.* at 43.)

Miller noted that Johnson had average intelligence, with a full-scale IQ score of 96, as indicated by records from Johnson's school psychologist. (*Id.* at 44.) He then testified about his "diagnostic formulation," which included a diagnosis of adjustment disorder, as suggested by Johnson's "impulsive, out of control behavior at school," or his "impairment in school functions." (*Id.* at 45.) Miller also listed the stressors Johnson faced, namely the

conflicts arising from his chaotic and violent family situation. (*Id.*) Miller testified that adjustment disorder, if left untreated, could lead to oppositional defiant conduct disorder, which in turn could lead to antisocial disorder. (*Id.* at 51.) Miller acknowledged that he did not recommend that Johnson see a psychiatrist or take any medications. (*Id.*)

Finally, defense counsel called two additional witnesses who provided evidence relevant to Johnson's residual doubt argument; namely that Quindell Carter was the shooter. Detective Michael Pope testified that on the night of the murder he collected samples from Carter's hands for gunshot residue testing. (RT 12/17/03 at 58-63.) John Knell, of the Phoenix Police Department crime lab, tested the samples and found two particles containing lead on the samples taken from each hand. (*Id.* at 70.)

In rebuttal, the State called psychologist Dr. Gina Lang. She testified that during her visits with Johnson, he exhibited normal emotions, "was very focused on what was going on in the room," exhibited no psychotic or manic symptoms, and was "alert and oriented in all spheres." (*Id.* at 97-98.) He was also "defensive," "evasive," and "deceptive." (*Id.* at 97-98.) For example, he described being abused by someone but refused to discuss the details; nor would he discuss the crime itself with Dr. Lang. (*Id.* at 98-99.)

Dr. Lang testified that collateral data showed Johnson was "physically abused by his father in a harsh manner often without provocation." (*Id.* at 99.) She testified that Johnson had received psychotherapy for behavioral problems as a child; that he was expelled from school often; that he attempted suicide several times; that he was involved in a gang as a "block monster"; and that he had an extensive arrest record as a juvenile and as an adult. (*Id.* at 100.)

Johnson told Dr. Lang there was no family history of mental illness or substance abuse and denied receiving any mental health diagnosis. (*Id.* at 108-09.) Dr. Lang found no evidence that he had ever been treated for any kind of mental illness. (*Id.* at 110-11.)

Dr. Lang discussed Dr. Cabanski's report, which diagnosed Johnson with a conduct disorder. (*Id.* at 11.) She testified that Johnson told her about being involved in a car accident at 16 years old. (*Id.* at 112-13.) He sustained serious injuries but did not lose

consciousness. (*Id.* at 113.) He had also been hit in the head while fighting but again could not recall being knocked unconscious. (*Id.*) However, he did lose consciousness on one occasion when his father beat him on the head with a belt. (*Id.*) Johnson "denied any problems . . . with his cognitive function, his ability to think, [or] his memory." (*Id.*)

Dr. Lang testified that she did not agree with Dr. Walter's conclusion that Johnson suffered from cognitive impairment. (*Id.* at 114.) She cited collateral data showing that Johnson had an average IQ, with a subtest administered by Dr. Jones indicating that one of Johnson's strengths was an ability to "plan in sequence." (*Id.* at 115.) Dr. Lang likewise questioned the reliability of data obtained through biofeedback because the results of such a procedure are readily manipulable. (*Id.* at 115-16.) Finally, she noted that Dr. Cabanski had concluded that Johnson did not suffer from any mental illness and was "suitable to go to adult court." (*Id.* at 116-17.)

Dr. Lang next testified about Johnson's substance abuse history. Johnson told her that he first drank alcohol at the age of four or five, that "he drank whenever he could get his hands on it," and drank more heavily after his mother was injured in a drive-by shooting (*Id.* at 118, 163.) He experimented with nearly every drug except crack cocaine and inhalants. (*Id.* at 119.) Marijuana was his drug of choice, and he had used it every day since seventh grade. (*Id.*) He snorted cocaine daily for three years, beginning at age 14 or 15. (*Id.*) He also used PCP, LSD, and hallucinogenic mushrooms during his teen years. (*Id.*)

Dr. Lang noted that on one occasion while in jail Johnson was diagnosed with depressive disorder NOS. (*Id.* at 120.) Around that same time, he had reported experiencing audio-visual problems, including auditory hallucinations, and had been prescribed the antipsychotic drug Risperdal. (*Id.* at 120-21.)

Dr. Lang then testified about her diagnoses. She diagnosed Johnson with a personality disorder NOS, with antisocial, borderline, and histrionic traits; poly-substance abuse; and a rule out diagnosis of malingering. (*Id.* at 133-42.) She explained that antisocial traits include reckless behavior, disregard for the rights and safety of others, impulsivity, and aggressiveness. (*Id.* at 143.) She also noted that borderline personality disorder "often

involves self-mutilation," such as Johnson's cigarette burns, and problems in interpersonal relationships. (*Id.* at 128, 144.) With respect to histrionic traits, Dr. Lang cited Johnson's outburst at the conclusion of his interview with Detective Kulesa. (*Id.* at 149-50.) Dr. Lang testified that a personality disorder does not prevent a person from knowing right from wrong, and Johnson's behavior on the night of the murder suggests he was aware that his actions were wrong. (*Id.* at 150-51.)

On cross-examination, Dr. Lang acknowledged that Johnson modeled his father's behavior of "either avoidance or anger" and that there is a "correlation between physical abuse on a child and their acting out behavior." (*Id.* at 176, 189.) She also agreed that a dysfunctional home life is one factor that would drive a child to join a gang. (*Id.* at 176-77.) She conceded that Dr. Walter, after performing a neuropsychological examination of Johnson, found frontal lobe dysfunction. (*Id.* at 193.) She also agreed that an abusive, dysfunctional home life can result in behavioral characteristics such as suspiciousness, manipulation, intimidation, and self-dramatization. (RT 12/18/03 at 18-19.)

### b.    PCR Evidence

Johnson presented additional mitigating evidence during the PCR proceedings, including declarations from relatives describing a family history of mental illness, involvement with the criminal justice system, and substance abuse. (*See, e.g.*, PCR Pet., Exs. 74, 76, 77-87.) The declaration of Johnson's uncle Daoud Ibrahim also details the family's experience with racism dating back to the days of slavery. (*Id.*, Ex. 74.) A declaration from Johnson's brother described Johnson performing oral sex on his half-sister and both Ruffin Jr. and Johnson being forced to perform oral sex on a cousin. (*Id.*, Ex. 77.)

Johnson also provided new evidence from experts regarding his mental health and neuropsychological condition. The key piece of this evidence was a report prepared in 2014 by Dr. Howard Mielke, Ph.D., of Tulane University. (PCR Pet., Ex. 23.)

Dr. Mielke noted that in 1980 Baltimore officials identified the Johnson family home as contaminated by lead paint. (*Id.* at 2.) When Johnson's brother was tested at age two and a half in 1981, his blood-lead level was "nearly 7 times the CDC reference level."

(*Id.* at 2.) Although Johnson himself was not tested, Dr. Mielke concluded that he "undoubtedly became chronically lead exposed," having lived in the home for two years until the lead problem was abated.[44] (*Id.* at 7.) Dr. Mielke then explained that "exposure to lead in early childhood damages the brain in ways that affect impulse control, learning and behavior," and can lead to violence. (*Id.* at 7.) As reported by his mother, Johnson was slow to learn to walk, suffered from delayed speech, and sucked his thumb until age 12. (*Id.* at 2.) According to Dr. Mielke, these symptoms are consistent with lead poisoning. (*Id.*)

Dr. Michael Cunningham, a clinical and forensic psychologist, reviewed Johnson's family history, including his potential exposure to lead, and opined that Johnson suffered from several "adverse developmental factors," including "[t]rans-generational family dysfunction and distress," "[h]ereditary predisposition to psychological disorder and personality pathology," and "[h]ereditary predisposition for alcohol and drug abuse/dependence." (PCR Pet., Ex. 66, ¶ 4.) Dr. Cunningham also opined that Johnson's "childhood exposure to lead is an additional etiological factor for [his] brain dysfunction" and that such exposure "markedly increases the risk of perpetrating a violent crime, including a homicide." (*Id.*, ¶¶ 43-44.) Finally, Dr. Cunningham opined that "the enduring deleterious cognitive and behavioral implications of elevated lead levels in childhood was well-established and available to trial counsel and mental health experts at the time of Mr. Johnson's capital sentencing in 2003." (*Id.*, ¶ 42.)

Dr. Edwardo Portillos, a sociology professor, prepared a report stating that Johnson was a victim of "structural inequalities"; that he learned the "code of the street" and therefore struggled with authority figures in school; that he had negative attitudes toward law enforcement; and that he escaped the violence at home by running to the only family who provided him with support, the street gang culture. (IOR 678 at 283.)

Dr. Jones prepared an addendum to the reports he had produced during Johnson's

---

[44] Exhibits in the PCR Petition show that an examination of the Johnson home on July 8, 1980, identified 19 lead paint violations. (PCR Pet., Ex. 20.) Ruffin Jr., born April 6, 1978, was tested for lead poisoning on January 2, 1981. The results placed his blood at the Class II, or "moderate risk," level. By May 25, 1981, all 19 violations in the home were abated.

trial and sentencing. (PCR Pet., Ex. 69.) It incorporated the additional social history information provided by family members as well as Dr. Mielke's report concluding that Johnson was the victim of lead poisoning as a young child. Dr. Jones agreed that Dr. Mielke's report "provide[d] an additional piece of data to be considered in the exploration of the etiology of [Johnson's] mental health and behavioral problems"; that at the time of Johnson's trial, research linked childhood lead exposure to antisocial behavior; and that Johnson's "childhood exposure to lead presents the extremely high likelihood of abnormal brain development which in turn is likely to have contributed to other developmental and functional difficulties." (*Id.* at 4.)

Dr. Walter likewise supplemented his report authored for Johnson's trial and sentencing. He found that Dr. Mielke's report "presents a compelling argument that Ruben Johnson was exposed to clinically significant levels of lead as a child, and this resulted in impairment in frontal lobe functioning." (PCR Pet., Ex. 71 at 1.) This was significant, Dr. Walter explained, because it was consistent with the results of his own neuropsychological examination of Johnson, revealing a disturbance in left frontal lobe functioning. (*Id.* at 1-2.) Impulsivity, prominent in past reports of Johnson's behavior and diagnoses, "is a hallmark of frontal lobe dysfunction." (*Id.* at 2.) Dr. Walter concluded that "to a reasonable degree of neuropsychological probability," Johnson's "neurocognitive impairment . . . was associated with his exposure to lead throughout his formative years in Baltimore." (*Id.*)

### c.    PCR Court's Ruling

The PCR court first addressed Johnson's claim that "trial counsel provided ineffective assistance in the sentencing phase by allegedly failing to conduct a basic social history investigation," including failing to fully engage the services of a mitigation specialist. (PCR Order, ME 1/28/15, at 16.) After summarizing the evidence presented at the penalty phase of trial, the court noted that:

> trial counsel's failure to hold team meetings or to supervise mitigation or to prepare a social history does not per se constitute ineffective assistance of counsel. The defendant must identify particular actions or failures to act that affect counsel's representation of the defendant. *See United States v. Cronic*, 466 U.S. 648 (1984).

(*Id.*)

The court then turned to Johnson's claim that counsel performed ineffectively by "failing to document a family history of mental illness." (*Id.* at 17.) The court rejected this allegation as well, explaining:

> Defendant specifically complains that the State's expert, Dr. Gina Lang, testified that she knew of no mental illness, physical abuse or substance abuse in the family. Specifically, as defendant notes in his petition, Dr. Lang was asked:
>
> Q: Did you, in you background on Mr. Johnson, find that there was any history in his family of mental illness?
>
> A: […] Mr. Johnson said to me there was no history of mental illness in his family.
>
> Defendant cannot now complain about an expert's reliance on his own statement. Further, the Arizona Supreme Court, and the jury as well, would have given additional family-history mental health evidence little weight, where the defendant—as both his and the State's experts agreed—knew right from wrong.

(*Id.*) (citation omitted).

The court addressed Johnson's claim that counsel performed ineffectively by "presenting an abridged social history," excluding evidence of Johnson's lead exposure:

> The defendant provides circumstantial evidence that he may have been exposed to lead as a toddler. Asked about the impact of lead exposure on defendant as a child, Dr. Jones opined that it presented an ". . . extremely high likelihood of abnormal brain development which in turn is likely to have contributed to other developmental and functional difficulties . . . " PCR Petition Exhibit 69. Additionally, lead exposure contributed to school and behavior problems in [the defendant's] childhood and life trajectory."
>
> Dr. Jones's opinion, shared by the additional PCR experts, merely corroborates what the jury learned at trial. In 2003, Dr. Jones attributed the defendant's neurocognitive impairments to physical abuse, sexual abuse and parental abandonment; in this PCR, Dr. Jones would testify that the neurocognitive impairment "was associated with exposure to lead." The neurocognitive impairment was not given great weight by the Supreme Court, and would not have been weighed more heavily with evidence of lead exposure. . . .
>
> The defendant claims that additional family members could provide texture and history in their testimony, bringing his family tree to life. (Uncle Daoud Ibrahim could have provided

family stories, texture and slavery history; for example, of defendant's great great grandmother). The defendant identifies the omission without explaining how evidence from four generations back relates to his "character, propensity, history or record, or circumstances of the offense."

The defendant claims that other family members would have testified more engagingly, and perhaps graphically, than those who were called. In doing so, the defendant faults the manner of presentation rather than the substance of the presentation. Eleven years after the sentencing with the defendant facing a death sentence, the witnesses suggest they would have been cooperative. Given defendant and his family's reluctance to cooperate with mitigation efforts at the time of trial, the Court is not persuaded that the identified witnesses would actually have made themselves available to be interviewed or to testify in 2003.

Considering the constraints placed upon trial counsel by his client, the Court finds that trial counsel's actions were reasonable and not deficient. To the extent that counsel determined to call, or determined not to call, particular witnesses or experts is a strategic decision. . . . Trial counsel's performance was not ineffective.

(*Id*. at 18) (citation omitted).

The question for this Court is whether the PCR court's ruling was contrary to or an unreasonable application of clearly established federal law or based on an unreasonable factual determination. 28 U.S.C. § 2254(d).

## ii.    Applicable Law

As explained above, to establish deficient performance under *Strickland*, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688. While trial counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary, . . . a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id*. at 691. Courts "must conduct an objective review of [counsel's] performance, measured for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." *Wiggins*, 539 U.S. at 523 (citation modified); *see*

1    *Rompilla v. Beard*, 545 U.S. 374, 381 (2005). "As long as a reasonable investigation was

2    conducted, we must defer to counsel's strategic choices." *Cox v. Ayers*, 613 F.3d 883, 899

3    (9th Cir. 2010); *see, e.g.*, *Williams v. Woodford*, 384 F.3d 567, 616 (9th Cir. 2004).

4        To determine prejudice at sentencing by counsel's failure to present available

5    mitigating evidence, "a court must decide whether it is reasonably likely that the additional

6    evidence would have avoided a death sentence. This analysis requires an evaluation of the

7    strength of all the evidence and a comparison of the weight of aggravating and mitigating

8    factors." *Thornell v. Jones*, 602 U.S. 154, 171-72 (2024); *see Lee v. Thornell*, 118 F.4th

9    969, 989 (9th Cir. 2024) (petitioner "'must show a reasonable probability' that a capital

10   sentence would have been rejected after the sentencer 'weighed the entire body of

11   mitigating evidence . . . against the entire body of aggravating evidence.'" (quoting *Wong

12   v. Belmontes*, 558 U.S. 15, 20 (2009)). "If the difference between the evidence that could

13   have been presented and that which actually was presented is sufficient to 'undermine

14   confidence in the outcome' of the proceeding, the prejudice prong is satisfied." *Duncan v.

15   Ornoski*, 528 F.3d 1222, 1240 (9th Cir. 2008) (quoting *Strickland*, 466 U.S. at 694).

16                    **iii.    Analysis**

17       In his petition, Johnson makes the bare arguments that the PCR court's decision was

18   contrary to and an unreasonable application of clearly established federal law and based on

19   an unreasonable determination of the facts. (Doc. 18 at 271.) He does not otherwise discuss

20   the ruling. It is only in his reply brief (*see* Doc. 44 at 224-27) that Johnson addresses the

21   reasonableness of the state court's decision under 28 U.S.C. § 2254(d), which is the "only

22   question that matters." *Kayer*, 592 U.S. at 124.

23       There, Johnson asserts that the PCR court's decision is "owed no deference" under

24   AEDPA (*id.* at 224) based on the following purported errors: the state court "found that

25   counsel were not *per se* ineffective for failing to supervise the mitigation investigation and

26   prepare a social history"; the court "found that any postconviction evidence about

27   Johnson's brain damage was cumulative to what the jurors already heard at trial"; and the

28   court "determined that Johnson was partially to blame for his counsel's failure to

1    investigate mitigation evidence due to the 'constraints' Johnson placed on his counsel."

2    (*Id.* at 224-26.) Finally, Johnson asserts that the PCR court unreasonably found there was

3    no prejudice from counsel's performance. (*Id.* at 226.)

4          Respondents argue that trial counsel did not perform deficiently and that Johnson

5    was not prejudiced by counsel's failure to present the additional evidence developed in the

6    PCR proceedings because the new evidence was largely cumulative to that presented at the

7    penalty phase and because its mitigation value was limited by the lack of a connection

8    between Johnson's diagnosed conditions—brain impairment leading to impulsive

9    behavior—and the premeditated nature of the crime. (Doc. 37 at 181-88.) Respondents also

10   contend that the evidence would not have been sufficient to overcome the aggravating

11   factors. (*Id.* at 188-89.)

12         As explained below, Johnson has not shown that the PCR court's rejection of these

13   claims is not entitled to deference under AEDPA. The PCR court's denial of relief was

14   neither contrary to nor an unreasonable application of clearly established federal law, nor

15   was it based on an unreasonable application of the facts under 28 U.S.C. § 2254(d).

16                   **a.**      **Counsel was not *Per Se* Ineffective**

17         Johnson argues that defense counsel's performance was ineffective *per se* because

18   he failed to coordinate and lead the defense team and failed to ensure the participation of a

19   qualified mitigation specialist. (Doc. 18 at 274-81.) The PCR court reasonably addressed

20   this allegation by explaining that it is counsel's particular actions or inaction that are

21   measured when assessing deficiency and prejudice under *Strickland*. (PCR Order, ME

22   1/28/15, at 16.) "A convicted defendant making a claim of ineffective assistance must

23   identify the acts or omissions of counsel that are alleged not to have been the result of

24   reasonable professional judgment." *Strickland*, 466 U.S. at 690; *see id.* at 688-89 ("No

25   particular set of detailed rules for counsel's conduct can satisfactorily take account of the

26   variety of circumstances faced by defense counsel or the range of legitimate decisions

27   regarding how best to represent a criminal defendant."). Johnson cites no authority for his

28   argument that counsel's failure to more-actively supervise the defense team constitutes a

1    *per se* Sixth Amendment violation.

2        A lawyer is generally presumed to be competent. *See United States v. Cronic*, 466

3    U.S. 648, 658 (1984).  A petitioner bears the burden of overcoming that burden except in

4    all but a few "limited circumstances." *Dows v. Wood*, 211 F.3d 480, 485 (9th Cir. 2000).

5    These circumstances exist only where an accused is denied counsel at a critical stage of the

6    proceedings, where there is an actual conflict of interest between the defendant and his

7    attorney, or where counsel "entirely fails to subject the prosecution's case to meaningful

8    adversarial testing." *Id.* (quoting *Cronic*, 466 U.S. at 659) (citation modified). None of

9    these situations was present in Johnson's case, so, as the state court rightly noted, there was

10   no *per se* prejudice from counsel's performance.

11                **b.    Evidence of Brain Damage and Lead Exposure**

12       Johnson argues that the PCR court's decision is not entitled to AEDPA deference

13   because, in his words, the court unreasonably determined "that any postconviction

14   evidence about Johnson's brain damage was cumulative to what the jurors already heard

15   at trial." (Doc. 44 at 224.)

16       The PCR court found that the experts' opinions about the effects of Johnson's

17   potential childhood exposure to lead "merely corroborate[d] what the jury learned at trial":

18   namely, that Johnson suffered from neurocognitive impairment. (PCR Order, ME 1/28/15,

19   at 17.) The court noted that Johnson's "neurocognitive impairment was not given great

20   weight by the [Arizona] Supreme Court, and would not have been weighed more heavily

21   with evidence of lead exposure." (*Id.*)

22       The Arizona Supreme Court, in evaluating this aspect of Johnson's mitigating

23   evidence, first noted that "both the State's and Johnson's psychological experts agreed that

24   Johnson's cognitive functions are intact." *Johnson*, 212 Ariz. at 440. The court proceeded

25   to accord Johnson's mitigating evidence "minimal value" because both State and defense

26   experts had "indicated that Johnson knew right from wrong and could not establish a causal

27   nexus between the mitigating factors and Johnson's crime." *Id.*

28       Johnson relies on *Caro v. Woodford*, 280 F.3d 1247 (9th Cir. 2002), for his argument

that counsel performed ineffectively in their investigation of his neurocognitive impairment. In *Caro*, the Ninth Circuit held that counsel's failure to investigate potential brain damage constituted ineffective assistance.[45] *Id.* at 1258. Although counsel was aware of Caro's "extraordinary history of exposure to pesticides and toxic chemicals," he failed to adequately investigate that history and did not inform the experts who examined Caro of the facts that were known to him. *Id.* at 1255. Counsel did not seek an expert to assess the effect of the poisoning on Caro's brain, and "[t]he only expert testimony presented relating to Caro's mental health did not shed light on his brain damage." *Id.* at 1255-57. The court found that Caro was prejudiced by counsel's failure to present such evidence because the existence of "physiological defects" in the brain that affect behavior and cause "'impulse discontrol' and irrational aggressiveness" is especially weighty mitigation. *Id.* at 1258. The court concluded: "By explaining that [Caro's] behavior was physically compelled, not premeditated, or even due to a loss of emotional control, his moral culpability would have been reduced." *Id. Caro*, however, is distinguishable.

First, Johnson's trial counsel retained both a psychologist, Dr. Jones, and a neuropsychologist, Dr. Walters. A neuropsychiatrist further performed a comprehensive neurological examination, which included brain imaging. Dr. Jones testified about Dr. Walter's findings, which suggested that Johnson suffered "some level of left frontal lobe dysfunction" and "memory and executive function impairment." (RT 12/16/03, p.m., at 46.) According to Dr. Jones, these conditions affect an individual's ability to "control and moderate behavior." (*Id.*) Counsel therefore investigated and presented the type of evidence that was absent from Caro's sentencing. The fact that Dr. Jones's testimony about Johnson's frontal lobe dysfunction was brief "does not diminish the overall impact of [his] mitigation testimony." *See Clark v. Mitchell*, 425 F.3d 270, 287 (6th Cir. 2005).

*Caro* is also distinguishable because the evidence of premeditation in that case "was

---

[45] Johnson also cites the dissent in *Mann*, 828 F.3d at 1170-71 (Doc. 18 at 316.). *Mann* held that the state court did not unreasonably apply *Strickland* in denying Mann's ineffective assistance of counsel claim. 828 F.3d at 1160-61. Thus, *Mann* does not support Johnson's argument.

not particularly strong," making evidence of a "physiological defect" that caused the defendant's behavior particularly compelling. 280 F.3d at 1258. In Johnson's case, by contrast, the evidence of premeditation was overwhelming. More than a week passed between the armed robbery and the murder of witness Stephanie Smith, whom Johnson killed after learning she would testify in an upcoming hearing involving a fellow gang member. This is not a case where the petitioner was "physically compelled" or reacted compulsively in committing the murder. *See id.*; *see also Williams (Terry)*, 529 U.S. at 398 (finding prejudice when the omitted evidence suggested that defendant's "violent behavior was a compulsive reaction rather than the product of cold-blooded premeditation").

Courts have consistently found prejudice lacking where the circumstances of the crime are inconsistent with impulsivity and other indicia of organic brain disorders. *See Wong*, 558 U.S. at 24-25 (finding that petitioner was not prejudiced by failure to present evidence of emotional instability and impulsivity where the "cold, calculated nature" of the murder and petitioner's "subsequent bragging about it would have served as a powerful counterpoint"); *Scott v. Ryan*, 686 F.3d 1130, 1133-34 (9th Cir. 2012) (new evidence of brain damage did "not explain [petitioner's] actions" and was insufficient to establish prejudice from counsel's failure to investigate his head injuries where petitioner "did not act in an impulsive way," "was an active participant in the planning, preparation, execution, and cover-up of the crime," and "was able to appreciate the wrongful nature of his crime"); *Pizzuto v. Arave*, 280 F.3d 949, 964 (9th Cir. 2002) (finding that evidence of a seizure disorder would have made no difference in the sentencing outcome because there was no evidence the petitioner actually suffered from a seizure given the "planned, calculated, and complex series of acts" committed by the petitioner at the time of the offense); *Apelt v. Ryan*, 878 F.3d 800, 834 (9th Cir. 2017) (finding no prejudice where "none of the proffered mitigating evidence excuses Apelt's callousness, nor does it reduce Apelt's responsibility for planning and carrying out the murder"); *Bolin v. Davis*, 13 F.4th 797, 816 (9th Cir. 2021) (rejecting claim of ineffective assistance based on counsel's failure to present expert testimony that Bolin was brain-damaged as a result of childhood abuse and exposure to

1    lead and neurotoxins, explaining that "a reasonable jurist (and jury) could well find the

2    opinions of Bolin's medical experts unpersuasive given Bolin's deliberate shooting of three

3    people and his strategic thinking after the murders").

4        Further, as Respondents note, Arizona courts, "[w]hen assessing the weight and

5    quality of a mitigating factor, . . . take into account how the mitigating factor relates to the

6    commission of the offense." *State v. Styers*, 227 Ariz. 186, 189 (2011) (acknowledging

7    Styers' PTSD diagnosis but giving it "little weight" where Styers' "entire course of action

8    was not impulsive, but instead was planned and deliberate" (citation modified)); *see State*

9    *v. Smith*, 215 Ariz. 221, 235 (2007) (giving less weight to mental health mitigating

10   evidence in light of testimony that defendant "could have controlled his impulses and that

11   he likely knew what he was doing and that it was wrong")[46]; *cf. Thornell*, 602 U.S. at 166

12   ("Because none of Jones's experts provided a real link between Jones's disorders and the

13   murders, their testimony would have done him little good in the Arizona courts.").

14       Johnson planned the murder, carried it out, and attempted to cover it up by hiding

15   the weapon, destroying its barrel, and burning his clothes. Johnson also later bragged about

16   committing the murder. This conduct would reduce the mitigating value of any evidence

17   that Johnson had impulsively violent behavior from frontal lobe dysfunction. The deficits

18   identified by Johnson's experts at sentencing and during the PCR proceedings fall short of

19   the types of conditions that would outweigh the aggravating factors.

20       In *Stankewitz v. Woodford*, 365 F.3d 706, 718 (9th Cir. 2004), for example, all of

21   defendant's experts agreed he was significantly brain damaged as a result of fetal alcohol

22   syndrome or childhood abuse. They also agreed defendant, from early childhood, had a

23   documented record of "psychotic thinking" and "sudden loss of control." *Id.* In *Summerlin*

24   *v. Schriro*, 427 F.3d 623, 643 (9th Cir. 2005), the defendant was prejudiced at sentencing

---

[46] Notwithstanding Johnson's arguments to the contrary, while a jury cannot be prevented from giving effect to mitigating evidence solely because it has no causal nexus to the crime, *see Tennard*, 542 U.S. at 287, "the failure to establish such a causal connection may be considered in assessing the quality and strength of the mitigation evidence," *State v. Newell*, 212 Ariz. 389, 405 (2006).

by counsel's failure to present available expert evidence that he suffered from psychomotor epilepsy and was experiencing a seizure when he committed the crime. The court found that the seizure would have "strongly affected Summerlin's ability to control his actions." *Id.* In *Porter v. McCollum*, 558 U.S. 30, 33-35 (2009), the Supreme Court found ineffective assistance where counsel failed to present evidence of the defendant's violent and abusive childhood, his record as a decorated Korean War veteran, and the traumatic effects of his service. During postconviction proceedings, Porter also presented evidence from a neuropsychologist who found that he "suffered from brain damage that could manifest in impulsive, violent behavior" and that "[a]t the time of the crime . . . Porter was substantially impaired in his ability to conform his conduct to the law and suffered from an extreme mental or emotional disturbance," both of which constituted statutory mitigating circumstances under state law. *Id.* at 36. The expert also determined that Porter suffered from cognitive defects at the time of trial. *Id.*

In each of these cases trial counsel failed to present mitigating evidence that the defendant suffered from brain damage at the time of his crime and that it could have contributed to his criminal behavior by causing him to lose control and act impulsively. Unlike those cases, the facts of the crime here do not suggest that Johnson's frontal lobe impairment, as identified by Dr. Walter, was causally related to his role in the murder.

In contrast to the disconnect between the circumstances of the crime and the effects of the frontal lobe dysfunction identified by Johnson's other experts, Dr. Jones testified that the impairments he diagnosed were present when Johnson committed the murder. (RT 12/16/10, p.m., at 49.) He also explained that children who are exposed to violence are more likely to become violent adults. (*Id.*) Defense expert Dr. Lang agreed, acknowledging that Johnson modeled his father's behavior and that there is a "correlation between physical abuse on a child and their acting out behavior." (*Id.* at 176, 189.) Thus, the jury did hear evidence connecting Johnson's criminal conduct with his mental health conditions and his social history.

In a declaration prepared in 2011 during the PCR proceedings, Johnson's trial

1    counsel attested that he could not remember why he didn't call Dr. Walter or Dr. Duane to

2    testify during the penalty phase, nor could he think of a tactical reason for not doing so or

3    for failing to present evidence of brain damage. (IOR 851, Ex. 28, ¶¶ 20, 21, 23.) With

4    respect to Dr. Duane's testimony, however, counsel informed the court during a status

5    conference a week before the sentencing phase that his "inclination at this point is not to

6    call [Dr. Duane] but to probably provide the results to my neuropsychologist to the degree

7    to which they corroborate his previous findings." (RT 11/3/03 at 5.) This statement

8    suggests counsel made a strategic choice not to call Dr. Duane which, under *Strickland*, is

9    "virtually unchallengeable." 466 U.S. at 690.

10       Respondents argue that testimony from Drs. Walter and Duane and evidence of

11   Johnson's possible exposure to lead paint as an infant would have been cumulative to

12   evidence from Dr. Jones and other witnesses detailing Johnson's impulsivity, poor

13   judgment, substance abuse issues, and brain dysfunction. (Doc. 37 at 182-85.) Relatedly,

14   the effects of exposure to lead would simply suggest another cause for Johnson's brain

15   impairment and impulsive conduct, issues that were explored in Dr. Jones's testimony. (*Id.*

16   at 183.) Respondents also note the speculative nature of the claim that Johnson, who was

17   not tested for lead poisoning, was harmed by his exposure to lead paint. (*Id.* at 182.)

18       Respondents' arguments are well-taken, especially when the PCR court's decision

19   is considered under the doubly deferential standard required by *Strickland* and AEDPA.

20   *See Richter*, 562 U.S. at 105; *see also Burt*, 571 U.S. at 15; *Lewis v. Andes*, 95 F.4th at

21   1177. Testimony from Drs. Walter and Duane, and evidence of lead poisoning, would have

22   been cumulative because Dr. Jones testified that Johnson was diagnosed with brain

23   dysfunction and exhibited symptoms consistent with that diagnosis, including impulsivity

24   and poor judgment. *See, e.g.*, *Benson v. Chappell*, 958 F.3d 801, 833 (9th Cir. 2020)

25   (finding no prejudice where new evidence of torture and sexual abuse was "cumulative" to

26   evidence of petitioner's "horrendous childhood"); *Rhoades v. Henry*, 638 F.3d 1027, 1051

27   (9th Cir. 2011) (finding no prejudice despite the fact that new evidence "exceed[ed] what

28   was uncovered and presented by trial counsel" in part because "much of the newly adduced

evidence is cumulative"); *Babbitt*, 151 F.3d at 1176 (finding no prejudice where evidence omitted at sentencing was "largely cumulative of the evidence actually presented"). Testimony about Johnson's exposure to lead paint would have been cumulative because, while it suggested a cause of Johnson's brain dysfunction, the jury heard testimony about the effects that dysfunction and other conditions, including Dr. Jones's personality disorder diagnosis, had on Johnson's conduct. *See Clark*, 425 F.3d at 287; *see also Smith v. Mitchell*, 348 F.3d 177, 202 (6th Cir. 2003).

Moreover, it has not been shown that Johnson was actually affected by exposure to lead paint. Unlike his older brother, who had been exposed to the lead paint for a year before Johnson was born and whose blood tests placed him at the "moderate risk" level, Johnson was not tested and any evidence that he was "poisoned" is, as the PCR court noted, "circumstantial." (PCR Order, ME 1/28/15, at 18.) Such evidence is less compelling "because it is not conclusive." *Smith*, 348 F.3d at 201-02; *cf. Lewis*, 95 F.4th at 1185 (characterizing as "weak or speculative" unpresented mitigating evidence of factors that "possibly affected Lewis's mental condition").

Similarly, while Dr. Cunningham complied a comprehensive list of "adverse developmental factors" affecting Johnson, including information about his hereditary predisposition for mental disorders and substance abuse, such evidence was cumulative to testimony the jury heard at sentencing, where witnesses testified about Johnson's dysfunctional and violent family life and his own lengthy substance abuse history.

Johnson also argues that counsel performed ineffectively by failing to prepare Dr. Jones as a witness and by presenting testimony from Dr. Jones that was "not helpful" and "prejudicial." (Doc. 18 at 317.) First, it is misleading to state, as Johnson does, that "the majority of the documents that Dr. Jones received from counsel arrived *after* he evaluated Johnson." (*Id.* at 318.) Dr. Jones testified that he did revise his initial diagnosis upon receiving additional documents, a process he described as not unusual. (RT 12/16/03, p.m., at 18.) He testified that a "good portion" of the documentation he reviewed arrived after his initial evaluation but also that the "initial amount of information [he] had was

1    tremendous" and "very large in volume." (*Id.* at 18, 19.) Nothing in this testimony suggests

2    that counsel failed to provide Dr. Jones with the information necessary to render an

3    accurate diagnosis in time for the sentencing hearing.

4         Next, Johnson argues that Dr. Jones's testimony was harmful because he testified

5    about Johnson's involvement in gangs and because a diagnosis of "personality disorder" is

6    not "valuable mitigation evidence." (Doc. 18 at 317.) Both arguments fail. First, the jury

7    had been instructed during the aggravation phase that Johnson had been found guilty of

8    assisting a criminal street gang. (*See* RT 12/10/03 at 57.) The jury had also heard extensive

9    testimony from Detective Stuart about Johnson's gang involvement. (*See* RT 12/8/03.)

10   Johnson was not prejudiced by testimony from Dr. Jones, who had experience working

11   with gang members, about the psychological factors that lead individuals to join gangs and

12   the difficulty in leaving a gang after becoming a member. (RT 12/15/03 at 191-92.)

13        Next, Johnson cites *State v. Kayer*, 194 Ariz. 423, 437 (1999), and *State v. Prince*,

14   226 Ariz. 516, 541 (2011), for the proposition that "personality disorders are not generally

15   considered mitigating factors." (Doc. 18 at 317.) This mischaracterizes the law. The

16   Arizona Supreme Court held that "personality or character disorders usually are not

17   sufficient to satisfy" the statutory mitigating circumstance in A.R.S. § 13-751(G)(1), which

18   provides that a mitigating circumstance exists where the defendant's capacity to appreciate

19   the wrongfulness of his conduct or to conform his conduct to the requirements of the law

20   is significantly impaired. *Kayer*, 194 Ariz. at 437; *see Prince*, 226 Ariz. at 541

21   ("Personality or character disorders, however, usually are insufficient to establish [A.R.S.

22   § 13-751(g)(1)]."). Those cases do not hold that personality disorders are not considered

23   mitigating—quite the opposite.

24        "The Arizona Supreme Court has made it clear that an antisocial personality

25   disorder (sociopathic disorder) is a mitigating factor, even if it does not come up to the

26   level of a factor specifically listed in the Arizona sentencing statute." *Smith v. Stewart*, 140

27   F.3d 1263, 1270 (9th Cir. 1998) (citing *State v. Thornton*, 187 Ariz. 325, 334-35 (1996));

28   *State v. Stokley*, 182 Ariz. 505, 521-22, 524 (1995). As the Ninth Circuit explained in

1    *Lambright v. Schriro*:

> Expert testimony presented at the evidentiary hearing also
> suggested that Lambright may suffer from a personality
> disorder. Dr. Lang, the state's expert, whose assessment of
> Lambright's mental health problems the district court found
> credible, concluded that Lambright suffers from a personality
> disorder not otherwise specified with antisocial, borderline,
> and inadequate features. This diagnosis, if properly developed
> and explained to the sentencer, would have had a mitigating
> effect under Arizona law.

490 F.3d 1103, 1125 (9th Cir. 2007).

Counsel did not perform ineffectively in preparing Dr. Jones for his testimony or in presenting the testimony. Through Dr. Jones counsel offered extensive evidence about Johnson's background and social history as well as diagnoses, including a personality disorder, that suggested a causal connection between Johnson's mental condition and his conduct in committing the crimes.

### c.    "Constraints" Johnson Placed on Trial Counsel

Johnson contends that the PCR court's denial of this claim is not entitled to deference under 28 U.S.C. § 2254(d)(1) because the court erroneously "determined that Johnson was partially to blame for his counsel's failure to investigate mitigation evidence." (Doc. 44 at 225.)

The court noted that Johnson and his family were "reluctan[t] to cooperate with mitigation efforts at the time of trial." (PCR Order, ME 1/28/15, at 18.) Therefore, the court was "not persuaded" that the witnesses—primarily family members—who provided declarations during the PCR proceedings "would actually have made themselves available to be interviewed or to testify in 2003." (*Id.*) The court concluded that, "[c]onsidering the constraints placed upon trial counsel by his client, . . . trial counsel's actions were reasonable and not deficient." (*Id.*)

Johnson argues that "a defendant's lack of cooperation does not eliminate counsel's duty to investigate." (Doc. 44 at 217.) He cites *Hamilton v. Ayers*, 583 F.3d 1100, 1118-19 (9th Cir. 2009), but counsel's "anemic" performance in that case—where counsel only presented one witness whose testimony occupied only five transcript pages,—bears no

relationship to counsel's performance in Johnson's case. *Id.* at 1119. The court in *Hamilton* also noted that both the Supreme Court and the Ninth Circuit "have found that a defendant's refusal to cooperate in the penalty phase may render counsel's limited investigation and presentation of mitigating evidence reasonable under the circumstances." *Id.* at 1118. In *Strickland*, the Court explained: "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." 466 U.S. at 691.

Johnson also cites *Silva v. Woodford*, 279 F.3d 825, 847 (9th Cir. 2002), for the proposition that "if a client forecloses certain avenues of investigation, it arguably becomes even more incumbent upon trial counsel to seek out and find alternative sources of information and evidence, especially in the context of a capital murder trial." Johnson does not indicate, however, what "alternative sources of information and evidence" counsel should have pursued or how that pursuit would have revealed evidence that would have "alter[ed] the sentencing profile" presented to the jury. *Strickland*, 466 U.S. at 700; *see Thornell*, 602 U.S. at 166.

Insofar as Johnson challenges the PCR court's factual finding that he constrained counsel's pursuit of mitigating evidence, particularly from family members, the record supports the PCR court's decision. For example, at a status conference two months before sentencing began, Johnson informed the court that he "object[ed] to the presentation of any mitigation at all with the exception of a few doctors," and had so instructed his counsel. (RT 9/12/03 at 21-22.) Johnson's counsel had also moved to withdraw due to the deterioration of his relationship with Johnson. During a colloquy with the judge, counsel explained that one of the reasons his relationship with Johnson had deteriorated was counsel's erroneous belief that Johnson would "direct his family to cooperate" in the mitigation investigation. (RT 8/12/03 at 13.)

### d.    Prejudice

Johnson's arguments fail to show that the PCR court's rejection of his claims

1   satisfied the deferential standard of 28 U.S.C. § 2254(d). This is further highlighted by

2   considering *Strickland*'s prejudice prong more closely.

3       As noted, to be entitled to relief on any of these claims, Johnson has the burden of

4   showing that there was a reasonable probability that he would not have been sentenced to

5   death if trial counsel had presented the mitigating evidence adduced during the PCR

6   proceedings. *See, e.g.*, *Lee*, 118 F.4th at 989. The court must assess "the strength of all the

7   evidence and a comparison of the weight of aggravating and mitigating factors." *Jones*,

8   602 U.S. at 171-72. "[W]here the aggravating factors greatly outweigh the mitigating

9   evidence, there may be no reasonable probability of a different result, even if the petitioner

10  presents substantial evidence of the kind that a reasonable sentencer might deem relevant

11  to the defendant's moral culpability." *Lee*, 118 F.4th at 989 (citation modified).

12      Counsel presented testimony at sentencing that Johnson was subjected to severe

13  physical abuse by his father; that he was sexually abused; that he abused drugs and alcohol

14  from a young age; that he was never afforded adequate therapeutic resources when he

15  entered the juvenile justice system; that there was evidence of frontal lobe dysfunction; and

16  that his poor judgment, violence, and impulsive conduct were products of the abuse and

17  neglect he experienced, his borderline personality disorder, and his brain impairment.

18      The totality of the mitigating evidence, which includes the additional evidence

19  adduced during the PCR proceedings, consists of more detailed accounts of the physical

20  and sexual abuse Johnson suffered; evidence of a possible hereditary predisposition to

21  mental illness and substance abuse; and evidence that exposure to lead paint might be

22  responsible for Johnson's frontal lobe dysfunction.

23      Weighed against that mitigating evidence are three aggravating factors, the first

24  being Johnson's armed robbery conviction, a "serious offense" under A.R.S.

25  § 13-703(F)(2). The second aggravating factor, that Johnson "knowingly created a grave

26  risk of death to another person or persons in addition to the person murdered,"

27  § 13-703(F)(3), involved the risk to Stephanie Smith's four-year-old son Jordan. As the

28  Arizona Supreme Court explained: "Even if Jordan was not in his mother's arms at the

time of the shooting, clearly he was in the zone of danger. Jordan and his mother were in a small bedroom, measuring 10 feet by 10 feet, and he was in close enough proximity when she was shot to have her blood splatter on his cheek and shirt." *Johnson*, 212 Ariz. at 438. The third aggravating factor, that the murder was especially heinous or depraved under § 13-703(F)(6), was established because Johnson's motive in murdering Smith was to eliminate her as a witness to the armed robbery. *Id.* at 439. Witness elimination signifies a heinous or depraved state of mind because "[e]nding the life of a human being so that that person cannot testify against the defendant indicates a complete lack of understanding of the value of a human life." *Id.* "Killings committed with this cold-blooded logic in mind are especially depraved . . . and separate the crime from the norm of first-degree murders." *Id.* (citation modified).

The aggravating factors here are weighty, and a reasonable jurist could determine that they are not overcome by Johnson's mitigation. *State v. Speer*, 221 Ariz. 449 (2009), closely parallels the facts and issues here. Speer was convicted of first-degree murder and sentenced to death for directing (from jail) his half-brother, Brian Womble, to kill the residents of an apartment they had burglarized. *Id.* at 791. Womble broke into the apartment and shot the mother and father. *Id.* The father was killed and found in bed with his arms around an infant. The mother was wounded but survived.

The State sought the death penalty, alleging four aggravating factors: Speer was previously convicted of a serious offense, A.R.S. § 13-751(F)(2); in the commission of the offense, Speer knowingly created a grave risk of death to the infant, A.R.S. § 13-751(F)(3); the murder was committed in a heinous or depraved manner (witness elimination), A.R.S. § 13-751(F)(6); and Speer committed the murder while in custody, A.R.S. § 13-751(F)(7). *Speer*, 221 Ariz. at 454. The jury found that all four factors had been proved. The Arizona Supreme Court, however, determined that (F)(3) factor was not established because Womble's knowledge of the infant's location could not be imputed to Speer. *Id.* at 45-60.

Speer claimed more than 20 mitigating circumstances. The Arizona Supreme Court found that the following were proven:

Speer proved that he suffered a difficult childhood. He grew up in what even the State's expert witness conceded was "a dysfunctional home." Drug abuse was pervasive in his family, and his mother used heroin during pregnancy. Speer was referred to juvenile court twenty-six times for various crimes. He was incarcerated twelve times between his fourteenth and eighteenth birthdays.

Speer proved at least some physical abuse during childhood. He presented evidence of sexual abuse by a female relative at age five. Speer also showed that during his early school years, his mother refused recommended evaluations of suspected learning disabilities.

The record also establishes that Speer habitually abused both alcohol and drugs. Speer began using drugs in his early adolescence, overdosing on methamphetamines when thirteen years old. He was sent to drug treatment as a juvenile. Speer later became addicted to heroin and apparently committed the March 14 burglary to get money to buy heroin.

. . . Speer's experts claimed that he had moderate to severe cognitive impairment, post-traumatic stress disorder ("PTSD"), depression, and a low IQ. The State's expert agreed that Speer suffered from depression but concluded that Speer was malingering cognitive impairment and had antisocial personality disorder, not PTSD.

. . . . We conclude that Speer proved that he suffered from depression. We also conclude that Speer proved that he had an IQ between 87 and 97.

We do not conclude that Speer proved significant cognitive impairment. Whatever the formal diagnosis of Speer's mental health, the record makes plain that he had a clear ability to think ahead and understand the wrongfulness of his actions. Speer meticulously planned the murder while in custody, cleverly used code in communicating with Brian [Womble] . . . , and repeatedly urged that Brian dispose of incriminating evidence.

Speer also proved that the death penalty would have negative effects on his family.

*Id.* at 464-65. Nevertheless, the court affirmed Speer's death sentence, explaining:

[H]is was not a crime of passion or an impetuous reaction to difficult circumstances. For almost a month, Speer planned the murder of two innocent victims of a burglary that he had committed, with the goal of avoiding the consequences of his prior crime. The three aggravating circumstances—prior serious conviction, witness elimination, and committing the offense while on parole or in custody—are cumulatively entitled to substantial weight. *And, the factor of witness elimination is in itself especially weighty, as it involves a direct*

*affront to the functioning of the justice system.*

*Id.* at 465 (emphasis added).

The PCR court denied Speer's claim that counsel had performed ineffectively at sentencing. *See Speer v. Thornell*, No. CV-16-04193-PHX-GMS, 2023 WL 2503733, at \*46 (D. Ariz. Mar. 14, 2023). Contrary to Speer's argument, the court found that it was reasonable "for trial counsel to rely heavily on mental health professionals, instead of Speer's family members" because "additional family members . . . would merely have offered cumulative evidence. Since they have a natural bias in favor of Defendant, the weight of their purported testimony would not in the Court's view have led to a different outcome." *Id.* The court explained that Speer was not prejudiced by any alleged deficiencies in counsel's mitigation presentation, especially "given the evidence that Defendant conspired with his brother to eliminate witnesses to a previous crime, which is a particularly egregious act." *Id.* On federal habeas review, the district court found that the PCR court's rejection of the claim was neither contrary to nor an unreasonable application of *Strickland* because the evidence omitted by counsel at sentencing was not of "sufficient magnitude to establish prejudice," *Stankewitz*, 365 F.3d at 716, and was "largely inconclusive or cumulative, and d[id] not change the 'sentencing profile' offered to the jury," *Strickland*, 466 U.S. at 700; *Speer*, 2023 WL 2503733, at \*51.

In Johnson's case, as in *Speer*, the PCR court reasonably applied *Strickland* in finding that the totality of the mitigating evidence was insufficient to warrant leniency given the weighty aggravating factors, in particular witness elimination, and therefore there was no reasonable probability of a different verdict if trial counsel had presented additional mitigating evidence.

### iv.    Summary: Claims 16(C)-(E)

"The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Yarborough*, 540 U.S. at 8. A habeas petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Richter*, 562 U.S. at 104 (quoting

1    *Strickland*, 466 U.S. at 687). Johnson criticizes Respondents for "focus[ing] on the limited

2    tasks that trial counsel did undertake, while ignoring the crucial ones they did not." (Doc.

3    44 at 223.) As already noted, however, "the relevant inquiry . . . is not what defense counsel

4    could have pursued, but rather whether the choices made by defense counsel were

5    reasonable." *Murray (Robert)*, 745 F.3d at 1011 (quoting *Babbitt*, 151 F.3d at 1173); *see*

6    *Siripongs*, 133 F.3d at 736.

7        Applying these principles, together with the deferential standard of review

8    prescribed by 28 U.S.C. § 2254(d), the Court finds that Claims 16(C), (D), and (E) are

9    meritless. The PCR court determined that Johnson failed to show either deficient

10    performance or prejudice. Johnson has not shown that there was "no reasonable basis,"

11    *Richter*, 562 U.S. at 98, for the PCR court to deny these claims.

12                   **2.    Claim 16(F)**

13        Johnson argues that trial counsel's "lack of preparation led to an unreasoned

14    decision to stipulate and allow the jury to hear co-defendant Carter's admissions." (Doc.

15    18 at 326.) The PCR court's denial of the claim was neither contrary to nor an unreasonable

16    application of *Strickland*. (PCR Order, ME 1/28/15, at 18-19)

17        To support the disparate sentence mitigating factor, counsel stipulated that the jury

18    would be informed that Quindell Carter pleaded guilty to second-degree murder and

19    received only a 16-year sentence for his role in Smith's murder. The State argued that it

20    should be allowed to introduce Carter's statements regarding the crime to explain his lesser

21    sentence and proposed the following stipulation:

22               On 2/20/02, Quindell Carter entered into a plea agreement
23               whereby he pled guilty to Second Degree Murder, as an
                 accomplice, of Stephanie Smith and pled guilty to the Burglary
                 in the First Degree of Stephanie Smith's home. Quindell Carter
24               admitted during these plea proceedings that he went with his
                 accomplice, Ruben Johnson to back him up and knew they
25               were going there to intimidate witness Stephanie Smith. Carter
                 further admitted he was in the back yard when the shot was
26               fired killing Stephanie Smith within her home.

27               On 3/20/02, Quindell Carter was sentenced by Judge James
                 Padish. Carter received 16 calendar years for the Second
28               Degree Murder, as an accomplice. Carter received a
                 consecutive term of supervised probation for the Burglary

offense, wherein he will face a prison term of up to 12.5 years for violating the terms of that probation. The supervised probation term begins immediately upon Carter's completion of the 16 calendar year prison sentence.

(IOR 530.)

Defense counsel objected to the introduction of Carter's admissions. (RT 12/17/03 at 4-8.) The trial court overruled the objection, finding the statements admissible under A.R.S. § 13-703(C) and (D) and the Arizona Rules of Evidence.[47] (*Id.* at 7.) The court explained that if the defense was "to have your cake, State can have their cake, they are allowed to rebut with the same type of evidence you are presenting." (*Id.*)

After the court's ruling, counsel stated that "given the choices that I have at this point, I am going to sign the stipulation." (*Id.* at 8.) The court noted that counsel could withdraw the disparate sentences claim, but counsel stated that given the court's ruling, he felt "compelled to sign the stipulation." (*Id.*) The stipulation was admitted into evidence. (*Id.* at 85-86.)

In his closing argument, defense counsel reiterated his residual doubt and disproportionate sentences arguments:

> You have the facts you have to consider on this issue about what really happened, what each person's role was; whether there's any questions, serious questions in the mind, not about guilt or innocence, but about who actually did what, and whether or not the penalties that have been imposed on Cheryl [Newberry] and Quindell Carter are disproportionate to the penalties Ruben faces, and whether or not the fact of the penalties they received should be considered in any way in deciding what kind of penalty should be imposed on Ruben.

(RT 12/18/03 at 77.)

Counsel also addressed the information contained in the stipulation regarding Carter's plea agreement. Counsel emphasized that the defense was not stipulating to the truth of Carter's statement that he was in the backyard when he heard the fatal shot fired;

---

[47] Section 13-703(C) provided that at the penalty phase of trial "the prosecution or the defendant may present any information that is relevant to any of the mitigating circumstances[,] . . . regardless of its admissibility under the rules governing admission of evidence at criminal trials."

the defense was stipulating only "that's what Quindell Carter said." (*Id.* at 80.) Counsel continued attacking Carter's motivation and credibility and again urging the jury to consider the existence of residual doubt:

> If you were Quindell Carter, would you have taken that deal if they offered it to you?
>
> You bet.
>
> Doesn't make it true.
>
> Is there a question in your mind about how this happened; who really did what?
>
> That's what this residual doubt, lingering doubt issue about comparative responsibility is concerned with.

(*Id.*) Counsel then asked the jury not to punish Johnson more harshly because Newberry and Carter "got off easy." (*Id.*)

In denying Johnson's ineffective assistance claim on this issue, the PCR court recounted this background. (PCR Order, ME 1/28/15, at 16-19.) The court continued:

> In argument, defense counsel minimized Carter's statement and argued Carter's self-interest in securing a plea deal, and remained in a position to argue disparate sentencing, accomplice liability, and residual doubt as mitigation.
>
> Considered in context, counsel made a reasonable and strategic decision that permitted defendant to present his mitigation. Trial counsel's performance was not deficient and this claim is not colorable.

(*Id.* at 16-19.)

Johnson argues that this ruling "ignores the relevant factual circumstances"; namely, that "counsel could have presented the mitigating evidence of disparate sentencing with Carter's sentence of probation and imprisonment—without the damaging narrative from his plea agreement." (Doc. 44 at 229.) Counsel attempted to do just that, but the trial court overruled counsel's objection, finding Carter's statement was admissible to rebut the defense argument that Carter's sentence was disproportionate to Johnson's. (RT 12/17/03 at 7.) *Cf. Smith v. Sherman*, No. CV 20-5354-RSWL (DFM), 2022 WL 708750, at *9 (C.D. Cal. Jan. 20, 2022), *report and recommendation adopted*, No. CV 20-5354-RSWL (DFM),

2022 WL 707211 (C.D. Cal. Mar. 8, 2022), *certificate of appealability denied*, No. 22-55379, 2023 WL 7099286 (9th Cir. July 24, 2023) ("Petitioner has not met his burden under the first *Strickland* prong of showing that counsel provided constitutionally deficient performance by failing to object to the admission of T.R's statements. This is because Petitioner's counsel <u>did</u>, in fact, argue that T.R.'s statements should be excluded."); *Cota v. Thornell*, No. CV-16-03356-PHX-DJH, 2023 WL 4595176, at *12 (D. Ariz. July 18, 2023) (rejecting ineffective assistance claim that counsel failed to object to evidence where "counsel *did* unambiguously move to suppress Cota's statement on the grounds that it was involuntary."); *Regan v. Overmyer*, No. CV 19-1502, 2023 WL 4670123, at *4 (E.D. Pa. Apr. 14, 2023), *report and recommendation adopted as modified*, No. CV 19-1502, 2023 WL 4670993 (E.D. Pa. July 19, 2023), *certificate of appealability denied*, No. 23-2501, 2023 WL 9659789 (3d Cir. Dec. 8, 2023) ("When counsel does in fact raise an argument, he cannot be found ineffective [in] failing to do so."); *Montue v. Sisto*, No. 2:08-CV-2397 TJB, 2010 WL 5394820, at *15 (E.D. Cal. Dec. 22, 2010) ("[C]ounsel cannot be deemed ineffective for failing to object to this testimony because he in fact did make a hearsay objection.").

Johnson does not suggest the availability of an alternative argument that would have convinced the trial court to exclude Carter's statement, nor does he contend that the trial court's ruling was erroneous. The failure to make a futile objection does not constitute ineffective assistance of counsel. *See, e.g.*, *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005) ("[T]rial counsel cannot have been ineffective for failing to raise a meritless objection."); *James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994).

Next, any prejudice from Carter's statement was also reduced by its cumulative nature. Biondo, Newberry, and Hansen had offered testimony consistent with the facts contained in Carter's statement. In addition, as defense counsel argued, Carter's credibility was questionable given the fact that he was a co-defendant seeking a lesser sentence and was therefore motivated to minimize his role in Smith's murder.

Finally, Johnson argues defense counsel performed ineffectively by "failing to

object to a statement Hansen made during her penalty phase testimony" when she explained that she finally reported Johnson to the police because she feared he was going to commit another murder. (Doc. 18 at 327-28.) Johnson did not raise this claim in state court. Because the claim is meritless, its default is not excused under *Martinez*. *See Runningeagle*, 825 F.3d at 982; *Atwood*, 870 F.3d at 1060.

On redirect examination during her penalty-phase testimony, Hanson was asked why she waited three months to tell the police about what had happened. (RT 12/4/03 at 88-89.) Defense counsel objected, but the trial court overruled the objection. (*Id.* at 89.) Counsel renewed his objection, arguing that the question went beyond the scope of cross-examination. (*Id.*) The court again overruled the objection. (*Id.*) Hansen then testified: "[a]fter the telephone call I had received from him on Sunday, I felt like he had already killed one witness to a different crime, and it sounded as though a second one was going to die, and I didn't want that to happen." (*Id.*)

Following Hansen's questioning by counsel, jurors submitted questions, one of which asked: "[a]fter the first phone call from Ruben, you said that one witness had already died, and it sounded like another one might. Do you know who that person might have been?" (*Id.* at 91.) Defense counsel objected to the question, arguing that the answer would be "speculation" and violate Arizona Rule of Evidence 404(b). (*Id.*) The trial court overruled the objection. (*Id.* at 92.) The court then read the question to Hansen. (*Id.* at 96.) Hansen replied: "I assume it to be Cheryl Newberry." (*Id.*)

Johnson argues that defense counsel should have objected because Hansen's testimony that she believed Johnson intended to murder Newberry was "speculative" and its probative value was substantially outweighed by the danger of undue prejudice under Rule 404(b). (Doc. 18 at 327-28.) Again, counsel *did* object to the testimony, on precisely those grounds. (RT 12/4/03 at 91.) Counsel's performance cannot be deemed deficient based on his failure to raise an objection he did in fact raise.[48] *Cf. Smith*, 2022 WL 708750,

---

[48] As described above, and as noted by the trial court with respect to Quindell Carter's statement, any information relevant to mitigating circumstances is admissible at the penalty phase of trial regardless of the Rules of Evidence. A.R.S. § 13-703(C); *see State v. McGill*,

1    at *9; *Cota*, 2023 WL 4595176, at *12; *Regan*, 2023 WL 4670123, at *4; *Montue*, 2010
2    WL 5394820, at *15.

3    Johnson's argument for *Strickland* prejudice also fails. He contends that counsel's
4    failure to object was "prejudicial as Hansen's response supported the State's theory that
5    Smith was murdered due to witness elimination." (Doc. 18 at 328.) However, as
6    Respondents note, in support of this argument Johnson cites the State's closing argument
7    at the *guilt phase* of trial—occurring two years before Hansen's penalty-phase testimony,
8    which is at issue in this claim. (*Id.* at 327) (citing RT 11/26/01 at 4041, 58); (*id.* at 328)
9    (citing RT 11/26/01 at 29-31, 37-38, 53, 112-14, 126-27).

10    This claim remains defaulted and barred from federal review.

11    ### 3.    Claim 16(G)

12    Johnson argues that he was prejudiced by the cumulative effect of counsel's errors.
13    (Doc. 18 at 328-29.) He did not present this claim in state court. (*See* Doc. 44 at 230.) He
14    argues that its default is excused under *Martinez* by the ineffective assistance of PCR
15    counsel. (*Id.*) Whatever its procedural status, the claim is meritless.

16    As already discussed, the United States Supreme Court has not specifically
17    recognized the doctrine of cumulative error as an independent basis for habeas relief.
18    *Lorraine*, 291 F.3d at 447; *cf. Morris*, 677 F.3d at 1132 n.3. In any event, the Court has not
19    identified any instances of constitutionally ineffective assistance. Therefore, it "is enough
20    to say that [Johnson's] cumulative error claim clearly fails in light of the absence of any
21    individual errors to accumulate." *Morris*, 677 F.3d at 1132 n.3. *See also McGill*, 16 F.4th
22    at 685 ("If there are no errors, there is no need to consider their cumulative effect.").

23    Claim 16 is denied.

24    ### H.    Claim 17:

25    Johnson argues that counsel performed ineffectively by failing to object to the
26    victim-impact statement offered by Smith's mother-in-law, Sandra Plinski. (Doc. 18 at

27
28    213 Ariz. 147, 156 (2006). Therefore, additional objections, or, as suggested by Johnson,
      a request for an unspecified limiting instruction, would have been futile.

330.) He argues that Plinski was not a victim as defined by Arizona law[49] and that her statement exceeded the bounds of what is permissible under *Payne v. Tennessee*, 501 U.S. 808 (1991). Johnson did not raise this claim in state court. He contends that its default is excused under *Martinez* by the ineffective assistance of PCR counsel. (Doc. 18 at 330.) Because the underlying claim is meritless, PCR counsel did not perform ineffectively.

Plinski read her statement at the end of the penalty phase of trial. Prior to her statement being read, the court and counsel engaged in a brief colloquy during which the court noted defense counsel's objection to "any victim evidence or testimony being presented"—an objection which the court had denied. (RT 12/18/03 at 40.) The prosecutor then explained, in reference to Plinski, that "[s]he does not particularly qualify under the rules, but [defense counsel] Mr. Storrs indicated because with her involvement in the family, he does not have an objection to her specifically making a statement." (RT 12/18/03 at 41-42.) Her statement read as follows:

> I am Stephanie Smith's mother-in-law. I have known her since 1991. We had a very good relationship, and I loved her very much.
>
> Her death in 2000 has left a big hole in everyone's heart. Her children have gone through so much. The youngest, Jordan, lives with me. I take him to school, and I care for him, and I try to fill his mother's role; however, I am not his mother. His friends and classmates have mothers, and they know Jordan does not.
>
> He's not forgotten that night. He still will talk about the police cars; they put yellow tape around the house, and he was very—he had extensive counseling, but nothing will erase his memories of that night.
>
> In school, they have the children write about their mother. Jordan has to write about me.
>
> Ruben shot Stephanie in front of Jordan. Her middle son, Kevin, found her and tried to pick her up.
>
> How do children ever forget?
>
> Stephanie was an excellent mother. Every holiday was a family

---

[49] Under then-current A.R.S. § 13-703.01, the definition of "victim" included the murdered person's spouse, parent, child, or other lawful representative.

1

2

> celebration. She read to Jordan every night. How can I replace
> her?
>
> I don't know why anyone would want to kill her. Her life met
> [sic] so much to everyone. She died on my birthday, and it will
> never be the same.

3

4

5

(*Id.* at 43-44.)

6      Stephanie's mother and son also gave brief statements, which included information

7   cumulative to that provided by Plinski. (*Id.* at 44-49.) The court then instructed the jury

8   that:

9

10

11

> The victim's survivors have made statements relating to the
> personal characteristics of the victim and impact of her murder
> on the victim's family. You may consider this information only
> to the extent that it may rebut the mitigation presented by the
> defendant. You may not consider the information as a new
> aggravating circumstance.

12

13   (*Id.* at 59.) The court further instructed the jurors that they were not to be "swayed by mere

14   sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling." (*Id.*

15   at 60.)

16      Regardless of whether counsel should have objected to the statement on the grounds

17   that Plinski was not a statutory victim, counsel's performance did not prejudice Johnson.

18   The statement was brief and immediately followed by slightly longer statements by the

19   victim's mother and son. Contrary to Johnson's argument, Plinski's statement did not run

20   afoul of *Payne*'s limits on the content of victim impact statements.

21      In *Booth v. Maryland*, 482 U.S. 496, 509 (1987), the Supreme Court held that the

22   introduction of a victim-impact statement to a capital sentencing jury violated the Eighth

23   Amendment. In *Payne*, however, the Court overruled *Booth* in part. 501 U.S. at 827. The

24   Court explained that the "State has a legitimate interest in counteracting the mitigating

25   evidence which the defendant is entitled to put in, by reminding the sentencer that just as

26   the murderer should be considered as an individual, so too the victim is an individual whose

27   death represents a unique loss to society and in particular to [their] family." 501 U.S. at

28   825 (citation omitted). Therefore, "if the State chooses to permit the admission of victim

1    impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects

2    no *per se* bar." *Id.* at 827. The Court left intact, however, *Booth*'s prohibition on the

3    admission of characterizations and opinions about the crime, the defendant, or the

4    appropriate sentence. *Id.* at 830 n.2.

5        Plinski's statement was not qualitatively different from the statements found

6    permissible in *Payne*, where, for example, the victim's mother testified about how the

7    murder of her daughter and granddaughter affected the daughter's three-year-old son.[50] 501

8    U.S. at 814-15; *see, e.g.*, *Simmons v. Bowersox*, 235 F.3d 1124, 1134 n.4 (8th Cir. 2001)

9    (recounting testimony of victim's husband, daughter, and sister). The statement did not

10   offer characterizations of the defendant or the appropriate sentence. *See Payne*, 501 U.S.

11   at 830 n.2. To the extent the statement referred to the defendant or the crime, such

12   references did not have a "substantial and injurious effect or influence in determining"

13   Johnson's sentence. *Brecht*, 507 U.S. at 637; *see Floyd v. Filson*, 949 F.3d 1128, 1149 (9th

14   Cir. 2020) (applying harmless error standard to admission of mother's victim-impact

15   statement); *Hooper v. Mullin*, 314 F.3d 1162, 1174 (10th Cir. 2002) (applying harmless

16   error standard to admission of improper victim-impact statement).

17       Furthermore, given the trial court's instructions, even if the victim-impact evidence

18   had been erroneously admitted, the error was harmless. *See Lockett v. Trammell*, 711 F.3d

19   1218, 1239-40 (10th Cir. 2013) (finding error harmless where jury was correctly instructed

20   that its sentencing decision was "limited to a moral inquiry into the culpability of the

21   defendant, not an emotional response to the evidence"); *Welch v. Workman*, 630 F.3d 980,

22   1003-04 (10th Cir. 2011) (admission of unconstitutional victim-impact statements "vividly

23   and emotionally" describing the crimes was harmless error where jury was properly

24   instructed); *United States v. Bernard*, 299 F.3d 467, 481 (5th Cir. 2002) ("[A]ny prejudice

25   that did result from the statements was mitigated by the district court's instructions to the

26   _____

27   [50] She testified that her grandson "cries for his mom. He doesn't seem to understand why
     she doesn't come home. And he cries for his sister Lacie. He comes to me many times
28   during the week and asks me, Grandmama, do you miss my Lacie. And I tell him yes. He
     says, I'm worried about my Lacie." *Payne*, 501 U.S. at 814-15.

1    jurors not to be swayed by passion, prejudice or sympathy.").

2        There was no reasonable probability of a different verdict if trial counsel had

3    objected to Plinski's statement on the grounds that she was not a "victim" or on any other

4    grounds. Because this claim of ineffectiveness lacks merit, PCR counsel did not perform

5    ineffectively in failing to raise it. *See Atwood*, 870 F.3d at 1060; *Sexton*, 679 F.3d at 1157.

6    Johnson therefore cannot show cause under *Martinez* for the claim's default.

7        Claim 17 is denied as procedurally defaulted and barred from federal review.

8    **I.    Claim 20:**

9        Johnson alleges that trial counsel performed ineffectively by failing "to timely

10   object, move to strike, move for a mistrial, and seek a curative instruction when evidence

11   of other homicide charges and speculation that Johnson's self-inflicted scars marked prior

12   assaults were introduced during the penalty phase." (Doc. 18 at 355.) Johnson did not raise

13   this claim in state court. He contends that its default is excused under *Martinez* by the

14   ineffective assistance of PCR counsel. (*Id.*) Because the underlying claim is meritless, PCR

15   counsel did not perform ineffectively in failing to raise it.

16       During the penalty phase, the State sought to introduce a chart showing Johnson's

17   criminal history. (RT 12/16/03, a.m., at 15.) The chart included reference to a homicide on

18   the Gila River Indian Reservation, a charge for which Johnson was tried and acquitted. (*Id.*

19   at 17-18.) The trial court granted defense counsel's objection to the admission of the chart.

20   (RT 12/16/03, p.m., at 3.)

21       The next day, the State called Dr. Lang, who had conducted a mental health

22   evaluation of Johnson. When asked about the "collateral documentation" she had reviewed

23   in reaching her diagnoses, Dr. Lang testified: "I looked up the police report for an incident

24   in Phoenix and previous homicide charges." (RT 12/17/03 at 100.) There was no objection.

25       Later in her testimony, Dr. Lang described 22 cigarette burns she had noted on

26   Johnson's upper arm, which, she opined, indicated "some sort of self-mutilation process

27   going on there." (*Id.* at 125.) Defense counsel raised an objection based upon "404(b) and

28   relevance." (*Id.*) At a sidebar discussion, defense counsel explained that the objection was

based on his fear Dr. Lang "is about to talk about other homicides, and I don't think it is relevant." (*Id.* at 126.) The prosecutor responded that self-mutilation was part of Dr. Lang's diagnosis and stated that Dr. Lang was "not going to talk about any other homicides." (*Id.*) Defense counsel then raised an objection to Dr. Lang's previous reference to another homicide. (*Id.* at 127.) The Court denied the objection as untimely and rejected counsel's additional arguments to the contrary. (*Id.*) The court concluded that the State could ask Dr. Lang about "the psychological significance of these burns or tattoos," but that she could not testify regarding "her recollection to any potential homicides" involving Johnson. (*Id.* at 127-28.) Dr. Lang then testified that Johnson would not discuss the scars with her, but that they informed her diagnosis of personality disorder. (*Id.* at 128.)

The next day, in response to a juror question asking if the information she reviewed explained the origin of the scars, Dr. Lang testified:

> Some people said they were cigarette burns. Some people said they were cuts. So there was something about that, and how they got there. There's some—some people have hypothesized it was him self-inflicting. But other people say it was due to his making marks, depending on maybe how many assaults he did for across—people across time. But, you know, that's still—so there's these different opinions about how they got there.

(RT 12/18/03 at 38.)

Johnson argues that counsel's failure to object led to the introduction of evidence that violated Rule 404(b) of the Arizona Rules of Evidence. (Doc. 18 at 358-59.) Respondents contend that counsel did not perform ineffectively because Rule 404(b) does not apply in the penalty phase of a capital case and therefore any objection would have been futile. (Doc. 37 at 205.)

Respondents are correct. "The Rules of Evidence do not apply to the admission of evidence during the penalty phase of a capital trial." *State v. Burns*, 237 Ariz. 1, 28 (2015); *see State v. Sanders*, 245 Ariz. 113, 133 (2018) ("We note that Rule 404(b) does not apply during the penalty phase of a capital case.") In *State v. Martinez*, 218 Ariz. 421, 431 (2008), the Arizona Supreme Court rejected the argument that evidence of a prior bad act should be excluded under Rule 404(b). The court cited A.R.S. § 13-703(C), which provides that

1    "the prosecution . . . may present any information that is relevant to any of the mitigating

2    circumstances . . . regardless of its admissibility under the rules governing admission of

3    evidence at criminal trials" in the penalty phase of a capital proceeding. *Id.* at 431 n.11.

4        An objection on relevance grounds would have failed as well. The reference to

5    another "homicide charge" occurred when Dr. Lang was questioned about the material she

6    had reviewed in preparing her evaluation of Johnson. Similarly, her testimony about

7    Johnson's scars was offered in support of her diagnosis that Johnson suffered from a

8    personality disorder and was therefore admissible. *See Burns*, 237 Ariz. at 29 (finding

9    inappropriate comments by defendant admissible in penalty phase as evidence of

10   anti-social behavior consistent with diagnosis offered by the State's expert).

11       Because the evidence was admissible, counsel's failure to object did not constitute

12   ineffective assistance. *See Rupe*, 93 F.3d at 1445 ("[T]he failure to take a futile action can

13   never be deficient performance."); *James*, 24 F.3d at 27 ("[F]ailure to make a futile motion

14   does not constitute ineffective assistance of counsel."). Because trial counsel did not

15   perform ineffectively, PCR counsel did not perform ineffectively in failing to raise this

16   claim. *See Atwood*, 870 F.3d at 1060; *Sexton*, 679 F.3d at 1157. Johnson cannot show cause

17   under *Martinez* for the claim's default. Claim 20 is therefore denied.

**J.    Claim 21:**

19       Johnson argues that trial counsel "erred in not seeking a mistrial after arguing the

20   grand jury indictment was deficient because the grand jury did not consider any of the

21   aggravating circumstances." (Doc. 18 at 365.) Johnson did not raise this claim in state

22   court. Because the claim is meritless, its default is not excused by the ineffective assistance

23   of PCR counsel.

24       While due process guarantees defendants a fair trial, it does not require the states to

25   observe the Fifth Amendment's provision for presentment or indictment by a grand jury.

26   *Hurtado v. California*, 110 U.S. 516, 538 (1884); *Branzburg v. Hayes*, 408 U.S. 665, 688

27   n.25 (1972). Although Johnson contends that *Ring II*, 536 U.S. 584, and *Apprendi v. New*

28   *Jersey*, 530 U.S. 466 (2000), support his position, (*see* Doc. 18 at 369), in neither of those

cases did the Supreme Court address this issue, let alone hold that aggravating factors must be included in an indictment and subjected to a probable cause determination. *See Ring II*, 536 U.S. at 597 n.4; *see also McGill v. Ryan*, No. CV-12-01149-PHX-JJT, 2019 WL 160732, at *22 (D. Ariz. Jan. 10, 2019), *aff'd sub nom. McGill v. Shinn*, 16 F.4th 666. The Arizona Supreme Court has expressly rejected the argument that *Ring II* requires aggravating factors to be alleged in an indictment and supported by probable cause. *McKaney v. Foreman*, 209 Ariz. 268, 270 (2004).

Trial counsel did not perform ineffectively in failing to pursue a futile action. *Rupe*, 93 F.3d at 1445; *James*, 24 F.3d at 27. PCR counsel did not perform ineffectively in failing to raise a meritless claim of ineffective assistance of trial counsel. Claim 21 is therefore denied as procedurally defaulted and barred from federal review.

### K.    Claim 25:

Johnson argues that appellate counsel performed ineffectively. (Doc. 18 at 382.) The claim consists of ten separate allegations, which were raised during the PCR proceedings and denied by the PCR court. (PCR Pet. at 118-45; PCR Order, ME 1/28/15, at 23-34.) In his Petition for Review, Johnson cited his appellate ineffectiveness claims and incorporated by reference the arguments set forth in his PCR Petition. (Doc. 19-10, PR, at 19.) The parties again disagree whether this was sufficient to exhaust the claims. The Court again finds, under Ninth Circuit precedent, that it was. *See Gallegos*, 820 F.3d at 1026 n.15. Therefore, the Court will consider the claims on the merits.

The Fourteenth Amendment guarantees a criminal defendant the right to effective assistance of counsel on his first appeal. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). To prevail on a claim of ineffective assistance of appellate counsel, a petitioner must show that counsel's appellate advocacy fell below an objective standard of reasonableness and a reasonable probability that, but for counsel's deficient performance, the petitioner would have prevailed on appeal. *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000).

"[F]ailure to raise untenable issues on appeal does not fall below the *Strickland* standard." *Turner v. Calderon*, 281 F.3d 851, 872 (9th Cir. 2002) (citing *Featherstone v.*

1    *Estelle*, 948 F.2d 1497, 1507 (9th Cir. 1991)). Nor does appellate counsel have a

2    constitutional duty to raise every nonfrivolous issue requested by a petitioner. *Miller v.*

3    *Keeney*, 882 F.2d 1428, 1434 n.10 (9th Cir. 1989) (citing *Jones v. Barnes*, 463 U.S. 745,

4    751-54 (1983)); *see also Davila*, 582 U.S. at 533 ("Declining to raise a claim on

5    appeal . . . is not deficient performance unless that claim was plainly stronger than those

6    actually presented to the appellate court.").

7    **1.    Failure to Brief Independent Review and Challenge Aggravators**

8    Johnson first alleges that appellate counsel "failed to brief independent review,

9    failed to argue for a life sentence, and improperly called Johnson's mitigation '*de minimis*'

10   at oral argument." (Doc. 18 at 386-89.) The PCR court denied the claim on the merits,

11   explaining that while "appellate counsel generally should take the opportunity to argue the

12   weakness of aggravating factors," in this case "the (F)(6) aggravator was particularly strong

13   and onerous," with "uncontroverted evidence support[ing] witness elimination as a motive

14   for the murder of Stephanie Smith." (PCR Order, ME 1/28/15, at 31 & n.14.) The (F)(6)

15   factor was "coupled with the unchallenged (F)(2) aggravator, as well as the (F)(3)

16   aggravator." (*Id.* at 31.) The PCR court then noted that "[a]lthough appellate counsel may

17   have characterized mitigation as *de minimis*, on independent review the [Arizona] Supreme

18   Court independently reached the same determination." (*Id.* at 32) (citing *Johnson*, 212

19   Ariz. at 440) ("Balancing the *de minimis* mitigation against the three established

20   aggravating factors, we conclude that the mitigating circumstances are not sufficiently

21   substantial to call for leniency."). The PCR court concluded:

22   > Given the [Arizona] Supreme Court's obligation to perform an
       > independent review and given the strength of the aggravators,
23   > counsel's decision was reasonable. The defendant notes that
       > appellate counsel was subsequently admonished for failing to
24   > brief independent review; however, that does not mandate a
       > finding of deficient performance.[51] The Court finds the
25   > Supreme Court's determination to uphold the death sentence

26   ---

27   [51] In *Speer* the court noted that "[d]espite the failure of defense counsel to brief the issue,
     we are directed by A.R.S. § 13-755 to review the evidence of aggravating and mitigating

28   circumstances and independently determine whether death is the appropriate penalty." 221
     Ariz. 449, 463 (2009) (citation omitted)

1                        would not have changed had appellate counsel briefed
2                        independent review.

3 (*Id.*)

4        In *Rogovich v. Ryan*, 694 F.3d 1094, 1106-07 (9th Cir. 2012), the Ninth Circuit

5 denied a claim that appellate counsel performed ineffectively by failing to challenge an

6 aggravating factor. The court found that the defendant could not establish prejudice from

7 appellate counsel's performance because the Arizona Supreme Court, in its independent

8 review of defendant's death sentence, determined that the aggravating factor had been

9 proven. *Id.* at 1106. The Arizona Supreme Court carried out the same independent review

10 of Johnson's sentence, balancing the aggravating factors against "myriad of statutory and

11 nonstatutory mitigating circumstances" before determining that the latter were not

12 sufficiently substantial to call for leniency. *Johnson*, 212 Ariz. at 438-40. Like *Rogovich*,

13 Johnson "provides no basis for concluding that . . . appellate counsel . . . could have

14 convinced the state court to reach the opposite conclusion." *Rogovich*, 694 F.3d at 1106-07.

15 The Arizona Supreme Court's independent review prevents Johnson "from establishing

16 prejudice under *Strickland* for counsel's alleged failure to challenge the death penalty." *Id.*

17 at 1107 (citing *Gerlaugh v. Stewart*, 129 F.3d 1027, 1045 (9th Cir. 1997)).

18        Because Johnson cannot show he was prejudiced by appellate counsel's

19 performance, the PCR court's denial of this claim was not contrary to or an unreasonable

20 application of clearly established federal law. The Court also rejects Johnson's argument

21 that the PCR court made an unreasonable factual determination when it found that the

22 Arizona Supreme Court independently weighed the mitigation evidence rather than, as

23 Johnson proposes, simply basing its conclusion on appellate counsel's description of the

24 evidence of *de minimis*.

25        For the same reasons, Johnson's claim that appellate counsel performed

26 ineffectively by failing "to appropriately challenge the aggravators" is also meritless, as

27 the PCR court found. (PCR Order, ME 1/28/15, at 29-31.) The Arizona Supreme Court

28 independently found that the aggravators existed. *Johnson*, 212 Ariz. at 438-40. As the

1  PCR court correctly noted, in doing so, the Arizona Supreme Court considered the factual

2  sufficiency of the evidence supporting the factors. *Id.* This forecloses a finding that Johnson

3  was prejudiced by appellate counsel's performance. *Rogovich*, 694 F.3d at 1106-07.

### 2.    Failure to Appeal Prosecutorial Misconduct

5      Johnson argues that appellate counsel performed ineffectively by failing to appeal

6  the admission of false or misleading testimony elicited by the State; the denial of trial

7  counsel's objection to prosecutorial vouching; the denial of trial counsel's objection to the

8  presentation of Johnson's other bad acts; the trial court's *Batson* ruling; and violations of

9  Johnson's right to be tried by a fair and impartial jury. (Doc. 18 at 390-94.)

10      As discussed above in Claim 3, there were no instances of prosecutorial misconduct

11  and there was no *Batson* violation. Appellate counsel's failure to raise such claims did not

12  prejudice Johnson or constitute ineffective assistance of counsel. *See Smith*, 528 U.S. at

13  285-86; *Miller*, 882 F.2d at 1434-35. The PCR court's denial of the claim (PCR Order, ME

14  1/25/18, at 28-29) was neither contrary to nor an unreasonable application of clearly

15  established federal law, nor was it based on an unreasonable determination of the facts.

### 3.    Failure to Appeal Denial of Jury Instructions on Non-Statutory Mitigators

18      As the PCR court correctly noted, appellate counsel *did* raise this issue. (Opening

19  Br. at 64.) The Arizona Supreme Court denied the claim. *Johnson*, 212 Ariz. at 436-37.

20  The court noted that: "[t]he Supreme Court has rejected the argument that judges should

21  instruct capital juries on specific mitigating factors." *Id.* at 437 (citing *Buchanan v.*

22  *Angelone*, 522 U.S. 269, 270 (1998)). The PCR court reasonably found that because the

23  Arizona Supreme Court considered and rejected the claim, "appellate counsel's

24  performance was not deficient." (ME 1/28/15 at 32.)

### 4.    Failure to Appeal the Denial of Continuance

26      Johnson was convicted in November 2001. Six continuances delayed the sentencing

27  hearing from the originally scheduled date of February 22, 2002, to January 9, 2003.

28  Johnson moved for a continuance of that date and, when the trial court denied the motion,

filed a special action with the Arizona Court of Appeals, which accepted jurisdiction and granted relief. (IOR 872, Ex. 15.) In an order dated February 21, 2003, the Court of Appeals stated that "[t]he record in this case leaves us with the impression that, because of budgetary concerns, petitioner has not been provided with adequate resources to mount a reasonable mitigation defense" and that Johnson had demonstrated "good cause justifying a continuance" of the January 2003 sentencing hearing.[52] (*Id.* at 4, 7.) Explaining that the trial court "is in a superior position to determine the appropriate length of the continuance and because the circumstances justifying a continuance are subject to change," the Court of Appeals left it to the trial court to determine the length of the continuance. (*Id.* at 7.)

In denying the claim that appellate counsel performed ineffectively by failing to raise this issue, the PCR court explained:

> The defendant asked for and was granted numerous continuances. Other than the denial of his December 2002 motion to continue, renewed in January 2003, which was taken up on Special Action to the Court of Appeals and served to effectively delay sentencing for ten months (from January 2003 to December 2003), defendant points to no specific continuance that was denied.

(PCR Order, ME 1/28/15, at 32.)

Johnson contends that this decision was unreasonable because it "ignored the main issue—the court's denial of his requested continuance after the Court of Appeals remanded where the continuance issue should have been appealed." (Doc. 44 at 295.) He also contends the trial court erred, and contradicted the ruling of the Court of Appeals, in finding that the defense was responsible for any delay. (*Id.*) Neither of these arguments is persuasive.

On remand, at a hearing in April 2003, Johnson asked the court for a trial date of January 1, 2004, based on the remaining mitigation work. (RT 4/11/03 at 5.) Johnson's former mitigation specialist, Pam Siller, and her supervisor, Mary Durand, acknowledged

---

[52] The court added, however, that "[t]o some extent, [Johnson] and his family contributed to this situation by refusing to fully cooperate with [mitigation specialist Nora] Shaw, allegedly because of cultural mistrust." (IOR 872, Ex. 15 at 5-6.)

that no mitigation work had been completed since the Court of Appeals issued its decision. (*See id.* at 8, 48-49.) The trial court, finding that the defense had not exercised "reasonable diligence" by "virtually stand[ing] pat during this past three months," set a date of September 16, 2003, for the beginning of the penalty phase. (*See* ME 4/11/03.) That date was extended to November 12, 2003, however, and Johnson did not begin presenting his mitigation case until December 15, 2003, less than a month earlier than the date of the continuance sought by Johnson's defense team at the April hearing on remand.

The PCR court's denial of this claim was not "objectively unreasonable." *Hurles*, 752 F.3d at 787 (citing *Richter*, 562 U.S. at 103). The claim was not "clearly stronger than those presented" on appeal, and Johnson has not met his burden of showing a reasonable likelihood that the Arizona Supreme Court would have reversed his sentence if the claim had been raised. *Smith*, 528 U.S. at 285, 288.

### 5.    Failure to Preserve Constitutional Challenges to the Death Penalty

Johnson argues that appellate counsel performed ineffectively by failing to raise "many meritorious challenges to the death penalty." (Doc. 18 at 403.) The PCR court denied this claim, finding that "Appellate counsel's performance is not deficient for failing to raise meritless claims." (PCR Order, ME 1/28/15, at 34.)

The PCR court reasonably determined that this claim fails because the challenges to the death penalty appellate counsel did not raise are without merit. Of the ten claims listed by Johnson, the Court addresses and denies five on the merits elsewhere in this order.[53] Each of the remaining claims is also meritless, so appellate counsel's failure to raise them cannot constitute ineffective assistance. *Turner*, 281 F.3d at 872.

Johnson argues that the death penalty is *per se* cruel and unusual punishment. (Doc. 18 at 403.) Supreme Court precedent holds that the death penalty does not constitute cruel

---

[53] These consist of Claim 38 (unconstitutionality of lethal injection), Claim 30(H) (death penalty applied in a racially discriminatory manner), Claim 22 (improper reasonable doubt instruction), Claim 3(D)(3) (prosecutor improperly urged a causal nexus test for mitigation), and Claim 37 (execution after prolonged incarceration on death row).

1    and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 169 (1976); *see also Glossip v.*

2    *Gross*, 576 U.S. 863, 881 (2015) ("[W]e have time and again reaffirmed that capital

3    punishment is not per se unconstitutional.").

4          Johnson alleges that "the death penalty is the irreversible denial of human rights and

5    the international community has evolved to a state of maturity that proscribes the death

6    penalty." (Doc. 18 at 406.) However, he cites no Supreme Court precedent holding that

7    capital punishment is illegal in this country based on international law, and "such

8    challenges to imposition of the death penalty have been repeatedly rejected." *Catlin v.*

9    *Davis*, No. 1:07-CV-01466-LJO-SAB, 2019 WL 6885017, at *230 (E.D. Cal. Dec. 17,

10   2019); *see Carter v. Chappell*, No. CV-06-4532 RGK, 2013 WL 781910, at * 80 (C.D.

11   Cal. Mar. 1, 2013) ("Clearly established federal law does not hold the death penalty to

12   violate international law or the federal Constitution."); *Rowland v. Chappell*, 902 F. Supp.

13   2d 1296, 1339 (N.D. Cal. 2012). In *Coleman v. Mitchell*, 268 F.3d 417 (6th Cir. 2001), the

14   Sixth Circuit explained that "the claim that international law completely bars this nation's

15   use of the death penalty . . . is unsupportable since the United States is not party to any

16   treaty that prohibits capital punishment per se, and since total abolishment of capital

17   punishment has not yet risen to the level of customary international law." *Id.* at 443 n.12

18   (citation omitted); *see also Medellin v. Dretke*, 544 U.S. 660, 664 (2005); *Sosa v.*

19   *Alvarez-Machain*, 542 U.S. 692, 734-35 (2004).

20         Johnson argues that various constitutional rights were violated by "[t]he failure to

21   provide the jury with a special verdict on Johnson's proffered mitigation, including specific

22   findings of fact and conclusions of law reviewable by an appellate court." (Doc. 18 at 405.)

23   The Constitution does not require a capital sentencer to document its analysis of mitigating

24   circumstances, as long as the sentencer considers all of the evidence. *See Jeffries v.*

25   *Blodgett*, 5 F.3d 1180, 1197 (9th Cir. 1993) ("[D]ue process does not require that the

26   sentencer exhaustively document its analysis of each mitigating factor as long as a

27   reviewing federal court can discern from the record that the state court did indeed consider

28   all mitigating evidence offered by the defendant." (citing *Parker v. Dugger*, 498 U.S. 308,

314-19 (1991)); *see also Jeffers v. Lewis*, 38 F.3d 411, 418 (9th Cir. 1994) (explaining that a defendant is not "entitled to a specific listing and discussion of each piece of mitigating evidence under federal constitutional law"); *Speer*, 2023 WL 2503733, at *76.

Finally, Johnson asserts that the "impenetrable complexity" of Arizona's death penalty statute "renders it vague, and its application irrational and arbitrary." (Doc. 18 at 407.) There is no authority holding that Arizona's death penalty statute is unconstitutional, on that or any other basis.

Appellate counsel did not perform ineffectively in failing to raise these meritless claims. The PCR court's denial of these claims was objectively reasonable.

Claim 25 is denied.

**L.    Claim 26:**

Johnson argues that trial and appellate counsel violated *McCoy v. Louisiana*, 584 U.S. 414 (2018), by, respectively, conceding Johnson's death eligibility and conceding his guilt. (Doc. 18 at 409.) Johnson did not raise this claim in state court and asserts ineffective PCR counsel is to blame.

In *McCoy*, decided in 2018, the Supreme Court held that "a defendant has the right to insist that counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty." 584 U.S. at 417. The Court explained that "it is the defendant's prerogative, not counsel's, to decide on the objective of his defense: to admit guilt in the hope of gaining mercy at the sentencing stage, or to maintain his innocence, leaving it to the State to prove his guilt beyond a reasonable doubt." *Id.* at 417-18. "[B]ecause a client's autonomy, not counsel's competence, is in issue," *Strickland* does not apply and the defendant need not prove prejudice. *Id.* at 426. "Violation of a defendant's Sixth Amendment-secured autonomy" is structural error "not subject to harmless-error review." *Id.* at 427.

This Court previously determined, in a 2019 order denying Johnson's motion for a stay to exhaust his *McCoy* claim in state court, that *McCoy* did not "announce a watershed rule of criminal procedure, so it doesn't apply retroactively." (Doc. 32 at 4.) Subsequently,

in *Christian v. Thomas*, 982 F.3d 1215 (9th Cir. 2020), the Ninth Circuit Court of Appeals considered whether a petitioner could bring a successive habeas corpus claim pursuant to *McCoy* under 28 U.S.C. § 2244(b)(2)(A), which allows for successive petitions when the second petition is based on a new rule of constitutional law "made retroactive on collateral review by the Supreme Court." 982 F.3d at 1222-23. After noting that the Court did not explicitly make *McCoy* retroactive and retroactivity was not "logically dictate[d]" by prior Supreme Court holdings, the Ninth Circuit concluded that "that the Supreme Court has not made *McCoy v. Louisiana* retroactive to cases on collateral review." *Id.* at 1224-25; *see also Smith v. Stein*, 982 F.3d 229, 235 (4th Cir. 2020) ("[W]e hold that the rule announced in *McCoy v. Louisiana*, . . . is not retroactively applicable on collateral review.").

Even if *McCoy* applied retroactively to Johnson's case, Claim 26 would fail. In *McCoy*, defense counsel ignored the defendant's express instructions to maintain his innocence. Counsel told the jurors in his guilt-phase opening statement that it would be impossible for them to hear the prosecution's evidence and not find the defendant guilty, conceded that "my client committed three murders," reiterated in his closing argument that the defendant was guilty, and told the jury he was taking the "burden off of" the prosecution. 584 U.S. at 418-19. The defendant "vociferously" maintained his innocence and "adamantly objected to any admission of guilt." *Id.* at 417. As the Supreme Court put it, the defendant "opposed [counsel's] assertion of his guilt at every opportunity, before and during trial, both in conference with his lawyer and in open court." *Id.*

It was the defendant's vehement opposition to his counsel's concession-of-guilt strategy that distinguished *McCoy* from *Florida v. Nixon*, 543 U.S. 175 (2004), which held that when counsel confers with the defendant and the defendant neither approves nor disapproves of counsel's proposed concession strategy, "no blanket rule demands the defendant's explicit consent" to implement that strategy. *McCoy* 584 U.S. at 417 (quoting *Nixon*, 543 U.S. at 192) (citation modified).

Johnson claims that trial counsel violated *McCoy* when he made the following statement at the opening of the aggravation phase of trial:

1

2

3

4

5

> Now, we will go through some of the facts of these situations, because they may be relevant here in making determinations, and they may be relevant later as well. If we get to the other stage, and, you know, folks, we are probably going to get to the second stage, so that's why it is important to listen to everything now so that you will have that information when we get to this second stage, so you ultimately decide that. But, you know, I am not going to sit here and look you in the eye and tell you that we're not, because we are.

6

(Doc. 18 at 411[54] (quoting RT 11/25/03 at 10)).

7

8

There is no record of Johnson expressing any opposition to this concession or quasi-concession. Because counsel did not pursue this strategy over Johnson's objection, *McCoy* does not apply. Counsel did not perform ineffectively under *Strickland* by telling the jury that the case was likely to proceed to the "second", penalty, stage. Johnson had been convicted of armed robbery, a serious offense under the (F)(2) aggravating factor. Because at least one aggravating factor existed, there was no question that the case would in fact proceed to the penalty phase. A.R.S. § 13-752(F). This was the reality that counsel was acknowledging in his opening statement. (*See* RT 11/25/03 at 10-11.)

9

10

11

12

13

14

15

16

Johnson also argues that appellate counsel violated *McCoy* by conceding his guilt throughout the appellate brief. (Doc. 18 at 413-14) (citing Opening Br., Doc. 18, Ex. 3). Johnson cites no authority, and the Court has found none, suggesting that *McCoy* applies to appellate proceedings. Nothing in *McCoy* indicates that its holding extends beyond the context of a criminal trial. *See* 584 U.S. at 421-23 (contrasting counsel's role in "trial management"—"making decisions such as what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence"—with defendant's "[a]utonomy to decide the objective of the defense," including "insist[ing] on maintaining her innocence in the guilt phase of a capital trial").

17

18

19

20

21

22

23

24

25

26

In addition, the "concessions of guilt" identified by Johnson in the appellate brief reflect appellate counsel's description of the evidence at trial (*see* Opening Br. at 12), by which a jury convicted Johnson and found the three aggravating circumstances, and her

27

28

---

[54] In his petition, Johnson abridges this quote to eliminate the first sentence of this paragraph and the opening clause of the second. (Doc. 18 at 411.)

1  legal challenges based on that evidence. Finally, Johnson did not, as required by *McCoy*,

2  object to appellate counsel's arguments, and under *Nixon*, 543 U.S. at 192, counsel was not

3  required to obtain Johnson's consent to make those arguments.

4        Claim 26 is denied.

5      **M.**    **Claim 27:**

6        Johnson argues that trial counsel performed ineffectively by "failing to request an

7  instruction to caution the jury that multiple witnesses' testimony should be examined with

8  greater caution due to receipt of government benefits." (Doc. 18 at 416.) Johnson cites the

9  testimony of Hansen and Newberry but also speculates that Biondo and Justice received

10  promises of leniency. (*Id.* at 416-18 & n.127.) Johnson did not raise this claim in state

11  court. He contends that its default is excused by the ineffective assistance of PCR counsel.

12  (*Id.* at 416.)

13        The Ninth Circuit Court of Appeals has held that an informant instruction may be

14  necessary when the informant's testimony is uncorroborated by other evidence.[55] *See*

15  *United States v. Bosch*, 914 F.2d 1239, 1247 (9th Cir. 1990). In *Bosch*, the court found that

16  trial counsel may have performed deficiently in failing to request such an instruction but

17  that the omission of the instruction was not prejudicial. *Id.* The court noted that the

18  witness's testimony was partially corroborated, the trial court gave "general credibility

19  instructions," and counsel had questioned the witness's credibility in his closing

20  arguments. *Id.* at 1248. The same circumstances apply to Johnson's case, with the

21  additional factor that the trial court *did* provide an informant/accomplice instruction.

22        At the guilt phase of Johnson's trial, the court's opening instructions informed the

---

[55] Other circuits differ. The Seventh Circuit, for example, has noted, "[a]s far as we can make out, this court has never reversed a criminal conviction for failure to give an instruction stating that informants' testimony should be given special scrutiny" and that, "[n]othing the Supreme Court has said makes a special informant instruction obligatory. Only two of its cases bear on the subject." *United States v. Cook*, 102 F.3d 249, 253 (7th Cir. 1996). The court concluded: "we think it adequate, in the main, to give a general credibility instruction referring to the possibility of bias, which coupled with cross-examination and closing argument by counsel will put the subject before the jury for decision." *Id.*

jurors that they must determine how much weight to give each witness's testimony; in doing so they were to consider whether the witness had "any motive, bias, or prejudice." (RT 11/5/01 at 22.) The trial court repeated this general credibility instruction at the close of the guilt phase before adding:

> You should consider the testimony of each witness in the light of all the rest of the evidence. You have heard evidence that a witness who testified in this trial did so pursuant to a plea agreement with the State. You are instructed that neither this court nor any other has determined whether any witness has complied with the terms of the plea agreement. You and you alone are the sole judges of each witness's credibility, including any witness who has a plea agreement with the State.

(RT 11/26/01 at 12-13.)

In addition, any potential prejudice from the omission of additional instructions was offset by defense counsel's cross-examination of Newberry and Hansen and by his closing argument. (RT 11/7/01 at 89, 105-131; RT 11/14/01 at 64-77; RT 11/26/01 at 70, 87.) Under these circumstances, Johnson cannot show he was prejudiced by counsel's failure to seek an informant instruction. *See United States v. Holmes*, 229 F.3d 782, 787 (9th Cir. 2000) ("Although this instruction did not expressly inform the jury that the testimony of a paid informant witness should be examined with greater caution than that of an ordinary witness, it did advise the jury in a clear fashion to scrutinize the credibility of a witness who had received money or benefits from the government.")[56]; *United States v. Hoyos*, 573 F.2d 111, 1116 (9th Cir. 1978) (finding no prejudice where defense counsel was allowed extensive cross-examination to explore any bias or prejudice and the trial court gave a general credibility instruction "which admonished the jurors to examine 'whether the witness had any motive for not telling the truth' and 'whether the witness has any interest in the outcome of this case'").

The underlying claim that trial counsel performed ineffectively by failing to request

---

[56] The instruction provided: "In considering the testimony of a witness, you may take into account . . . the witness' interest in the outcome of the case and any bias, prejudice, and whether the witness received money or benefits from the Government in connection with the case . . . and any other factors that bear on believability." *Holmes*, 229 F.3d at 787.

1    an informant instruction is without merit. PCR counsel did not perform ineffectively in

2    failing to raise the claim. *See Atwood*, 870 F.3d at 1060; *Sexton*, 679 F.3d at 1157. Johnson

3    therefore cannot show cause under *Martinez* for the claim's default. Claim 27 is denied as

4    procedurally defaulted and barred from federal review.

5         **N.    Claim 28:**

6         Johnson argues that trial counsel performed ineffectively by failing to challenge the

7    prosecution's handwriting analysis.[57] (Doc. 18 at 422.) He argues that reasonable counsel

8    would have moved to exclude the testimony of the State's expert as "standardless and

9    subjective" and retained a handwriting expert who "could have educated the jurors

10   regarding the unreliable and subjective methodology used by the State's expert." (*Id.* at

11   427-32.) Johnson did not raise this claim in state court. He argues that under *Martinez* its

12   default is excused by the ineffective assistance of PCR counsel. (*Id.* at 422.)

13        Respondents contend that the claim is meritless. They argue that it would have been

14   futile for counsel to seek exclusion of the State's handwriting evidence because such

15   evidence is admissible in Arizona courts and the witness, John Hsueh, a forensic document

16   examiner with the Phoenix Crime Lab, was qualified to testify as an expert under Rule 702

17   of the Arizona Rules of Evidence based on his training and experience. (Doc. 37 at 227.)

18        Arizona courts have consistently allowed handwriting analysis evidence under Rule

19   702. *See State v. Riley*, 248 Ariz. 154, 166 (2020); *State v. Mathers*, 165 Ariz. 64, 71

20   (1990); *State v. Saunders*, No. 1 CA-CR 15-0416, 2016 WL 3264105, at *3 (Ariz. App.

21   June 14, 2016). Hsueh was an expert as defined by Rule 702. He had worked at the crime

22   lab for six years. (RT 11/15/01 at 115.) He also had been trained by the lab's senior

23   questioned-document examiner, attended classes by the FBI and Secret Service, and read

24   books and articles about handwriting and questioned documents. (*Id.*) Hsueh had been

25   qualified as an expert in both Maricopa and Pinal County. (*Id.*) Counsel did not perform

26   ineffectively by failing to challenge the admissibility of Hsueh's testimony.

27

28   [57] The State's handwriting expert testified that writings found at Hanson's home matched
     known samples of Johnson's handwriting. (*See, e.g.*, RT 11/15/2001 at 123, 129-39.)

With respect to Johnson's claim that counsel performed ineffectively by not hiring a defense handwriting expert, Respondents argue it fails because Johnson did not identify the witness, describe what the witness's testimony would have been, and explain how the testimony would have affected the outcome of the trial. (Doc. 37 at 228 (citing *Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997)); *see United States v. Murray*, 751 F.2d 1528, 1535 (9th Cir. 1985); *United States v. Harden*, 846 F.2d 1229, 1231-32 (9th Cir. 1988)).

In his habeas petition Johnson did not identify such an expert; instead, he referred to an exhibit containing criticisms of the practice of handwriting analysis. (Doc. 18 at 431-32; Doc. 21-15, Ex. 75.) In his reply brief, Johnson countered Respondents' argument by identifying Mark Denbeaux, a law professor at Seton Hall and the author of the report found at Exhibit 75, as an "expert willing to testify." (Doc. 44 at 320.)

Denbaux's report, which also criticizes Hsueh's qualifications and practices, is dated December 4, 2018. (Doc. 21-15, Ex. 75 at 27.) The Court may not consider this new evidence unless the "stringent requirements" of 28 U.S.C. § 2254(e)(2) are met. *Ramirez*, 596 U.S. at 389; *see id.* at 382 ("[U]nder § 2254(e)(2), a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel.").

Johnson does not attempt to satisfy § 2254(e)(2). This claim does not rely on a new, retroactive rule of constitutional law; nor does it rely on a factual predicate that could not have been discovered previously through due diligence. Denbaux's report contains no information that did not exist at the time of Johnson's state court proceedings.

For the reasons stated above, Johnson's underlying claim of ineffective assistance is without merit. Johnson has not shown, therefore, that PCR counsel performed ineffectively in failing to raise it. *See Atwood*, 870 F.3d at 1060; *Sexton*, 679 F.3d at 1157. Johnson cannot demonstrate cause under *Martinez* for the claim's default. Claim 28 is therefore denied as procedurally defaulted and barred from federal review.

**O.    Claim 34:**

As previously noted, this claim consists of two allegations. Johnson alleges that his

1    rights under the Fifth and Fourteenth Amendments were violated when the trial court

2    denied his motion for a mistrial after Russell Biondo testified that Johnson groped

3    Stephanie Smith during the Affordable Massage robbery, and that counsel performed

4    ineffectively in failing to seek a limiting instruction. (Doc. 18 at 476.) He acknowledges

5    that he did not raise either subclaim in state court. (*Id.*) The alleged ineffectiveness of PCR

6    counsel cannot excuse the default of the first subclaim—denial of the defense motion for a

7    mistrial—because *Martinez* applies only to claims of ineffective assistance of trial counsel.

8    *Martinez (Ernesto)*, 926 F.3d at 1225; *Pizzuto*, 783 F.3d at 1177; *Hunton*, 732 F.3d at

9    1126-27. That subclaim is procedurally defaulted and barred from federal review.

10       Johnson's defaulted allegation that trial counsel was ineffective for failing to request

11    a limiting instruction is meritless, so PCR counsel's failure to raise the claim does not

12    constitute ineffective assistance for purposes of *Martinez*.

13       Biondo testified that during the robbery he saw a man standing behind Smith, who

14    was larger than her, holding her "around the chest" and "[g]roping" her. (RT 11/6/01 at

15    113-14.) He testified that he was upset by what he saw and had no doubt Johnson was the

16    man holding Smith. (*Id.* at 116.) After the "groping" testimony, defense counsel asked the

17    judge for and was granted an opportunity to recross Biondo. (*Id.*) He also asked for a

18    mistrial, arguing that the prosecutor's questioning exceeded the scope of cross-examination

19    and that the evidence was irrelevant and unduly prejudicial. (*Id.* at 163-64.) The court

20    denied the motion, finding that Biondo had been subjected "to some rather intense

21    cross-examination" and that his ability to perceive and remember details was relevant in

22    determining the weight the jury should give to his testimony. (*Id.* at 165.)

23       Johnson argues that counsel performed ineffectively by failing to seek an instruction

24    limiting the jury's "consideration of the groping testimony to Biondo's state of mind." (*Id.*

25    at 481.) In general, the decision not to request a limiting instruction is "solidly within the

26    acceptable range of strategic tactics employed by trial lawyers in the mitigation of damning

27    evidence." *Musladin*, 555 F.3d at 846 (quoting *United States v. Gregory*, 74 F.3d 819, 823

28    (7th Cir. 1996)); *see Albrecht v. Horn*, 485 F.3d 103, 127 (3d Cir. 2007) ("Trial counsel is

not constitutionally required to request a limiting instruction any time one could be given, because counsel might reasonably conclude that such an instruction might inadvertently call attention to the evidence of prior bad acts."). Johnson has not overcome the presumption that the decision not to request a limiting instruction was a reasonable tactic designed to avoid highlighting Biondo's groping testimony. *See Strickland*, 466 U.S. at 689. Johnson has also failed to show he was prejudiced. *See, e.g.*, *Berghuis v. Thompkins*, 560 U.S. 370, 390-91 (2010) (failure to request an instruction that the jury could consider accomplice's acquittal in prior trial only in assessing his credibility and not as substantive evidence of defendant's guilt, was not prejudicial in light of other evidence of his guilt, including the surviving victim's identification of defendant as the shooter); *Albrecht*, 485 F.3d at 128-29 ("The ample if not overwhelming evidence of Albrecht's guilt . . . supports the conclusion that he suffered no prejudice as a result of counsel's deficient performance in not seeking a limiting instruction.").

Trial counsel's failure to seek a limiting instruction violated neither prong of *Strickland*. Because this underlying claim of ineffective assistance lacks merit, PCR counsel did not perform ineffectively, and the cause requirement of *Martinez* is not satisfied. *See Atwood*, 870 F.3d at 1060; *Sexton*, 679 F.3d at 1157. The claim remains procedurally defaulted and barred from federal review.

## III.    Challenges to Death Penalty

Johnson raises several constitutional objections to his death sentence, Arizona's death penalty scheme, and to capital punishment in general. These challenges include both exhausted and unexhausted claims. All are meritless.

### A.    Claim 19:

Johnson argues that the "imposition of the death penalty on persons twenty-one and younger at the time of the offense constitutes cruel and unusual punishment." (Doc. 18 at 342.) Johnson did not raise this claim in state court. It is procedurally defaulted and barred from federal review. It is also meritless because, notwithstanding the "emerging medical and societal consensus" discussed by Johnson, the claim is unsupported by any controlling

authority. (*Id.* at 346-48.)

Johnson cites *Roper v. Simmons*, 543 U.S. 551, 578 (2005), which placed a categorical ban on the execution of persons under the age of 18. "*Roper* is clear in its holding," however, and Johnson's argument that it should be expanded beyond an offender's chronological age "runs into a hard wall of precedent," including subsequent Supreme Court rulings which "support the principle that age eighteen is a valid dividing line between juveniles and adults in an Eighth Amendment context." *United States v. Johnson*, No. CR 17-201, 2020 WL 8881711, at *3 (E.D. La. July 13, 2020) (citing *Miller v. Alabama*, 567 U.S. 460 (2012), and *Graham v. Florida*, 560 U.S. 48 (2011)). "The Court drew this line well aware of the 'objections always raised against categorical rules.'" *United States v. Mitchell*, 502 F.3d 931, 981 (9th Cir. 2007) (citing *Roper*, 543 U.S. at 574).

"Although policy arguments may support an extension of the law to prohibit a death sentence for an offender who is developmentally juvenile," this Court's analysis is "confined to a consideration of constitutional law as it presently stands." *In re Garner*, 612 F.3d 533, 536 (6th Circ. 2010); *see United States v. Bernard*, 762 F.3d 467, 482 (5th Cir. 2014) (finding "no legal support for [the defendant]'s argument" that he was ineligible for the death penalty because he was nineteen years old at the time of the offense but "operating at a much lower mental age"); *Mitchell*, 502 F.3d at 981 (rejecting argument "that it would violate the Eighth Amendment to sentence him to death because of his age and maturity level").

Claim 19 is denied.

**B.    Claim 30:**

Johnson argues that several aspects of Arizona's capital sentencing scheme are unconstitutional. (Doc. 18 at 441.) The claim consists of eight subclaims, 30(A) to 30(H). Johnson contends that he presented subclaims (A), (C), (E), (G), and (H) in state court. (*Id.*) Respondents concede that Johnson raised subclaims (A), (C), and (E) on direct appeal. (*See* Doc. 37 at 235-39.) The Arizona Supreme Court's denial of those claims, *Johnson*, 212 Ariz. at 440-41, was neither contrary to nor an unreasonable application of clearly

1    established federal law.

2         In subclaim (A), Johnson argues that Arizona's capital-sentencing framework is

3    unconstitutional because it creates a "presumption of death."[58] (Doc. 18 at 442.) The

4    Supreme Court has held, however, that Arizona's death penalty statute is not impermissibly

5    mandatory and does not create a presumption in favor of death. *Walton v. Arizona*, 497

6    U.S. 639, 651-52 (1990), *overruled on other grounds by Ring II*, 536 U.S. 584; *see Kansas*

7    *v. Marsh*, 548 U.S. 163, 173-75 (2006) (upholding death penalty statute which directs

8    imposition of the death penalty when the state has proved that mitigating factors do not

9    outweigh aggravators); *Smith*, 140 F.3d at 1272 (rejecting a challenge to the "mandatory"

10   quality of Arizona's death penalty statute).

11        In subclaim (C), Johnson argues that Arizona's capital-sentencing scheme is

12   unconstitutional because it does not include objective standards to guide the sentencer in

13   weighing the aggravating factors and mitigating circumstances. (Doc. 18 at 446.) This

14   claim is meritless. The Supreme Court has held that a capital sentencer "need not be

15   instructed how to weigh any particular fact in the capital sentencing decision." *Tuilaepa v.*

16   *California*, 512 U.S. 967, 979 (1994); *see Marsh*, 548 U.S. at 175 ("In aggregate, our

17   precedents confer upon defendants the right to present sentencers with information relevant

18   to the sentencing decision and oblige sentencers to consider that information in determining

19   the appropriate sentence. The thrust of our mitigation jurisprudence ends here."); *Franklin*

20   *v. Lynaugh*, 487 U.S. 164, 179 (1988) ("[W]e have never held that a specific method for

21   balancing mitigating and aggravating factors in a capital sentencing proceeding is

22   constitutionally required.").

23        In subclaim (E), Johnson argues that Arizona's "heinous, cruel, or depraved"

24   aggravating circumstance is vague and fails to channel the sentencer's discretion. (Doc. 18

25   at 449.) The United States Supreme Court and the Ninth Circuit have upheld Arizona's

26   ───────────────

27   [58] Johnson cites A.R.S. § 13-703(E), which provides that "the trier of fact shall impose a
     sentence of death if the trier of fact finds one or more of the aggravating
28   circumstances . . . and then determines that there are no mitigating circumstances
     sufficiently substantial to call for leniency."

death penalty statute against assertions that certain aggravating factors, including the (F)(6) factor, do not adequately narrow the sentencer's discretion. *See Jeffers*, 497 U.S. at 774-77; *Walton*, 497 U.S. at 652-56. In *Walton*, the Supreme Court held that the "especially heinous, cruel or depraved" aggravating circumstance was facially vague, but the vagueness was remedied by the Arizona Supreme Court's clarification of the factor's meaning. 497 U.S. at 654; *see also Smith v. Ryan*, 823 F.3d 1270, 1294-95 (9th Cir. 2016). Johnson argues that *Walton* no longer controls after Arizona switched to jury sentencing in capital cases. (Doc. 18 at 451.) This argument is unpersuasive. "There is no clearly established federal law holding that jury instructions based on the Arizona Supreme Court's narrowing construction are inadequate." *Dixon v. Ryan*, No. CV-14-258-PHX-DJH, 2016 WL 1045355, at *45 (D. Ariz. Mar. 16, 2016), *aff'd*, 932 F.3d 789 (9th Cir. 2019).

Johnson acknowledges that he did not present subclaims (B), (D), and (F) in state court. (Doc. 18 at 441.) Johnson's argument that their default is excused by the ineffective assistance of trial and PCR counsel fails for the reasons discussed throughout this order. *See Martinez (Ernesto)*, 926 F.3d at 1225; *Pizzuto*, 783 F.3d at 1177; *Hunton*, 732 F.3d at 1126-27; *Edwards*, 529 U.S. at 45; *Carrier*, 477 U.S. at 489-90.

Johnson also argues that "the Arizona Supreme Court considered all of these issues under its duty of independent review, and arguably this claim is exhausted." (Doc. 18 at 441.) Again, the Arizona Supreme Court's independent review of the facts establishing the aggravating and mitigating factors and the sentence imposed "does not exhaust all claims of constitutional error." *Wood*, 693 F.3d at 1122. The allegations contained in Claim 30 "are not included in the scope of the Arizona Supreme Court's independent review of the death sentence as defined by that court, and therefore were not exhausted." *Moormann*, 426 F.3d at 1058. Subclaims (B), (D), and (F) are procedurally defaulted and barred from federal review.

In addition, subclaims (B), (D), and (F) are meritless. In subclaim (B), Johnson argues Arizona's death penalty scheme is unconstitutional because it "does not require the

sentencer to find aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt." (Doc. 18 at 444.) For this argument he relies on *Hurst v. Florida*, 577 U.S. 92 (2016). (*Id.* at 444-45.) Contrary to Johnson's argument, however, *Hurst* does "not apply retroactively on collateral review." *McKinney v. Arizona*, 589 U.S. 139, 145 (2020); *see Ybarra v. Filson*, 869 F.3d 1016, 1032-33 (9th Cir. 2017).

Even if *Hurst* does apply retroactively, Johnson would not be entitled to relief. In *Hurst* the Court held that Florida's capital sentencing scheme, in which a jury rendered an advisory verdict while the judge made the ultimate factual determinations necessary to sentence a defendant to death, violated *Ring II*, 536 U.S. 584. *Hurst*, 577 U.S. at 98, 102-03. The Court held that this procedure was invalid because it "does not require the jury to make the critical findings necessary to impose the death penalty." *Id.* The Court did not hold that a jury is required to find beyond a reasonable doubt that the aggravating factors outweigh the mitigating circumstances. *See United States v. Tsarnaev*, 968 F.3d 24, 88-89 (1st Cir. 2020) (*Hurst* "made no holding regarding [the] determination . . . that the mitigators do not outweigh the aggravators"), *rev'd on other grounds*, 595 U.S. 302 (2022).

In *McKinney*, 589 U.S. at 144, the Court reiterated that while "a jury must find the aggravating circumstance that makes the defendant death eligible . . . , in a capital sentencing proceeding just as in an ordinary sentencing proceeding, a jury (as opposed to a judge) is not constitutionally required to weigh the aggravating and mitigating circumstances or to make the ultimate sentencing decision within the relevant sentencing range." Thus, *Ring II* and *Hurst* "did not require jury weighing of aggravating and mitigating circumstances." *Id.* at 145. If jury weighing is not constitutionally required, there cannot be a constitutionally required standard for that weighing. Subclaim (B) is meritless as well as procedurally defaulted and barred from review.

In subclaim (D), Johnson argues that Arizona's death penalty scheme is unconstitutional because it "does not sufficiently channel the discretion of the sentencing authority." (Doc. 18 at 446.) Arizona's death penalty scheme allows only certain statutorily defined aggravating factors to be considered in determining death eligibility. "The presence

of aggravating circumstances serves the purpose of limiting the class of death-eligible defendants, and the Eighth Amendment does not require that these aggravating circumstances be further refined or weighed by [the sentencer]." *Blystone v. Pennsylvania*, 494 U.S. 299, 306-07 (1990). Again, the Supreme Court and the Ninth Circuit have upheld Arizona's death penalty statute against allegations that its aggravating factors do not adequately narrow the sentencer's discretion. *See Jeffers*, 497 U.S. at 774-77; *Walton*, 497 U.S. at 649-56; *Woratzeck v. Stewart*, 97 F.3d 329, 335 (9th Cir. 1996). Subclaim (D) is meritless as well as procedurally defaulted and barred from review.

In subclaim (F), Johnson asserts that Arizona's death penalty scheme is unconstitutional because it denies capital defendants the benefit of proportionality review of their sentences. (Doc. 18 at 454.) There is no federal constitutional right to proportionality review of a death sentence. *McCleskey v. Kemp*, 481 U.S. 279, 306 (1987) (citing *Pulley v. Harris*, 465 U.S. 37, 43 (1984)); *see Allen*, 395 F.3d at 1018-19. The "substantive right to be free from a disproportionate sentence" is protected by the application of "adequately narrowed aggravating circumstance[s]." *Ceja v. Stewart*, 97 F.3d 1246, 1252 (9th Cir. 1996). Subclaim(F) is meritless as well as procedurally defaulted and barred from review.

Johnson argues that he exhausted subclaims (G) and (H) by raising them in his PCR Petition and incorporating them by reference in his Petition for Review. (Doc. 44 at 441.) The Court finds this sufficient to fairly present the claims. *See Gallegos*, 820 F.3d at 1026 n.15; *Scott*, 567 F.3d at 582. The claims, however, are meritless.

In subclaim (G), Johnson argues that Arizona's death penalty scheme is unconstitutional because it affords the prosecutor unbridled discretion to seek the death penalty. (Doc. 18 at 455.) The Supreme Court has held that prosecutors have wide discretion in making this decision. *See McCleskey*, 481 U.S. at 296-97; *Gregg*, 428 U.S. at 199 (holding that pre-sentencing decisions by actors in the criminal justice system that may remove an accused from consideration for the death penalty are not unconstitutional). In *Smith*, 140 F.3d at 1272, the Ninth Circuit rejected the argument that Arizona's death

penalty statute is constitutionally infirm because "the prosecutor can decide whether to seek the death penalty." Subclaim (G) is both procedurally defaulted and meritless.

In subclaim (H), Johnson asserts that Arizona's death penalty scheme is unconstitutional because it is applied unequally based on race. (Doc. 18 at 456.) "[A] defendant who alleges an equal protection violation has the burden of proving 'the existence of purposeful discrimination'" and must demonstrate that such discrimination had an effect on him. *McCleskey*, 481 U.S. at 292 (quoting *Whitus v. Georgia*, 385 U.S. 545, 550 (1967)). Therefore, to prevail on this claim, Johnson "must prove that the decisionmakers in his case acted with discriminatory purpose." *Id.* Johnson does not attempt to meet this burden, offering no evidence specific to his case that would support an inference that race played any part in his sentence. *See Richmond v. Lewis*, 948 F.2d 1473, 1490-91 (1990) (holding that statistical evidence that Arizona's death penalty is discriminatorily imposed based on race, sex, and socioeconomic background is insufficient to prove decisionmakers in petitioner's case acted with discriminatory purpose), *vacated on other grounds*, 986 F.2d 1583 (9th Cir. 1993). Subclaim (H) is both procedurally defaulted and meritless.

## C.    Claim 31:

Johnson argues that his death sentence is unconstitutional because the "Arizona law that allows defendants to waive mitigation violates the right to due process and a sentence free of arbitrariness, caprice, and emotion." (Doc. 18 at 458.) Respondents contend the claim is non-cognizable, procedurally defaulted, and meritless. (Doc. 37 at 243.)

As previously discussed, after his PCR Petition was denied, Johnson moved *pro se* to strike all mitigation claims from the petition. (IOR 892.) The PCR court ordered Johnson to be evaluated to determine if he was competent to waive mitigation. (IOR 900.) The court ultimately ruled that Johnson "validly waived the claims as specified in his *Pro Per* Supplement, and that he did so knowingly, intelligently and voluntarily." (IOR 912.)

In his Petition for Review, Johnson challenged the waiver of his sentencing claims under "settled Arizona law," including *State v. Hausner*, 230 Ariz. 60 (2012); *State v.*

*Brewer*, 170 Ariz. 486 (1992); and Rule 32.4(a) of the Arizona Rules of Criminal Procedure. (Pet. for Review at 20.) He did not assert any violation of the United States Constitution arising from the PCR court's acceptance of the waiver. The claim therefore was not fairly presented to the state courts. *See Gray v. Netherland,* 518 U.S. 152, 162-63 (1996) ("[A] claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle the petitioner to relief."); *Lyons v. Crawford*, 232 F.3d 666, 669-70 (2000), *as amended by* 247 F.3d 904 (9th Cir. 2001) (explaining that a petitioner has not "fairly presented" a federal claim in state court unless he specifically indicated to that court that the claim was based on federal law); *Castillo v. McFadden*, 399 F.3d 993, 999 (9th Cir. 2005) ("[T]he petitioner must have either referenced specific provisions of the federal constitution or cited to federal or state cases involving the legal standard for a federal constitutional violation.").

While "a citation to a state case analyzing a federal constitutional issue serves the same purpose as a citation to a federal case analyzing such an issue," *Peterson* 319 F.3d at 1158, "[f]or a federal issue to be presented by the citation of a state decision dealing with both state and federal issues relevant to the claim, the citation must be accompanied by some clear indication that the case involves federal issues," *Casey*, 386 F.3d at 912 n.13. "Where . . . the citation to the state case has no signal in the text of the brief that the petitioner raises federal claims or relies on state law cases that resolve federal issues, the federal claim is not fairly presented." *Id.* As the Ninth Circuit later explained, "*Casey* refused to recognize any such 'signal' where the relevant brief never used the word 'federal'; 'did not refer expressly to the federal constitution or to any of its provisions'; and 'did not indicate in parentheticals or elsewhere whether the[ ] state cases [the brief did cite] discussed the federal constitution.'" *Arrendondo v. Neven*, 763 F.3d 1122, 1138 (9th Cir. 2014) (quoting *Casey*, 386 F.3d at 911-12). Johnson's citation to *Hausner* contained none of these indications or signals that he was raising a federal constitutional claim.

Claim 31 is procedurally defaulted and barred from federal review. It is also non-cognizable and without merit.

First, the Court agrees with Respondents that the claim, which alleges errors during post-conviction proceedings, is non-cognizable on habeas review. *See Franzen v. Brinkman*, 877 F.2d 26, 26 (9th Cir. 1989) ("A habeas petition must allege the petitioner's detention violates the constitution, a federal statute, or a treaty. . . . [A] petition alleging errors in the state post-conviction review process is not addressable through habeas corpus proceedings."); *see also Villafuerte v. Stewart*, 111 F.3d 616, 632 n.7 (9th Cir. 1997) (petitioner's claim that "he was denied due process in his state habeas corpus proceedings" was "not addressable in a section 2254 proceeding"); *Cooper*, 641 F.3d at 331-32 (dismissing petitioner's alleged violations of due process, stating that the claims "are not cognizable for federal habeas review").

Even if the claim were cognizable, it is meritless. In *Hausner*, the Arizona Supreme Court held that a capital defendant may waive the presentation of mitigating evidence if he is competent and makes the decision knowingly, intelligently, and voluntarily. 230 Ariz. at 84. Johnson asserts that "[t]he *Hausner* decision is unconstitutional." (Doc. 18 at 460.) Among the purported "constitutional flaws" Johnson identifies is that "*Hausner* effectively shuts down the adversarial process for the most important decision a court can make: whether to terminate a life. *Hausner* essentially prevents counsel from presenting a habeas claim with mitigation evidence—a strategic choice that should be counsel's to make." *Id.* (citing *Nixon*, 543 U.S. at 178). Johnson further argues that "even if *Hausner* is constitutional," the PCR court "did not comply with its procedures"—that is, the court did not "confirm on the record that the defendant is waiving mitigation knowingly, intelligently, and voluntarily" but "simply accepted the doctors' evaluation of Johnson without engaging with Johnson or his counsel directly." (*Id.* at 461.)

These arguments fail. The Arizona Supreme Court noted, there is "no viable argument that the Sixth Amendment requires the defense to present mitigation despite the defendant's waiver." *Hausner*, 230 Ariz. at 85 (citing *Schriro v. Landrigan*, 550 U.S. 465, 476, 481 (2007)). In *Landrigan*, the United States Supreme Court held that the defendant could not show *Strickland* prejudice based on counsel's failure to investigate and present

mitigating evidence when the defendant himself chose not to pursue a case in mitigation. 550 U.S. at 478-79; *cf. Blystone*, 494 U.S. at 306 & n.4 (upholding death sentence where "[a]fter receiving repeated warnings from the trial judge, and contrary advice from his counsel, petitioner decided not to present any proof of mitigating evidence during his sentencing proceedings"). In *Landrigan*, the Court also explained that it had "never imposed an 'informed and knowing' requirement upon a defendant's decision not to introduce evidence" and had "never required a specific colloquy to ensure that a defendant knowingly and intelligently refused to present mitigating evidence." 550 U.S. at 479.

Claim 31 is denied.

**D.    Claim 37:**

Johnson argues that executing him after more than 17 years on death row is unconstitutional. (*See* Doc. 18 at 490.) This claim, which Johnson raised in his PCR Petition and included by reference in his Petition for Review, is plainly meritless.

"The Supreme Court has never held that execution after a long tenure on death row is cruel and unusual punishment." *Allen v. Ornoski*, 435 F.3d 946, 958 (9th Cir. 2006); *see Lackey v. Texas*, 514 U.S. 1045 (1995) (mem.) (Stevens, J. & Breyer, J., discussing denial of certiorari and noting the claim has not been addressed); *Thompson v. McNeil*, 556 U.S. 1114 (2009) (mem.) (Stevens, J. & Breyer, J., dissenting from denial of certiorari; Thomas, J., concurring, discussing *Lackey* issue); *see also Knight v. Florida*, 528 U.S. 990 (1999) (Thomas, J., concurring in denial of certiorari). Circuit courts have consistently held that prolonged incarceration under a sentence of death does not violate the Eighth Amendment. *See, e.g.*, *Murray (Roger)*, 882 F.3d at 799 (citing *McKenzie v. Day*, 57 F.3d 1493, 1493-94 (9th Cir. 1995)). Claim 37 is denied.

**E.    Claim 38:**

Johnson argues that execution by lethal injection constitutes cruel and unusual punishment. (Doc. 18 at 496.) This claim, also raised in Johnson's PCR Petition and included by reference in his Petition for Review, is plainly meritless. *See, e.g.*, *Baze v. Rees*, 553 U.S. 35, 48 (2008) ("This Court has never invalidated a State's chosen procedure

for carrying out a sentence of death as the infliction of cruel and unusual punishment."). Neither the United State Supreme Court nor the Ninth Circuit has concluded that Arizona's lethal injection protocols violate the Eighth Amendment. *See Dickens v. Brewer*, 631 F.3d 1139, 1149-50 (9th Cir. 2011).

In his habeas petition, Johnson's assertions focus on Arizona's lethal injection protocols and history. (Doc. 18 at 497-505.) Those protocols are no longer in place. *Cf. Guardian News & Media LLC v. Ryan*, No. CV-14-02363-PHX-GMS, 2017 WL 4180324, at *2 (D. Ariz. Sept. 21, 2017). Johnson may challenge that protocol in a separate civil rights action under 42 U.S.C. § 1983. *See Hill v. McDonough*, 547 U.S. 573, 579-80 (2006) (recognizing that a challenge to the State's execution method may be brought in a § 1983 action); *Nance v. Ward*, 597 U.S. 159, 169 (2022). Claim 38 is denied.

**F.    Claim 39:**

Johnson argues that his conviction and death sentence are unconstitutional "as his trial, and state court review of his conviction and sentence, were conducted by elected judicial officers." (Doc. 18 at 507.) That is, judicial officers appointed by the governor and subject to retention elections. (*Id.*) He admits he did not raise this claim in state court. (*Id.*) The claim's default is not excused, as Johnson argues, by the ineffective assistance of trial and PCR counsel. (*Id.*) *See Martinez (Ernesto)*, 926 F.3d at 1225; *Pizzuto*, 783 F.3d at 1177; *Hunton*, 732 F.3d at 1126-27; *Edwards*, 529 U.S. at 45; *Carrier*, 477 U.S. at 489-90. Claim 39 is procedurally defaulted and barred from this Court's review. In addition, because Johnson cites no authority holding that criminal judicial proceedings presided over by judges subject to retention elections are invalid, the claim is meritless. Claim 39 is therefore denied.

**IV.    Cumulative Error: Claim 40**

Johnson argues that his conviction and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments "due to the cumulative effect of the constitutional errors that occurred at the guilt and penalty phase proceedings." (Doc. 18 at 516.) He contends that he raised this claim in his PCR Petition and in his Petition for Review. (*Id.*) Respondents

1    argue that Johnson never presented a "stand-alone cumulative error claim to the Arizona
2    Supreme Court." (Doc. 37 at 262.)

3         In his PCR Petition, Johnson invoked the cumulative error doctrine with respect to
4    the State's alleged *Brady* violations (PCR Pet. at 62-64) and the alleged ineffective
5    assistance of trial counsel (*id.* at 68, 96, 117) and appellate counsel (*id.* at 138).

6         In his Reply brief, Johnson argues under *Martinez* that the ineffective assistance of
7    PCR counsel excuses the default. (Doc. 44 at 361.) Because this is not an ineffective
8    assistance of trial counsel claim, *Martinez* cannot excuse its default.

9         The claim is also meritless. The Court determined that no error of constitutional
10    magnitude occurred, so no cumulative prejudice is possible. *Hayes*, 632 F.3d at 524; *Taylor*
11    *v. Beard*, 616 F. App'x. at 345; *Dixon*, 2016 WL 1045355, at *40.

12         Claim 40 is denied.

13    **REQUEST FOR EVIDENTIARY DEVELOPMENT**

14         Johnson requests evidentiary development with respect to Claims 1, 2, 3, 4, 5, 8,
15    9(B), 10, 11, 12, 13, 14, 15, 16, 17, 19, 20, 21, 25, 26, 27, 28, 29, 30(D) and (E), and 37.
16    (Doc. 49.) He seeks discovery consisting principally of depositions from members of the
17    defense team, various trial witnesses, and experts (on eyewitness identification and the
18    effects of methamphetamine use); an evidentiary hearing featuring testimony from those
19    deponents; and expansion of the record to include reports from the experts, police reports,
20    and juror questionnaires. *See* Rules 6, 7, and 8 of the Rules Governing § 2254 Cases in the
21    United States District Courts, 28 U.S.C. foll. § 2254.

22    **I.    Claims Adjudicated on the Merits in State Court**

23         Claims 9 (in part), 12 (in part), 16, and 30 (in part) were raised and denied on the
24    merits in state court. This Court's review under § 2254(d) is confined to the record that
25    was before the state court that adjudicated the claim. *Shoop*, 596 U.S. at 819; *Pinholster*,
26    563 U.S. at 181; *see also Gulbrandson*, 738 F.3d at 993 & n.6. Having determined that the
27    state courts' denials of these claims did not satisfy AEDPA's deferential standard of
28    review, 28 U.S.C. § 2254(d), the Court is precluded from considering new evidence in

support of those claims. *Stokley v. Ryan*, 659 F.3d 802, 809 (9th Cir. 2011) (citing *Pinholster*, 563 U.S. at 185). Under these circumstances, there is no reason to hold an evidentiary hearing or expand the record and no good cause exists to authorize discovery. *See also Sully v. Ayers*, 725 F.3d 1057, 1075 (9th Cir. 2013) ("[A]n evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief.").

## II.   Procedurally Defaulted Claims

The remaining claims for which Johnson seeks evidentiary development were not presented in state court. Johnson makes several arguments in favor of his entitlement to evidentiary development. Relying on *Martinez*, he argues that postconviction counsel's failure to develop the record is not attributable to the petitioner. (Doc. 49 at 14.) He also asserts that "the diligence requirement in § 2254(e)(2) does not apply to *Martinez* issues" and therefore evidentiary development is available "to help demonstrate cause and prejudice to overcome the default of several claims." (*Id.* at 16.) As discussed above, however, *Shinn* forecloses these arguments.

In *Shinn v. Ramirez*, the United States Supreme Court "considered two specific issues concerning the proper construction of § 2254(e)(2)." *McLaughlin v. Oliver*, 95 F.4th 1239, 1248 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 598 (2024). First, the Court "addressed what counts as a fail[ure] to develop the factual basis of a claim in State court, so as to trigger the application of § 2254(e)(2)'s restrictions." *Id.* (citation modified) The Court then held "a petitioner 'fails' to develop the state court record within the meaning of § 2254(e)(2) when he or his state post-conviction counsel is at fault for the undeveloped record in state court." *Id.* (citation modified). The Court explained that:

> [A] prisoner bears the risk in federal habeas for all attorney errors made in the course of the representation, unless counsel provides constitutionally ineffective assistance. And, because there is no constitutional right to counsel in state post-conviction proceedings, a prisoner ordinarily must bear responsibility for all attorney errors during those proceedings. Among those errors, *a state prisoner is responsible for counsel's negligent failure to develop the state postconviction record.*

*Id.* (citation modified).

The Court also "reaffirmed that [§ 2254(d)(2's)] restrictions also apply 'when a prisoner seeks relief based on new evidence without an evidentiary hearing.'" *Id.* (citation omitted). Therefore, even if a federal habeas court "admits or reviews new evidence" for some other purpose, such as determining whether the *Martinez* exception applies, the court "may not consider that evidence on the merits of a negligent prisoner's defaulted claim unless the exceptions in § 2254(e)(2) are satisfied." *Id.* (citation omitted).

Johnson has not satisfied the requirements of § 2254(e)(2); that is, he has not shown that the claims for which he seeks evidentiary development rely on (1) a new and previously unavailable rule of constitutional law made retroactively applicable by the Supreme Court, or (2) "a factual predicate that could not have been previously discovered through the exercise of due diligence." 28 U.S.C. § 2254(e)(2)(A)(i), (ii). The evidence Johnson seeks to develop existed at the time of the state court proceedings, so there is no new factual predicate under § 2254(e)(2). *See Lee*, 108 F.4th at 1161-62; *Speer*, 2023 WL 2503733, at *88.

Accordingly, Johnson is not entitled to evidentiary development.

## **CERTIFICATE OF APPEALABILITY**

Pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure, a petitioner cannot take an appeal unless a certificate of appealability has been issued by an appropriate judicial officer. Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that a district judge must either issue or deny a certificate of appealability when it enters a final order adverse to the applicant. If a certificate is issued, the court must state the specific issue or issues that satisfy 28 U.S.C. § 2253(c)(2).

A certificate of appealability may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." *Id*. This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack*, 529 U.S. at 484 (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings,

a certificate of appealability will issue only if reasonable jurists could debate whether the petition states a valid claim of the denial of a constitutional right and whether the court's procedural ruling was correct. *Id.* The Court finds that reasonable jurists could debate its resolution of Claim 16(C), (D), and (E), alleging ineffective assistance of counsel at sentencing.

## **CONCLUSION**

The Court has considered Johnson's claims and determined that none establish that he is entitled to habeas relief.

Based on the foregoing,

**IT IS HEREBY ORDERED denying** Johnson's Petition for Writ of Habeas Corpus (Doc. 18). The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED denying** Johnson's request for evidentiary development. (Doc. 49.)

**IT IS FURTHER ORDERED granting** a certificate of appealability with respect to Claim 16(C), (D), and (E).

**IT IS FURTHER ORDERED** that the Clerk of Court forward a courtesy copy of this Order to the Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ 85007-3329.

**IT IS FINALLY ORDERED** that the Clerk of Court must close this case.

Dated this 17th day of November, 2025.

Michael T. Liburdi
United States District Judge